# Exhibit A

**Part 4 of 8**

Sep 07 2006 12:28PM   GIBBS & OLIPHANT LLP            5108348886              p.10

Theo Oliphant
August 29, 2006
Page C-3

VI. Brokerage

    Greystone shall be under no obligation for payment of any brokerage commission or fee of any kind with respect to the Loan or any subsequent HUD Commitment, and Borrower shall indemnify, defend and hold Greystone harmless for any claim for such, other than a specific brokerage commission or fee reflected in the Greystone Commitment, if any.

Case 1:07-cv-08377-RPP    Document 25-5    Filed 01/07/2008    Page 3 of 15
Case 3:07-cv-05454-JCS    Document 1    Filed 10/25/2007    Page 63 of 75

Sep 07 2006 12:28PM    GIBBS & OLIPHANT LLP    5108348886    p.11

Theo Oliphant
August 29, 2006
Page D-1

## EXHIBIT D

### Required Documentation

SECTION 221(D)(4) SUBSTANTIAL REHAB

Brochure &/or resumes for:
    a. Mortgagor/sponsor entity
    b. Each principal of the mortgagor/sponsor
    c. General contractor and its principals

Organizational documents creating mortgagor entity:
    For Partnerships: Certificate of Partnership and Partnership Agreement reflecting current partners.
    For Corporations: Certificate of Incorporation; Articles of Incorporation or Charter, plus any amendments; By-Laws; any shareholder agreement; and Minutes reflecting current officers and directors

Site plan containing overall dimensions, major site elements (example: parking lots) location of utilities (example: water, sewer, electric, gas)

Typical unit and building layouts

Ground floor and typical floor plans

Wall section plan to include foundation, footing, wall and floor structure. Plan must indicate the basic materials in the structure, floor & exterior finish.

Site control evidence (deed, purchase agreement, option)

Ground lease, if applicable

As-is sketch plans.

Description of how existing residents will be moved and served during the work or any plans for relocation of existing residents because of sub-rehab work

Audited financial statements for the property for the past three years and year-to-date.

Evidence of availability of state or local grants or tax credits, if they are anticipated as part of the project financing.

Applicant's Initials _TPO_

# EXHIBIT B

#155243v2
GT Draft 12/17/06

# BRIDGE LOAN AGREEMENT

by and between

GREYSTONE CDE, LLC,

and

SANTA FE POINTE, L.P.

Dated as of December __, 2006

BRIDGE LOAN AGREEMENT

This BRIDGE LOAN AGREEMENT (as amended, modified or supplemented from time to time, this "Agreement"), made as of December __, 2006, by and between **GREYSTONE CDE, LLC**, a limited liability company organized and existing under the laws of the State of Delaware, with its principal offices at 419 Belle Air Lane, Warrenton, Virginia 20186 (together with its successors and assigns, "Lender"), and **SANTA FE POINTE, L.P.**, a limited partnership organized and existing under the laws of the State of Oklahoma, with its principal offices at 16416 Oconee Creek Drive, Edmond, Oklahoma 73013 (together with its permitted successors and assigns, "Borrower"),

WITNESSETH:

WHEREAS, Borrower has requested that Lender make a bridge loan in the maximum principal amount outstanding at any time of $500,000.00 to finance predevelopment expenses of an affordable housing development to be known as the Santa Fe Pointe Apartments located at 125 SW 74th Street in Oklahoma City, Oklahoma, which will be developed and owned by the Borrower, and

WHEREAS, subject to the terms and conditions set forth below, and in reliance upon the representations and warranties and the covenants and undertakings of Borrower contained herein, Lender wishes to make such bridge loan to Borrower.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties, intending to be legally bound, hereby agree as follows:

ARTICLE I
DEFINITIONS AND RULES OF CONSTRUCTION

**Section 1.1    Definitions.** In addition to terms defined elsewhere in this Agreement, the following terms as used in this Agreement shall have the meanings specified below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Agreement" means this Bridge Loan Agreement, as the same may be amended, modified, or supplemented from time to time.

"Assignment of Project Documents" has the meaning given to that term in Section 3.1(a).

"Assignment of Purchase Contract" has the meaning given to that term in Section 3.1(a).

"Bonds" means those certain $_____ in original aggregate principal amount of _____, the proceeds of which are to be loaned to Borrower to finance a portion of the costs of acquisition and rehabilitation of the Project.

"Bond Documents" means the documents evidencing or securing the Bonds and the loan of the proceeds thereof to Borrower.

"Borrower" means Santa Fe Pointe, L.P., a limited partnership duly organized, validly existing and in good standing under the laws of the State of Oklahoma, together with its successors and permitted assigns.

"Borrower Affiliates" means, collectively, an entity controlled by Borrower or under common control by any person or entity controlling Borrower, together with their respective successors and assigns.

"Business Day" means any day that is not a Saturday, Sunday or public holiday under the laws of the State of New York or the District of Columbia.

"Certificate of Deposit Pledge" has the meaning given to that term in Section 3.1(a).

"Closing" has the meaning given to that term in Section 2.1.

"Closing Date" means the date on which the Closing occurs.

"Collateral" means all property subject to the lien of the Partner Pledge, the Assignment of Project Documents, the Assignment of Purchase Contract, the Developer Fee Pledge and the Certificate of Deposit Pledge.

"Default" means any event which, with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

"Developer" means _____, a _____ duly organized and validly existing under the laws of the State of _____, together with its permitted successors and assigns.

"Developer Fee Pledge" has the meaning given to that term in Section 3.1(a).

"Disbursement" has the meaning given to that term in Section 6.1.

"Disbursement Request Form" shall be the form of request for Disbursements set forth on Exhibit A hereto.

"Event of Default" has the meaning given to that term in Section 9.1.

"Future Project Expenses" has the meaning given to that term in Section 6.2(a).

"General Partner" means Santa Fe Pointe Management, LLC, a limited liability company duly organized and validly existing under the laws of the State of Oklahoma, together with its permitted successors and assigns, in its capacity as a general partner of Borrower.

"Guarantor" means Theotis F. Oliphant, a [married] individual and a resident of the State of California, together with his heirs, executors, legal representatives, personal representatives and permitted successors and assigns.

"Guaranty" has the meaning given to that term in Section 3.1(a).

"LIBOR" means the rate per annum fixed by the British Bankers' Association at 11:00 a.m. (London time) on the last Business Day before the first day of each month, relating to quotations for London Interbank Offered Rates on U.S. dollar deposits for a three (3) month period and as published and reported by the Telerate Service by reference to the screen page currently designated as "Page [3750]" on that service (or such other screen page which may replace such screen page) or if no longer provided by Bloomberg LP or the Telerate Service, such rate as shall be determined in good faith by Lender from such sources as it shall determine to be materially comparable to the Telerate Service.

"Limited Partner" means Theotis F. Oliphant, an individual and a resident of the State of California, together with his heirs, executors, legal representatives, personal representatives, successors and assigns, in his capacity as a limited partner of Borrower.

"Loan" means, the bridge loan to be extended by Lender to Borrower pursuant to the terms of this Agreement.

"Loan Amount" has the meaning given to that term in Section 2.3.

"Loan Documents" means this Agreement, the Note, the Subordinate Mortgage and any other agreements or documents now or in the future executed or delivered to Lender by Borrower in connection with this Agreement and/or the making of the Loan.

"Loan Term" has the meaning given to that term in Section 2.4.

"Note" has the meaning given to that term in Section 2.2.

"Obligors" means, collectively, Borrower, the Guarantor, the Developer, the Limited Partner and the General Partner.

"Origination Period" means the period during which Disbursements may be made by Lender to Borrower, as described in Section 2.7.

"Partner Pledge" has the meaning given to that term in Section 3.1(a).

"Project" means the affordable multi-family housing development to be known as "Santa Fe Pointe Apartments" located at 125 SW 74th Street in Oklahoma City, Oklahoma.

"UCC Filings" has the meaning given to that term in Section 3.1(b).

Section 1.2     Accounting Terms. All accounting terms not specifically defined in this Agreement shall be construed, and all calculations with respect to accounting or financial matters shall be computed, in accordance the generally accepted accounting principles, consistently applied.

Section 1.3     Incorporation by Reference. All provisions of the other Loan Documents, as may be amended, modified, or supplemented from time to time, are incorporated by reference in this Agreement with the same effect as though fully set forth in this Agreement. In the event of any inconsistency between the provisions of this Agreement and the provisions of

the other Loan Documents, the provisions of this Agreement or of such other Loan Documents as Lender shall designate in its discretion shall control.

## ARTICLE II
## THE LOAN

**Section 2.1   Agreement to Lend.** Subject to the terms and conditions in this Agreement and the other Loan Documents, Lender agrees to lend to Borrower such amounts as Borrower may request and Lender may approve, to be disbursed in accordance with the terms hereof, up to an aggregate amount at any time outstanding not in excess of the Loan Amount. The closing of the Loan will occur upon satisfaction of the conditions set forth in Sections 5.1 and Section 5.2 (the "Closing").

**Section 2.2   Note.** The Loan is evidenced by a Bridge Loan Promissory Note dated December __, 2006 made by Borrower payable to the order of Lender in the principal amount of up to $500,000.00 (together with any extensions, modifications, renewals, replacements or refinancing thereof, the "Note").

**Section 2.3   Loan Amount.** The maximum principal amount of the loan at any time outstanding shall be Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "Loan Amount").

**Section 2.4   Loan Term.** The term of the Loan commenced on the Closing Date and shall end on June 15, 2007 (the "Loan Term"), which may be extended for an additional six (6) months with (i) prior written approval of both Lender and Borrower, and payment to Lender by Borrower of an extension fee equal to one quarter of one percent (0.25%) of the Loan Amount (the "Extension Fee") and (ii) execution and delivery by Borrower of an allonge to the Note and confirmation by the Guarantor, the Developer and the General Partner of their obligations under the Loan Documents to which they are parties, all in form and substance acceptable to Lender in its sole discretion.

**Section 2.5   Interest; Exit Fee.**

(a)   The Loan shall bear interest on the full Loan Amount (whether or not disbursed) at a variable rate equal to LIBOR plus two and three-quarters percent (2.75%) per annum, accruing on the full Loan Amount (whether or not disbursed) from the Closing Date. The Note provides for a default rate of interest of the lesser of (i) twelve percent (12.0%) per annum or (ii) the highest rate of interest permitted by applicable law. Interest on the Loan Amount (whether or not disbursed) shall be due and payable (i) on a quarterly basis, on each March 1, June 1, September 1 and December 1, commencing March 1, 2007 until all amounts due in respect of the Loan shall have been paid in full; (ii) contemporaneously with any payment of the Loan pursuant to Section 2.6 in an amount equal to the accrued and unpaid interest on prepayment of the Loan; and (iii) in full, in the amount of all accrued and unpaid interest, at the end of the Loan Term. Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed. Borrower shall receive a credit against interest due hereunder and under the Note as set forth in Section 6.3 hereof.

(b) In addition to and not in lieu of interest on the Loan, at the end of the Loan Term Borrower shall pay to Lender an exit fee equal to two percent (2%) of the Loan Amount (the "Exit Fee"). The Lender shall waive the Exit Fee if the Borrower closes its permanent financing through the Lender or an affiliate of the Lender upon terms and conditions satisfactory to Lender or its affiliate.

Section 2.6   Mandatory Repayment Schedule. A mandatory repayment of the outstanding principal amount of the Loan, plus all accrued and unpaid interest on the Loan Amount and other sums due and payable by Borrower under the Note and the other Loan Documents shall be due and payable on the earlier of: (A) the date on which the FHA-insured 221(d)(4) construction and permanent loan closing occurs in respect of the Project; or (B) the expiration of the Loan Term.

Section 2.7   Origination Period. Lender shall make proceeds of the Loan available to Borrower from time to time, up to a maximum amount equal to the Loan Amount, in separate Disbursements, as more fully provided in Article VI. Disbursements shall be made by Lender, if at all during a period commencing on the Closing Date ending on January 1, 2007, as such date may be extended in accordance with Section 2.4 hereof (the "Origination Period"), after which Lender shall no longer have any obligation to disburse funds to Borrower. Borrower shall have no right to or interest in any portion of the Loan Amount which has not been disbursed to Borrower in accordance with the provisions of Article VI on or before the end of the Origination Period. Amounts disbursed to Borrower and repaid may not be re-borrowed by Borrower.

ARTICLE III
SECURITY

Section 3.1   Collateral.

(a) As security for the due and punctual payment of all liabilities of Borrower with respect to the Loan, including without limitation the payment of all amounts due or to become due under the Note, and as security for the prompt performance of all other obligations of Borrower under the Loan Documents, Borrower shall execute and deliver or cause to be executed and delivered to Lender (i) a guaranty and suretyship agreement dated as of December ___, 2006 (as the same may be amended, modified or supplemented from time to time, the "Guaranty"), from the Guarantor in favor of Lender, (ii) an assignment of certificate of deposit dated as of December ___, 2006 (as the same may be amended, modified or supplemented from time to time, the "Certificate of Deposit Pledge"), from the Guarantor in favor of Lender, with the consent of the senior pledgee, (iii) an assignment of project documents dated as of December ___, 2006 (as the same may be amended, modified or supplemented from time to time, the "Assignment of Project Documents"), from Borrower to Lender, (iv) an assignment of purchase contract dated as of December ___, 2006 (as the same may be amended, modified or supplemented from time to time, the "Assignment of Purchase Contract"), from Borrower to Lender, with the consent of the seller, (v) a partner limited guaranty, pledge and security agreement dated as of December ___, 2006 (as the same may be amended, modified or supplemented from time to time, "Partner Pledge") from the General Partner and the Limited Partner to Lender and (vi) a developer limited guaranty, pledge and security agreement dated as of December ___, 2006 (as the same may be amended, modified or supplemented from time to

time, the "Developer Fee Pledge") from the Developer to the Lender. All such documents shall be substantially in the form agreed upon by the parties, and shall create a valid second lien on the Project in favor of Lender. Upon request by Lender, Borrower shall record or file such instruments in the official public records of the State of Oklahoma and/or all state and/or local jurisdictions in which such recording or filing as shall be required to perfect Lender's security interest in the Collateral, and Borrower shall pay all recording costs and other fees in connection with such recording or filing.

(b) Borrower hereby authorizes Lender to file UCC-1 financing statements or other documents as Lender may determine necessary to perfect, continue and/or reinstate the perfection of such security interest in the Collateral (the "UCC Filings"). Borrower shall pay all filing fees and other costs in connection with such UCC Filings.

Section 3.2   Application of Collateral. All amounts received by Lender on account of any other Collateral shall be applied in the following order of priority: (i) first, to the costs of preserving and protecting the Collateral and the costs of collection, if any, including without limitation reasonable attorneys' fees, incurred by Lender in connection with the collection of all or any portion of any amounts due under the Note; (ii) second, to the payment of any amounts other than principal, interest owing or Exit Fee under the Loan Documents; (iii) third, to the payment of accrued and unpaid interest due under the Note; (iv) fourth, to the payment of principal of the Note; (v) fifth, to the payment of unpaid Exit Fee; and (vi) sixth, to Borrower or as a court of competent jurisdiction may direct.

Section 3.3   Power of Attorney. Borrower authorizes, and makes, constitutes, and appoints Lender, and any officer or authorized agent of Lender, with full power of substitution, as Borrower's true and lawful attorney-in-fact, with power, in Lender's own name or in Borrower's name, (i) to execute and deliver on Borrower's behalf such documents as Lender may from time to time consider reasonably necessary to create, perfect, or preserve its security interest in the Collateral or to exercise its rights and remedies with respect to the Collateral, and (ii) to endorse any chattel paper, note, draft, instrument, or any other form or obligation relating to or constituting part of the Collateral or any right under the Collateral and, upon the occurrence of an Event of Default, to demand, collect, receipt for, compromise, settle, and sue for monies due in respect of the Collateral; and Borrower ratifies all that said attorney shall lawfully do or cause to be done by virtue thereof. This power of attorney is and shall be deemed coupled with an interest and shall be irrevocable so long as any amounts remain outstanding under the Note and/or the other Loan Documents.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to fund the Disbursements, Borrower represents and warrants to Lender, as of the Closing Date and as of the date of each Disbursement, as follows:

Section 4.1   Organization. Borrower is a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Oklahoma, and has paid all taxes and filed all reports, if any, necessary to maintain its status and good standing as an Oklahoma

limited partnership. No proceeding or action is pending or, to the best of Borrower's knowledge, threatened, against Borrower which could affect its organization, existence or status and good standing under the laws of the State of Oklahoma.

Section 4.2   **Power and Authority.** Borrower has the legal and other power and authority to conduct all of the activities which it now conducts or proposes to conduct as contemplated by the Loan Documents to which Borrower is a party, to enter into the Loan Documents to which Borrower is a party, and to make and perform the representations, warranties, covenants and undertakings provided in the Loan Documents to which Borrower is a party.

Section 4.3   **Binding Agreement.** Borrower has taken all legal and other action necessary to authorize the execution and delivery of the Loan Documents to which Borrower is a party and the consummation of transactions contemplated by such Loan Documents, and such Loan Documents are valid and binding obligations of Borrower, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other law and equity principles applied for the relief of debtors generally. Neither the execution and delivery of the Loan Documents to which Borrower is a party nor the consummation of the transactions contemplated by such Loan Documents will constitute a violation or breach of the articles of organization or operating agreement of Borrower, or any provision of any contract or other instrument to which Borrower is a party or by which Borrower or its properties are bound or any order, writ, injunction, decree, statute, rule or regulation of any court or regulatory agency. No consent, order, authorization or other approval of any governmental body or agency is required in order for Borrower to execute or deliver, or perform its obligations under, the Loan Documents to which Borrower is a party.

Section 4.4   **Financial Condition.** The financial statements of Borrower and the other Obligors previously furnished to Lender were prepared in accordance with generally accepted accounting principles, consistently applied, are substantially complete and correct, and present fairly the financial position, the results of operations and the contingent liabilities of Borrower and the other Obligors as of their dates and for the periods then ending. Since the date of the most recent financial statements of Borrower and the other Obligors furnished to Lender, no material adverse change has occurred in the financial condition, operations or prospects of Borrower or the other Obligors.

Section 4.5   **Litigation.** No action, suit or proceeding or no investigation is pending or, to the best of Borrower's knowledge, threatened, against or affecting Borrower and/or the Collateral, at law or in equity, in any court or by any federal, state, municipal or other governmental authority, department, commission, board, agency or other governmental instrumentality which could have a material adverse effect on Borrower's ability to undertake the Project or on the financial condition or operations of Borrower, or which questions, or is likely to materially adversely affect, Borrower's undertakings under, or performance of, the Loan Documents to which Borrower is a party or its financial conditions, operations or prospects.

Section 4.6   **No Defaults.** Borrower is not in default or alleged to be in default with respect to any judgment, order, writ, injunction or decree or in breach or, alleged to be in breach or default under any lease, contract, agreement, commitment, instrument or obligation to which it

is a party or by which it or its properties are bound (including, without limitation, the Collateral); and, no state of facts exists which is likely to create or cause a default or breach under any such lease, contract, agreement, commitment, instrument or obligation. There are no defaults or events which, with the giving or notice or the passage of time would constitute defaults on the part of Borrower.

Section 4.7    Compliance with Governmental Requirements. Borrower has complied with all federal, state and local laws, regulations and orders applicable to the conduct of its operations or the ownership of its properties (including, without limitation, the Collateral).

Section 4.8    Taxes. All tax returns (including, but not limited to, information returns) required to be filed by Borrower in any jurisdiction have in fact been filed, and all taxes, assessments, fees and other governmental charges upon Borrower, or upon any of its assets, income or franchises, which are due and payable, have been paid.

Section 4.9    Other Agreements. Borrower is not a party to any agreement or instrument, or subject to any restriction, which could materially adversely affect Borrower's properties or assets (including, without limitation, the Collateral), operations, prospects or condition, financial or otherwise.

Section 4.10    Disclosure. No representation, warranty or statement of Borrower in this Agreement or the other Loan Documents to which Borrower is a party, or in any document furnished to Lender pursuant to this Agreement or the other Loan Documents, or in connection with the transactions contemplated in this Agreement, contains any untrue statement of a material fact, or omits any material fact, the omission of which would be misleading. Borrower has disclosed to Lender in writing every fact that affects the financial condition or prospects or its ability to perform its obligations under this Agreement and the other Loan Documents.

Section 4.11    Judgments. No judgment, confession of judgment, decree, order, order to show cause, writ, lien, attachment, or injunction, including without limitation those on appeal, has been filed or entered against Borrower and/or the Collateral, in any court or in any arbitration proceeding.

Section 4.12    Security. The UCC Filings will be in proper recordable form and, upon recording in the official public records of the State of Oklahoma and all other state and local jurisdictions where required to be filed and will create a valid and binding liens upon the Collateral in favor of Lender, securing payment of the Loan.

## ARTICLE V
## CONDITIONS TO LENDER'S OBLIGATIONS

Section 5.1    General Conditions. The obligation of Lender under this Agreement fund the Loan is subject to the following conditions precedent, all of which shall be fulfilled to Lender's satisfaction on or prior to the Closing Date, which Closing Date shall occur on or before December __, 2006, and shall be in effect on the Closing Date:

(a) The representations and warranties made by Borrower in this Agreement and the other Loan Documents shall be true and correct with the same effect as though such representations and warranties had been made on and as of such time.

(b) No Event of Default shall have occurred and be continuing or shall result from the funding of the Loan.

(c) No material adverse change, as determined by Lender in its sole discretion, shall have occurred with respect to the Collateral and/or in the financial condition, operations or prospects of any of the Obligors since the dates of the Obligors' financial information most recently provided to Lender.

(d) The Contract for Sale of Real Estate dated effective July 21, 2006 in respect of the Project shall have been assigned to Borrower and the deadline for closing under such contract shall have been extended to no later than March 31, 2007, with an opportunity to extend again to a date no later than June 30, 2007 for an additional escrow deposit of not more than $75,000.

(e) Contemporaneously with the closing, Borrower shall have paid Lender's out-of-pocket expenses in connection with the Loan, including, without limitation, the fees and expenses of counsel to Lender.

Section 5.2 **Delivery of Documents.** As conditions precedent to the obligation of Lender to initially fund the Loan, Borrower shall deliver or cause to be delivered to Lender, at or prior to the Closing Date, the following documents, all of which shall be in form and substance acceptable to Lender:

(a) The original Agreement, duly executed by Lender and Borrower.

(b) The original Note, duly executed by Borrower.

(c) The original Guaranty, Certificate of Deposit Pledge, Assignment of Project Documents, Assignment of Purchase Contract, Developer Fee Pledge and Partner Pledge, all duly executed by the parties thereto.

(d) Closing certificates of Borrower, the General Partner, the Developer and the Guarantor, each substantially in the form provided by Lender to Borrower, with attached exhibits, certified by the Guarantor and the appropriate authorized representatives of Borrower, the General Partner and the Developer.

(e) Such UCC-1 financing statements as may be requested by Lender.

(f) Copies of the most recent annual compiled financial statements and quarterly unaudited financial statements of Borrower, the General Partner, the Developer and the Guarantor, each including a schedule of contingent liabilities.

(g)     An opinion of counsel for Borrower, the General Partner, the Developer and the Guarantor, in form and substance reasonably satisfactory to Lender and Lender's counsel.

(h)     Such additional documents and information and such additional certificates and assurances as reasonably requested by Lender under the terms of this Agreement, the other Loan Documents, or otherwise.

## ARTICLE VI
## DISBURSEMENTS

Section 6.1     Loan Proceeds. Lender shall disburse to Borrower proceeds of the Loan from time to time in the form of separate disbursements ("Disbursements"), in accordance with the procedures and subject to the conditions set forth in Sections 6.2, 6.3 and 6.4. Except for Disbursements to pay interest on the Loan Amount pursuant to Section 6.3 hereof, the proceeds of each Disbursement shall be made directly to Borrower (or as otherwise directed by Borrower) from time to time to pay development expenses of the Project incurred by Borrower, in each case as pre-approved by Lender. Prior to disbursement of the proceeds of the Loan in accordance with the terms hereof, neither Borrower nor any creditor of Borrower shall have any right to or interest in any undisbursed portion of the Loan Amount, notwithstanding anything herein to the contrary.

Section 6.2     Specific Conditions and Procedures for Disbursements.

(a)     As conditions precedent to the obligation of Lender to make a Disbursement (other than the Disbursement on the Closing Date or pursuant to Section 6.3 hereof), Lender shall have received from Borrower at least ten (10) Business Days before the requested date of the Disbursement, a Disbursement Request Form, substantially in the form attached hereto and made a part hereof as Exhibit A, properly completed and duly executed by Borrower, accompanied by (i) evidence reasonably satisfactory to Lender that the Project development expenses for which the Disbursement is sought are solely related to the Project and have been incurred by Borrower or are reasonably expected to be incurred by Borrower within the next thirty (30) days ("Future Project Expenses") and (ii) evidence as to the expenditure of funds for Future Project Expenses which were the subject of previous Disbursements, to the extent not already provided to Lender. Each Disbursement shall be subject to any other conditions reasonably required by Lender. Failure to provide Lender with satisfactory evidence of the expenditure of Future Project Expenses previously disbursed to Borrower shall be a condition precedent to any future request for Disbursement. Borrower may not request Disbursements more frequently then once every thirty (30) calendar days.

(b)     Lender will make good faith efforts to approve each Disbursement, or to advise Borrower of any deficiencies, within ten (10) Business Days of receipt by Lender of the materials described in Section 6.2(a).

(c)     After approval by Lender of the Disbursement Request Form and the accompanying documentation, and subject to all other conditions in this Section 6.2 and in Section 6.4, the Disbursement shall be made by wire transfer or otherwise as directed to