# EXHIBIT "D"

1  Mark D. Kemple (State Bar No. 145219)
   Erik K. Swanholt (State Bar No. 198042)
2  JONES DAY
   555 South Flower Street
3  Fiftieth Floor
   Los Angeles, CA 90071-2300
4  Telephone:  (213) 489-3939
   Facsimile:  (213) 243-2539
5  Email: mkemple@jonesday.com
   Email: ekswanholt@jonesday.com
6
   Attorneys for Defendants
7  Greystone Servicing Corporation, Inc., and
   Greystone CDE, LLC
8
9              UNITED STATES DISTRICT COURT
10             NORTHERN DISTRICT OF CALIFORNIA
11                (SAN FRANCISCO DIVISION)
12
13 | SANTA FE POINTE, LP, and Oklahoma      | CASE NO. C 07-05454 JCS
   | limited partnership; SANTA FE          |
14 | MANAGEMENT, LLC, an Oklahoma           | DECLARATION OF MATTHEW
   | limited liability company; RANT, LLC, a| JAMES
15 | Delaware limited liability company; and|
   | THEOTIS F. OLIPHANT, an individual,    |
16 |                                        |
   |            Plaintiffs,                 |
17 |                                        |
   |       v.                               |
18 |                                        |
   | GREYSTONE SERVICING                    |
19 | CORPORATION., a Georgia corporation;   |
   | GREYSTONE CDE, LLC, a Delaware         |
20 | limited liability company; and DOES 1  |
   | through 100 inclusive,                 |
21 |                                        |
   |            Defendants.                 |
22
23
24
25
26
27
28

LAI-2919440v1                                          Declaration of Matthew James
                                                              C 07-05454 JCS

## DECLARATION OF MATTHEW JAMES

I, Matthew James, declare and state as follows:

1. I am the Director of Greystone CDE, LLC ("Company"). The following is based on my personal knowledge, or upon my review of Company records maintained in the ordinary course of business, or upon my personal contact with Plaintiff Theotis F. Oliphant ("Oliphant") in regard to the real estate development project that is the subject of this dispute (the "Santa Fe project"), or upon information and belief where noted, and, if called upon to do so, I could and would testify competently thereto.

2. I am currently employed as Director of Greystone CDE, LLC's New York, New York office, a position I have held since 2005 and at all times relevant to this action. I am a citizen and resident of the State of New Jersey.

3. In July of 2006, I was contacted by Andre Blakely of National Equity Fund, a tax credit syndicator, on behalf of Plaintiff Theotis F. Oliphant ("Oliphant") regarding Oliphant's interest in developing a Low Income Housing Tax Credit project located in Oklahoma City.

4. Since that time, I have been closely involved in every aspect of the Santa Fe project on behalf of Greystone.

5. As proposed, financing for the Santa Fe project was to be comprised of a mortgage loan insured by the Federal Housing Authority ("FHA"), an office of the United States Department of Housing and Urban Development ("HUD"), in conjunction with tax-exempt bonds issued by the Oklahoma Housing Finance Agency ("OHFA").

6. The development and financing schedule I discussed with Oliphant contemplated closing on the HUD-insured mortgage loan in 2007.

7. To facilitate the Federal Home Loan "Affordable Housing Program" ("AHP") grant process required for his project, Oliphant initially chose to work with ORO Development Corporation ("ORO"), an Oklahoma non-profit housing assistance and development group.

8. In September of 2006, Oliphant obtained a bond allocation from OHFA that was to expire by the end of the year.

9. Between September and November of 2006, three significant outstanding issues stood in the way of presenting a complete underwriting package to HUD before the expiry of the bond allocation: (1) OHFA rejected ORO's involvement as the non-profit development group for the Santa Fe project due to past problems between OHFA and ORO, thus removing the AHP grant from the possible sources of funding for the Santa Fe project; (2) National Equity Fund became unable to participate in the Santa Fe project due to a liquidity crisis, and Oliphant was unable to find a replacement tax credit syndicator; and (3) Oliphant had consistently failed to meet Greystone's numerous requests to provide information and materials necessary for completion of the underwriting process and submission of the HUD application.

10. In November of 2006, Oliphant requested that Greystone provide him with bridge financing to allow him to acquire the subject real property for the Santa Fe project prior to the expiration of his purchase contract in December of 2006.

11. On November 16, 2006, Greystone provided Oliphant with a proposal letter from Greystone (the "November Proposal") providing for up to $4,348,400 in bridge financing, subject to underwriting criteria, on a non-recourse basis and secured by the real property to allow Oliphant to acquire the subject real property required for the Santa Fe project.

12. Oliphant rejected the November Proposal because it required him to contribute 15% of the acquisition price for the subject real property. Oliphant requested, instead, a different proposal for bridge financing that would allow him to fund his OHFA bond allocation into escrow, as opposed to acquiring the subject real property.

13. Due to the looming deadline on the bond allocation, I urged Oliphant to reapply for a new bond allocation the following year after resolving the other outstanding issues affecting his HUD application, such as the lack of a tax credit syndicator, because failure to complete those requirements and close on the HUD-insured mortgage loan in a

timely manner would result in forfeiture of the bond issuance. This was because the collateral for the bond issuance was to be ultimately secured by the HUD loan for both its principal and interest payments, and, as I explained to Oliphant, obtaining a bond allocation in 2007 would have been less difficult than obtaining the necessary HUD approval in 2006 under those circumstances.

14. Oliphant rejected my suggestion, and decided instead to obtain a bridge loan to have his bonds funded into escrow.

15. On December 4, 2006, at Oliphant's request, Greystone provided Oliphant with a proposal letter from Greystone (the "December Proposal") providing for a $500,000 note with full recourse to the borrower and backed by Oliphant's personal guaranty. Attached hereto as Exhibit 1 is a true and correct copy of the December Proposal signed by Oliphant.

16. Oliphant acknowledged his acceptance of the terms proposed in the December Proposal by signing and returning a copy of the December Proposal on December 5, 2006. Attached hereto as Exhibit 2 is a true and correct copy of the e-mail communication dated December 5, 2006 from Oliphant to me with the signed December Proposal transmitted as an attachment thereto.

17. During the month of December, Oliphant and I communicated on a daily basis by telephone and e-mail regarding the Santa Fe project and the proposed bridge loan transaction, and I urged Oliphant not to fund the OHFA bonds into escrow.

18. On December 17, 2006, Oliphant was provided with draft documents reflecting the same terms as those acknowledged by him in his acceptance of the December Proposal. He was provided with the following documents: the Bridge Loan Agreement; Assignment of Purchase Agreement; Guaranty and Suretyship Agreement; Partner Guaranty, Pledge and Security Agreement; Developer Limited Guaranty, Pledge and Security Agreement; Assignment of Project Documents; and Bridge Promissory Note (collectively, the "Bridge Loan documents").

19. Oliphant did not object to any of the terms in the draft documents or indicate any preference as to the existence of forum selection and choice of law provisions.

20. Having indicated to Greystone that he was prepared to execute the Bridge Loan documents, the final documents were presented to Oliphant on December 18, 2006.

21. As a convenience to Oliphant, the final Bridge Loan documents were sent to Oliphant in Oklahoma City where he was traveling that day to negotiate the first extension of his purchase contract for the real property that was the subject of the Santa Fe project.

22. As the documents reflect, Oliphant executed the Bridge Loan documents on December 20, 2006.

23. Oliphant did not object to any of the terms in the final Bridge Loan documents, including the New York forum selection and choice of law provisions.

24. On December 20, 2006, Oliphant's spouse, Robin van der Vegt, signed a Spouse's Consent to Oliphant's commitment as a personal guarantor under the Bridge Loan documents. Attached hereto as Exhibit 3 is a true and correct copy of the Spouse's Consent executed by Robin van der Vegt.

25. On December 26, 2006, Oliphant's law firm, Gibbs & Oliphant LLP, which represented Oliphant's Santa Fe entities in connection with the negotiation and execution of the Bridge Loan documents, issued an opinion letter (the "Opinion Letter") to Greystone endorsing the validity and enforceability of the Bridge Loan documents. Attached hereto as Exhibit 4 is a true and correct copy of the December 26, 2006 Opinion Letter from Gibbs & Oliphant LLP to Greystone.

26. From January to March of 2007, Oliphant attempted to complete the HUD underwriting package, which included finding a tax credit syndicator and general contractor for the Santa Fe project. Oliphant finally received a letter of intent from the Richman Group to act as the tax credit syndicator required for approval of the HUD application.

27.     Within two weeks of receiving the Richman Group's letter of intent Greystone submitted the HUD application to the HUD office in Oklahoma City, Oklahoma.

28.     In April of 2007, the Richman Group backed out of the Santa Fe project. Without the Richman Group's participation, Oliphant again lacked a tax credit syndicator for his project, a requirement for HUD approval. However, Greystone elected not to "pull" the HUD application at that time to allow Oliphant to find a replacement tax credit syndicator.

29.     In June of 2007, when Oliphant's obligations under the Bridge Loan documents came due, he negotiated an extension of time for repayment with Greystone conditioned on his securing an extension on the purchase contract for the real property required for the Santa Fe project.

30.     At the time of negotiating that extension with Greystone, Oliphant did not object to or seek modification of any other terms under the Bridge Loan documents, including the New York forum selection and choice of law provisions.

31.     On or about July 6, 2007, Oliphant met directly with HUD, contrary to previous instructions from, and his agreement with, Greystone.

32.     HUD informed Oliphant that his application had been rejected due to the non-viability of the Oklahoma market.

33.     After HUD's rejection of Oliphant's application, I persuaded Betsy Vartanian, Executive Vice President of Greystone Servicing Corporation, Inc., who is located in Warrenton, Virginia, to intervene on Oliphant's behalf.

34.     Vartanian convinced HUD to rescind its rejection, and accept a revised and complete application to be submitted within 30 days. My informed belief as to these facts is based upon my review of Company records maintained in the ordinary course of business, as well as on my having contacted Ms. Vartanian after HUD's rejection of Oliphant's application to persuade her to intervene on Oliphant's behalf and convince HUD to rescind its rejection.

35. Around this time, Oliphant represented to me that he had partnered with an Arkansas-based developer named David Henry on the Santa Fe project.

36. By August of 2007, Oliphant's purchase contract had expired, he did not have a tax credit syndicator, and he lacked the additional financing needed to acquire the real property necessary for the Santa Fe project.

37. Oliphant still had not secured the participation of a tax credit syndicator, and again failed to provide Greystone with the information and materials necessary for completion of the underwriting process and submission of the HUD application.

38. On August 9, 2007, Miriam Simon, Greystone's senior underwriter on the Santa Fe project, located in Wisconsin, notified HUD of Greystone's withdrawal of the application for the Santa Fe project.

39. By withdrawing the HUD application, Greystone avoided an inevitable second rejection by HUD, which, in my experience with similar transactions, would have established a precedent making it very difficult if not impossible for Oliphant to obtain HUD approval for the Santa Fe project at any time in the future.

40. On August 10, 2007, Oliphant sent me an e-mail advising me that "David Henry should handle all negotiations with Greystone on all aspects of the HUD deal." In his e-mail to me, Oliphant represented that "David is driving the bus" and that Oliphant would "have ZERO ownership interest" according to terms presumably reached privately among them, and requested that I "[c]all him [David Henry] directly." Attached hereto as Exhibit 5 is a true and correct copy of the e-mail communication from Oliphant to me.

41. At around this time, in a telephone conversation in early to mid August of 2007, Henry advised me that Oliphant had expressed disdain for Greystone and that Oliphant was preparing for what he believed to be inevitable litigation with Greystone. My informed belief as to this fact is based upon my personal contact with Henry in regard to the Santa Fe project.

42.   Henry further advised me that the subject real property had been placed back on the open market by the property owner. My informed belief as to this fact is based upon my personal contact with Henry in regard to the Santa Fe project.

43.   Thom Ruffin, a Senior Vice President at Greystone Servicing Corporation, Inc.'s Warrenton, Virginia headquarters, was brought in to negotiate a "workout" with Oliphant and Henry. It was clear that Oliphant did not have a viable project. My informed belief as to these facts is based upon my review of Company records maintained in the ordinary course of business, my personal contact with Mr. Ruffin on this matter, and my participation in the "workout" negotiations.

44.   On September 14, 2007, I participated in a conference call with Thom Ruffin, Oliphant, Anne Draper (identified as counsel for Oliphant and Plaintiffs), and Diane Fischer, counsel for Greystone, during which Oliphant attempted to negotiate for Greystone's rescission of its August 21, 2007 notice of default letter.

45.   Although Oliphant's counsel, Ann Draper, participated in the September 14, 2007 conference call, Greystone had not been served at that time and was not aware that Plaintiffs had filed suit against it. At no time during that call did Oliphant or Draper apprise Greystone of the complaint that Plaintiffs had filed against it in Alameda County Superior Court one week earlier.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed in New York, New York on December 14, 2007.

_____
Matthew James

# EXHIBIT "E"

December 4, 2006

Mr. Theo Oliphant
Rant LLC
113 Carmel Avenue
El Cerrito, CA 94530

Re: **Bridge Loan from Greystone CDE, LLC**

Dear Mr. Oliphant:

    Greystone CDE, LLC or its affiliate ("Greystone") is pleased to submit to you, or a single asset entity you control, ("Borrower"), the following proposal for a Bridge Loan (the "Bridge Loan") on the following terms and conditions:

| | |
|---|---|
| **PURPOSE:** | To bridge permanent financing for the multifamily housing project known as the Santa Fe Pointe Apartments (the "Project"), located in Oklahoma City, OK. Disbursements against the Bridge Loan will be used exclusively for the acquisition, tax-exempt bond, and bridge financing costs associated with the Project as approved by Greystone in its sole discretion. |
| **PROPOSED AMOUNT:** | $500,000 |
| **TERM:** | One year with one six month extension subject to, among other things, Greystone's approval and payment by the Borrower of an extension fee of 0.25% of the original principal amount of the Bridge Loan. |
| **ORIGINATION FEE:** | $20,000. |
| **APPLICATION FEE:** | Waived |
| **INTEREST RATE:** | The three month LIBOR rate plus 2.75% per annum calculated on the basis of a 360-day year for the actual number of days elapsed. Interest will accrue and be due and payable monthly in arrears. |
| **INTEREST PAYMENTS:** | Interest only payments will be due and payable monthly in arrears. Interest will be drawn from the capitalized interest portion of the loan. |
| **LOAN SIZING RATIOS:** | The size of the Bridge Loan will be the lesser of:<br><br>• 85% of the amount of anticipated take out financing for the transaction;<br><br>• 85% Loan to Value;<br><br>• 85% Loan to project acquisition and interim financing cost. |

**REPAYMENT:** All amounts due and owing under the Bridge Loan, including all principal, accrued but unpaid interest and any other fees or costs due under the loan documents, shall be paid on the earlier of: (i) the maturity date of the loan (subject to the provisions described above under *"Term"*); (ii) upon the closing of any permanent or additional financing in connection with the Project; or (iii) any time that same shall become due and payable under the loan documents, including, but not limited to, an event of default.

**COLLATERAL:** Borrower's obligations in respect of the Bridge Loan shall be secured by a pledge all of its personal property in the Project including: its General Partnership interests, its Tax Exempt Bond and LIHTC Awards from the State of Oklahoma, all development fees directly or indirectly to be received by Borrower, its managing member/members or their affiliates in conjunction with the Project, and any assets of the Borrower including any plans, specifications, permits, reports etc.

**EXIT FEE:** Greystone CDE, LLC will charge an exit fee of 2% of the original principal amount of the Bridge Loan, which will be waived if the Borrower elects to close its permanent financing through Greystone.

**GUARANTORS:** This loan is fully recourse to the borrower.

**DOCUMENTATION:** Borrower and any of its affiliates entitled to receive development fees or general partner fees or profits shall execute in respect of the Bridge Loan customary and appropriate documents including but not limited to, a promissory note, security agreement, a limited recourse guaranty, a Bridge Loan Agreement and any other documents reasonably requested by Greystone *("Loan Documents")* which shall contain, without limitation, the following covenants: (1) neither Borrower nor its general partner or any other affiliate who has pledged collateral to secure repayment of the Bridge Loan shall incur indebtedness (direct or contingent) or place additional liens on such pledged collateral without the prior written consent of Greystone; and (2) Borrower shall provide customary financial reporting (including annual audited financial statements) and access to books and records of Borrower, its general partner and affiliates who have pledged collateral or have guaranteed or assumed any obligations with respect to the Bridge Loan.

**BORROWING PROCEDURES:** The Bridge Loan shall be deemed fully funded at Bridge Loan Closing. Disbursements under the Bridge Loan shall be made from time to time, but not more frequently than monthly, upon submission by Borrower of a disbursement request and supporting documentation provided Greystone has approved same following Greystone's review.

## GENERAL REQUIREMENTS:

A.   The documents evidencing or securing or delivered in connection with the Bridge Loan and all due diligence submissions in connection with the Bridge Loan shall be in form and substance satisfactory to Greystone and its counsel.

B.   Borrower shall have delivered such instruments, reports, documents and information as are customarily required by providers of financing facilities of this size and nature, including, without limitation, the following:

1. **Financial Statements.** Audited financial statements, schedules of contingent liabilities, and federal tax returns of Borrower, its managing member and all affiliates thereof entitled to receive development fees or general partner fees or profits, together with evidence that there has occurred no material adverse change in such parties' financial condition between the respective dates of such financial statements and the closing date of the Bridge Loan, and together with pro forma financial statements of Borrower satisfactory to Greystone.

2. **Project Budget.** The pro forma construction and operating budgets for Project satisfactory to Greystone.

3. **Other Financing Documents.** True, correct and complete copies of all documentation relating to:

    1. Tax exempt bond indenture;

    2. Loan application, as submitted to FHA for Firm Commitment;

    3. Receipt of HUD's acceptance of FHA loan application;

    4. Executed Letter of Intent with LIHTC investor.

4. **Financing and Reference Checks.** Financing and credit reports of Borrower, its managing member and any affiliate referenced in clause (1) above from outside sources selected or approved by Greystone.

5. **UCC, Litigation and Bankruptcy Searches.** UCC, bankruptcy and litigation searches in respect of Borrower, its managing member and any affiliate.

6. **Organizational Documents.** For each of Borrower, its managing member and any affiliate, certified copies of the following:

    1. its operating agreement, limited liability company agreement, articles of incorporation, by-laws, as applicable;

    2. certificates of good standing/existence/authorization under the laws of its jurisdiction of organization; and

    3. resolutions or unanimous written consents of members, partners or directors approving the execution and delivery of the documentation evidencing or securing the Bridge Loan and the performance of the obligations thereunder.

7. **Opinion of Counsel.** Opinions of counsel, as to the following:

1. the valid organization, qualification, existence and good standing of Borrower, its managing member and any affiliate;

2. the due authorization, execution and delivery of the documents evidencing and securing the Bridge Loan (the "Bridge Loan Documents");

3. the legality, validity, binding effect and enforceability of the Bridge Loan Documents and the validity and perfection of the security interests granted thereunder;

4. that the execution and delivery of and performance of the obligations of Borrower, its managing member and any affiliate under the Bridge Loan Documents will not violate any provision of law or any applicable judgment, order, or regulation of any court, or of any public or governmental agency or authority, and will not conflict with or constitute a default under Borrower, its managing member's or any such affiliate's organizational documents or under any instrument to which the Borrower, its managing member or any such affiliate is a party or by which Borrower, its managing member or any such affiliate is bound; and

5. that there are no pending or, threatened actions, claims or proceedings against Borrower, its managing member or any affiliate, before any court or governmental agency, which, if determined adversely to Borrower, its managing member or any such affiliate, would have a material adverse effect upon performance of the Bridge Loan Documents.

8. **Due Diligence Submissions:**

    1. Property Description (be certain that the property meets eligibility requirements set forth on page one of this summary).
    2. Neighborhood Description
    3. Appraisal
    4. Phase I Environmental Report
    5. Color Photographs
    6. City and Neighborhood Maps
    7. Sources and Uses of Funds, Copy of Purchase Agreement, if applicable
    8. Property Ownership History (when purchased, what price and any significant events during Borrower's tenure of ownership)
    9. Existing Debt Data (lender name, contact name and phone number, loan amount, maturity date and interest rate)
    10. Three years' certified tax returns for Borrower and each Guarantor
    11. Certified Financial Statements for Borrower and each Guarantor
    12. Borrower and Key Principal Resumes
    13. Borrower Organizational Documents
    14. Copy of Current Owner's Title Policy
    15. Copy of current survey

9. **Other.** Such other documents, instruments, opinions and assurances as Greystone may reasonable request.

| Bridge Loan Sources and Uses: | | |
|---|---:|---:|
| Number of Units: | 224 | |
| Closing Period: | 6 Months | |
| 3-Month LIBOR: | 5.37% | |
| Interest Rate: | 2.75% | |
| All In Rate: | 8.12% | |
| Underwriting Rate: | 0.00% | |
| Underwriting Rate: | 8.12% | |
| **Sources:** | **Total** | **Per Unit** |
| Bridge Loan | 500,000 | 2,232 |
| Owner Equity | (199,700) | (892) |
| **Total Sources:** | **300,300** | 1,341 |
| **Uses:** | | |
| Origination Fees: | $ 20,000 | 89 |
| Capitalized Interest: | $ 20,300 | 91 |
| Interest Offset: | $ - | - |
| Bond Costs: | $ 250,000 | 1,116 |
| Rehabilitation Escrow: | $ - | - |
| Acquisition Costs: | $ - | - |
| Legal: | $ 10,000 | 45 |
| Third Party Costs: | $ - | - |
| **Total Uses:** | **$ 300,300** | 1,341 |

| | |
|---|---|
| **INVESTMENT ACCOUNT:** | Undisbursed Bridge Loan funds will be invested by Greystone on behalf of the Borrower and the interest earned thereon will be used to offset interest due on the Bridge Loan. |
| **PROJECT DUE DILIGENCE:** | Upon the Borrower's execution and delivery hereof, Borrower shall provide Greystone with access to the housing development site and records with respect thereto. It is anticipated that Greystone representatives shall conduct site visits at the development. Borrower shall use its best efforts to cause responsible persons at the development to make themselves available to Greystone's representatives and to provide Greystone's representatives with such information regarding the development as Greystone may reasonably request. |
| **COSTS AND EXPENSES:** | All costs and expenses incurred in connection with the Bridge loan, including fees and expenses of Greystone's counsel, costs of due diligence, and costs of any third party experts or consultants shall be the responsibility of Borrower. Payment of such amounts is not contingent upon closing of the Bridge Loan. |

Kindly acknowledge your receipt and acceptance of this proposed term sheet by signing in the space below and returning it to Greystone; Attention: Matthew James.

Very truly yours,

GREYSTONE CDE, LLC

By: _____
Name:
Title:


RECEIVED AND ACKNOWLEDGED:

_[signature]_
Name: Theo Oliphant
Date:


> *The foregoing does not constitute, and shall not be deemed, a promise or commitment by Greystone or any of its affiliates to lend or enter into any financing transaction. Any such commitment shall be subject to completion by Greystone of underwriting and due diligence satisfactory to Greystone in its sole discretion, receipt by Greystone of all necessary approvals and consents from all entities and governmental authorities, the preparation and execution of definitive written loan documents and such other requirements as Greystone may require in its sole discretion.*