Donald N. David (DD 5222)
Brian A. Bloom  (BB 5722)
Jeremy A. Shure  (JS 0490)
AKERMAN SENTERFITT LLP
335 Madison Avenue, Suite 2600
New York, New York 10017
Telephone:  212.880.3800
Facsimile:  212.880.8965

*Attorneys for Defendants and Counterclaimants*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GREYSTONE CDE, LLC,<br><br>*Plaintiff-Counterclaim Defendant,*<br><br>- against –<br><br>SANTE FE POINTE, L.P.,<br>SANTE FE POINTE MANAGEMENT, LLC<br>RANT LLC, and<br>THEOTIS F. OLIPHANT,<br><br>*Defendants-Counterclaimants,*<br><br>- against -<br><br>GREYSTONE SERVICING CORPORATION, INC.,<br><br>*Additional Counterclaim Defendant.* | Civil Case No:  07-CV.8377 (RPP)<br><br>**ANSWER WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** |

Defendants Santa Fe Pointe, L.P. (erroneously sued herein as "Sante Fe Point, L.P."),

Santa Fe Pointe Management, LLC (erroneously sued herein as "Sante Fe Pointe Management,

LLC"), Rant LLC and Theotis F. Oliphant (collectively referred to herein as the "Defendants"),

through its undersigned counsel, Akerman Senterfitt LLP, as and for their Answer to the

Amended Complaint filed by Plaintiff Greystone CDE, LLC ("Greystone"), dated October 5, 2007 ("Amended Complaint") state as follows:

## PARTIES

1.      Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph "1" of the Amended Complaint, and therefore deny same.

2.      Defendants admit the allegations contained in the first sentence of paragraph "2" of the Amended Complaint. Defendants are without information or knowledge sufficient to form a belief as to the truth of the allegations contained in the second sentence of paragraph "2" of the Amended Complaint as the word "partner" has not been defined.

3.      Defendants admit the allegations contained in paragraph "3" of the Amended Complaint.

4.      Defendants admit the allegations contained in paragraph "4" of the Amended Complaint.

5.      Defendants admit that Rant LLC was and is a limited liability company organized and existing under the law of the State of Delaware, with an address at 113 Carmel Avenue, El Cerrito, CA 94530, but is without information or knowledge sufficient to form a belief as to whether Rant LLC is an affiliate of Sante Fe Pointe, L.P. as the term "affiliate" is not defined in the Amended Complaint.

## JURISDICTION AND VENUE

6.      Defendants admit the allegations contained in paragraph "6" of the Amended Complaint.

7.    Defendants admit the allegations contained in paragraph "7" of the Amended Complaint.

8.    With regard to the allegations contained in paragraph "8", Defendants admit that the Partner Guaranty, Pledge and Security Agreement, contained a permissive jurisdiction clause under which Defendants could be subject to personal jurisdiction in New York.  Defendants reserve the right to contest the validity of the Partner Guarantee, Pledge and Security Agreement along with the provisions contained therein.

## BACKGROUND

9.    Defendants admit the allegations contained in paragraph "9" of the Amended Complaint.

10.    Defendants deny that the Purchase Agreement provides for the purchase by Rant LLC of the Project real estate from Walnut Creek Apartments, Inc.  Defendants also deny that the Purchase Agreement (properly termed the "Contract for the Sale of Real Estate") provided for a Closing to occur not later than March 31, 2007.

11.    Defendants admit the allegations contained in paragraph "11" of the Amended Complaint.

12.    Defendants admit the allegations contained in paragraph "12" of the Amended Complaint.

13.    Defendants deny the allegations contained in paragraph "13" of the Amended Complaint except admit that on or about December 20, 2006 Oliphant entered into a "Guaranty and Suretyship Agreement" with Plaintiff.

14.    Defendants deny the allegations contained in paragraph "14" of the Amended Complaint, except admit that on or about December 20, 2006 Santa Fe Pointe LP and Oliphant entered into a Partner Guaranty, Pledge and Security Agreement with Plaintiff.

15.    Defendants deny the allegations contained in paragraph "15" of the Amended Complaint, except admit that on or about December 20, 2006 Rant entered into a Developer Limited Guaranty, Pledge and Security Agreement" with Plaintiff.

16.    Defendants deny that Santa Fe Pointe LP assigned the Project Documents to Lender pursuant to Exhibit "F."    Without opining or admitting to the validity and/or enforceability of the documents contained in Exhibit "F," Defendants state that the document entitled "Assignment of Project Documents," and contained within Exhibit "F," purportedly created a security interest in the Project Documents, subject to certain restrictions.

17.    Defendants admit the allegations contained in paragraph "17" of the Amended Complaint.

18.    Defendants admit the allegations contained in paragraph "18" of the Amended Complaint.

19.    Defendants deny and state that the Note does not provide for the maturity date and/or the specific payment detailed in paragraph "19."

20.    Defendants deny and state that the Notice of Default, annexed to the Amended Complaint as Exhibit "I," does not read as detailed by Plaintiff in paragraph "20."

## COUNT I
## AGAINST SANTE FE POINTE, L.P.
### (Breach of Contract)

21.    Defendants neither admit nor deny the allegations in paragraph "21," as this is not an allegation to which responsive pleading is required.

22.    Defendants deny and state that the Loan Agreement does not provide for automatic acceleration upon all Events of Default detailed in section 9.1 of the Loan Agreement.

23.    The allegation contained in paragraph "23" is a legal conclusion and therefore is not an allegation to which responsive pleading is required.  Defendants leave Plaintiff to its proofs with respect to this allegation.  To the extent responsive pleading is required:  deny.

24.    Defendants admit that Exhibit "J" to the Amended Complaint is a letter from Greystone CDE, LLC to Sante Fe Pointe, L.P., Sante Fe Pointe Management, L.L.C., Theotis F. Oliphant, and Rant, LLC, which purports to be a "notice of acceleration."  However, Defendants deny that allegation number "24" is an element of a breach of contract claim against Santa Fe Pointe LP.

25.    Defendants deny the allegations contained in paragraph "25" and further deny that the allegation in paragraph "25" is an element of a breach of contract claim against Santa Fe Pointe LP.

26.    The allegation contained in paragraph "26" is a legal conclusion and not an allegation to which responsive pleading is required.  Defendants leave Plaintiff to its proofs with respect to this allegation. To the extent that responsive pleading is required: deny.

27.    The allegation contained in paragraph "27" is a legal conclusion and not an allegation to which responsive pleading is required.  Defendants leave Plaintiff to its proofs with respect to this allegation.  To the extent that responsive pleading is required:  deny.

28.    Defendants deny the allegations contained in paragraph "28" of the Amended Complaint.

## COUNT II
## AGAINST ALL THE DEFENDANTS
### (Breach of Contract)

29.    Defendants neither admit nor deny the allegations in paragraph "29," as this is not an allegation to which responsive pleading is required.

30.    Defendants deny the allegation contained in paragraph "30" and state that the Loan Agreement does not state that a condition thereto was that Borrower not default on the Purchase Contract.

31.    Defendants deny the allegation contained in paragraph "31" of the Amended Complaint.

32.    Defendants deny the allegation contained in paragraph "32" and state that the Loan Agreement does not provide that a condition thereto was that Borrower not default on its commitment to provide equity in the Project by a date certain.

33.    Defendants deny the allegation contained in paragraph "33" as it does not accurately reflect the condition of paragraph 5.1(c) of the Loan Agreement.

34.    Defendants neither admit nor deny the allegation in paragraph "34" as Addendum #3, as provided by Plaintiff, is not an executed copy of Addendum #3 as claimed in allegation number "34." Defendants reserve the right to further reply to this allegation if supplied with an executed copy of Addendum #3 at some future date.

35.    Defendants admit the allegations contained in paragraph "35" of the Amended Complaint, but state that the quotation contained therein is not complete.

36.     Defendants object to the allegation contained in paragraph "36" as being vague and ambiguous. However, to the extent that a response is required: deny.

37.     The allegation contained in paragraph "37" is a legal conclusion, as whether or not there was a default is a legal determination. As such, paragraph "37" is not an allegation to which responsive pleading is required, and Defendants leave Plaintiff to its proofs with respect to whether there has been a "default." To the extent that responsive pleading is required: deny.

38.     Defendants object to the allegations contained in paragraph "38" as non-specific as to the origin and/or nature of the "conditions" referred to in paragraph "38." However, to the extent that a response is required: deny. Notwithstanding the foregoing, Defendants admit that a certain disbursement was made by Plaintiff; the facts surrounding said disbursement are in dispute.

39.     The allegation contained in paragraph "39" is a legal conclusion, as the fact of whether or not there was "due demand" is a legal determination. As such, paragraph "39" is not an allegation to which responsive pleading is required, and Defendants leave Plaintiff to its proofs with respect to whether there has been due demand. To the extent that responsive pleading is required: deny.

40.     The allegation contained in paragraph "40" is a legal conclusion and not an allegation to which responsive pleading is required. Defendants leave Plaintiff to its proofs with respect to this allegation. To the extent that responsive pleading is required: deny.

41.     The allegation contained in paragraph "41" is a legal conclusion and not an allegation to which responsive pleading is required. Defendants leave Plaintiff to its proofs with respect to this allegation. To the extent that responsive pleading is required: deny.

## COUNT III
## AGAINST ALL DEFENDANTS
(Breach of Contract)

42.    Defendants neither admit nor deny the allegations in paragraph "42," as this is not an allegation to which responsive pleading is required.

43.    Defendants object to the allegations contained in paragraph "43" as they are compound.  However, to the extent that a response is required:  deny.

44.    Defendants deny the allegations contained in paragraph "44" of the Amended Complaint.

45.    Defendants deny the allegations contained in paragraph "45" of the Amended Complaint.

## AFFIRMATIVE DEFENSES

As separate and distinct affirmative defenses to Plaintiff's Amended Complaint, Defendants allege as follows:

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE
(Failure to State a Claim)

46.    Plaintiff's Amended Complaint fails to set forth facts sufficient to state a claim upon which relief may be granted, and further fails to state facts sufficient to entitle Plaintiff to the relief sought, or any other relief from Defendants.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE
(Prior Pending Action)

47.    Plaintiff's action is barred by the existence of an identical prior pending action in the United States District Court in and for the Northern District of California, styled *Santa Fe*

*Pointe LP, et al. v. Greystone Servicing Corporation, Inc, et al.*, Index Number 3:07-cv-05454-JCS.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE
### (Fraud)

48.    Plaintiff's action, and each and every claim made therein, is barred by virtue of the fact that Plaintiff committed fraud against Defendants.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE
### (Undue Influence)

49.    Plaintiff's action, and each and every claim made therein, is barred by virtue of the doctrine of undue influence.

50.    As such, the alleged agreements, including the Guaranty (annexed to the Amended Complaint as exhibit "C") are *void ab initio*.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE
### (Economic Duress)

51.    Plaintiff's action, and each and every claim made therein, is barred because to the extent that Defendants entered into any of the alleged agreements, they did so under economic duress.

52.    As such, the alleged agreements, including the Guaranty (annexed to the Amended Complaint as exhibit "C") are *void ab initio*.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE
### (Lack of Consideration)

53.     Plaintiff's action, and each and every claim made therein, is barred by virtue of the fact that the alleged agreements were not supported by valid consideration.

54.     As such, the alleged agreements, including the Guaranty (annexed to the Amended Complaint as exhibit "C") are *void ab initio*.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE
### (Breach of Fiduciary Duty)

55.     Plaintiff's action, and each and every claim made therein, is barred by virtue of Plaintiff's breach of its fiduciary duty owed to Defendants.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

56.     Plaintiff's action, and each and every claim made therein, is barred by the doctrine of unclean hands.

57.     As such, the alleged agreements, including the Guaranty (annexed to the Amended Complaint as exhibit "C") are *void ab initio*.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE
### (Estoppel)

58.     Plaintiff's action, and each and every claim made therein, is barred by the doctrine of estoppel.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

59.    Plaintiff's action, and each and every claim made therein, is barred because a recovery in favor of Plaintiff would cause Plaintiff to be unjustly enriched.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE
### (Breach of the Covenant of Good Faith and Fair Dealing)

60.    Plaintiff's action, and each and every claim made therein, is barred by virtue of Plaintiff's breach of the covenant of good faith and fair dealing.

61.    As such, the various agreements entered into by the Defendants are voidable and/or void.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE
### (Right to Assert Additional Defenses)

62.    Defendants hereby give notice that they intend to rely on any additional affirmative defenses that become available or apparent through discovery and/or the factual development of this case or otherwise, and thus reserve the right to amend their Answer to assert such additional defenses. Defendants also hereby give notice that they intend to rely on and reserve the right to assert such other or related defenses that may become available in the event of a determination that this action, or some part thereof, is governed by the substantive law of a state other than New York or of a foreign country, or in the event it becomes apparent that the facts on which this action is premised lack any necessary nexus to New York.

## COUNTERCLAIMS

Defendants and Counter-Claimants Theotis F. Oliphant, Santa Fe Pointe, LP, Santa Fe Pointe Management, LLC, and Rant, LLC (collectively, the "Oliphant Parties") allege the following:

## DEMAND FOR JURY TRIAL

The Oliphant Parties demand a jury trial as provided in Federal Rule of Civil Procedure 38(a).

## PRELIMINARY ALLEGATIONS
## RELATED TO THE COUNTERCLAIMS

63.     This is an action for damages and declaratory relief arising because the Greystone parties effectively sabotaged the Oliphant Parties' efforts in 2006 and 2007 to acquire and rehabilitate a 224-unit apartment building (the "Apartment Building") in Oklahoma City known as Santa Fe Pointe (the "Project") under a federal program encouraging development of low income housing projects.

64.     The Federal Housing Administration, through its Office of Housing and Urban Development ("HUD"), offers incentives to private developers to buy, renovate, and manage housing that will be income-restricted—and therefore affordable—to low income families. The developer under this program obtains a loan to fund a portion of this activity, which is insured by HUD (and therefore is non-recourse to the developer), and the developer is paid a fee equal to 14% of the total allowable project costs. Typically the developer also funds a portion of the project through local government agency funds that are supported by tax-exempt bonds issued by that agency. Such was to be the case here.

65.     The Oliphant Parties had a contract to purchase the Apartment Building that would be renovated and managed under the federal program. They hired Greystone as their fiduciary to deal with HUD to obtain the HUD-insured project loan. They also arranged, through another entity, for the tax-exempt bond financing, which would carry six-figure transaction fees.

66.     Greystone negligently performed its duties as fiduciary and did not timely apply for the HUD-insured loan. The Oliphant Parties therefore risked losing the project entirely because of the timing exigencies of the bond financing and the Apartment Building purchase.

67.     To ameliorate the effects of its malfeasance, Greystone represented to the Oliphant Parties, through a written "term sheet," that it would give a non-recourse bridge loan to allow the Oliphant Parties to purchase the Apartment Building and fund the bond financing. Greystone waited, however, until the opportune time to pull a classic "bait-and-switch." It was not until after the bonds had been issued and sold (and the Oliphant Parties were obligated for the transaction fees), and on the eve of the close of the Apartment Building transaction, that Greystone sent the formal loan documents to the Oliphant Parties. In those documents, Greystone had unilaterally changed the bridge loan terms, knowing the Oliphant Parties had no choice but to accept or risk losing the Project. Greystone would no longer lend on the Apartment Building purchase, only on the bond fund costs. And, more significantly, Greystone turned the non-recourse loan into one Mr. Oliphant and his wife had to personally guaranty.

68.     After Mr. and Mrs. Oliphant were forced to sign their personal guaranties, Greystone abandoned its HUD fiduciary obligations to the Oliphant Parties, concentrating instead on ensuring that its position as a bridge loan lender was not compromised. With a blind eye to its conflicted situation, Greystone surreptitiously began dealing with a substitute developer to take over the Project, unilaterally withdrew the Oliphant Parties' HUD application,

declared a bogus default of the bridge loan (which was never in financial default), and sent letters to the financial community disparaging the Oliphant Parties. All of this while still contractually obligated to act as the Oliphant Parties' fiduciary.

69.    Aside from project expenditures and lost opportunity costs, the Oliphant Parties will ask the jury to award significant punitive damages against Greystone.

## THE PARTIES

70.    The Counterclaimants are:

A.    Theotis F. Oliphant ("Mr. Oliphant") is an individual who resides in Contra Costa County, California.

B.    Santa Fe Pointe, LP ("SFP") is an Oklahoma limited partnership formed by Mr. Oliphant in October 2006 to acquire and rehabilitate the Apartment Building and to be the "Borrower" entity on any Project loans.

C.    Santa Fe Pointe Management, LLC ("SFM") is an Oklahoma limited liability company formed by Mr. Oliphant in October 2006 to manage the Project and be SFP's general partner. At all times material, Mr. Oliphant was SFM's managing member.

D.    Rant, LLC ("Rant") is a Delaware limited liability company having its principal place of business Contra Costa County, California. At all times material, Mr. Oliphant was Rant's managing member.

71.    The Counterdefendant and Third-Party Defendant are:

E.    Greystone CDE, LLC ("Greystone CDE") is a Delaware corporation and an affiliate of Greystone Servicing.

F.    <u>Greystone Servicing Corporation, Inc. ("Greystone Servicing")</u> is a Georgia corporation and one of the nation's leading originators of Federal Housing Administration (FHA) multifamily loans.

72.    Greystone Servicing and Greystone CDE are sometimes referred to either singularly or jointly as "Greystone" in this pleading because in fact the numerous Greystone affiliated corporations often refer to themselves in such a manner.    It is often difficult to distinguish one from the other, although they formally claim to be distinct legal entities.    The ironic significance of this looseness of formal corporate separation will become apparent below.

## JURISDICTION AND VENUE

73.    The Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exclusive of interest and costs exceeds seventy-five thousand ($75,000) dollars.

74.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## COMMON ALLEGATIONS

### Greystone Becomes the Oliphant Parties' Fiduciary in Dealings with HUD

75.    Greystone is one of the nation's leading originators of HUD multifamily loans. The HUD financing originated by Greystone provides loans to developers that are long-term, fully amortizing, fixed rate, and non-recourse.    Greystone has regional origination offices throughout the United States, and it provides loan officers, underwriters, analysts and consultants to assist developers in successfully acquiring, rehabilitating, and financing projects such as this one.

76.    Greystone is a HUD-approved underwriter for the FHA's Multifamily Accelerated Processing (MAP) program. This program establishes national standards for approved lenders to prepare, process and submit their own loan applications. In this process, Greystone serves as an intermediary between their developer-clients and HUD offices to facilitate approval of applications and to obtain financing within required time frames.

77.    On or about September 7, 2006, Mr. Oliphant (on behalf of an entity to be created) and Greystone Servicing entered into a written agreement by which the Oliphant Parties appointed Greystone Servicing to serve as the exclusive agent to process the HUD application for financing the acquisition and rehabilitation of the Project (the "Engagement Agreement"). On the same date, Mr. Oliphant paid $14,000 in fees to Greystone Servicing as required by the Engagement Agreement.

78.    Under the Engagement Agreement and FHA procedures, Greystone Servicing became the exclusive lender to underwrite and process a HUD-insured loan for the Project on behalf of the Oliphant Parties. The Oliphant Parties were neither authorized nor permitted to communicate directly with HUD as to the HUD application.

### Because Greystone Servicing Does Not Timely Complete the HUD Application, It Agrees To Extend a Non-Recourse Bridge Loan

79.    Also on or about September 7, 2006, the Oliphant Parties engaged Seibert Branford Shank & Company, LLC ("SBS") to serve as investment bank underwriter to sell $7,095,000 of tax-exempt bonds through which the Project was to be partially financed. The bond financing had to close by December 20, 2006 or the bond issue would expire.

80.    To accomplish timely sale of the tax-exempt bonds, SBS had to coordinate the bond sales with Greystone's HUD application submittal. To this end, SBS impressed upon

Greystone the importance of completing the HUD application by November 2006. In late September 2006, SBS distributed to the Oliphant Parties and to Greystone a financing timetable setting a specific date for Greystone to submit the HUD application. Miriam Simon ("Simon"), Greystone's senior underwriter for the Project, received the SBS document and participated in project meetings and telephone conferences on behalf of Greystone. Mr. Oliphant informed Simon he was willing to pay incremental costs to accelerate the filing of the HUD application.

81.     On or about October 5, 2006, Mr. Oliphant, Simon, and SBS representatives met with HUD officials in Oklahoma City about the Project. There, HUD officials emphasized that the HUD application had to be submitted by the first week of December 2006 or HUD's review of it would be delayed.

82.     Greystone knew at this time that the Oliphant Parties wanted to complete the purchase of the Apartment Building by December 20, 2006 and would lose the $7,095,000 of tax-exempt bond financing if the bond financing was not closed by then.

83.     On or about October 27, 2006, Simon informed the Oliphant Parties that the HUD application process was behind schedule. In light of the December 20, 2006 deadlines, the Oliphant Parties were understandably troubled by this revelation and communicated their concerns to Matt James ("James"), the business development person at Greystone Serving who initially sold the Oliphant Parties on using Greystone's services. To assuage the Oliphant Parties' concerns, James told the Oliphant Parties that if Greystone Servicing in fact could not complete the HUD application in time, an affiliated Greystone company (Greystone CDE) would extend a non-recourse bridge loan to fund both the purchase of the Apartment Building and the cost of issuing the bonds being sold by SBS. The loan would "bridge" the period between the

December 20 deadline and when the ultimate HUD-insured Project loan issued, and would be repaid from the HUD-insured loan proceeds.

84.     On or about November 13 and 14, 2006, the Oliphant Parties delivered to Greystone Servicing the final items needed to allow Greystone Servicing to submit the Oliphant Parties's application to HUD, which included architectural plans and financial certifications of Project participants. All other aspects concerning the timely execution of the HUD application were within Greystone Servicing's sole control. A full two weeks remained before Greystone Servicing's scheduled submittal of the HUD application.

85.     Despite having the needed items required to complete the application, Greystone on November 14, 2006 told the Oliphant Parties for the first time that it would not submit the HUD application in 2006. James reiterated to the Oliphant Parties, however, that Greystone was committed to funding both the purchase of the Apartment Building and the cost of issuing the bonds to be sold by SBS, and would do so through a non-recourse bridge loan.

86.     The bridge loan concept was not initiated by the Oliphant Parties. It was the brainchild of Greystone and was necessary only because of Greystone's negligence in not having the HUD application ready by the scheduled dates.

87.     The terms of the bridge loan were confirmed on November 16, 2006 through a term sheet Greystone Servicing submitted to the Oliphant Parties on behalf of its affiliate Greystone CDE, which would be the lending entity. The term sheet said that Greystone CDE would extend a six-month non-recourse bridge loan in the amount of $4,348,400.

88.     On the basis of the term sheet commitment, SBS proceeded with the tax-exempt bond issuance. On November 21, 2006, SBS presented a final financing timetable in which it confirmed that all costs of issuing and selling the tax-exempt bonds would be paid through the

Greystone bridge financing.  Thereafter, SBS proceeded to complete arrangements for bond issuance, the Oliphant Parties notified the building seller the sale close would be by December 20, and Mr. Oliphant made arrangements to travel to Oklahoma City on December 18 through 20 to facilitate that event.

### Knowing The Oliphant Parties Had No Choice but To Accept, Greystone Changes the Bridge Loan Terms at the Eleventh Hour to a Recourse Loan

89.     The tax-exempt bonds were priced on December 13 and 14, and sold by SBS to institutional investors.  As a result, the Oliphant Parties became responsible for approximately $251,000 in bond issuance costs.

90.     On December 17, 2006, the literal eve of Mr. Oliphant's departure to Oklahoma City, Greystone's counsel delivered the first drafts of the bridge loan documents.  These differed significantly from the financing initially promised.  They provided for a bridge loan of only $500,000 (rather than the $4,348,400), which would cover the bond issuance cost but not the Apartment Building acquisition.   In addition, instead of the promised non-recourse financing, the loan documents required Mr. Oliphant and his wife to personally guarantee the loan, an entirely new and different condition.  The documents were presented on a take-it-or-leave-it basis.

91.     Greystone knew full well that the Oliphant Parties could not "leave it."  The $251,000 bond issuance costs had already been incurred because the bonds had been sold.  The Oliphant Parties had no choice but to sign the bridge loan documents as presented.  Copies of the loan documents are attached to Greystone CDE's First Amended Complaint in this action.

**Greystone Abdicates Its Fiduciary Responsibilities to
Oliphant as a HUD Underwriter and Becomes an Antagonist**

92.    At the time the bridge loan was extended, Greystone wore two hats.  Under the first, it was obligated as a fiduciary to diligently and faithfully pursue the Oliphant Parties' best interests and assist in seeing that the Oliphant Parties succeeded in obtained HUD-insured financing for the Project.  Under the second, it was a lender with the self-interest in seeing that its bridge loan was repaid.  As shown below, Greystone ultimately abdicated and ignored its fiduciary role to the Oliphant Parties, pursuing only its self-interest.

93.    Greystone Servicing did not submit the Oliphant Parties' final HUD application until on or about March 14, 2007.

94.    Part of the financial structure of the Project included the sale of tax credits to a purchaser/syndicator.  Under the original HUD application, the tax credit purchaser/syndicator was the Richman Group.  In mid-April 2007, however, the Richman Group backed out of the deal.  Thereafter, with the knowledge and consent of Greystone, the Oliphant Parties pursued other syndicators and co-developers to complete the financial aspects of the Project.

95.    On or about June 14, 2007, the Oliphant Parties were introduced to David Henry ("Henry"), an experienced Arkansas developer.  The Oliphant Parties sought to bring Henry into the Project as a co-developer.  The Oliphant Parties obtained the agreement of the seller of the Apartment Building to extend the purchase closing date to July 31, 2007.  Because Greystone's bridge loan financing was inadequate to fund the Apartment Building acquisition, the Oliphant Parties intended to bring Henry into the deal and arrange bridge loan financing through Henry's financial sources to acquire the Apartment Building.

96.    On or about July 5, 2007, the Oliphant Parties met with HUD personnel in Oklahoma City and learned that the HUD application had been rejected by a letter sent out

earlier that day. At this meeting, the HUD representative also informed the Oliphant Parties that at a HUD conference in St. Louis on June 19, Greystone's representative Simon had gone out of her way to make unsolicited disparaging remarks about the Project to the HUD representative from Oklahoma City. When the Oliphant Parties brought these facts to James's attention, James reassured Oliphant that "one of the top HUD loan executives at Greystone" was going to intercede. On or about July 11, 2007, the Oliphant Parties were informed that HUD had agreed to reconsider the application without starting the process anew, and that Greystone would submit written materials responsive to HUD's concerns.

97.    In the meantime, the Oliphant Parties and Henry proceeded to attempt to close the Apartment Building purchase. They obtained a loan commitment from a lender and reached an agreement with the seller to carry back a second mortgage in the amount of $500,000. Shortly before the scheduled July 31, 2007 close date, however, Henry had second thoughts about the deal, and consequently the July 31 date passed without the closing being consummated.

98.    In early August 2007, Greystone surreptitiously began negotiating with Henry on ways to complete the Project without the Oliphant Parties. On August 9, 2007, without prior notice or warning to the Oliphant Parties, Greystone Servicing unilaterally withdrew the Oliphant Parties' HUD loan application.

99.    The withdrawal of the HUD application placed at risk the $7,095,000 in tax exempt bond proceeds. It also caused the seller of the Apartment Building to temporarily terminate negotiations with the Oliphant Parties for further extensions of the close date because it made it appear that it would take another ten to twelve months if the HUD process were started anew.

**Greystone Declares the Bridge Loan in Default and**
**Wrongfully Refuses To Rescind the Default After Cure**

100.    On or about August 22, 2007, Thom Ruffin ("Ruffin") of Greystone CDE informed the Oliphant Parties that the Oliphant Parties would receive a letter declaring the bridge loan in default. Ruffin told the Oliphant Parties that Greystone had been talking to Henry about terms upon which Henry would take over the Oliphant Parties' deal.

101.    The default letter was dated August 21, 2007. In it, Greystone CDE did not claim the loan was in financial default, because it was not. Instead, the letter cited default as being the expiration of the close date for the purchase and sale of the Apartment Building, without that date having been extended. Of course, it was Greystone's unilateral act of withdrawing the HUD application that had made negotiations to extend the close date difficult in the first place. (The letter also specified a variety of supposed "defaults" that were inaccurate, were not defaults, or had previously been waived by Greystone.)

102.    Over the next several days, Greystone pressured the Oliphant Parties to assign all interest in the Project to Henry with Mr. Oliphant assuming responsibility to pay more than $200,000 of the bridge loan and agreeing not to sue Greystone for its malfeasance in handling the HUD application. The terms of such a proposed "assignment agreement and covenant not to sue" were financially unacceptable to the Oliphant Parties.

103.    Although Greystone's unilateral withdrawal of the HUD application had made negotiations with the seller of the Apartment Building difficult, the Oliphant Parties nonetheless were able to obtain another agreement to extend the close date. On September 11, 2007, the Oliphant Parties notified Greystone of this development, showed Greystone the document that verified the extension, and requested that the Greystone default notice be rescinded.

104.    In a telephone conference on September 14, 2007, Greystone refused to rescind the default notice, claiming the bridge loan was still in default because there was (Greystone representatives claimed) no tax credit syndicator. In fact, however, the bridge loan was not in default for that reason. First of all, Greystone had waived this condition in April 2007 when the initial tax credit syndicator withdrew from the deal. Moreover, the Oliphant Parties had obtained a commitment from a successor tax credit syndicator in June 2007 that, at the time of the September 14 telephone conference, was still in effect and had not been withdrawn.

105.    By letter dated September 21, 2007, Greystone CDE notified the Oliphant Parties that it was accelerating the bridge loan and declaring all amounts due under the bridge loan note immediately due and payable.

### Greystone Exacerbates Its Wrongdoing and Further Undercuts The Oliphant Parties' Ability To Develop the Project By Disparaging the Oliphant Parties to the Financial Community

106.    On October 29, 2007, Greystone Servicing caused a letter (the "October 29 Letter") to be delivered to the Oklahoma County Finance Authority, the government entity who issued the tax-exempt bonds for the Project. The letter specifically referenced the tax-exempt bond issue that had been sold for the Project in December 2006.  The October 29 letter contained a statement that "the borrower's contract for the purchase of the Santa Fe Apartments project expired without being extended," and that this led to "a default under the bridge loan documents" resulting in litigation "in Federal Court in New York." The October 29 Letter omitted any mention that the Oliphant Parties had extended the contract, and was artfully drafted to create the impression the Oliphant Parties had unilaterally defaulted, the Project was dead, and Greystone had filed a collection against the Oliphant Parties. A copy of Greystone's complaint

in this action (the "New York Complaint") was included with the October 29 Letter (purportedly for the recipient's "information"), yet no mention was made of the fact that the Oliphant Parties had filed, over a month earlier, a lawsuit in California seeking damages for Greystone's malfeasance in handling the Oliphant Parties' HUD application.

107.    The effect of the October 29 Letter and accompanying New York Complaint was to gratuitously publish the disputed, objectionable and scandalous matter in the New York Complaint before the Oliphant Parties even had an opportunity to respond to those statements.

108.    In addition to the Oklahoma County Finance Authority, Greystone Servicing delivered the October 29 Letter and the accompanying New York Complaint to the following:

> Standard & Poor's
> (dominent bond-rating institution)
>
> Bank of Oklahoma, N.A.
> (trustee for the tax-exempt bond issue)
>
> Floyd Law Firm, P.C. of Norman, Oklahoma
> (outside counsel for Oklahoma County Finance Authority)
>
> Siebert Brandford Shank
> (investment bank and underwriter for the tax-exempt bond issue)
>
> Eichner & Norris PLLC of Washington, DC
> (outside counsel for Siebert Brandford Shank)
>
> ImageMaster, Inc. of Ann Arbor, Michigan
> (commercial printing company for bond issuance)
>
> Shawn Smith and Smith Real Estate Development, Inc. of Edmond, Oklahoma
> (Oliphant's local tax credit real estate professional)

109.    The October 29 Letter and accompanying New York Complaint were designed to, and did, interfere with the Oliphant Parties' ability to successfully complete the financing, rehabilitation and development of the Project.  For example:

G. By delivering the materials to Standard & Poors, Greystone intended to, and did, expose the tax-exempt bonds issued and sold for the Project to a significant risk of being downgraded or de-rated, which would cause the interest rate to increase, thus making it more difficult and more costly, and potentially impossible, to complete the Project.

H. By delivering the materials to the Bank of Oklahoma, N.A., the bond trustee, Greystone intended to, and did, damage the marketability of the tax-exempt bonds.

I. By delivering the materials to the Department of Housing and Urban Development ("HUD"), Greystone jeopardized completion of the Project because HUD could decline to insure the loan in the face of such incomplete, misleading, and disparaging statements about the Oliphant Parties.

110. The delivery of the October 29 Letter and accompanying New York Complaint was malicious, highly detrimental to the Oliphant Parties' reputation and business esteem, and was intended to prevent the Oliphant Parties from completing the Project and/or from mitigating damages occasioned by Greystone's conduct.

## FIRST CLAIM FOR RELIEF
### (Negligence)

111. The Oliphant Parties incorporate the allegations of Paragraphs 1 through 110 as if fully restated herein.

112. Greystone owed the Oliphant Parties a duty of due care by virtue of the business relationship established through the Engagement Agreement by which the Oliphant Parties

appointed Greystone Servicing to serve as its exclusive agent to process the HUD application for financing the acquisition and rehabilitation of the Project.

113.    Greystone owed the Oliphant Parties a duty of due care by virtue of Greystone Servicing's position as a HUD-approved underwriter for the FHA's Multifamily Accelerated Processing (MAP) program and the respective roles and involvements of the Oliphant Parties in the Project.

114.    Greystone owed the Oliphant Parties a duty to use such skill, prudence and diligence as other HUD-approved underwriters for the FHA's Multifamily Accelerated Processing (MAP) program commonly possess and exercise.

115.    Greystone breached its duties of due care owed to the Oliphant Parties as to the Project and the HUD financing. The breaches of Greystone, which are ongoing, include, but are not limited to, failing to expedite processing, preparation and submission of the HUD application, causing delay in the processing, preparation and submission of the HUD application, making and publishing unsolicited, unprivileged, and derogatory statements about the Oliphant Parties and the Project to HUD representatives and others, changing the terms of the bridge financing, withdrawing the HUD application without prior notice to or consent by the Oliphant Parties, demanding priority for the bridge loan to which it was not entitled, negotiating directly with Henry under terms that cut the Oliphant Parties out of the deal, and by attempting to force the Oliphant Parties to transfer its prospective financial and non-economic gain in the Project to Henry.

116.    As a direct and legal result of Greystone's breaches of duties of due care owed to the Oliphant Parties, the Oliphant Parties have been damaged and injured in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty / Constructive Fraud)

117.    The Oliphant Parties incorporate the allegations of Paragraphs 1 through 116 as if fully restated herein.

118.    Greystone stands in a confidential and fiduciary relationship with the Oliphant Parties by virtue of the trust and confidence the Oliphant Parties reposed in Greystone through the Engagement Agreement, the business relationship, and Greystone's position as a HUD-approved underwriter for the FHA's Multifamily Accelerated Processing (MAP) program.

119.    Greystone breached its fiduciary duties to the Oliphant Parties by failing to expedite processing, preparation and submission of the HUD application, by causing delay in the processing, preparation and submission of the HUD application, by making unsolicited derogatory statements about the Oliphant Parties and the Project to HUD representatives and others, by changing the terms of the bridge financing, by withdrawing the HUD application without prior notice to or consent by the Oliphant Parties, by demanding priority for the bridge loan to which they were not entitled, by negotiating directly with Henry under terms that cut the Oliphant Parties out of the deal, and by attempting to force the Oliphant Parties to transfer their prospective financial and non-economic gain in the Project to Henry.  These breaches of fiduciary duties are continuing.

120.    The Oliphant Parties were prejudiced by the foregoing breaches of duty in that they advanced funds and expended time and energy and incurred obligations in connection with the Project. The Oliphant Parties stand to be further prejudiced by risking loss of prospective financial and non-economic gain from the Project.

121.    As a direct and legal result of the conduct of Greystone, the Oliphant Parties have been damaged and injured in an amount to be proven at trial.

122.    The conduct of Greystone was fraudulent, malicious and oppressive, and done for the specific purpose of interfering with the Oliphant Parties' efforts to complete the project and/or gaining control over the Oliphant Parties' monies and/or opportunities for Greystone's own use and benefit. Greystone also displayed reckless indifference to the Oliphant Parties as to the conduct alleged. The Oliphant Parties should recover punitive damages, in addition to actual damages, to make an example of and to punish Greystone.

### THIRD CLAIM FOR RELIEF
**(Intentional Interference with Prospective Economic Advantage)**

123.    The Oliphant Parties incorporate the allegations of Paragraphs 1 through 122 as if fully restated herein.

124.    At all times material, the Oliphant Parties had an existing business relationship with the seller of the Apartment Building and with the HUD office in Oklahoma City.

125.    At all times material, the Oliphant Parties had a probability of future economic benefit from successful completion of the financing, rehabilitation and development of the Project.

126.    The past and continuing conduct of Greystone disrupted, delayed and interfered with the Oliphant Parties' prospective economic advantage and was wrongful in that Greystone delayed and failed to expedite the HUD application, changed terms of the deal at the last minute, and breached fiduciary duties to the Oliphant Parties. This conduct was substantially certain to result in interference with the Oliphant Parties' prospective economic advantage in the Project. Greystone knew of the Oliphant Parties' business relationship and prospective economic advantage.

127.    As a direct and legal result of the conduct of Greystone, the Oliphant Parties have been and continue to be damaged and injured in an amount to be proven at trial.

128.    But for the disruption, delay and interference of Greystone, it is reasonably probable that the Oliphant Parties would have realized the anticipated prospective economic advantage from the Project.

129.    The conduct of Greystone was fraudulent, malicious and oppressive in that Greystone was guilty of reckless indifference towards the Oliphant Parties, acted willfully and knowingly in the manner in which it torpedoed the Project and the Oliphant Parties' HUD application and the tax-exempt bond issue, undertook separate negotiations with Henry to cut out the Oliphant Parties, and maliciously transmitted inaccurate and misleading disparaging material about the Oliphant Parties as described above. The Oliphant Parties should recover punitive damages, in addition to actual damages, to make an example of and to punish Greystone.

### FOURTH CLAIM FOR RELIEF
**(Negligent Interference with Prospective Economic Advantage)**

130.    The Oliphant Parties incorporate the allegations of Paragraphs 1 through 129 as if fully restated herein.

131.    At all times material, Greystone owed the Oliphant Parties a duty of due care as alleged above.

132.    Greystone breached that duty by wrongfully disrupting, delaying and interfering with the Oliphant Parties' prospective economic advantage, in delaying and failing to expedite the HUD application, changing terms of the deal at the last minute, breaching their fiduciary duties to the Oliphant Parties, and maligning the Oliphant Parties and the Project to the Oklahoma County Finance Authority and others, as described above.

133.    The conduct of Greystone in disrupting, delaying and interfering with the Oliphant Parties' opportunity to complete the Project, did and continues to foreseeably disrupt and interfere with the Oliphant Parties' prospective economic advantage in the Project. As a

direct and legal result of such conduct the Oliphant Parties have been damaged and injured in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Anticipatory Breach)

134.    The Oliphant Parties incorporate the allegations of Paragraphs 1 through 133 as if fully restated.

135.    The Oliphant Parties and Greystone entered into a series of written agreements (including but not limited to the Engagement Agreement) to accomplish the financing for the acquisition and rehabilitation of the Project.

136.    Greystone has expressly and unequivocally repudiated those contracts by stating that it will not further perform, by stating that it is "out" of the deal unless the Oliphant Parties provides proofs and assurances to which Greystone is not entitled, by refusing to rescind the August 21 notice of default, and by sending the September 18 notice of acceleration.

137.    The Oliphant Parties are ready, willing and able to perform under the agreements but for Greystone's repudiation and anticipatory breach.

138.    As a direct and legal result of the breaches of Greystone, the Oliphant Parties have been damaged and injured in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

139.    The Oliphant Parties incorporate the allegations of Paragraphs 1 through 138 as if fully restated.

140.    The Oliphant Parties and Greystone entered into a series of written agreements (including but not limited to the Engagement Agreement) to accomplish the financing for the acquisition and rehabilitation of the Project.  Inherent in those agreements is an implied covenant

of good faith and fair dealing by each party not to do anything that will deprive the other party of the benefits of the contract.

141.   Greystone breached the implied covenants of good faith and fair dealing by interfering as alleged above and by failing to cooperate with the Oliphant Parties in the performance of the agreements.

142.   As a direct and legal result of the breaches of Greystone, the Oliphant Parties have been damaged and injured in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
**(Declaratory Relief)**

143.   The Oliphant Parties incorporate the allegations of Paragraphs 1 through 142 as if fully restated herein.

144.   An actual controversy now exists between the Oliphant Parties and Greystone about their respective legal rights, duties and obligations under the bridge loan, the guarantees and the other agreements. Greystone claims the bridge loan is in default and it has accelerated maturity of the bridge loan. The Oliphant Parties dispute that the bridge loan is in default or has been accelerated.

145.   The Oliphant Parties desire a judicial determination and declaration of the parties' respective rights, duties and obligations as to (a) whether the bridge loan is in default and (b) whether maturity of the bridge loan has been accelerated. In addition, the Oliphant Parties desire a judicial determination and declaration as to whether any payment is currently due and payable from the Oliphant Parties on the bridge loan, the guarantees and/or the related agreements and, if so, the amount thereof.

146.   The Oliphant Parties claim an offset against any amounts due Greystone under the bridge loan, the guarantees and the related agreements by reason of the Oliphant Parties' claims

for damages. Accordingly, the Oliphant Parties seek a judicial determination and declaration as to (a) whether the Oliphant Parties are entitled to offset any damages against any amounts due Greystone under the bridge loan, the guarantees and the related agreements and, if so, the amount of offset, and (b) whether any sum is currently due and payable on the bridge loan, the guarantees and/or the related agreements and, if so, the amount thereof.

*[Remainder of Page Intentionally Left Blank]*

## PRAYER FOR RELIEF

**WHEREFORE,** the Defendants and Counterclaimants request judgment dismissing the Amended Complaint with prejudice, together with an award of costs and reasonable attorneys' fees in defending against Plaintiff's claims, and further demands judgment on its Counterclaims against Counterclaim Defendant Greystone CDE, LLC and Additional Counterclaim Defendant Greystone Servicing Corporation, Inc. as follows:

For general damages, according to proof;

      A.    For general damages, according to proof;

      B.    For compensatory damages, according to proof;

      C.    For punitive and exemplary damages;

      D.    For any statutory damages or penalties available under statute;

      E.    For a judicial determination and declaration of the parties' respective rights, duties and obligations as to (1) whether the bridge loan is in default, (2) whether maturity of the bridge loan has been accelerated, (3) whether any payment is currently due and payable from Oliphant on the bridge loan, the guarantees and/or the related agreements and, if so, the amount thereof, (4) whether Oliphant is entitled to offset any damages against any amounts due any of Greystone under the bridge loan, the guarantees and the related agreements and, if so, the amount of offset, and (5) whether any sum is currently due and payable on the bridge loan, the guarantees and/or the related agreements and, if so, the amount thereof;

      F.    For reasonable attorney's fees;

      G.    For costs of suit; and

      H.    For such other and further relief as the Court deems just or proper.

Dated:  New York, New York
        March 3, 2008

                                Respectfully submitted,

                                AKERMAN SENTERFITT LLP

                                By: _____
                                       Donald N. David (DD 5222)
                                       Brian A. Bloom  (BB 5722)
                                       Jeremy Shure    (JS 0490)

                                335 Madison Avenue, 26th Floor
                                New York, New York 10017-4636
                                Telephone:  (212) 880-3800

                                *Attorneys for Defendants and Counterclaimants*