# COMPENDIUM OF UNREPORTED CASES

AS CITED IN DEFENDANT/COUNTERCLAIMANT'S
MEMORANDUM OF LAW IN OPPOSITION TO GREYSTONE'S MTION FOR
SUMMARY JUDGMENT AND TO DISMISS COUNTERCLAIMS

PART 2 OF 4

Westlaw.

--- F.Supp.2d ----                                                                                                    Page 1
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

F.T.C. v. Medical Billers Network, Inc.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
FEDERAL TRADE COMMISSION, Plaintiff,
v.
MEDICAL BILLERS NETWORK, INC., et al.,
Defendants.
**No. 05 Civ.2014(RJH).**

March 31, 2008.

**Background:** Federal Trade Commission brought
action against company that solicited work-at-home
medical billing opportunities, its president, tele-
marketing company and its president, alleging viol-
ation of the Federal Trade Commission Act (FTCA)
and the Telemarketing Sales Rule. Cross-motions
for summary judgment were filed.

**Holdings:** The District Court, Richard J. Holwell,
J., held that:
(1) genuine issue of material fact precluded sum-
mary judgment on issue of FTCA violation;
(2) misrepresentations by companies and individu-
als about their relationship with doctors on Medi-
care list were material;
(3) failure of companies and individuals to disclose
additional "one-time" fee required before purchaser
would be allowed to submit bills to clearinghouse
for processing was deceptive telemarketing act or
practice in violation of Telemarketing Sales Rule;
(4) failure to disclose no refund policy prior to ac-
cepting payment from purchasers violated Tele-
marketing Sales Rule and FTCA;
(5) work-at-home company was liable for violations
of FTCA resulting from representations made by
telemarketing company; and
(6) president of work-at-home company could be
held personally liable for company's acts in viola-
tion of FTCA.

Plaintiff's motion granted in part and denied in part;

defendants' motion granted in part and denied in part.

**[1] Evidence 157 ☞0**

157 Evidence
Printout of website showing graphs of salary data
for medical billers in the United States was hearsay,
and thus inadmissible on summary judgment to
show that medical billers in fact earned those salar-
ies in Federal Trade Commission's action against
president of telemarketing company that solicited
work-at-home medical billing opportunities. Feder-
al Trade Commission Act, § 5(a), 15 U.S.C.A. §
45(a).

**[2] Federal Civil Procedure 170A ☞0**

170A Federal Civil Procedure
President of company that marketed work-at-home
medical billing opportunities, proceeding pro se,
made effort to respond to Federal Trade Commis-
sion's (FTC) motion for summary judgment in ac-
tion alleging that company's sales practices violated
Federal Trade Commission Act, although president
failed to adhere to local rules for pro se litigants,
and thus district court would consider totality of
parties' submissions, rather than deeming as admit-
ted all factual averments made by FTC against
president. Fed.Rules Civ.Proc.Rule 56(e), 28
U.S.C.A.

**[3] Federal Civil Procedure 170A ☞0**

170A Federal Civil Procedure
A court should interpret a pro se litigant's papers
liberally, and interpret them to raise the strongest
arguments that they suggest.

**[4] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
To prove a deceptive act or practice under Federal
Trade Commission Act, three elements must be
shown: (1) a representation, omission, or practice,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3), that the representation, omission, or practice is material. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

**[5] Antitrust and Trade Regulation 29T ⬤⟿0**

29T Antitrust and Trade Regulation
The Federal Trade Commission Act is violated if the first contact with consumer is secured by deception even though the true facts are made known to the buyer before he enters into the contract of purchase; it is not required that the deception have been made in bad faith or with intent to deceive. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

**[6] Antitrust and Trade Regulation 29T ⬤⟿0**

29T Antitrust and Trade Regulation
A court determining whether violation of Federal Trade Commission Act occurred should focus on the overall impression created by the advertising, not its literal truth or falsity. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

**[7] Antitrust and Trade Regulation 29T ⬤⟿0**

29T Antitrust and Trade Regulation
The failure to disclose material information may cause an advertisement to be false or deceptive even though it does not state false facts. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

**[8] Antitrust and Trade Regulation 29T ⬤⟿0**

29T Antitrust and Trade Regulation
When determining whether violation of Federal Trade Commission Act occurred, each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information; the alleged misrepresentations should be evaluated as a whole without emphasizing isolated words or phrases apart from their context. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. §

45(a)(1).

**[9] Antitrust and Trade Regulation 29T ⬤⟿0**

29T Antitrust and Trade Regulation
A claim is considered material under Federal Trade Commission Act if it involves information important to consumers and, hence, is likely to affect their choice of, or conduct regarding a product. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

**[10] Antitrust and Trade Regulation 29T ⬤⟿0**

29T Antitrust and Trade Regulation
Express representations that are shown to be false are presumed material under Federal Trade Commission Act. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

**[11] Evidence 157 ⬤⟿0**

157 Evidence
No foundational testimony is required in order to admit evidence under hearsay exception for records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report. Fed.Rules Evid.Rule 803(8), 28 U.S.C.A.

**[12] Evidence 157 ⬤⟿0**

157 Evidence
In order to fit within the purview of hearsay exception for records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, the evidence must (1) contain factual findings, and (2) be based upon an investigation made pursuant to legal authority. Fed.Rules Evid.Rule 803(8)(C), 28 U.S.C.A.

**[13] Evidence 157 ⬤⟿0**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

157 Evidence
Once a party has shown that a set of factual findings satisfies the minimum requirements of hearsay exception for records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, the admissibility of such factual findings is presumed, and the burden to show 'a lack of trustworthiness' then shifts to the party opposing admission. Fed.Rules Evid.Rule 803(8)(C), 28 U.S.C.A.

**[14] Antitrust and Trade Regulation 29T** ⟜0

29T Antitrust and Trade Regulation
Misrepresentations regarding expected income from a business opportunity are material for purposes of a violation of Federal Trade Commission Act. Federal Trade Commission Act, § 5(a), 15 U.S.C.A. § 45(a).

**[15] Federal Civil Procedure 170A** ⟜0

170A Federal Civil Procedure
Genuine issue of material fact existed regarding whether purchasers of work-at-home medical billing opportunities earned income, precluding summary judgment on issue of violation of Federal Trade Commission Act in Federal Trade Commission's action against company that solicited work-at-home medical billing opportunities, its president and its marketing company. Federal Trade Commission Act, § 5(a), 15 U.S.C.A. § 45(a).

**[16] Antitrust and Trade Regulation 29T** ⟜0

29T Antitrust and Trade Regulation
Misrepresentations by companies and individuals in business of soliciting work-at-home medical billing opportunities about their relationship with doctors on Medicare list were material, for purposes of Federal Trade Commission's (FTC) action against companies and individuals alleging violation of FTC Act and Telemarketing Sales Rule; belief that de-

fendants were already working with large number of doctors in the process of converting to electronic billing to become "compliant" with non-existent Medicare requirements would significantly reduce perceived risk of purchase, and ease with which a purchaser would be able to connect with doctor's office willing to use purchaser's services would influence consumer's decision whether or not to purchase program. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1); 16 C.F.R. § 310.3(4)(b).

**[17] Antitrust and Trade Regulation 29T** ⟜0

29T Antitrust and Trade Regulation
Evidence that some customers actually misunderstood the thrust of the message is significant support for the finding of a tendency to mislead, for purposes of a violation of Federal Trade Commission Act. Federal Trade Commission Act, § 5(a)(1), 15 U.S.C.A. § 45(a)(1).

**[18] Federal Civil Procedure 170A** ⟜0

170A Federal Civil Procedure
Company that solicited work-at-home medical billing opportunities and its president raised argument that rule governing pleading fraud or mistake did not permit Federal Trade Commission to assert nondisclosure of additional costs and requirements for work-at-home opportunities as grounds for violation of Telemarketing Sales Rule for the first time in their reply brief, and thus district court would not consider it. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[19] Antitrust and Trade Regulation 29T** ⟜0

29T Antitrust and Trade Regulation
Failure of companies and individuals marketing work-at-home medical billing opportunities to disclose additional "one-time" fee required before purchaser would be allowed to submit bills to clearinghouse for processing was deceptive telemarketing act or practice in violation of Telemarketing Sales Rule and Federal Trade Commission Act. Federal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

Trade Commission Act, § 5(a), 15 U.S.C.A. § 45(a); 16 C.F.R. § 310.3(a)(2) (iii).

**[20] Federal Civil Procedure 170A ⟳0**

170A Federal Civil Procedure
Genuine issue of material fact existed regarding whether representations by company that solicited work-at-home medical billing opportunities implied that purchasers would have no costs for supplies, precluding summary judgment on Federal Trade Commissions claims against company and its president and marketer that defendants violated Telemarketing Sales Rule based on alleged hidden costs. Federal Trade Commission Act, § 5(a), 15 U.S.C.A. § 45(a)16 C.F.R. § 310.3(a)(2) (iii).

**[21] Federal Civil Procedure 170A ⟳0**

170A Federal Civil Procedure
Summary judgment declaration of single purchaser of work-at-home medical billing opportunity who complained that online training required him to pass two online tests when he expected only one was insufficient to show any express or implied representation made by companies and individuals marketing work-from-home medical billing opportunities regarding requirements associated with program training, in Federal Trade Commission's action against companies and individuals alleging violation of Telemarketing Sales Rule. Federal Trade Commission Act, § 5(a), 15 U.S.C.A. § 45(a)16 C.F.R. § 310.3(a)(2) (iii).

**[22] Antitrust and Trade Regulation 29T ⟳0**

29T Antitrust and Trade Regulation
Failure of companies and individuals marketing work-at-home medical billing opportunities to disclose no refund policy prior to accepting payment from purchasers violated Telemarketing Sales Rule and Federal Trade Commission Act. Federal Trade Commission Act, § 5(a), 15 U.S.C.A. § 45(a); 16 C.F.R. § 310.3(a) (1)(iii).

**[23] Antitrust and Trade Regulation 29T ⟳0**

29T Antitrust and Trade Regulation
In the context of a credit card transaction, a customer "pays" when he provides his credit card information and authorizes the vendor to charge it.

**[24] Administrative Law and Procedure 15A ⟳0**

15A Administrative Law and Procedure
An agency's interpretation of its own regulations is entitled to great deference.

**[25] Principal and Agent 308 ⟳0**

308 Principal and Agent
The law is clear that under the Federal Trade Commission Act, a principal is liable for misrepresentations made by his/her agents, those with the actual or apparent authority to make such representations, regardless of the unsuccessful efforts of the principal to prevent such misrepresentations.

**[26] Principal and Agent 308 ⟳0**

308 Principal and Agent
Telemarketing company had actual and apparent authority to make representations on behalf of company soliciting work-at-home medical billing opportunities, and thus work-at-home company was liable for violations of Federal Trade Commission Act resulting from representations made by telemarketing company as telemarketer of the work-at-home program; president of work-at-home company created telemarketing sales script and provided it to telemarketing company, sales script indicated telemarketer was calling from work-at-home company rather than telemarketing company, and purchasers believed they were speaking with representative of work-at-home company rather than telemarketing company. Federal Trade Commission Act, § 5(a), 15 U.S.C.A. § 45(a).

**[27] Corporations 101 ⟳0**

101 Corporations
Individual defendants may be liable for corporate acts or practices if they (1) participated in the acts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

or had authority to control the corporate defendant and (2) knew of the acts or practices.

**[28] Corporations 101 ☞0**

101 Corporations
Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.

**[29] Corporations 101 ☞0**

101 Corporations
The knowledge requirement for individual liability for corporate acts is satisfied by actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.

**[30] Corporations 101 ☞0**

101 Corporations
An individual's degree of participation in business affairs is probative of knowledge.

**[31] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
The Federal Trade Commission (FTC) is not required to show that a defendant intended to defraud consumers in order to hold that individual personally liable for violation of FTC Act.

**[32] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
Because of the knowledge requirement for individual liability under Federal Trade Commission (FTC) Act, a defendant's good-faith belief in the truth of a representation, while not relevant to the question of whether the representation violates the FTC Act, may be relevant to whether that defendant can be held individually liable for these misrepresentations.

**[33] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
President of company that solicited work-at-home medical billing opportunities could be held personally liable for company's acts in violation of Federal Trade Commission Act; president was chief executive officer, sole director, and sole shareholder of company, he was designer and draftsman of program and materials used to market program, including sales script, he required telemarketing company and all sales representatives to sign compliance agreement requiring them to represent product according to his policies, he structured marketing and registration for program so that purchasers were not provided with registration agreement, which contained additional disclosures and refund policy, until after they had provided credit card information, and he placed advertisements and telemarketed on behalf of company. Federal Trade Commission Act, § 5(a), 15 U.S.C.A. § 45(a).

**[34] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
President of telemarketing company that solicited work-at-home medical billing opportunities could be held personally liable for company's violation of Federal Trade Commission Act; president had authority to control telemarketing company, and president had knowledge of the falsity of representations regarding doctor contacts provided by program and regarding program's no-refund policy.

**[35] Federal Civil Procedure 170A ☞0**

170A Federal Civil Procedure
Genuine issue of material fact existed regarding whether president of telemarketing company knew work-at-home medical billing opportunities required purchaser to pay additional fee to submit claims, precluding summary judgment on issue of president's individual liability for violations of Federal Trade Commissions Act regarding additional costs.

**[36] Injunction 212 ☞0**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

212 Injunction
Permanent injunction was warranted in Federal Trade Commission's action against company that solicited work-at-home medical billing opportunities, its president, telemarketing company and its president, although parameters of such injunction could not be determined on summary judgment, where defendants knowingly made misrepresentations to consumers for years and a large number of consumers purchased program based on misrepresentations, and defendants continued to insist that their representations were true, and ignored obvious impressions that they actually conveyed to consumers. Federal Trade Commission Act, § 13(b), 15 U.S.C.A. § 53(b).

**[37] Injunction 212 ☞0**

212 Injunction
Permanent injunctive relief is appropriate when there is a some cognizable danger of recurring violation.

**[38] Injunction 212 ☞0**

212 Injunction
Some factors to consider in determining whether a danger of recurring violation exists, as would warrant permanent injunction, include: the defendants' scienter, whether the conduct was isolated or recurrent, whether defendants are positioned to commit future violations, the degree of consumer harm caused by defendants, defendants' recognition of their culpability, and the sincerity of defendants' assurances, if any, against future violations.

**[39] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
While consumer reliance need not be established in order to issue a permanent injunction, the Federal Trade Commission (FTC) must make such a showing before a court may order restitution under FTC Act. Federal Trade Commission Act, § 13(b), 15 U.S.C.A. § 53(b).

**[40] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
The Federal Trade Commission (FTC) satisfies its burden of establishing consumer reliance for restitution under FTC Act by showing that (1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products. Federal Trade Commission Act, § 13(b), 15 U.S.C.A. § 53(b).

**[41] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
It is initially the Federal Trade Commission's (FTC's) burden to provide a reasonable approximation of unjust gains when determining restitution under FTC Act; if the FTC shows that its calculations reasonably approximated the amount of the defendant's unjust gains the burden shifts to the defendants to show that those figures were inaccurate. Federal Trade Commission Act, § 13(b), 15 U.S.C.A. § 53(b).

### MEMORANDUM ORDER AND OPINION

RICHARD J. HOLWELL, District Judge.
*1 This is an action brought by the Federal Trade Commission ("FTC") against defendants Medical Billers Network ("MBN"), Chris Taylor ("Taylor"), Caceres Quality Distribution, Inc. ("CQD"), Wilson Jose Caceres ("Caceres") (collectively "Defendants") and relief defendant Knarek Kalantaryan ("Kalantaryan") for allegedly deceptive representations regarding "work-at-home medical billing opportunities" promoted and sold by Defendants. The FTC alleges that Defendants' advertising and sales practices violated Section 5(a) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45(a), and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

The FTC's Amended Complaint includes four causes of action. Counts I and II assert violations of Section 5(a) of the FTC Act based on Defendants' alleged misrepresentations that purchasers of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

MBN medical billing opportunity (the "MBN Program") were "likely to earn a substantial income" (Count I) (Am.Compl.¶ 17) and that purchasers would receive information regarding physicians who were likely to use the purchasers for medical billing (Count II) (*id.* at ¶ 20). Counts III and IV assert violations of the TSR based on Defendants' alleged misrepresentations regarding "material aspects" of the MBN Program (Count III) (*id.* at ¶ 28) and Defendants' failure to disclose MBN's no-refund policy to purchasers prior to payment (Count IV) (*id.* at ¶ 29).

The FTC and defendants Taylor and MBN (the "Taylor Defendants") have filed cross-motions for summary judgment. The Court's review of the record, guided by the parties' Rule 56.1 statements and responses, shows that the following facts are both undisputed and adequately supported by evidence the Court may consider in connection with a motion for summary judgment.[FN1]

### FACTS

#### I. Parties and Background

MBN and CQD promoted and sold work-at-home medical billing opportunities. (Pl.'s Rule 56.1 Statement of Material Facts Not in Dispute on Mot. for Summ. J. ("FTC Facts") ¶¶ 10, 11.) Taylor is the president, chief executive officer, sole director, and sole shareholder of MBN, and the registrant of MBN's website. (*Id.* at ¶¶ 4, 12, 14, 15, 16; Taylor Defs.' Statement of Material Facts in Dispute in Resp. to Pl.'s Mot. for Summ. J. ("Taylor Defs.' Disputed Facts")[FN2] ¶ 21.)

Taylor was the designer and draftsman of the MBN program and the materials used by MBN to market the program to the public. (Taylor Defs.' Disputed Facts ¶ 22.) The program and materials were a result of extensive research and analysis, including research regarding laws governing medical billing and research regarding the "laws and facts" surrounding prior FTC actions against medical billing

companies and other companies that sold business opportunities. (*Id.* at ¶¶ 33, 34, 42, 44, 91.)Taylor also researched the earnings potential of medical billers by consulting available statistics and people familiar with the industry. (*Id.* at ¶¶ 43, 69, 70, 71, 72, 81, 82, 87.)Taylor concluded from his research that the Health Insurance Portability and Accountability Act ("HIPAA") made it beneficial for a physician to file Medicare claims electronically and that any provider still filing paper claims would be motivated to do so. (*Id.* at ¶ 70.)Taylor believed and continues to believe that all of MBN's practices were legal. (*Id.* at ¶¶ 31, 45, 46, 86.)

*2 Since at least 2001, Defendants offered and sold medical billing employment opportunities to consumers. (Caceres Resp. to Pl.'s Rule 56.1 Statement ("Caceres Resp.") ¶ 25; Am. Answer ¶ 6.) In 2002, Caceres was hired by Taylor to sell the MBN Program. (Caceres Resp. ¶ 19.) Later, in 2002 or 2003, Caceres started a corporation named CQD; Taylor and MBN contracted with CQD to handle telemarketing for the MBN Program. (*Id.* at ¶¶ 6, 97; Taylor Defs.' Resp. to Pl.'s Statement of Material Facts Not in Dispute in Supp. of Plaintiff's Mot. for Summ. J. ("Taylor Defs.' Resp.")[FN3] ¶ 99; FTC Exs. in Supp. of Mot. for Summ. J. ("FTJ SJ") Ex. 1 at 263:23-266:2; Aff. of Daniel A. Zimmerman, May 25, 2007 ("Zimmerman Aff.") Ex. 94 at 52:3-53:11.) Caceres was the president, secretary, treasurer, sole director, and principal owner of CQD. (FTC Facts ¶¶ 13, 20; Caceres Resp. ¶¶ 13, 20; FTC Exs. in Supp. of TRO ("FTC TRO") Ex. 1 Att. B 7-8.) He used his own credit cards to provide startup capital for the company and was actively involved in its day-to-day operation. (Caceres Resp. ¶¶ 13, 100, 101.) [FN4]CQD was listed on purchasers' credit card statements as the entity that was paid for the purchase of the MBN Program. (*Id.* at ¶ 22.)

Caceres characterized his business relationship with Taylor by saying "it was [Taylor's] program and ... verbiage and my job [ ] was to sell it."(FTC Facts ¶ 99.) Caceres's role in the MBN-CQD relationship was to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

Page 8

advertise and market the MBN Program, generate leads, and pay for customer service and phone bills.(*Id.* at ¶¶ 98, 99.)He also hired commissioned salespeople to do telemarketing for CQD. (*Id.* at ¶ 103.)Taylor occasionally asked Caceres to hire employees for CQD. (*Id.* at ¶ 102.)

CQD paid MBN between $25 and $40 for each sale. (*Id.* at ¶¶ 118, 125.)Payments were made by electronic transfer directly into the personal checking account of relief defendant Kalantaryan, Taylor's wife. (*Id.* at ¶ 1 24.)Kalantaryan withdrew approximately $6,500 each month from this account as her MBN salary. (*Id.* at ¶¶ 126-127.)

In January 2005, Caceres and Taylor decided to change the name of MBN to United Career System ("UCS") because they believed UCS was a "better name." (Zimmerman Aff. Ex. 94 at 196:15-200:25; FTC Facts ¶¶ 72-75.[FN5]) While technically UCS was a d/b/a filed by Caceres on behalf of himself (Second Aff. of Christopher Taylor Identifying Exs. ("Second Taylor Aff") Ex. 76; Taylor Defs.' Resp. ¶ 72), UCS was not a distinct corporate entity-it was the exact same business as MBN and used essentially the same sales script that was used to telemarket under the MBN name. (FTC Facts ¶¶ 72-74; Zimmerman Aff. Ex. 94 at 196:15-200:22, 206:18-23, 208:2-210:4; FTC SJ Ex. 2 at Pl.'s Ex. 2, Ex. 2 at Pl.'s Ex. 6.)

Taylor testified that all sales representatives were required to sign a Compliance Agreement [FN6] which, *inter alia,* instructed them not to guarantee that purchasers would have success using the MBN program. (Taylor Defs.' Disputed Facts ¶¶ 93-96; Zimmerman Aff. Ex. 92 at 128:11-137:17.) He also testified that, on or before March 11, 2003, he created additional compliance guidelines that sales representatives were required to sign; these guidelines, *inter alia,* instructed sales representatives not to make earnings representations to consumers using specific dollar amounts. (Taylor Defs.' Disputed Facts ¶ 100; Zimmerman Aff. Ex. 92 at 169:14-179:2.) Taylor states that he intended the guidelines in these documents to comply with

the laws governing telemarketing. (Taylor Defs.' Disputed Facts ¶ 101.) The contract between Caceres and Taylor specified that Caceres was also required to follow these compliance guidelines and was not to make any changes to the sales script or rebuttals without Taylor's approval. (*Id.* at ¶ 102; Zimmerman Aff. Ex. 92 at 177:13-178:20.)

*3 Taylor conferred with customer service lead David Arnold regarding Better Business Bureau complaints to determine whether any particular CQD sales representative was violating the Compliance Agreement, but never identified any such individual. (Taylor Defs.' Disputed Facts ¶ 97; Zimmerman Aff. Ex. 92 at 127:3-130:3, 137:18-138:21.) Before CQD took over as the telemarketer for MBN, Taylor had spoken to one sales representative who had been named in two BBB complaints and informed this representative that he would be terminated if he did not adhere to the Compliance Agreement. (Taylor Defs.' Disputed Facts ¶ 98; Zimmerman Aff. Ex. 92 at 140:16-142:4.)

Taylor has testified that, after CQD took over telemarketing for MBN, approximately 20,000 sales of the MBN Program were made for prices ranging from $199 to $299. (FTC Facts ¶ 117.) In 2003, CQD totaled $2,030,018 in sales. (*Id.* at ¶ 122.)From MBN, Taylor earned $32,800 in 2001, $261,580 in 2002, $250,020 in 2003, and $220,420 in 2004. (*Id.* at ¶¶ 119-121, 123.)

## II. Defendants' Representations

### A. Earnings representations in print advertisements

Defendants typically promoted the MBN Program in classified advertisements in newspapers and other publications. (*Id.* at ¶ 26; Am. Answer ¶ 6.) The advertisements stated that consumers could earn significant income working at home processing medical claims and urged consumers to call the listed toll-free telephone number to learn more about the opportunity. (FTC Facts ¶¶ 48-50; Am. Answer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

¶ 6.) [FN7] A representative advertisement from October 2004 read: "DATA ENTRY Work from home. Flexible Hours! $$$ Great Pay! $ Personal Computer required. 1-800-913-2823 x-100."(FTC Facts ¶ 27.) While with CQD, Caceres created advertising copy for the MBN Program and placed ads like these in newspapers. (FTC Facts ¶¶ 29-30.) CQD placed advertisements in many states nationwide. (*Id.* at ¶ 28.)

During 2004, CQD ran ads that stated "DATA ENTRY Could Earn $50,000/yr.... Great Pay! ..."(Caceres Resp. ¶ 31; Taylor Defs.' Resp. ¶ 25, FTC SJ Ex. 5.) Defendants dispute the length of time for which the "$50,000/yr." ads ran, but all defendants apparently concede that they ran for at least ten days.[FN8]Caceres states that he believed in good faith that these ads were true and promptly discontinued the ads after being informed that they could not state a specific dollar amount. (Caceres Resp. ¶ 31.)

**B. Earnings representations by telemarketers**

Consumers who called the toll-free number listed in Defendants' advertisements and spoke with Defendants' salespeople were told that, for a price of between approximately $200 and $295, they would receive what they needed to get started in medical billing, including electronic medical billing training, customer support and assistance, and necessary software to do electronic billing for physicians in the consumer's local area. (FTC Facts ¶¶ 52-54; FN9 Am. Answer ¶ 7.)

*4 Taylor wrote the original sales script used to market the MBN Program to consumers. (FTC Facts ¶ 55.) Taylor testified that minor changes were made to the sales scripts over time, but that the verbiage on important points remained the same. (Ex. in Supp. of Pl.'s Reply Mem. at 108:4-109:8.) A sales script used by MBN indicated that "an average biller can process 5-15 claims per hour and an average doctor generates about 100 claims per week.... All you have to do is join Med-

ical Billers Network and agree to process your claims through our network clearinghouse."(FTC Facts ¶ 130; FTC S.T Ex. 2 at Pl.'s Ex. 1.) When Taylor himself telemarketed for MBN, he told callers who asked how much money they could earn using the MBN Program that the average doctor generates around one hundred claims per week and that the industry standard was to pay between three and ten dollars per claim. (FTC Facts ¶ 43; Zimmerman Aff. Ex, 92 at 105:11-107:23.)

As a telemarketer for MBN, Caceres read from Taylor's sales scripts, including a script of "Commonly Asked Questions." (FTC Facts ¶¶ 44-46.) The Commonly Asked Questions script included a representation that "working part-time, with one doctor, a biller processes an average of 80 to 120 claims per week. A biller makes an average of five dollars per claim, paid directly by the doctor, on a biweekly basis, $400-600 per week."(*Id.* at ¶¶ 45-46; FTC S.T Ex. 2 at Pl.'s Ex. 2.)

The UCS sales script also contained the representation that " [i]ndividual results will vary based on typing speed, but an average biller can process five to fifteen claims per hour and the current industry standard is three to five dollars per claim."(FTC Facts ¶ 76; FTC SJ Ex. 2 at Pl.'s Ex. 6.)

FTC investigator Robert Cancellaro submitted a declaration dated February 9, 2005 indicating that an MBN salesperson left a message on his answering machine that stated, "You make an average of about $400 to $600 per week" using the MBN Program. (FTC TRO Ex. 1 at ¶ 12, Ex. 1 at Att. H.) Cancellaro submitted another declaration dated September 30, 2005 which states that, in March 2005, two UCS salespersons represented to him that Medicare had given UCS a list of doctors who, due to new regulations, were "now required to input a lot of new information into their computer systems" and that there was money to be made processing these doctors' claims electronically. (FTC Facts ¶ 131; Decl. of Robert Cancellaro, Sept. 30, 2005 ("Sept.2005 Cancellaro Decl.") ¶¶ 5 , 11.) According to Cancellaro, one representative stated that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

average person makes approximately three to five dollars per claim and processes approximately one hundred claims in ten to fifteen hours (Sept.2005 Cancellaro Decl. ¶ 6), and the other stated that the average person makes five dollars per claims and processes five to fifteen claims per hour (*id.* at ¶ 12).

Six purchasers submitted sworn declarations stating that Defendants' salespeople made representations indicating that purchasers would earn or could expect to earn $500 per week (FTC TRO Ex. 2, Ex. 3, Ex. 14, Ex. 16, Ex. 20) or more (*id.*Ex. 3, Ex. 12, Ex. 14). (FTC Facts ¶¶ 32-33.) Five other purchasers submitted declarations reporting similar representations regarding earnings. (FTC TRO Ex. 4 ¶ 6 (describing representation that "in a very short period of time [declarant] would be processing medical claims from home and making a good income"), Ex. 6 ¶ 4 (describing representation that purchaser could make $500 in a 20 hour work week), Ex. 9 ¶ 6 (describing representation that purchaser could make "a good deal of money" using the MBN Program and could process 100-120 claims at $5 each per week), Ex. 13 ¶ 6 (describing representation that "it was very easy to make a lot of money from home"), Ex. 15 ¶¶ 5, 7 (describing representation of two MBN representatives that they were earning $500 per week using the MBN Program)).[FN10]

### C. Representations by telemarketers regarding physician leads

**\*5** The MBN sales script instructed salespersons to tell consumers that "Medicare has just provided us a list of over 150,000 doctors who are still filing their insurance claims on paper. We are in the process of converting these doctors to electronic filing so they will be in compliance with the new Medicare requirements."(FTC Facts ¶ 58; FTC SJ Ex. 2 at 29:5-31:21, Ex. 2 at Pl.'s Ex. 1.) [FN11] The UCS sales script changed this wording slightly to "Medicare has provided us with a list of over 100,000 doctors nationwide who are still filing their

claims on paper. Our program is designed to bring these doctors into compliance with the new Medicare requirements."(FTC SJ Ex. 2 at Pl.'s Ex. 6.)

Eighteen purchasers of the MBN Program have submitted declarations stating that Defendants' salespersons represented that, after the purchaser completed training, he or she would be either provided with medical bills to process, "set up" with at least one physician-client, and/or provided with access to a list of physicians in need of a medical biller. (FTC Facts ¶ 62; FTC TRO Exs. 2-7, Exs. 9-20.) For example, one purchaser claims she was told that "medical billers were in great demand in [her] area and employment was guaranteed."(*Id.* Ex. 20 ¶ 6.) Another said that the representative told him that MBN "knew of doctors in [his] area who needed medical billing services, doctors who were waiting for [him] to start working."( *Id.* Ex. 14 ¶ 7.) Another claims she was told that her "only responsibility would be to pick up the work at the doctors' offices and mail it back upon completion ."(*Id.* Ex. 5 ¶ 6.)

Cancellaro's September 30, 2005 declaration states that he told two UCS salespersons that he was worried about "cold calling" physicians and was told in response that the doctors were "pre-screened" by Medicare and/or UCS. (Sept.2005 Cancellaro Decl. ¶¶ 8, 14.) One representative told him that because the doctors were pre-screened, they would be willing to work with him; another told him that due to the prescreening he would not be making "cold calls." (*Id.*)

### D. Disclosure in the MBN registration agreement

Before accessing or downloading training materials, purchasers were required to agree to a Registration Agreement, which includes, *inter alia,* the following provisions:

> # 1. I understand that my lifetime membership in MEDICAL BILLERS NETWORK entitles me to all the privileges of membership including: Free

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

medical billing software and free software up-grades. Free training through online training modules. Free access to an online database of non-electronic physicians. Free online technical support and marketing assistance.

....

# 4. 1 understand that MEDICAL BILLERS NETWORK is not an employment agency, nor do I work directly for MEDICAL BILLERS NETWORK. I understand that as a member 1 am entitled access to online databases of physicians who have been identified by Medicare as filing their claims on paper, as well as extensive marketing tools and information to help me secure contracts with those physicians. I acknowledge that completing the training is my responsibility and upon completion of the training I am entitled to assistance from MEDICAL BILLERS NETWORK in locating doctors who can benefit from my services. I understand and accept that MEDICAL BILLERS NETWORK cannot guarantee my success and that my success as a medical biller is ultimately dependent on my own ability to complete the training, perform the work correctly and present and conduct myself professionally.

*6 # 5. I understand that upon acceptance of the terms of this agreement, MEDICAL BILLERS NETWORK will process my registration and give me access to the remaining training modules and the software download.

I understand that this is proprietary information and it is the exclusive property of MEDICAL BILLERS NETWORK, licensed solely for use by members. Any reproduction or distribution of the software or training materials to any non-member is a violation of the terms of this agreement and copyright law. Any violations of the license agreement will result in immediate cancellation of membership privileges as well as civil [and/or] criminal prosecution.

I understand and accept that once final access has been released to me, there is no way for MEDICAL BILLERS NETWORK to confirm a return of all copies of training materials and software the user might have made. For this reason, we cannot authorize any cancellations of membership following the release of final access....

I understand and agree to all of the above-mentioned terms.

(*See* Taylor Defs.' Disputed Facts ¶¶ 47-53, 73; Second Taylor Aff. Ex. 12.) CQD and MBN are both parties to the Membership Agreement, (Caceres Resp. ¶ 23.)

The MBN website was set up in such a way that all purchasers were required to accept the terms of the Registration Agreement in order to "take final delivery" and "complete their purchase" of the MBN Program materials. (Taylor Defs.' Disputed Facts ¶¶ 66, 68.) While the parties dispute whether or not acceptance of the Registration Agreement preceded "payment," neither the FTC nor any defendant has cited any evidence indicating at what point during the transaction purchasers' credit cards were actually charged for the MBN Program. (*See, e.g., id.* at ¶ 103; FTC Resp. to Taylor Defs.' Disputed Facts ("FTC Resp.") ¶ 103.)

**III. Consumer experience using the MBN Program**

**A. Purchasers' earnings**

The FTC submitted the declarations of twenty purchasers who claim to have earned no income using the MBN Program. (FTC Facts ¶ 51; FTC TRO Exs. 2-20, Ex. 23.) Defendants point out, however, that all but two of these twenty individuals never attempted to contact any doctors or to market their services to physicians, and that many did not even successfully access the MBN Program materials. (Taylor Defs.' Opp'n Br. 21-39.) Defendants have submitted declarations from four purchasers who report that they successfully contracted with physi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

cians, charged between $2.50 and $8.00 per claim, and processed a sufficient number of claims to earn income from medical billing in amounts ranging from approximately $95 to $2400 per week.[FN12](Second Taylor Aff. Ex. 30.)

Taylor had no oral or electronic communications with purchasers regarding whether they had earned money from the program, but claims that he had "actual knowledge" that purchasers were succeeding. (FTC Facts ¶¶ 7 0-71.) Defendants' claims regarding purchasers' success in contracting with doctors are based in part on communications from purchasers indicating, for example, that they had contracted with doctors to do electronic billing. (See, e.g., Second Taylor Aff. Ex. 6, Exs. 36-41; Zimmerman Aff. Ex. 94 at 47:11-48:1; FTC SJ Ex. 1 at 281:15-283:21; Taylor Defs.' Statement of Material Facts Not in Dispute in Supp. of Taylor Defs.' Cross Mot, For Summ. J. ("Taylor Defs.' Facts") FN13 ¶¶ 12, 35, 36; Caceres Resp. ¶ 69.) [FN14]

**B. Physician contacts provided to purchasers**

*7 In fact, Defendants did not "set up" purchasers with physicians or provide purchasers with information about physicians who had specifically expressed an interest in hiring MBN Program members. (FTC Facts ¶ 63.) Instead, Defendants provided access to two lists of physicians. The first was a list obtained from Medicare in response to a Freedom of Information Act ("FOIA") request (the "Medicare List"). (See Zimmerman Aff. Ex. 92 at 84:20-86:4.) This list included the names and locations of approximately 150,000 physicians' offices that were, at that time, not submitting Medicare claims electronically. (See Taylor Defs.' Disputed Facts ¶¶ 3, 33; Zimmerman Aff. Ex. 92 at 84:20-86:4.)

The second list provided to MBN purchasers was a list of physicians' offices that had been contacted and surveyed by MBN's marketing department (the "Surveyed List"). (FTC Facts ¶ 104; Taylor Defs.' Facts ¶ 4; Second Taylor Aff. Ex. 5; Zimmerman

Aff. Ex. 93 at 75:16-80:4.) Using the Surveyed List, purchasers were able to view the responses of each surveyed office to the MBN survey questions. (FTC Facts ¶ 104; Taylor Defs.' Facts ¶ 4; Second Taylor Aff. Ex. 5; Zimmerman Aff. Ex. 93 at 75:16-80:4.)

The surveys were conducted by Susan Kichline, who was hired by Taylor to do marketing and doctor surveys for MBN.[FN15] (FTC Facts ¶ 104; Taylor Defs.' Facts ¶ 4; Zimmerman Aff. Ex. 93 at 75:16-80:4.) Taylor trained Kichline to conduct these surveys-he told her which doctors to call and prepared the script that Kichline followed. (FTC Facts ¶¶ 105-107; FTC S.T Ex. 3 at Pl.'s Ex. 4.) Per Taylor's instructions and survey script, Kichline told doctors she was calling from the "Medicare Information Center." (FTC Facts ¶¶ 109-111.) She represented that the Medicare Information Center was "currently assisting Medicare in their nationwide campaign to convert doctors to electronic filing."(Id. at ¶ 112.)In fact, Medicare Information Center was simply a "business name" used for the purpose of conducting these surveys and was not affiliated with Medicare or the government. (Id. at ¶ 113; Zimmerman Aff. Ex. 93 at 54:18-67:15.) If asked, Kichline clarified that Medicare Information Center was not associated with Medicare or with the government but otherwise she simply followed the script, which did not reveal that Medicare Information Center was a private company. (Zimmerman Aff. Ex. 93 at 59:11-67:15.)

In surveying physicians, Kichline asked physicians whether their offices were currently filing Medicare claims electronically. (FTC SJ Ex. 3 at Pl.'s Ex. 4.) If they were not, she then informed them of several alleged benefits of filing electronically and asked if, in light of this information, the physician could "think of a specific reason why [he or she] would not choose to convert to electronic filing at this time."(Id.) Kichline then said, "[O]ur system is showing that there are several Medicare certified billing contractors in your area, would you like us to forward your information to one of those con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

tractors so they can provide you with further information about the benefits of compliance?"(*Id.*) If the physician agreed to be contacted, Kichline said, "I am showing that there are contractors available through Medical Billers Network, are you familiar with the network? Medical Billers Network is a nationwide organization of home-based billing contractors. They are all Medicare certified and fully compliant with all HIPAA standards. I can have a representative contact you soon. What is a good time to catch you in the office?"(*Id.*) Kichline did not ask whether the doctors had any interest in using MBN purchasers to process their claims. (*Id.;* FTC Facts ¶ 114; Zimmerman Aff. Ex. 93 at 68:23-78:23.)

**\*8** Once a purchaser completed the MBN Program training, they were provided with three "surveyed leads", *i.e.,* three local physicians' offices that had been surveyed by Kichline and had affirmatively indicated that they could be contacted by an MBN representative. (Taylor Defs.' Facts ¶ 1 1; Zimmerman Aff. Ex. 93 at 68:23-71:2, 108:4-117:10.) Kichline estimated that she surveyed between 23,710 and 47,420 physicians' offices, generating a total of 14, 226 "surveyed leads." (Second Taylor Aff. Ex. 90.) Kichline testified during her deposition that the majority of offices she contacted indicated that they would be willing to receive a call from an MBN representative. (Taylor Defs.' Facts ¶ 7; Zimmerman Aff. Ex. 93 at 69:2-71:12.) [FN16]

Representatives from twelve physicians' offices selected from one of Defendants' physician lists submitted declarations stating that they do not remember any phone communication from MBN. (FTC Facts ¶ 66; FTC TRO Ex. 21.) However, it is not clear from which list these offices were selected (*i.e.,* the Medicare List or the Surveyed List), nor do the declarations rule out the possibility that Kichline called the office in question but spoke to someone other than the declarant. (Taylor Defs.' Resp. ¶ 66; Taylor Defs.' Disputed Facts ¶¶ 4, 9, 15, 17-20.) Also, the survey does not even use the name MBN unless the physician indicates that he or

she is willing to be contacted with more information. (FTC SJ Ex. 3 at PL's Ex. 4.) Therefore, these declarations do not necessarily indicate that Defendants failed to provide purchasers with a list of surveyed physicians.

### C. Refunds

The FTC submitted declarations from at least twelve purchasers who requested refunds from Defendants but were either refused or received no response. (FTC Facts ¶ 80.)

According to Defendants' policy, no refund would be issued to an MBN purchaser after accepting the terms of the Registration Agreement.[FN17](*See, e.g.,* FTC Facts ¶ 82; Taylor Defs.' Resp. ¶ 81; Taylor Defs.' Disputed Facts ¶ 20; FTC TRO Ex. 2 Att. D; Zimmerman Aff. Ex. 94 at 169:3-18; FTC SJ Ex. 1 at 286:16-287:2.) This policy was not disclosed in the MBN sales script, but was included in the "Commonly Asked Questions" section of the sales script as a response to a purchaser's question about MBN's refund policy. (FTC Facts ¶ 83, FTC SJ Ex. 2 at Pl's Ex. 2; Zimmerman Aff. Ex. 94 at 40:2-42:23.) The UCS sales script does disclose the refund policy, but only after the purchaser provides his or her credit card information. (FTC SJ Ex. 2 at PL's Ex. 6.) Three purchasers submitted declarations indicating that Defendants did not disclose their no-refund policy to prospective purchasers before the purchasers provided credit card information to Defendants during the telemarketing call. (FTC Facts ¶ 81; FTC TRO Ex. 3 ¶ 11, Ex. 13 ¶¶ 7, 14, Ex. 23 ¶¶ 5, 8.) The Registration Agreement stated that MBN "cannot authorize any cancellations of membership following the release of final access."(Second Taylor Aff. Ex. 12.) However, the Registration Agreement was only provided to purchasers after they provided credit card information to Defendants. (FTC Facts ¶¶ 85-86, 88.)

**\*9** The sales script indicates that purchasers were informed after providing credit card information that "the $199 will be billed to your credit card in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

the next one to four business days."(FTC SJ Ex. 2 at Pl.'s Ex. 1.) It is not clear at what point Defendants actually charged purchasers' credit cards. (*See* Taylor Defs.' Resp. ¶ 81 ("[P]rospective purchasers were required to agree to all the terms and conditions in the Purchaser Agreement prior to payment ...."); *but see* Aff. of Christopher Taylor, Aug. 6, 2007 ("Aug.2007 Taylor Aff.") ¶¶ 5, 9 (stating that purchasers received "credits" or "refunds" after providing credit card information but prior to accepting the Registration Agreement)). During Taylor's deposition, he stated that he did not know when credit cards were processed but, to his knowledge, CQD processed the cards of anyone who signed up. (FTC SJ Ex. 1 at 286:4-286:15).

**D. Additional costs associated with the MBN Program**

Purchasers of the MBN Program would have to pay an additional $100 to join a medical billing clearinghouse before they were permitted to process any claims for a physician. (FTC Facts ¶ 93.) The original telemarketing sales script used by MBN did not disclose the clearinghouse cost. (*Id.* at ¶ 56, 94; Zimmerman Aff. Ex. 92 at 160:5-161:1.) However, Taylor testified at his deposition that the clearinghouse fee was later made part of the sales script. (Zimmerman Aff Ex. 92 at 160:5-161:7; 162:19-165:4.) The clearinghouse also charged a fee of 35 cents for each claim submitted by an MBN biller, (FTC Facts ¶ 9 6.) Taylor testified at his deposition that, at least initially, when he made telemarketing sales for MBN, he did not disclose any additional costs unless the caller asked about them. (*Id.* at ¶¶ 57, 95; Zimmerman Aff. Ex. 92 at 163:18-164:7.)

Some purchasers have submitted declarations stating that, prior to asking for payment for the program, Defendants had misrepresented or failed to disclose additional costs or requirements associated with the opportunity (FTC Facts ¶ 89),[FN18] additional requirements for completion of training (*id.* at ¶ 90);[FN19] inability to access or download train-

ing materials (*id.* at ¶ 90; FTC TRO Ex. 3 ¶ 9, Ex. 8 ¶ 10, Ex. 12 ¶ 9); and inadequate or unresponsive training support (FTC Facts ¶ 91).[FN20]

## LEGAL STANDARDS

### I. Standard For Deciding a Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c)."[A]ffidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."*Id.* 56(e). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor.*Am. Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the court may consider, in addition to Rule 56(e) affidavits, other evidence that would be admissible at trial. *See, e.g., Universal Film Exchanges, Inc. v. Walter Reade, Inc.,* 37 F.R.D. 4, *5-6 (S.D.N.Y.1965) ("It is the policy of Rule 56(e) to allow the affidavit to contain evidentiary matter which, if the affiant were in court, would be admissible as a part of his testimony.") (quoting *Am. Securit Co. v. Hamilton Glass Co.,* 254 F.2d 889, 893 (7th Cir.1958)); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 746 (2d Cir.1998) ("On a summary judgment motion, the district court properly considers only evid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

ence that would be admissible at trial.").

**\*10** The moving party can satisfy its burden by showing that the opposing party is unable to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex,* 477 U.S. at 321;*Gallo v. Prudential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). Indeed, summary judgment is "mandated" when "the evidence is insufficient to support the nonmoving party's case."*Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir.1998).

If the moving party meets its burden, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial."*Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996); *Celotex,* 477 U.S. at 322-23. An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no genuine issue of material fact."*Liberty Lobby,* 4 77 U.S. at 247-48 (emphasis in original). Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures, or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See id.* at 256-57;*Gross v. Nat'l Broad. Co.,* 232 F.Supp.2d 58, 67 (S.D.N.Y.2002); *see also FTC v. Gill,* 265 F.3d 944, 954 (9th Cir.2001) ("Once the FTC has made a prima facie case for summary judgment, the defendant cannot rely on general denials but must demonstrate with evidence that is 'significantly probative' or more than 'merely colorable' that a genuine issue of material fact exists for trial.") (quoting *Liberty Lobby,* 4 77 U.S. at 249-50).

"Where cross-motions for summary judgment are filed, a court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.' " *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir.2002).

**II. Requirements of Local Rules 56.1 and 56.2**

Under Local Rule 56.1 of the Local Rules of the Southern and Eastern Districts of New York, a motion for summary judgment must be accompanied by a list of numbered paragraphs specifying those "material facts as to which the moving party contends there is no genuine issue to be tried" (a "Rule 56.1 Statement"). Local Civ. R. 56.1(a), A party opposing summary judgment must then submit a response consisting of correspondingly numbered paragraphs responding to each paragraph in the moving party's Rule 56.1 Statement (a "Rule 56.1 Response").*Id.* 56.1(b). According to Local Rule 56.1(c), "[a]ny numbered paragraph in the [Rule 56.1 Statement] ... will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph" in the response. *Id.* 56.1(c). Assertions in Rule 56.1 Statements and Rule 56.1 Responses must be followed by citation to admissible evidence, in accordance with Fed.R.Civ.P. 56(e).*Id.* 56.1(d).

**\*11** Under Local Rule 56.2, a *pro se* litigant must receive a "Notice to *Pro Se* Litigant Opposing Summary Judgment," which specifically details the litigant's obligations in opposing the motion for summary judgment and the consequences of failure to fulfill these obligations. *Id.* 56.2.Specifically, this Rule requires that a *pro se* litigant opposing summary judgment be informed that "you may NOT oppose summary judgment simply by relying upon the allegations in your complaint" and that "if you do not respond to the motion for summary judgment on time with affidavits or documentary evidence contradicting the facts asserted by the defendant, the court may accept defendant's factual assertions as true."*Id.*

[1] Since March 17, 2006, defendant Caceres has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceeded *pro se* in this litigation.[FN21]Caceres received the notice required by Local Rule 56.2. Caceres responded to the FTC's summary judgment papers by filing a "Response to Plaintiff's Rule 56.1 Statement" and a "Supplemental Response to Plaintiff's Rule 56.1 Statement," which include numbered paragraphs specifically responding to each paragraph in the FTC's Rule 56.1 Statement. Caceres did not cite to any supporting affidavits or other admissible evidence and attached only a print-out of a website showing graphs of salary data for medical billers in the United States as of May 2007. This document is inadmissible hearsay to show that medical billers in fact earned these salaries.[FN22]Caceres also refers once to his deposition testimony but does not provide a citation or attach the relevant portion of the transcript.

[2] As a preliminary matter, the Court must address the question of whether it should deem all facts set forth in the FTC's Rule 56.1 Statement to be admitted for purposes of this motion because, despite having received notice of the requirements of Local Rule 56.1, Caceres failed to adhere to all of those requirements in his Response. The FTC argues that these facts should be deemed admitted because Caceres has either admitted, impliedly admitted, or failed to adequately controvert all of the FTC's asserted facts. (*See* PL's Reply Mem. as to Def. Caceres ("FTC Caceres Reply") 910.) In particular, the FTC notes that Caceres does not cite to affidavits, deposition testimony, or any other admissible evidence in his Response. (*Id.* at 45.)

Despite the deficiencies in Caceres's response, he has plainly made an effort to respond to the FTC's motion, with two responsive submissions, which, while imperfect, do effectively highlight for the FTC and the Court those facts that Caceres believes to be in dispute.[FN23]Furthermore, allegations are not "deemed true simply by virtue of their assertion in [the] Local Rule 56.1 statement."*Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001). If the FTC's allegations are not accompanied by citation to admissible evidence or if the cited evidence

does not support the allegation, the Court is free to disregard them. *See id.*

**\*12** Given that Caceres is proceeding *pro se,* that summary judgment may only be granted where the Court is satisfied that there is no genuine issue of material fact, and that in many cases the Court can easily refer to the Taylor Defendants' submissions to locate the evidentiary support lacking in Caceres's submissions, the Court declines to accept blindly as "admitted" all factual averments made by the FTC with respect to Caceres. *See id.*(stating that a court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules") (citations omitted); *see also, e.g., Melendez v. Devry Corp.,* No. 03 Civ. 1029, 2005 WL 3184277, at \*1-2 (E.D.N.Y. Nov. 29, 2005) (declining to deem admitted all facts set forth in defendant's statement, where plaintiff was proceeding *pro se); Berdugo v. City of New York,* No. 03 Civ. 7319, 2004 WL 1900357, at \*1 (S.D.N.Y. Aug. 23, 2004) (where plaintiff failed to follow requirements of Local Rule 56.1, deeming defendants' statements of facts admitted, but only to the extent that they were supported by the record). Rather, the Court will "consider the totality of the parties' submissions in identifying disputed material facts, and will construe those disputed facts in [the non-movant's] favor as is appropriate on summary judgment."*Hamilton v. Bally of Switz.,* No. 03 Civ. 5685, 2005 U.S. Dist. LEXIS 9319, at \*34 (S.D.N.Y. May 12, 2005); *see also Melendez,* 2005 WL 3184277, at \*2 ( examining "the entire record before the court, glean[ing] the material facts therefrom, and decid[ing] the motion based on those facts" despite *pro se* plaintiff's failure to comply with Local Rule 56.1(c)); *Goldman v. Admin. for Children's Servs.,* 04 Civ. 7890, 2007 WL 1552397, at \*1 n. 2 (S.D.N.Y. May 29, 2007) (considering the factual assertions made by *pro se* plaintiff in response to Rule 56.1 Statement, though plaintiff "did not submit any affidavits, and submitted only scant documentary evidence").

[3] A court should interpret a *pro se* litigant's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

"papers liberally, and ... interpret them to raise the strongest arguments that they suggest."*Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Although Caceres's arguments may ultimately be rejected if unsupported by the law or the evidence, the Court will afford him "special solicitude" in responding to the FTC's motion for summary judgment. *Goldman,* 2007 WL 1552397, at *1 n. 2. In particular, the Court will consider the best arguments suggested by Caceres's submissions and allow Caceres to benefit from the Taylor Defendants' briefs and supporting papers whenever appropriate. However, Caceres's conclusory statements that facts listed in the FTC's Rule 56.1 Statement are "incorrect," "vague," "incomplete," or "disputed" are not sufficient to put any fact in dispute when Caceres does not adequately put into dispute the FTC's underlying evidence.

CQD remains represented by counsel and has failed to submit any response to the FTC's motion for summary judgment. Therefore, the Court grants summary judgment against CQD on all counts. *See FTC v. P.M.C.S., Inc.,* 21 F.Supp.2d 187, 189 (E.D.N.Y.1998) ("At the very least, [defendants'] failure to participate in this litigation and oppose the FTC's motion may be viewed as constituting a concession that summary judgment is appropriate....").

### III. Section 5(a) of the FTC Act

*13 [4][5] Section 5(a) (1) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."15 U.S.C. § 45(a)(1)."To prove a deceptive act or practice under § 5(a)(1), the FTC must show three elements: (1) a representation, omission, or practice, that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3), [that] the representation, omission, or practice is material."FN24*FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 63 (2d Cir.2006)."The law is violated if the first contact ... is secured by deception ... even though the true facts are made known to the buyer before he enters into the contract of pur-

chase."*Exposition Press, Inc. v. FTC,* 295 F.2d 869, 873 (2d Cir.1961). It is not required that the deception have been made in bad faith or with intent to deceive. *Verity,* 443 F.3d at 63;*FTC v. Five-Star Auto Club, Inc.,* 97 F.Supp.2d 502, 526 (S.D.N.Y.2000).

[6][7][8] A court should focus on the overall impression created by the advertising, not its "literal truth or falsity." *See, e.g., FTC v. Sterling Drug, Inc.,* 317 F.2d 669, 675 (2d Cir.1963) ("It is well established that advertising need not be literally false in order to fall within the proscription of the [FTC Act].... for we have increasingly come to recognize that 'Advertisements as a whole may be completely misleading although every sentence separately considered is literally true....' "); *Removatron Int'l Corp. v. FTC,* 884 F.2d 1489, 1496 (1st Cir.1989) ("The impression created by the advertising, not its literal truth or falsity, is the desideratum .... " (quoting *Am. Home Prods. Corp. v. FTC,* 695 F.2d 681, 686 (3d Cir.1982))); *FTC v. Peoples Credit First, LLC,* 244 Fed. Appx. 942, 944 (11th Cir.2007) ( "[T]he undisputed evidence establishes that the appellants made material representations, express or implied, that were likely to mislead reasonable consumers. The fact that the words in the mail piece are technically or literally true is not persuasive."); *FTC v. NCH, Inc.,* No. 95-16893, 1997 WL 22246, at *2 (9th Cir. Jan.15, 1997) ("A representation is deceptive and violates Section 5 of the [FTC Act] if its net impression is likely to mislead consumers, even if the representation is literally true."). "The failure to disclose material information may cause an advertisement to be false or deceptive even though it does not state false facts." *Katharine Gibbs School (Inc.) v. FTC,* 612 F.2d 658, 665 (2d Cir.1979). Furthermore, "each representation must stand on its own merit, even if other representations contain accurate, nondeceptive information ." *FTC v. Gill,* 71 F.Supp.2d 1030, 1044 (C.D.Cal.1999) (citing *Removatron,* 884 F.2d at 149697). The alleged misrepresentations should be evaluated "as a whole without emphasizing isolated words or phrases apart from their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)

**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

context." *See, e.g., Five-Star Auto Club,* 97 F.Supp.2d at 528;*Removatron,* 884 F.2d at 1496.

**\*14** [9][10]"A claim is considered material if it 'involves information important to consumers and, hence, [is] likely to affect their choice of, or conduct regarding a product.' " *Five-Star Auto Club,* 97 F.Supp.2d at 529 (quoting *Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir.1992)). Express representations that are shown to be false are presumed material. *FTC v. Patriot Alcohol Testers, Inc.,* 798 F.Supp. 851, 856 (D.Mass.1992).

### IV. The Telemarketing Sales Rule

The TSR was promulgated pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act, which directed the FTC to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices."15 U .S.C. §§ 6101 *et seq; see also FTC v. 1263523 Ontario, Inc.,* 205 F.Supp.2d 218, 219 (S.D.N.Y.2002). The TSR prohibits a seller from "[m]isrepresenting, directly or by implication ... [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer."16 C.F.R. § 310.3(a)(2). The TSR also requires a seller to disclose any no-refund policy "in a clear and conspicuous manner ."*Id.* § 310.3(a)(1). This disclosure must be made "[b]efore a customer pays for goods or services."*Id.*

Any violation of the TSR is deemed a "deceptive act or practice" in violation of Section 5(a) of the FTC Act. 15 U.S.C. § 6102(c); 16 C.F.R. § 310.1.

### ANALYSIS

#### I. Count I-Expected Income

#### A. The nature of Defendants' earnings representations

Defendants' earning representations included print advertisements representing that consumers could earn "Great Pay!" and statements during telephone sales calls that "working part-time, with one doctor, a biller processes an average of 80 to 120 claims per week. A biller makes an average of five dollars per claim, paid directly by the doctor, on a bi-weekly basis, $400600 per week" (FTC SJ Ex. 2 at Pl.'s Ex. 2) and "individual results will vary based on typing speed, but an average biller can process five to fifteen claims per hour and the current industry standard is three to five dollars per claim"(*id.*Ex. 2 at Pl.'s Ex. 6). In addition, for some period of time, Defendants ran ads stating that consumers could earn $50,000 per year.

Declarations submitted by MBN purchasers and an FTC investigator also indicate that Defendants' salespeople represented that purchasers make, "could" make, "could expect" to make, or "would" make income from the program. The income representations were both specific (*e.g.,* $500 or more per week and $400 to $600 per week) and general (*e.g.,* "a good deal of money," "a lot of money").

[11][12][13] Defendants do not deny that their sales scripts included earnings representations but instead argue that the representations did not refer to the income that MBN purchasers were likely to earn, but to "the type of earnings that could be expected by someone working in the medical billing field," as gathered from Taylor's conversations with "working medical billers" and "medical billing experts," from statistics compiled by the U.S. Department of Labor, Bureau of Labor Statistics ("BLS statistics") regarding average wages for "Medical Records and Health Information Technicians," and from magazine articles and advertisements found online. (Taylor Defs.' Opp'n Br. 911; Second Taylor Aff. Ex. 61.) Of course, Taylor's alleged conversations with "medical billing experts" are rank hearsay, as are the online magazine articles and advertisements. Assuming the BLS statistics can be considered by the Court, [FN25] it borders on the fanciful to contend that these statistics, which re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----, 2008 WL 857663)

port the income of a broad category of "Medical Records and Health Information Technicians," including full-time employees working for hospitals, nursing care facilities, government entities and insurance companies, provide a rational basis for estimating the earnings of freelance home billers using programs similar to the MBN Program.

*15 The Court finds, moreover, that the actual impression created by Defendants' various earnings representations was that a typical purchaser earned "great pay"-$400 to $600 per month-and "could earn" as much as $50,000 per year *with the MBN Program.* This is especially true of the earnings representation in the "Commonly Asked Questions" section of the MBN sales script, which Taylor testified is used as a response to a consumer who asks "How much money can 1 make doing this?"(Zimmerman Aff. Ex, 94 at 41:11-42:23 .) No consumer would have interpreted Defendants' earnings representations as pertaining to the average income of "Medical Records and Health Information Technicians" reported in BLS statistics. These representations, made in the context of MBN advertisements and telemarketing calls, would obviously have been assumed to refer to the income a purchaser would earn using the MBN Program. *See, e.g., FTC v. Febre,* No. 94 C 3625, 1996 WL 396117, at *2 (N.D.Ill. July 3, 1996) (finding, with respect to representations that a purchaser "could earn" specified amounts and that it was "possible" to make this amount, that "it can be presumed that a consumer would reasonably believe that [these statements] represent typical or average earnings"); *FTC v. Medicor LLC,* 217 F.Supp.2d 1048, 1053-1054 (C.D.Cal.2002) (finding that even if earnings representations were qualified with the statement "results may vary," consumers could reasonably believe that the statements of earnings potential represented typical or average earnings).

The Taylor Defendants also argue that their earnings representations did not constitute a Section 5(a) violation because they were "not false ... but true." (Taylor Defs.' Opp'n Br. 4.) Of course, Defendants proffer no admissible evidence indicating that their representations were true. In any event, a representation may be misleading in violation of Section 5(a) even if it is literally true. *See, e.g., Sterling Drug,* 317 F.2d at 675 ("It is well established that advertising need not be literally false in order to fall within the proscription of the [FTC Act]."). Therefore, Defendants' argument can only succeed if the *impression* created by the representation is true. The Taylor Defendants argue that the representation that "an average biller can process 5 to 15 claims per hour" is true because even a below average typist would be physically capable of entering far more than the necessary 200 to 600 keystrokes necessary to process this number of claims. (Taylor Defs.' Opp'n Br. 1315.) This argument does not help Defendants. No consumer would interpret this statement to mean that a medical biller is physically capable of entering 5 to 15 claims per hour. The obvious implication of the statement in the context of a telemarketing call is not only that an average medical biller is capable of processing 5 to 15 claims per hour, but also that he *receives* a sufficient number of claims to process claims at this rate, and could reasonably expect to process this number of claims. The prospective purchaser was interested in the amount of money he could earn from the MBN Program and would interpret this statement in context as being relevant to expected income, not to the non-limiting factor of typing ability. To the extent this information was understood to refer to the potential purchaser's typing speed, it could only be misleading, as it would imply that a purchaser's potential earnings are limited only by the purchaser's typing speed, rather than the number of claims referred to the purchaser by physicians. Indeed, Defendants promoted such an interpretation in the MBN sales script, which states, "We recommend starting out part time with one doctor until you are confident with your processing speed. Once you know how many claims per hour you can process you can increase your workload accordingly."(FTC SJ Ex. 2 at Pl.'s Ex. 6.)

*16 The Taylor Defendants' argument that the Re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----, 2008 WL 857663)

Page 20

gistration Agreement did not contain any misleading earnings representations is irrelevant. (Taylor Defs.' Opp'n Br. 7-8.) The alleged misrepresentations were made in print advertisements and during telephone sales calls, not in the Registration Agreement. Even if the representations in the Registration Agreement are accurate, these would not somehow cure misrepresentations that had already been made. *See, e.g., Exposition Press,* 295 F.2d at 873 ("The law is violated if the first contact is secured by deception even though the true facts are made known to the buyer before he enters into the contract of purchase."); *FTC v. Cyberspace.com LLC,* 453 F.3d 1196, 1200 (9th Cir.2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.").

**B. Actual earnings of MBN purchasers**

[14] Misrepresentations regarding expected income from a business opportunity are material. *See Five-Star Auto Club,* 97 F.Supp.2d at 529 ("The case law is clear that representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations in violation of Section 5."); *FTC v. Minuteman Press,* 53 F.Supp.2d 248, 258 (E.D.N.Y.1998) ("Such misrepresentations-which tend to bear directly on the economic viability of the transaction under consideration-are both likely to deceive and material."). Therefore, if Defendants' representations regarding earnings were false or misleading, they violated Section 5(a) of the FTC Act.

[15] However, neither the FTC nor the Taylor Defendants are entitled to summary judgment on Count I because there are disputed issues of material fact regarding the actual earnings of MBN purchasers.

In support of its motion for summary judgment, the FTC submitted twenty affidavits of MBN purchasers who did not bill any claims or earn any money using the program. (FTC Facts ¶ 51; FTC TRO Exs. 220, Ex. 23.) However, as Defendants point out, only two of these declarants completed the MBN training and attempted to contact physicians. (Taylor Defs.' Opp'n Br. 21-39.) One reported that she tried to contact over one hundred physicians from the Medicare List but found none willing to hire her as a medical biller. (FTC TRO Ex. 20 ¶ 12.) The other had a similar story, reporting that she contacted twenty to thirty doctors from the Surveyed List without success. (*Id.* Ex. 23 ¶ 7.) The remaining declarations, from purchasers who never attempted to become medical billers, shed no light on the actual earnings that purchasers could or did achieve using the MBN Program.FN26

Defendants likewise submitted declarations of four MBN purchasers who claim to have earned money as medical billers using the MBN Program. The average income reported in these declarations, interpreted in the most favorable light for Defendants, is approximately S830 per month.FN27(Second Taylor Aff. Ex. 30.)

**\*17** In other cases in which courts have granted summary judgment of Section 5(a) violations for misleading earnings representations, the evidence submitted by both parties established beyond dispute that typical actual earnings were far less than the earnings represented. By contrast, in this case, the present record includes only a handful of selected declarations from purchasers, some which support Defendants' earnings representations and some which do not. Neither party provides any evidence indicating that its declarations are typical or representative of MBN purchasers.

In *Federal Trade Commission v. Patriot Alcohol Testers,* 798 F.Supp. 851 (D.Mass.1992), the District of Massachusetts district court granted summary judgment that the defendants had violated Section 5(a) by representing to consumers that the average income generated by its product was $130 per week. 798 F.Supp. at 85556.Both the defendants and the FTC submitted affidavits from purchasers reporting the amount of income the pur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

chaser earned from the product. *Id.* at 856.The affidavits submitted by defendants, even interpreted in the most favorable light to defendants, reported an average income of $49 per week per device. *Id.* This average would have been considerably lower if the FTC's affidavits, all of which reported earnings of twenty dollars or less per week, had been included. *Id.* The court found that because of the wide disparity between the earnings representations and the evidence of earnings in the record, "the only conclusion a reasonable finder of fact could reach is that the representations were false and likely to mislead consumers acting reasonably under the circumstances. *Id.*

In *Federal Trade Commission v. Medicor,* 217 F.Supp.2d 1048 (C.D.Cal.2002), the Central District of California district court granted summary judgment against defendant based on its deceptive representations regarding earnings.Like MBN, defendant Medicor sold medical billing software. FN28 2 17 F.Supp.2d at 1054. Medicor made representations that purchasers could earn $20 to $40 per hour, $300 to $600 per week, and $20,000 to $45,000 per year. *Id.* The FTC presented unconverted evidence that, of the 40,420 consumers who purchased Medicor's medical billing software, only 64 ever processed claims, for a total of 2,641 claims. *Id.* This evidence, the court found, "indicates that the vast majority of consumers did not earn the amount represented as the earning potential."*Id.*

In *Federal Trade Commission v. Stefanchik,* No. C04-1852RSM, 2007 WL 1058579 (W.D.Wash. April 3, 2007), the Western District of Washington district court granted the FTC's motion for summary judgment, where defendant's representations that purchasers could earn "large amounts of money in their spare time" were found to be "false and unsubstantiated earnings claims," as demonstrated, in part, by a consumer survey conducted by the FTC's expert witness. 2007 WL 1058579, at *56.

*18 In light of the evidence submitted in *Medicor,* which involved the sale of a similar program, it appears unlikely that the average income of MBN purchasers is consistent with Defendants' representations. *See Medicor,* 217 F.Supp.2d at 1054 (describing uncontroverted evidence that only 64 of over 40,000 purchasers of medical billing software processed even one medical claim.) However, there is insufficient evidence in this record for the Court to find that there is no genuine issue of material fact regarding the falsity of Defendants' earnings representations. *See supra* pp. 33-36 and note 26.Accordingly, each party's motion for summary judgment on Count I is denied.

## II. Physician Information

[16] The FTC alleges that Defendants represented that they would give purchasers access to information regarding "physicians who were likely to use the purchasers to process the physicians' medical claims," while in fact these physicians "knew nothing of Defendants and had no use for these purchasers' services."(FTC Br. 11.)

The MBN sales script represented that "Medicare has just provided us a list of over 150,000 doctors who are still filing their insurance claims on paper. We are in the process of converting these doctors to electronic filing so they will be in compliance with the new Medicare requirements."(FTC Facts ¶ 5 8; FTC SJ Ex. 2 at 29:531:21, Ex. 2 at PL's Ex. 1.) As a whole, these representations in the sales script, especially in the context of MBN's representation that it was a "network," created the impression that some of the doctors on the Medicare List had already decided to convert to electronic filing and that MBN had some existing relationship with these doctors and was actively working with them as part of some ongoing conversion "process."

In fact, the undisputed evidence indicates that the doctors had not decided to convert to electronic filing or even expressed an interest in doing so. At best, some of the subset of doctors that had been contacted by Susan Kichline (who falsely identified herself as associated with the "Medicare Informa-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

tion Center") had stated, based on the information Kichline provided, that they could not think of a reason why they would not switch to electronic filing and were willing to receive more information. (*See, e.g.,* FTC SJ Ex. 3 at Pl.'s Ex.4; Zimmerman Aff. Ex. 93 at 68:2371:23.) This is a far cry from being "in the process" o f conversion to electronic billing. Furthermore, it is undisputed that MBN had no relationship with these doctors. Though Kichline claims to have surveyed between 23, 710 and 47,420 physicians on the Medicare list in order to provide purchasers who have completed their MBN Program training with three physician "leads" (*see, e.g.,* Second Taylor Aff. Ex. 90; Zimmerman Aff. Ex. 93 at 45:2046:21, 108:4117:10), she asked these physicians only if they would be willing to receive more information about the "benefits of compliance." (FTC SJ Ex. 3 at PL's Ex. 4.) When physicians agreed to be contacted with more information, Kichline informed them that MBN was a network of home-based billing contractors and that an MBN contractor would be in touch with them. She did not ask for or obtain any commitment from these physicians to work with MBN in any capacity. Therefore, in no sense was MBN "in the process of converting" the physicians on the Medicare List to electronic filing.

*19 Taylor stated that the representation that MBN was "in the process of converting these doctors [on the Medicare list] to electronic filing" referred to the fact that the ultimate goal of MBN's training program and phone surveys was to "aid[ ][the] nationwide conversion ... to electronic filing."(Taylor Defs.' Disputed Facts ¶ 84; Taylor Defs.' Facts ¶ 34; Zimmerman Aff. Ex. 92 at 89:3-90:24.) While it is true that MBN purchasers were trained to convert doctors to electronic filing and that a handful were even in the process of doing so, Defendants' sales script used the word "we," not "our purchasers." Whatever Defendants' undisclosed intentions were, the sales pitch clearly would have given a reasonable consumer the impression that it was MBN-not MBN purchasers-who were "in the process" of converting doctors to electronic filing. Even assuming

*arguendo* that the representation is literally true if "we" is interpreted to include MBN purchasers, literal truth is not the standard for determining whether a violation of Section 5(a) has occurred. *See, e.g., Sterling Drug,* 317 F.2d at 675 ("It is well established that advertising need not be literally false in order to fall within the proscription of the [FTC Act].... for we have increasingly come to recognize that 'Advertisements as a whole may be completely misleading although every sentence separately considered is literally true....' "); *see also Resort Car Rental Sys., Inc. v. FTC,* 518 F.2d 962, 964 (9th Cir.1975) ("Advertising capable of being interpreted in a misleading way should be construed against the advertiser.").

[17] In fact, Defendants had no relationship with these doctors and were not helping them to convert to electronic filing. To the contrary, it was the purchasers of the MBN Program who had to attempt to convert these physicians to electronic filing, a fact about which some purchasers claim to have been affirmatively misled.[FN29]"[E]vidence that some customers actually misunderstood the thrust of the message is significant support for the finding of a tendency to mislead."*Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (3d Cir.1976); *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029-30 (7th Cir.1988) (same).

Defendants' representations also created the impression that physicians were required to file Medicare claims electronically. In his deposition, Taylor explained that the representation that doctors who converted to electronic filing would in doing so become "complian[t] with Medicare requirements" referred to the fact that Medicare "wants" doctors to submit claims electronically, has tried to pass laws to this effect, and has "done everything in their power to ... force physicians to convert ... to electronic filing."(Zimmerman Aff. Ex. 92 at 91:4-96:7.)

Taylor further testified at his deposition that the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") made electronic filing mandat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

ory but that the deadline for compliance has been pushed back each year. (FTC Facts ¶¶ 6061; Taylor Defs.' Disputed Facts ¶¶ 8 9, 90; Zimmerman Aff. Ex. 92 at 87:12-88:8.) However, Defendants offer no evidence that supports their assertion that HIPAA has required or will require electronic filing of Medicare bills at any time. (Zimmerman Aff. Ex. 92 at 87:1288:17, 91:417, 93:1018, 96:17.) The provisions of HIPAA cited by Defendants only provide for the *standardization* of electronic filing for those physicians who choose to file claims electronically-they do not indicate that physicians are required or will ever be required to file claims electronically.[FN30](Second Taylor Aff. Ex. 43 (quoting excerpts from Health Insurance Portability and Accountability Act of 1996, Pub.L. 104-191, §§ 261, 262, 110 Stat.1936,202131 (1996) (codified at 42 U.S.C. §§ 1320d1320d-8)); Taylor Defs.' Disputed Facts ¶ 85; Zimmerman Aff. Ex. 92 at 87:388:17, 91:1892:6.)

***20** Defendants' misrepresentations about their relationship with the doctors on the Medicare list were obviously material. The belief that Defendants were already working with a large number of doctors who were in the process of converting to electronic billing to become "compliant" with nonexistent Medicare requirements would have significantly reduced the perceived risk of the purchase. The ease with which a purchaser would be able to connect with a doctor's office willing to use the purchaser's services obviously would influence the consumer's decision whether or not to purchase the MBN program. *See, e.g., Five-Star Auto Club, Inc.,* 97 F.Supp.2d at 529 ("A claim is considered material if it 'involves information important to consumers and, hence, [is] likely to affect their choice of, or conduct regarding a product.' ").

Finally, contrary to Defendants' arguments (*see, e.g.,* Taylor Defs.' Opp'n Br. 18-19), the disclosure regarding the MBN Program in the Registration Agreement is irrelevant to whether the representations made during telephone sales calls were deceptive and/or misleading.[FN31]*See, e.g., Exposi-*

*tion Press,* 295 F.2d at 873 ("The law is violated if the first contact is secured by deception, even though the true facts are made known to the buyer before he enters into the contract of purchase."); *Gill,* 71 F.Supp.2d at 1044 ("[E]ach representation must stand on its own merit, even if other representations contain accurate, non-deceptive information.") (citing *Removatron,* 884 F.2d at 1496-97).

## III. Misrepresentations regarding "Material Aspects" of the MBN Program

In addition to the prohibition under Section 5 of the FTC Act of "deceptive acts or practices," the TSR independently makes unlawful the "misrepresent [ation], directly or by implication, in the sale of goods or services ... [of] [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer."16 C.F.R. § 310.3(a)(2)(iii). The FTC asserts that Defendants violated this provision by (1) failing to disclose additional costs associated with becoming a medical biller; and (2) failing to disclose additional requirements to complete the medical billing training. (FTC Br. 13.) [FN32]

[18] The Taylor Defendants argue that the FTC's claims that Defendants violated the TSR by failing to disclose additional costs and requirements associated with the MBN Program are subject to Rule 9(b) of the Federal Rules of Civil Procedure. (*See* Taylor Defs.' Reply Br. 1-2, 8, 17 n. 30.) Rule 9(b) requires a plaintiff asserting a claim for fraud or mistake to plead the circumstances constituting such fraud or mistake with particularity.Fed.R.Civ.P. 9(b). Count III of the FTC's Amended Complaint does not specifically include any allegation regarding a TSR violation based on Defendants' failure to disclose additional costs and requirements. These issues are raised in the FTC's moving papers. The Taylor Defendants argue that Rule 9(b) does not permit the FTC to now assert such nondisclosures as grounds for a TSR violation. (*See* Taylor Defs.' Reply Br. 12, 8, 17 n. 30.) As the Taylor Defendants raise this argu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----, 2008 WL 857663)

Page 24

ment for the first time in their reply brief and the FTC has had no opportunity to address it, the Court declines to consider it. *See, e.g., In re Dobbs,* 227 Fed. Appx. 63, 64 (2d Cir.2007) ("[W]e think that it was entirely proper for the District Court to decline to consider debtor-appellant's argument, raised for the first time in its reply brief"); *Playboy Enters., Inc. v. Dumas,* 960 F.Supp. 710, 720 n. 7 (S.D.N.Y.1997) ( "Arguments made for the first time in a reply brief need not be considered by a court."). In any case, the argument is likely without merit. Defendants do not argue that they have suffered any prejudice because they lacked notice of the specific additional grounds the FTC now asserts in support of its Count III. Nor do Defendants explain why the pleading requirements of Rule 9(b) should apply to this action. Other district courts have held that actions brought by the FTC for violations of Section 5(a) of the FTC Act are not subject to Rule 9(b).*See FTC v. Communidyne, Inc.,* No. 93 C 6043, 1993 WL 558754, at *2 (N.D.Ill.Dec.3, 1993) (holding that a claim under Section 5(a) is not a claim of fraud or mistake subject to Rule 9(b) because it has no scienter or reliance requirement.); *FTC v. Skybiz.com, Inc.,* No. 01-CV-396-K(E), 2001 WL 1673649, at *4 (N.D.Okla. Aug.2, 2001) (holding that Rule 9(b) d oes not apply to Section 5(a) claim); *FTC v. Nat'l Testing Servs., LLC,* No. 3:05-0613, 2005 WL 2000634, at *2 (M.D.Term. Aug. 18, 2005) (holding that Rule 9(b) does not apply to Section 5(a) claims because neither intent to deceive, proof of consumer reliance, nor proof of consumer injury are necessary elements).

**A. Misrepresentations regarding additional costs**

*21 [19] It is undisputed that an MBN purchaser was required to pay a fee of approximately $100 to a medical billing clearinghouse before the purchaser would be allowed to submit bills to that clearinghouse for processing. (FTC Facts ¶ 93; *see* Zimmerman Aff. Ex. 92 at 158:17-160:5.) The original MBN sales script did not contain any language disclosing this $100 fee. (FTC Facts ¶ 94; *see* Zimmerman Aff. Ex. 92 at 160:15-161:8.) At

some later time, a disclosure about the clearinghouse fee was added to the sales script. (*See* Zimmerman Aff. Ex. 92 at 160:15-161:8.) However, Taylor testified that, at least initially, if a customer did not ask about additional costs, he was not informed about the clearinghouse fee. (FTC Facts ¶ 95; *See* Zimmerman Aff. Ex. 92 at 163:18-164:7.)

Following the MBN sales script, Defendants' sales representatives told customers, "All you have to do is join [MBN] and agree to process your claims through our network clearinghouse. There is a one-time programming fee of $199 that covers your setup with [MBN] and includes free software, free training as well as free technical support on line."(FTC SJ Ex. 2 at Pl.'s Ex. 1.) The use of the phrase "our network clearinghouse" created the impression that MBN also operated the clearinghouse to which purchasers would submit their claims.FN33 Because Defendants represented that the clearinghouse was part of the MBN "network," the representation that purchasers paid a "one-time programming fee ... that covers your setup with [MBN]" implied to a reasonable consumer that this "one-time" fee covered any "setup" fee associated with the clearinghouse as well.

[20] Payment of the clearinghouse fee is necessary if a purchaser wants to begin earning money as a medical biller. An additional $ 100 fee connected with a $ 199 purchase is clearly a "material aspect of the performance, efficacy, nature, or central characteristics" of the MBN Program. 16 C.F.R. § 310.3(a)(2) (iii). The FTC is entitled to summary judgment that Defendants' representations regarding the "one-time" fee were "deceptive telemarketing acts or practices" in violation of the TSR.FN34

**B. Additional Requirements to Complete Training**

[21] The FTC also asserts that Defendants violated the TSR by failing to disclose "additional requirements to complete the medical billing training."The only relevant evidence cited by the FTC in support

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.