# COMPENDIUM OF UNREPORTED CASES

AS CITED IN DEFENDANT/COUNTERCLAIMANT'S
MEMORANDUM OF LAW IN OPPOSITION TO GREYSTONE'S MTION FOR
SUMMARY JUDGMENT AND TO DISMISS COUNTERCLAIMS

PART 3 OF 4

of this claim is the declaration of a single purchaser who complained that the online training required him to pass two online tests when he expected only one. (FTC TRO Ex. 12 ¶ 11.) This purchaser does not indicate that Defendants' sales representatives made any representations to him regarding training requirements. The FTC has not identified any express or implied representation made by Defendants regarding the requirements associated with the MBN Program training. Therefore, Defendants are entitled to summary judgment on the FTC's claim that Defendants violated the TSR by misrepresenting "additional requirements to complete the medical billing training."

### IV. Refund Policy

**\*22** [22] In Count IV, the FTC alleges that Defendants violated § 310.3(a) (1)(iii) of the TSR, which requires a covered seller or telemarketer to disclose a seller's no-refund policy "in a clear and conspicuous manner."16 C.F.R. § 310.3(a)(1)(iii). This disclosure must be made "before a customer pays for goods or services offered."*Id.*

It is undisputed that MBN had a no-refund policy that went into effect once the purchaser accepted the Registration Agreement. (*See, e.g.,* Taylor Defs.' Facts ¶¶ 33-34; Aug.2007 Taylor Aff. ¶ 9.) The Registration Agreement stated that, because there was no way for CQD and MBN to confirm that all copies of the software and training materials had been returned, CQD and MBN could not "authorize any cancellations of membership following the release of final access."(*See* Second Taylor Aff. Ex. 12.) Defendants concede that MBN's no-refund policy was not disclosed before purchasers' credit card information was taken. (Taylor Defs.' Opp'n Br. 40 at n. 13.) Because the FTC does not argue otherwise, the Court will assume that Defendants did not charge purchasers' credit cards until after they logged on to the MBN website and accepted the terms of the Registration Agreement.FN35

The FTC argues that, even if purchasers' credit cards were not charged until they accepted the Registration Agreement, Defendants nevertheless violated the TSR by failing to disclose that they had a no-refund policy prior to taking purchasers' credit card information. Under the FTC's interpretation of the TSR, a purchaser "pays for goods or services" in a credit card transaction when he gives the vendor his credit card information. (FTC Br. 13-14.) Defendant disputes this interpretation, arguing that payment occurs, at the earliest, when the transaction is processed and the vendor submits the charge to the credit card issuer. (Taylor Defs.' Br. 42-43; Taylor Defs.' Reply Br. 14-15 n. 26.)

The FTC's argument relies on the Statement of Basis and Purpose for the TSR, which directly addresses this issue. *Telemarketing Sales Rule, Statement of Basis and Purpose and Final Rule,* 60 Fed.Reg. 43842, 43846 (Aug. 23, 1995). Two commenters to the FTC's proposed rule asked whether " 'payment' occur[s] when the customer provides a seller or telemarketer with his or her credit card information, or when the customer's credit card account is charged for the goods or services?"*Id.* The FTC responded by stating that it "intends that the disclosures be made *before* the consumer sends funds to a seller or telemarketer or divulges to a telemarketer or seller credit card or bank account information. Thus, a telemarketer or seller who fails to provide the disclosures until the consumer's payment information is in hand violates the Rule."*Id.* (emphasis in original).

Defendant argues that the Court cannot consider the clarification provided by the FTC in the Statement of Basis and Purpose because the language of the regulation is not ambiguous-a customer "pays" when she "satisfie[s] her obligation to the vendor". (Taylor Defs. Reply Br. 14-15.)

**\*23** [23] The Court finds that, in the context of a credit card transaction, a customer "pays" when he provides his credit card information and authorizes the vendor to charge it. According to the MBN sales script, Defendants' telemarketers, after taking

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

Page 26

a purchaser's credit card information, informed the purchaser that "the $199 will be billed to your credit card in the next one to four business days."(FTC SJ Ex. 2 at Pl.'s Ex. 1.) The sales script includes nothing indicating that a purchaser needed to take any further action in order to authorize Defendants to bill the purchaser's credit card for the MBN Program. The MBN sales script clearly created the impression that a purchaser had authorized Defendants to bill his or her credit card for the MBN Program upon providing Defendants with credit card information. Therefore, the purchaser "paid" for the MBN program by providing credit card information during the sales call.

[24] Alternatively, even if the phrase were found to be ambiguous, the Court would adopt the FTC's interpretation of this language. An agency's interpretation of its own regulations is entitled to great deference. *See, e.g., Udall v. Tollman,* 380 U.S. 1, 16-17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) ("[A] court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... The ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 41314, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)); *see also Central Tex. Tel. Co-op., Inc. v. FCC,* 402 F.3d 205, 213 (D.C.Cir.2005) (" '[T]he courts and the public may use [Statements of Basis and Purpose] in the interpretation of the agency's rules.'") (quoting Attorney General's Manual on the Administrative Procedure Act 32 (1947)).

The Taylor Defendants next argue that MBN did not violate § 310.3(a)(1) of the TSR because the telemarketer CQD permitted refunds and MBN disclosed its no-refund policy in the Registration Agreement. This argument is a nonstarter. MBN is a "seller" as defined by the TSR.[FN36] CQD is a "telemarketer" as defined by the TSR.[FN37] The TSR prohibits a seller or telemarketer from failing to tell the customer before payment that the seller

has a policy of not providing refunds. CQD telemarketed for the seller MBN and did not disclose MBN's no-refund policy.

Defendants also argue that the failure to disclose MBN's no-refund policy did not violate the TSR because the policy did not go into effect until the purchaser accepted the Registration Agreement and acknowledged that he had understood and agreed to its terms. (Taylor Defs.' Reply Br. 1516.) Therefore, by the time there was a no-refund policy, the required disclosure had been made. This characterization of Defendants' refund policy does not alter the Court's analysis. The TSR states unambiguously that if a seller has a no-refund policy, it must be disclosed prior to payment. The TSR does not distinguish between policies that are triggered immediately and those that go into effect at some later time or upon acceptance of additional terms. It is undisputed that Defendants had a no-refund policy: a purchaser who accessed the MBN software and/or training materials was not entitled to a refund if he was unsatisfied with his purchase. Defendants violated the TSR by failing to disclose this policy prior to payment.

*24 The Taylor Defendants also seek to avoid liability for the inadequate disclosure of MBN's refund policy by pointing out that MBN (as opposed to CQD) did no telemarketing, took no credit card information, and accepted no payment. (Aug.2007 Taylor Aff. ¶¶ 2, 9.) Under § 310.3(4)(b) of the TSR, it is a "deceptive telemarketing act or practice" and a TSR violation for an entity to knowingly "provide substantial assistance or support" to a seller or telemarketer that is engaged in a violation of §§ 310.3(a), (c), or § 310.4. *See*16 C.F.R. § 310.3(4)(b). MBN knowingly provided substantial assistance to CQD's violations by developing and supplying the sales script that violated the TSR. Therefore, MBN also engaged in "deceptive telemarketing act[s] or practice[s]" in violation of the TSR.

To sum up, the FTC is entitled to summary judgment that Defendants have violated the TSR, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

Page 27

therefore section 5(a) of the FTC Act, by misrepresenting the nature of the doctor contacts provided to MBN purchasers, misrepresenting that purchasers would not be required to pay a clearinghouse an additional fee to process their claims, and failing to disclose MBN's no-refund policy before the customer paid for the MBN Program.

**V. Liability**

The FTC contends that both MBN and CQD should be held liable for the representations in the MBN sales script, even though CQD, as the telemarketer for MBN, was the entity that actually made representations to consumers. The FTC further argues that Taylor should be held liable for the actions of MBN and that Caceres should be held liable for the actions of CQD.

**A. Liability of MBN for the acts and representations of CQD**

[25][26] Sometime after September 2002, CQD took over the telemarketing of the MBN Program and was the entity that actually made the representations and omissions at issue in this action. (*See, e.g.,*FTC Facts ¶¶ 9798; FTC SJ Ex. 1 at 263:4-264:18.) However, "[t]he law is clear that under the FTC Act, a principal is liable for misrepresentations made by his/her agents (i.e., those with the actual or apparent authority to make such representations) regardless of the unsuccessful efforts of the principal to prevent such misrepresentations."[FN38]*Five-Star Auto Club,* 97 F.Supp.2d at 527;*see also Goodman v. FTC,* 244 F.2d 584, 592 (9th Cir.1957) ("[T]he courts take the view that the principal is bound by the acts of the salesperson he chooses to employ, if within the actual or apparent scope of his authority, even when unauthorized."). Moreover, MBN may be liable for representations made by CQD even if, as Defendants claim, CQD was acting as an "independent contractor." (*See* Taylor Defs.' Resp. ¶ 99); *see, e.g., Five-Star Auto Club,* 97 F.Supp.2d at 527 (holding that defendants

were liable for misrepresentations made by marketing directors even if these individuals would be considered independent contractors by law); *Stefanchik,* 2007 WL 1058579, at *22 ("It is well settled that a principal is liable under the FTC Act for misrepresentations by its agents, even if those agents do not fall within the traditional definition of agency."); *Goodman,* 244 F.2d at 592 ("[R]egardless of the manner in which these salespersons may have been designated in contracts between them and the petitioner or were carried on his books, so far as the public was concerned, they were his authorized agents and acted not only within the apparent but also within the actual scope of their authority."). It is clear that CQD had actual and apparent authority to make representations on behalf of MBN. (*See, e.g.,*FTC Facts ¶¶ 9798; FTC SJ Ex. 1 at 264:4266:2.) For example, Taylor created the sales script and provided it to CQD (*see, e.g.,*FTC Facts ¶¶ 22, 44, 55; Taylor Defs.' Disputed Facts ¶¶ 67, 9396, 98, 100102; Second Taylor Aff. Ex. 63), required CQD and its sales representatives to comply with his "policies" (Zimmerman Aff. Ex. 92 at 128:11-131:14), and recommended that all sales representatives follow the sales script "word for word" (FTC Facts ¶ 55; Taylor Defs.' Disputed Facts ¶¶ 22, 9396, 98, 100, 102; Second Taylor Aff. Ex. 63).*See Stefanchik,* 2007 WL 1058579, at * 1819, 2122 (finding that marketing company acted as agent of defendant based on agreement to market defendant's services, defendant's receipt of a percentage of gross revenue, and defendant's authority to "review and approve ... telemarketing scripts" and direct mail pieces and to determine what products were sold). The sales script indicated that the salesperson was calling from MBN, not CQD. (FTC SJ Ex. 2 at Pl.'s Ex. 1); *see Five-Star Auto Club,* 97 F.Supp.2d at 527 (noting that it would be "inappropriate" for a defendant to hold out salespeople as its representatives and to ' "reap the fruits from their acts and doings without incurring such liabilities as attach thereto.' "). In addition, most of the purchaser declarations submitted by the FTC indicate that the purchaser believed he or she was speaking with a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

representative of MBN. (*See, e.g.,* FTC TRO Ex. 2 ¶ 5, Ex. 3 ¶ 3, Ex. 5 ¶ 5, Ex. 7 ¶ 9, Ex. 8 ¶ 7, Ex. 9 ¶ 6, Ex. 10 ¶ 5, Ex. 11 ¶ 5, Ex. 12 ¶ 7, Ex. 14 ¶ 5, Ex. 16 ¶ 6, Ex. 20 ¶ 6.) Therefore, MBN is also liable for Section 5(a) violations resulting from representations made by CQD as the telemarketer of the MBN Program.

**B. Liability of Taylor and Caceres for acts of MBN and CQD**

**\*25** [27] Individual defendants may be liable for corporate acts or practices if they (1) participated in the acts or had authority to control the corporate defendant and (2) knew of the acts or practices. *FTC v. Crescent Publ'g Group, Inc.,* 129 F.Supp.2d 311, 324 (S.D.N.Y.2001); *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 574 (7th Cir.1989).

[28] "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel,* 875 F.2d at 573-74; *see also Consumer Sales Corp. v. FTC,* 198 F.2d 404, 407-08 (2d Cir.1952), *cert. denied,* 344 U.S. 912, 73 S.Ct. 335, 97 L.Ed. 703 (1953) (holding that individual officer-directors of defendant corporation were properly included in FTC cease and desist order, citing fact that these individuals "directed and guided the corporation in matters of policy.").

[29][30][31] The knowledge requirement is satisfied by "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Amy Travel,* 875 F.2d at 574. An individual's degree of participation in business affairs is probative of knowledge. *Id.* at 573-74. "[T]he FTC is not required to show that a defendant *intended* to defraud consumers in order to hold that individual personally liable." *FTC v. Publ'g Clearing House, Inc. .,* 104 F.3d 1168, 1171 (9th Cir.1997).

[32] Because of the knowledge requirement for individual liability, a defendant's good-faith belief in the truth of a representation, while not relevant to the question of whether the representation violates the FTC Act, may be relevant to whether that defendant can be held individually liable for these misrepresentations. *See Patriot Alcohol Testers,* 798 F.Supp. at 860 n. 3 ("Although ... Prall's purported good-faith belief about the validity of the representations concerning insurance discounts is not material in determining whether such representations violate [Section 5(a) of the FTC Act], it is material in determining whether he can be held personally liable for such representations.").

[33] The requirements for individual liability are clearly met in this case with respect to Taylor. Taylor is the president, chief executive officer, sole director, and sole shareholder of MBN. (FTC Facts ¶¶ 4, 12, 14, 15; Taylor Defs.' Disputed Facts ¶ 21.) He was the "designer and draftsman" of the MBN program and the materials used by MBN to market the program to the public, including the sales script on which all of Defendants' section 5(a) violations are based. (*See, e.g.,* FTC Facts ¶¶ 44, 55, 104108; Taylor Defs.' Disputed Facts ¶¶ 22, 44.) He required CQD and all sales representatives to sign a compliance agreement requiring them to represent the product according to his "policies." (Taylor Defs.' Disputed Facts ¶ 9 3, 95; Zimmerman Aff. Ex. 92 at 128:11 131:14 .) He structured the marketing and registration for the MBN program so that purchasers were not provided with the Registration Agreement, which contained additional disclosures about the nature of the MBN Program as well as its refund policy, until after they had provided credit card information to Defendants based on the representations made in the MBN sales script. (*See, e.g.,* FTC Facts ¶¶ 83, 86; Taylor Defs.' Disputed Facts ¶¶ 44, 46, 66, 68.) He placed advertisements and telemarketed on behalf of MBN. (FTC Facts ¶¶ 17, 43.) Taylor knew of the representations made to consumers during telemarketing calls and knew (1) that the doctors on the Medicare List had not agreed to convert to electron-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----, 2008 WL 857663)

Page 29

ic filing, (2) that Defendants did not have an existing relationship with these doctors and were not "in the process of converting" them to electronic filing, (3) that Medicare did not in fact require doctors to file claims electronically, (4) that there was an additional clearinghouse registration fee of approximately $100 that was not disclosed for some portion of MBN's operation, and (5) that MBN had a no-refund policy that was not disclosed to purchasers by the time they provided credit card information and agreed to be charged. As such, Taylor had authority to control MBN, participated in some of the deceptive acts and practices at issue, and had knowledge of all of them. The Court grants summary judgment as to the individual liability of Taylor for the actions of MBN.

*26 Taylor argues that he did not have knowledge of any misrepresentations, as he believed that the representations in the sales script were "true," "reasonably based," and "carefully researched." (Taylor Defs.' Reply Br. 18.) To the extent Taylor is arguing that he had a good-faith belief in the truth of the representations, he is merely asserting a belief in his own interpretation of the representations, an interpretation that differs from the impression these representations conveyed to the reasonable consumer. For example, the Taylor Defendants cite their assertion that the doctors on the Medicare List were in fact likely to hire an electronic biller because "doctors do indeed use electronic billers."(*Id.*) However, Defendants did not represent that, in general, doctors use electronic billers, but that the doctors on the Medicare list were affiliated in some way with MBN and were in the process of converting to electronic billing. Taylor did not, and could not have had, a good-faith belief in this representation, because he knew that it was not accurate.

Finally, the Taylor Defendants repeatedly point out that Taylor designed the marketing of the MBN Program, including the sales script and compliance guidelines, to comport with applicable FTC laws. (*See, e.g.,* Taylor Defs.' Disputed Facts ¶¶ 8, 10, 22,

3436, 4246, 67, 86.) Taylor specifically refers to an excerpt from a court order allegedly issued in *Federal Trade Commission v. Medicor,* which directed Medicor to alter its sales script to include specific verbiage. (*See* Second Taylor Aff. Ex. 65.) Taylor claims to have "extrapolated" some of this verbiage for use in the MBN sales script. (Taylor Defs.' Disputed Facts ¶ 86; Second Taylor Aff. Ex. 65; Zimmerman Aff. Ex. 92 at 99:3-101:16.) [FN9]Indeed, Taylor previously worked as a telemarketer for Medicor, an organization that sold similar home medical billing opportunities and was found to have engaged in multiple violations of the FTC Act for similar misrepresentations to those at issue in this action, *see Medicor,* 217 F.Supp.2d at 105354, he testified that he "was never really clear on" the reasons why Medicor had been sued by the FTC. (Zimmerman Aff. Ex. 92 at 99:12-100:6.) Leaving aside Mr. Taylor's *bona fides,* it is sufficient to point out that because Taylor's assessment regarding the legality of the MBN marketing was wrong, this argument is unavailing. *Cf. Cyberspace.com LLC,* 453 F.3d at 1202 (" '[R]eliance on advice of counsel [is] not a valid defense on the question of knowledge' required for individual liability."(quoting *Amy Travel,* 875 F.2d at 575)).

[34] With respect to the individual liability of Caceres, the undisputed evidence indicates that, as the president, secretary, treasurer, sole director, and principal owner of CQD, Caceres had authority to control CQD, at least until early 2005. (Caceres Resp. ¶ 20; FTC TRO Ex. 1 Att. B 78.) Undisputed evidence also indicates that Caceres had knowledge of the falsity of the representations regarding the doctor contacts provided by MBN and regarding MBN's no-refund policy. (*See, e.g.,*FTC Facts ¶ 82; Caceres Resp. ¶¶ 8182.) For example, the FTC cites a letter from around July 2003 written by Caceres to Citibank in opposition to a purchaser's attempt to dispute his charge for the MBN program. (FTC TRO Ex. 2 at Ex. D.) The letter indicates Caceres's knowledge of the nature of the doctor contacts provided by MBN. Caceres disputes the purchaser's misunderstanding that MBN would "provid[e] doc-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

Page 30

tors" for purchasers, arguing that the Registration Agreement "clearly states ... the service we provide"-the purchaser is entitled to "a database of physicians who have been identified by Medicare as filing their claims on paper."[FN40](FTC TRO Ex. 2 ¶¶ 15-17, Ex. 2 at Exs. A, D.) In the letter, Caceres further argues that the Registration Agreement "clearly states" that the purchase of the MBN Program was non-refundable once the Membership Agreement was accepted. (FTC TRO Ex. 2 ¶¶ 15-17, Ex. 2 at Exs. C.D.) Caceres also testified at his deposition that "we tried to stick with" MBN's policy of not providing refunds after acceptance of the Registration Agreement, indicating that Caceres knew of the existence of the policy. (Zimmerman Aff. Ex. 94 at 169:3-171:16.) The FTC is entitled to summary judgment on the issue of Caceres's individual liability relating to the misrepresentations regarding doctor contacts and the post-payment disclosure of MBN's no-refund policy.

*27 [35] The FTC has not directed the Court's attention to any evidence indicating that Caceres knew of the additional fee required for a purchaser to submit claims to MBN's clearinghouse. While "[t]he degree of participation in business affairs is probative of knowledge,"*Amy Travel,* 875 F.2d at 573-74, and Caceres, by his own admission, "was constantly thinking about how to improve the program" (Caceres Resp. ¶ 101; Caceres Supp'l Resp. 6-7), the FTC has not cited to evidence indicating that Caceres was involved in this aspect of the business. The FTC is therefore not entitled to summary judgment on the issue of Caceres's individual liability for Defendants' representations regarding these additional costs.

**C. Injunctive relief**

In its summary judgment papers, the FTC requests the entry of a permanent injunction and monetary damages pursuant to Section 13(b) of the FTC Act. 15 U.S.C. § 53(b).Section 13(b) states that "in proper cases the [FTC] may seek, and after proper proof, the court may issue a permanent injunction."

[36][37][38] The FTC has demonstrated that a permanent injunction is warranted against Defendants. Section 13(b) permits a court to issue a permanent injunction for the violation of any law enforced by the FTC. *See, e.g., Minuteman Press,* 53 F.Supp.2d at 260;*FTC v. Evans Prods. Co.,* 775 F.2d 1084, 1086-87 (9th Cir.1985)."Permanent injunctive relief is appropriate when there is a 'some cognizable danger of recurring violation.' " *Medicor,* 217 F.Supp.2d at 1057;*see also Minuteman Press,* 53 F.Supp.2d at 260 ("A permanent injunction may properly issue in those situations involving a 'cognizable danger of recurrent violation[s]' " (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953))). Some factors to consider in determining whether such a danger exists include: the defendants' scienter, whether the conduct was isolated or recurrent, whether defendants are positioned to commit future violations, the degree of consumer harm caused by defendants, defendants' recognition of their culpability, and the sincerity of defendants' assurances (if any) against future violations.*Minuteman P ress,* 5 3 F.Supp.2d at 260-61. As discussed above, Defendants knowingly made misrepresentations to consumers for years and a large number of consumers purchased the MBN program based on these misrepresentations. Defendants do not recognize their culpability, but continue to insist that their representations were true, ignoring the obvious impressions that they actually conveyed to consumers. Under these circumstances, a permanent injunction is warranted.

However, because the FTC's claims against Defendants have not been completely resolved on summary judgment, the scope of the permanent injunction that will ultimately issue is as yet undetermined and entry would be premature at this time. Once all liability issues are resolved, the Court will enter an appropriate injunction directed towards the deceptive acts and/or practices for which Defendants have been found liable.

**D. Monetary Damages**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)

**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

**\*28** Section 13(b) of the FTC Act has been interpreted as granting a court the authority to order a defendant to pay restitution as ancillary relief to effectuate a permanent injunction. *See, e.g., FTC v. Febre,* 128 F.3d 530, 534 (7th Cir.1997) ("The power to grant ancillary relief includes the power to order repayment of money for consumer redress as restitution or recession."); *see also FTC v. Verity Int'l Ltd.,* 443 F.3d 48, 66 (2d Cir.2006) (noting that Fifth, Seventh, Eighth, Ninth, and Eleventh circuits had concluded that § 13(b) permitted restitution or other ancillary equitable relief); *FTC v. Freecom Commc'ns, Inc.,* 401 F.3d 1192, 1203 n. 6 (10th Cir.2005) ("Although § 13(b) does not expressly authorize a court to grant consumer redress (i.e., refund, restitution, rescission, or other equitable monetary relief), § 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable remedies, including the power to grant consumer redress."); *Five-Star Auto Club,* 97 F.Supp.2d at 533 ("This grant of permanent injunctive power gives the court broad equitable authority to 'grant any ancillary relief necessary to accomplish complete justice,' ").

[39][40] Because the Court has held that a permanent injunction is warranted in the instant case, restitution may also be available. However, while consumer reliance need not be established in order to issue a permanent injunction, the FTC must make such a showing before a court may order restitution under § 13(b).*Freecom Commc'ns,* 401 F.3d at 1205. The FTC satisfies its burden, however, by showing that "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products."FN41*Id.* at 1206.As discussed above, Defendants made material misrepresentations that were misleading to a reasonable consumer. These misrepresentations, all of which were part of the MBN sales script, were widely disseminated, and led to an estimated 20,000 sales.

[41] In the Second Circuit, "[t]he appropriate measure for restitution is the benefit unjustly received by the defendants."*Verity,* 443 F.3d at 67. Under the circumstances presented, in which Defendants sold directly to consumers and no non-party middleman received any part of the payment, the Defendants' "unjust gains" are equivalent to the consumers' loss. *Id.* at 67-68 ("[I]n many cases in which the FTC seeks restitution, the defendant's gain will be equal to the consumer's loss because the consumer buys goods or services directly from the defendant."). It is initially the FTC's burden to provide a reasonable approximation of this amount. *Id.* at 67.If the FTC "show[s] that its calculations reasonably approximated the amount of the defendant's unjust gains ... 'the burden shifts to the defendants to show that those figures were inaccurate.' " *Id.* (quoting *Febre,* 128 F.3d at 535).

**\*29** What constitutes a "reasonable approximation" of unjust gains may vary depending on the information available to the FTC. *See id.* at 69 ("Of course, the reasonableness of an approximation varies with the degree of precision possible."). While "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty," the FTC should use available resources to obtain and make use of relevant information in constructing its estimate. *See id.* at 69-70 (vacating district court's monetary award of district court that "required no precision even though precision could be had" in light of the "FTC's investigatory power"); *see also FTC v. Oks,* No. 05 C 5389, 2007 WL 3307009, at \*6 (N.D.Ill. Nov.2, 2007) (denying motion for summary judgment with respect to monetary relief for Section 5(a) violation where "the FTC has failed to provide sufficient information with regard to the calculation of the monetary relief sought.").

The FTC proposes that Defendants be held jointly and severally liable for a restitution award of $4,000,000, a calculation based on 20,000 sales of the MBN product at $199 each for the period from the time CQD took over telemarketing for MBN FN42 until February 10, 2005, when the Complaint in this action was filed ("the CQD Period"). (FTC

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

Br. 23.) The FTC also seeks $294,380 from Taylor and MBN for income earned from MBN program sales in 20012002, prior to the creation of CQD. (*Id.* at 24.)Finally, the FTC seeks recovery of any income earned by Defendants from sales made between February 10, 2005 and December 6, 2005, the period during which the parties have stipulated that Defendants made sales in contempt of the Court's March 18, 2005 Stipulated Preliminary Injunction Order ("the Contempt Period").(*Id.*) The FTC acknowledges that the amount of damages assessed for sales made during the Contempt Period will need to be determined at a hearing. (*Id.* at 24 n. 11.)

The FTC estimates Defendants' earnings from sales of the MBN Program during the CQD Period based on Taylor's deposition testimony stating that "about 20,000 units of the MBN products" were sold at prices of $199, $219, and $299 per unit since CQD took over the telemarketing for MBN. (FTC Facts ¶ 117; FTC SJ Ex. 1 at 283:21-284:22.) Defendants do not dispute the FTC's assertion that 20,000 sales were made at a price of between $199 and $299. (*See, e.g.,* Caceres Resp. ¶ 117, Taylor Defs.' Resp. ¶ 117.) Assuming 20,000 sales were made during the CQD Period at $199, $219, and $299 per sale, consumers paid between $3,980,000 and $5,980,000 to defendants during this period. Since Defendants apparently concede that these sales were made at these prices, the Court finds that the FTC has demonstrated that consumer loss totaled at least $3,980,000 (less any refunds paid during this period), and that this constitutes a reasonable approximation of Defendants' unjust gains during the CQD Period. [FN43]

**\*30** The FTC asserts that is entitled to recover $294,380 from Taylor and MBN for income earned from sales of the MBN Program that occurred before Caceres and CQD took over telemarketing for MBN. (FTC Br. 24.) The FTC appears to have based this figure on Taylor's Financial Disclosure Statement, which indicates that he earned $32,800 in 2001 and $261,580 in 2002 from MBN. (FTC

Facts ¶¶ 119, 123; FTC SJ Ex. 9.) The Court is aware of no evidence in the record indicating precisely when the CQD Period began. Taylor's deposition testimony suggests that Caceres took over telemarketing for MBN sometime after August or September of 2002. (FTC SJ Ex. 1 at 263:4-264:18.) A damages judgment of $3,980,000 from Defendants for the CQD Period and $294,380 from Taylor for 2001 and 2002 sales of the MBN Program would potentially constitute double recovery. The Court therefore finds that the FTC has not provided a reasonable approximation of Taylor and MBN's unjust gains from sales prior to the CQD Period. *See Oks,* 2007 WL 3307009, at \*6 ("The FTC must clarify which amount it seeks (for what time period) and specify precisely how that amount is calculated with proper evidentiary support for that specific time period.").

Though the Court finds that the FTC has provided a reasonable approximation of Defendants' unjust gains during the CQD Period, summary judgment with respect to a fixed amount of damages would be premature at this time in light of the necessity for further proceedings regarding Defendants' liability for Counts I and III, the calculation of damages for sales before and after the CQD Period, and the calculation of any refunds issued by Defendants. The Court will address damages issues more comprehensively at a later date. At such time, Defendants will have an opportunity to present evidence demonstrating that the FTC's approximations of Defendants' unjust gains are inaccurate.

### CONCLUSION

The FTC's motion for summary judgment [40] is granted in part and denied in part. The Taylor Defendants' motion for summary judgment [53] is granted in part and denied in part.

SO ORDERED.

FN1. The Court's review and assessment of Defendants' evidence was made consider-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

ably and unnecessarily more difficult by Defendants' repeated use of incorrect exhibit numbers in their citations, failure to tab or otherwise separate exhibits, failure to provide the Court with copies of all exhibits, and failure to provide deposition transcripts with visible page numbers.

FN2. "Taylor Defendants' Statement of Material Facts in Dispute in Response to Plaintiff's Motion for Summary Judgment" can be found at pages 16-29 of the Taylor Defendants' submission entitled "Statement of Defendants Medical Billers Network, Inc. and Chris Taylor Pursuant to Local Rule 56.1."

FN3. "Taylor Defendants' Response to Plaintiff's Statement of Material Facts Not in Dispute in Support of Plaintiff's Motion for Summary Judgment" can be found at pages 2-16 of the Taylor Defendants' submission entitled "Statement of Defendants Medical Billers Network, Inc. and Chris Taylor Pursuant to Local Rule 56.1."

FN4. Caceres maintains that he cut ties with CQD and left the medical billing industry in late March or early April of 2005. (Caceres Resp. ¶ 34.) However, a letter from Caceres to FTC attorney Ronald Waldman dated September 3, 2005 describes Caceres's continuing active involvement with MBN and/or CQD. (FTC SJ Ex. 5.)

FN5. The Taylor Defendants purport to dispute this fact, asserting that the evidence cited by the FTC does not support its assertion and citing Exhibit 58t and pages 320-22 of Taylor's deposition. The Caceres deposition testimony cited by the FTC clearly supports the statement. Furthermore, the Taylor Defendants have provided no exhibit numbered 58t, and the cited pages of Taylor's deposition either do

not exist or have not been provided. The Taylor Defendants have not successfully established that this fact is in dispute.

FN6. The Taylor Defendants state that the Compliance Agreement appears at Exhibit 10. However, there is no Exhibit 10 accompanying the Taylor Defendants' summary judgment papers. It appears that the Compliance Agreement is included as Exhibit 51 to the Taylor Defendants summary judgment papers. (*See* First Aff. of Christopher Taylor, May 23, 2007 ("First Taylor Aff.") ¶ 53, Second Taylor Aff. Ex. 51.)

FN7. The Taylor Defendants now purport to dispute the FTC's assertion that "[i]n numerous instances, Defendants' classified ads indicated that consumers can earn significant income."(FTC Facts ¶ 50; Taylor Defs.' Resp. ¶ 50.) However, Defendants previously admitted this fact in their Answer to the FTC's Amended Complaint. (Am. Answer ¶ 6.)

FN8. Caceres claims, without citation to supporting evidence, that these ads ran for only "about ten days." (Caceres Resp. ¶ 31.) Confirmation letters from Advertising Connection, the company that placed the ads, indicate that they ran for fifteen weeks. (FTC Facts ¶¶ 128-129, FTC SJ Ex. 8.) Previously, in a September 3, 2005 letter to the FTC's counsel, Caceres stated that these ads ran for three weeks. (FTC SJ Ex. 5.)

FN9. The Taylor Defendants now purport to dispute the FTC's assertion that "[c]onsumers who call Defendants are told that they will receive the software necessary to do electronic billing for physicians in the consumer's local area."(FTC Facts ¶ 54; Taylor Defs.' Resp. ¶ 54.) However, Defendants previously admitted this fact in their Answer to the FTC's Amended Com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----, 2008 WL 857663)

plaint. (Am. Answer ¶ 6.)

FN10. The Taylor Defendants maintain that any "specific earnings representations," such as the $500/week representation, were made by CQD telemarketers in disregard of the MBN guidelines. (Taylor Defs.' Resp. ¶ 32.) The Taylor Defendants claim they are responsible only for the representations in the MBN sales script and sales training materials.(*Id.*)

FN11. The sales script also included a "Rebuttals" section that included suggested responses to the following questions: Q: "How do I get the doctors?"A: "[MBN] will assist you in getting set up with doctor contacts."(FTC SJ Ex. 2 at Pl.'s Ex. 2.) Q: "So you give me the doctor?"A: "[W]e have a biller placement department that will assist you in getting set up with doctor contacts after you complete the training."(*Id.*)

FN12. Cheryl Peacock declared that she charges $5 per claim, earns approximately $400 per week billing for two clients. (Second Taylor Aff. Ex. 30.) Debra Chase declared that she charges $2.50 or $3.50 per claim and earns approximately $1700 per month billing for three clients. (*Id.*) Janice Thomas declared that she charges $8 per claim and processes an average of between 100 and 300 claims per week billing for one client.(*Id.*) Charlton declared that she charges $5 per claim and earned approximately $370 per month billing for one client. (*Id.*)

FN13."Taylor Defendants' Statement of Material Facts Not in Dispute in Support of Taylor Defendants' Cross Motion for Summary Judgment" can be found at pages 30-34 of the Taylor Defendants' submission entitled "Statement of Defendants Medical Billers Network, Inc. and Chris

Taylor Pursuant to Local Rule 56.1."

FN14. These communications are inadmissible hearsay for the purpose of showing that purchasers were in fact able to enter into contracts with doctors and the Court cannot consider them. The Taylor Defendants also cite to a number of emails allegedly sent by MBN purchasers indicating that they successfully contracted with providers who would use their electronic billing services. (*See, e.g.,* Second Taylor Aff. Ex. 6, Ex. 57.) The FTC correctly objects to these emails as hearsay. (*See, e.g.,*FTC Resp. ¶¶ 12, 54.) Likewise, the statements in the declarations of David Arnold, Christa Merrill, Sue Moore, and Chris Taylor that they received emails from MBN purchasers reporting that they had successfully contracted with physicians are based on hearsay, not personal knowledge, and are inadmissible. (*See* Second Taylor Aff. Ex. 36, Ex. 38, Ex. 40, Ex. 41;) Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge...."); *see also Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge, and a hearsay affidavit is not a substitute for the personal knowledge of a party....") (internal citation omitted). The purchaser emails and statements of Defendants' employees based on the content of these emails will not be considered by the Court as evidence that purchasers actually contracted with providers.

FN15. Taylor told Kichline that she would be working for Caceres and CQD. (FTC Facts ¶ 115.) However, she reported to Taylor. (Caceres Resp. ¶¶ 115, 116.)

FN16. In a sworn declaration, however, Kichline stated that it was typically neces-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

sary to contact between five and ten offices in order to generate three surveyed leads for a purchaser. (Second Taylor Aff. Ex. 90.)

FN17. An undated letter from Caceres written around July 2003 indicates Caceres's understanding that the Registration Agreement states that the medical billing opportunity is non-refundable once accepted by the purchaser. (FTC Facts ¶ 82; FTC TRO Ex. 2 at Ex. D .)

FN18. Specifically, the purchasers state that they were not informed of costs such as the fee to obtain a medical billers license (FTC TRO Ex. 2 ¶ 12, Ex. 6 ¶¶ 11-12, Ex. 12 ¶ 12), fees for access to doctor contacts (id.Ex. 5 ¶ 11), a fee to be "put on the payroll" (id.Ex. 6 ¶¶ 9-12), fees for supplies (id.Ex. 12 ¶ 12 (forms), Ex. 15 ¶ 10 (medical coding manual), Ex. 20 ¶ 14 (medical coding books)), a fee to join their clearinghouse (id.Ex. 14 ¶ 13, Ex. 15 ¶ 10, Ex. 18 ¶ 15, Ex. 20 ¶ 14), and the clearinghouse's per claim charge for processing bills (id.Ex. 14 ¶ 13). (SeeFTC Facts ¶ 89 .).

FN19. The FTC cites two declarations in support of its claim that "Defendants misrepresented or failed to disclose ... additional or excessive requirements in order to complete the training."(FTC Facts ¶ 90.) One declarant stated that he was unaware of the need to buy a coding manual. (FTC TRO Ex. 15 ¶ 10.) Another stated that he was "surprise[d]" and "angry" that he was required to complete two online traiuing courses when he believed that the training consisted of only one course. (Id. Ex. 12 ¶ 11.)

FN20. In support of Defendants' failure to disclose their inadequate or unresponsive training support, the FTC offers declara-

tions of purchasers who report not receiving receive helpful answers via email (FTC TRO Ex. 12 ¶ 9), receiving no response to questions submitted via email (id.Ex. 11 ¶ 7), and being unable to contact MBN by phone (id.Ex. 9 ¶¶ 13-14, Ex. 11 ¶ 7)). Caceres disputes that training support was inadequate, however, maintaining that "Customer service was available." (Caceres Resp. ¶ 91.)

FN21. Caceres's former connsel asked to withdraw after learning that Caceres planned to argue that he sold his home in violation of this Court's Asset Freeze Order with the approval of his former counsel. (See Mar. 17, 2006 Tr. at 5:128:22, 19:59.)

FN22. Caceres also purports to cite to data from the Department of Labor, Bureau of Labor Statistics on wages of "Medical Records and Health Information Technicians."(Caceres Resp. ¶ 47.) As discussed infra, there is no reason to believe that these statistics have any relevance to the expected earnings of home-based medical billers using the MBN Program.

FN23. Furthermore, while Caceres did not submit a Memorandum of Law, his "Response" and "Supplemental Response" both include Caceres's arguments responding to the FTC's brief. The Court rejects the FTC's suggestion that Caceres has, due to his failure to submit a separate document labeled as a memorandum of law, "consented to all of the FTC's legal arguments."(FTC Caceres Reply 10.)

FN24. As the Tenth Circuit has noted, "reference to the 'reasonable consumer' in the context of Section 5 may be misleading. Consumer protection laws exist to protect 'the public-that vast multitude, which includes the ignorant, the unthinking, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----, 2008 WL 857663)

the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions.' 'Unlike the abiding faith which the law has in the "reasonable man," it has very little faith indeed in the intellectual acuity of the "ordinary purchaser" who is the object of the advertising campaign.' "The average purchaser has been variously characterized as not "straight thinking," subject to "impressions," uneducated, and grossly misinformed; ... he wishfully believes in miracles ....' At the same time, however, courts should remain mindful that 'the purchasing public must be credited with at least a "modicum of intelligence," a "minimum capacity for discrimination." Ordinary carelessness does not encompass extraordinary blindness.' " *FTC v. Freecom Commc'ns, Inc.,* 401 F.3d 1192, 1202 n. 5 (10th Cir.2005) (internal citations omitted).

FN25.Federal Rule of Evidence 803(8) states that "records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ... unless the sources of information or other circumstances indicate lack of trustworthiness" are not excluded by the hearsay rule. Fed.R.Evid. 803(8). No foundational testimony is required in order to admit evidence under this hearsay exception. *See U.S. v. Doyle,* 130 F.3d 523, 546 (2d Cir.1997)."In order to fit within the purview of Rule 803(8)(C), the evidence must (1) contain factual findings, aud (2) be based upon an investigation made pursuant to legal authority. Once a party has shown that a set of factual findings satisfies the minimum requirements of Rule 803(8)(C), the admissibility of such factual

findings is presumed. The burden to show 'a lack of trustworthiness' then shifts to the party opposing admission."*Bridgeway Corp. v. Citibank,* 201 F.3d 134, 143 (2d Cir.2000). The BLS statistics appear on their face to be factual findings made pursuant to legal authority. The FTC has objected to the BLS statistics as hearsay, but has made no attempt to show that these statistics are untrustworthy. (FTC Resp. ¶ 1.)

FN26. In an October 22, 2007 letter to the Court, the FTC requested permission to supplement the record with a sworn declaration from Karen Knicely (the "Knicely Declaration"), the Vice President and Chief Financial Officer of Electronic Translations and Transmittals Corporation ("ET & T"), the medical billing clearinghouse to which MBN purchasers were referred. (Knicely Decl. ¶ 6; Zimmerman Aff. Ex. 92 at 159:13-17.)

According to the FTC, the Knicely Declaration was not submitted as part of its original summary judgment papers because the FTC became aware of the potential relevance of Ms. Knicely's testimony only after Defendants' belated production of correspondence between ET & T and MBN regarding the low success rates and inadequate knowledge of medical billers referred by MBN. In subsequent correspondence to the Court, Defendants do not deny that this correspondence was not timely produced to the FTC, but nevertheless object to the FTC's request to supplement the record, claiming that Defendants have been denied the opportunity to respond to the Knicely Declaration. The FTC indicated that it would not object to Defendants' submission of an affidavit in response to the Knicely Declaration, but Defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

never requested leave to file any such response. Defendants did respond to the Knicely Declaration, however, both in a October 23, 2007 letter to the Court and at oral argument. The Court finds that Defendants are not prejudiced by the Court's consideration of the Knicely Declaration and grants the FTC's request to supplement the record.

In her declaration, Ms. Knicely states that ET & T employees reported that they received "frequent and time-consuming inquiries from MBN's customers," whose "basic questions demonstrate[ed] that they lacked the requisite knowledge and training to process a medical bill and were receiving inadequate software support from MBN ." (Knicely Decl. ¶ 19.) In February 2004, based on ET & T's records and consultations with staff, Knicely determined that, in fifteen months, only twelve MBN purchasers had enrolled with ET & T, and only four had submitted a claim. (*Id.* at ¶¶ 2 0-21.)Knicely further states that "ET & T staff ... repeatedly informed Taylor of the extremely low success rate of MBN's customers ."(*Id.* at ¶ 24.)Knicely eventually terminated the relationship with MBN and refused to accept any new MBN customers due to continued problems with MBN purchasers. (*Id.* at ¶ 27.)Knicely states that she consulted ET & T's database containing yearly claims data for MBN purchasers and determined that, during the entire course of the relationship between MBN and ET & T (from October 2002 until March 2005), only twenty-eight MBN purchasers submitted claims to ET & T, that the MBN customers were, as a group, "very minimal billers with the great majority unable to submit more than a few hundred claims per year," and that most "were

only enrolled with ET & T for six months or less and had only one doctor account, which ET & T has found insufficient to become a successful medical biller."(*See id.* at ¶ 31.)

Attached to the Knicely Declaration are the data on which Knicely's statements regarding the success of MBN purchasers are based-a spreadsheet summarizing the number of claims filed by MBN purchasers who enrolled with ET & T from 2002 through 2007. (*See id .*Att. D.) At oral argument, the FTC sought to rely on these data as evidence that Defendants' earnings representations were false. Defendants do not deny that this information is accurate but correctly object that this portion of the Knicely Declaration is based on inadmissible hearsay.

Knicely's testimony about the number of claims submitted by MBN purchasers is based on her review of yearly claims data in the ET & T database.(*Id.* at ¶ 31.)The Court cannot consider the information from the database under the "business records" hearsay exception provided by Federal Rule of Evidence 803(6) because the FTC has not submitted the necessary foundation testimony. *See*Fed.R.Evid. 803(6) (requiring "testimony of the custodian or other qualified witness [or certification under Rules 902(11) or 902(12) ]" showing that evidence is "[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, [ ] kept in the course of a regularly conducted business activity, and [that] it was the regular practice of that business activity to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

make the memorandum, report, record or data compilation.") The Court notes, however, that data regarding the number of claims submitted by MBN purchasers to the only clearinghouse to which MBN purchasers were directed (at least until March 2005), if admissible, would likely resolve any disputed issue of fact regarding whether Defendants' earnings representations were false and/or misleading. If the FTC wishes to renew its motion with respect to Defendants' earnings representations at a later time, supported by the ET & T data and a supplemental affidavit providing the foundation testimony required by Rule 803(6), the Court may revisit its decision on this issue at such time.

FN27. Resolving ambiguities in favor of Defendants, the Court has calculated this average using the larger amount reported by those declarants who reported an earnings range. This average includes the earnings of one declarant who reported an income of between $800 and $2400 per week.

FN28. The FTC notes that Defendant Taylor previously worked as a telemarketer for Medicor, the defendant in *Medicor.*(Pl.'s Reply Mem. as to Taylor Defs. ("FTC Taylor Reply") 18; Zimmerman Aff. Ex, 92 at 31:2433:1.)

FN29.*See, e.g.,*FTC TRO Ex. 2 ¶ 7 ("The representative also implied that MBN had relationships with doctors' offices to receive medical bills."), Ex. 3 ¶ 7 ("The representative added that MBN would refer me to doctors in my area who would use my services to process their medical bills."), Ex. 4 ¶ 13 ("It was also my understanding that MBN would find my first physician client which they did not do."), Ex. 5 ¶ 6 ("[T]he [MBN] representative

told me that once I passed the test and was referred to doctors who were in need of my services, my only responsibility would be to pick up the work at the doctors' offices and mail it back upon completion."), Ex. 6 ¶ 8 ("I was also supposed to get access ... to a list of doctors interested in employing people like me to process their medical bills."), Ex. 7 ¶ 6 ("[The representative] said that [MBN] had connections to the local doctors on this list and ... assured [sic] me that there was available work in my local area."), Ex. 7 ¶ 7 ("I expected to do well based on the impression that the representative gave me that my new medical billings [sic] skills were highly needed by the local doctors."), Ex. 10 ¶ 5 ("The impression I got from the [MBN] representative was that they would provide me with the names of doctors that were ready, willing, and able to retain me to provide medical billing services-these would be doctors who had been contacted directly by [MBN] and that when I contacted these doctors they would know I was [an MBN] trained billing processor."), Ex. 14 ¶ 7 ("The reprcseutative also said that MBN knew of doctors in my area who needed medical billing services, doctors who were waiting for me to start working for them."), Ex. 14 ¶ 14 ("I learned that MBN would not set me up with a doctor's office for billing, but would only provide me with a list of doctor's offices, which I would then be expected to solicit on my own. This contradicted my prior impression-rooted in my initial telephone conversation with MBN's representative-that MBN would actively help place me with a doctor(s) in my area."), Ex. 15 ¶ 7 ("After my conversation with Ms. Jane Kelly I felt reassured that upon completing the training, MBN's marketing team would contact me and introduce me to doctors ... who were known by MBN and who needed to hire

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

me as a representative of MBN to process claims on their behalf."), Ex. 23 ¶ 5 ("I was also informed ... that the doctors I would be working for were members of MBN....").

FN30. Taylor indicated at his deposition that the claim that physicians who "converted" to electronic filing would be "in compliance with new Medicare requirements" referred only to the fact that MBN's software was compliant with these HIPAA standards, not that electronic filing of Medicare claims was required. (Zimmerman Aff. Ex. 92 at 91:4-97:4.)

FN31. Defendants rely on the following section of the Registration Agreement in support of their argument that their representations regarding physician leads were not misleading (*see* Taylor Defs.' Opp'n Br. 18 n. 11):

# 4. I understand that MEDICAL BILLERS NETWORK is not an employment agency, nor do I work directly for MEDICAL BILLERS NETWORK. I understand that as a member I am entitled access to online databases of physicians who have been identified by Medicare as filing their claims on paper, as well as extensive marketing tools and information to help me secure contracts with those physicians. I acknowledge that completing the training is my responsibility and upon completion of the training I am entitled to assistance from MEDICAL BILLERS NETWORK in locating doctors who can benefit from my services. I understand and accept that MEDICAL BILLERS NETWORK cannot guarantee my success and that my success as a medical biller is ultimately dependent on my own ability to complete the training, perform the work correctly and present and conduct myself

professionally,

(Second Taylor Aff. Ex. 12.)

FN32. The FTC also asserts TSR violations based on Defendants' misrepresentations (1) that MBN purchasers are likely to earn a substantial income, and (2) that MBN will provide purchasers with information about physicians who are likely to use the purchasers' medical billing services. The Court has already addressed these alleged misrepresentations in connection with Counts I and II of the FTC's Complaint, respectively. For the same reasons discussed *supra* with respect to whether these representations constituted "deceptive acts or practices" under Section 5 of the FTC Act, the Court holds that (1) neither party is entitled to summary judgment on the issue of whether Defendants' earnings representations constitute a violation of the TSR, and (2) the FTC is entitled to summary judgment that Defendants' representations regarding physician contacts constitute a violation of the TSR.

In its reply brief, the FTC attempts to raise two additional representations it alleges violate § 310.3(a)(2)(iii) of the TSR: representations regarding the availability of training materials and representations regarding the adequacy and responsiveness of MBN's customer snpport. (Pl.'s Reply Br. 1112.) These claims were raised for the first time in the FTC's reply brief To avoid prejudice to Defendants, who have had no opportunity to respond, the Court will not consider these additional purported grounds supporting Count III. *See, e.g., In re Dobbs,* 227 Fed. Appx. 63, 64 (2d Cir.2007) ("[W]e think that it was entirely proper for the District Court to decline to consider debtor-appellant's argument, raised for the first time in its reply

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

brief"); *Playboy Enters., Inc. v. Dumas,* 960 F.Supp. 710, 720 n. 7 (S.D.N.Y.1997) ("Arguments made for the first time in a reply brief need not be considered by a court."). In any case, though Defendants did represent in the MBN sales script that purchasers would have access to free training materials and free online technical support (FTC SJ Ex. 2 at PL's Ex. 1), Defendants would likely be entitled to summary judgment on the FTC's claims that these representations violated the TSR, given the meager record before the Court. The evidence supporting the claim that Defendant misrepresented the accessibility of its training materials consists of the declarations of three purchasers who had problems accessing or downloading the MBN training materials and one who did not receive a disk necessary to complete the training. (FTC Facts ¶ 90.) The evidence supporting the claim that Defendant misrepresented the quality of its online technical support consists of the declaration of one purchaser who received no response to two emails sent to MBN customer support and the declaration of another who received responses but found them "not helpful." (*Id.* at ¶ 91.)"Confronted with a properly supported summary judgment motion, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to find in his favor."*See, e.g., Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101 (2d Cir.2001). Neither of the FTC's new Count III grounds is supported by evidence from which a reasonable jury could conclude that the unavailability of training materials or inadequacy of technical support was so common or typical as to constitute a "material aspect of the performance, efficacy, nature, or central characteristics" of the MBN Program. 16

C.F.R. § 310.3(a)(2)(iii).

FN33. This representation was apparently false; Taylor testified at his deposition that MBN worked with the ET & T clearinghouse. (Zimmerman Aff. Ex. 92 at 159:13-17.)

FN34. The FTC also cites three declarations of purchasers complaining of other "hidden costs" for "forms" (FTC TRO Ex. 12 ¶ 12) and medical coding manuals (*id.*Ex. 15 ¶ 10, Ex. 20 ¶ 14). There are disputed issues of fact as to whether any of Defendants' representations (such as the representation that there was a "one-time programming fee of $199") implied that purchasers would have no costs for supplies. (FTC SJ Ex. 2 at Pl.'s Ex. 1.) Defendants' representation that the "one-time programming fee" covered "free training" implies that the purchaser will not have to purchase additional manuals in order to complete the training. (*Id.*) However, it is not clear from the declarations whether these medical coding manuals were actually required to complete the training or whether the declarants bought them on their own initiative as a supplement to the MBN training. There are therefore disputed issues of fact as to whether Defendants misrepresented that there would be no costs to the purchaser for additional coding manuals. On the present record, neither party is entitled to summary judgment on the FTC's claims for TSR violations based on Defendants' representations regarding allegedly "hidden costs" associated with forms and coding manuals.

FN35. I t is unclear when Defendants actually charged purchasers' credit cards. While Defendants assert that "the evidence plainly demonstrates [that] ... payment wasn't finalized until registration was complete" (Taylor Defs.' Opp'n Br. 4243) and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

that "only when the customer acknow-ledged having read the agreement ... and had accepted all the terms, was there pay-ment by the consumer"(*id.* at 40 & n. 13), the Court is aware of no evidentiary sup-port for this statement, which is in fact dir-ectly contradicted by Defendants' argument that purchasers could and did receive re-funds prior to acceptance of the Registra-tion Agreement (*see, e.g.,* Aug. 2007 Taylor Aff. ¶ 5 (stating that there were "many instances in which customers have 'paid' CQD for the MBN Product by ten-dering a credit card" then later, before ac-cepting the Registration Agreement, "cancelled the deal" and received an "immediate credit" or "refund")). Taylor stated in his deposition that he did not know at what point CQD processed pur-chasers' credit cards but that "to [his] knowledge, they processed everybody that signed up."(FTC SJ Ex, 1 at 286:4-15.) However, Taylor also indicates that he "set up the MBN website" so that purchasers had to accept the terms of the Registration Agreement before they "completed their purchase of and paid for the MBN product."(First Taylor Aff. ¶ 41.)

FN36. A seller is defined as "any [individual, group, unincorporated associ-ation, limited or general partnership, cor-poration, or other business entity] who, in connection with a telemarketing transac-tion, provides, offers to provide, or ar-ranges for others to provide goods or ser-vices to the customer in exchange for con-sideration."16 C.F.R. § 310.2(o), (r). Taylor acknowledges that MBN is a "seller" according to this definition. (Aug.2007 Taylor Aff. ¶ 2.)

FN37. A telemarketer is defined as "any [individual, group, unincorporated associ-ation, limited or general partnership, cor-

poration, or other business entity] who, in connection with telemarketing, initiates or receives telephone calls to or from a cus-tomer."16 C.F.R. § 310.2(o), (t). Taylor acknowledges that CQD is a "telemarketer" according to this definition. (Aug.2007 Taylor Aff. ¶ 2.)

FN38. Here, because all of the representa-tions on which liability is based were part of the MBN sales script, any attempts by MBN to prevent CQD salespeople from making misrepresentations is not at issue.

FN39. Taylor asserts that the MBN sales script disclosure, "individual results will vary based on typing speed but an average biller can process 5-15 claims per hour," was based on the sales script language ordered by the court in *Medicor.*(Taylor Defs.' Disputed Facts ¶ 86.) The full text of the relevant excerpt from the document to which Taylor refers is as follows:

It is further ordered that the following shall replace paragraphs 3 and 4 in [M]edicor['s] current sales script ...:

"We will provide you with the software, all the training, training materials, a database of prospective doctors to con-tact for potential claims processing em-ployment, as well as unlimited technical and marketing support to help you get started right away. Individual results may vary, but it is possible to process five to fifteen claims per hour, depend-ing on your typing speed. [T]his allows you to be part of a lucrative industry. You understand that [M]edicor will provide training, but your actual success is based on your individual efforts. *Doc-tor solicitation is required.*The list of doctors is obtained from [M]edicare and identifies doctors who do not currently bill electronically. The list is current as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 857663)**

of 'date.' "

(Second Taylor Aff. Ex. 65 (emphasis added).) Interestingly, Taylor did not incorporate into the MBN sales script the disclosure that doctor solicitation would be required.

FN40. In the letter, Caceres wrote, "As for his claim of us providing doctors for him, 'again' the enclosed membership clearly states 'your [sic] entitled to a database of physicians who have been identified by Medicare as filing their claims on paper.'"(FTC TRO Ex. 2 at Ex. D.)

FN41. As discussed above, the FTC has established that Taylor can be held individually liable for any consumer redress ordered as relief for the violations on which summary judgment has been entered against Defendants, and that Caceres can be held individually liable for consumer redress for the misrepresentations regarding doctor contacts and the failure to disclose MBN's no-refund policy prior to payment.

FN42. According to Taylor's deposition testimony, Caceres created CQD and took over telemarketing for MBN sometime after August or September 2002. (FTC SJ Ex. 1 at 263:4-264:18.)

FN43. Defendants assert that, despite MBN's no-refund policy, approximately $160,000 in refunds were issued (Taylor Defs.' Reply Br. 13, 17; Caceres Resp. ¶ 81) and Caceres maintains that he cut all ties with CQD and left the medical billing industry in early 2005 (Caceres Resp. 23, ¶ 25). The Court is aware of no evidence in the current record to indicate the amount that was refunded to purchasers by Defendants or any evidence indicating that Caceres severed his relationship with CQD

at any time. If Defendants wish to pursue these arguments, they must reassert them with proper evidentiary support at the appropriate time.

S.D.N.Y.,2008.
F.T.C. v. Medical Billers Network, Inc.
--- F.Supp.2d ----, 2008 WL 857663 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1492380)

Page 1

C

Garcia v. Maersk, Inc.
E.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Francisco GARCIA, Plaintiff,
v.
MAERSK, INC., Aktieselskabet Dampskibsselska-
bet Svendborg, and Dampskibsselskabet AF 1912,
Aktieselskabet, Defendants
Maersk, Inc., Aktieselskabet Dampskibsselskabet
Svendborg, and Dampskibsselskabet AF 1912, Ak-
tieselskabet, Third-Party Plaintiffs
v.
MTC Transportation Corp. and 716 Corp., d/b/a
MTC Transportation Co., Third-Party Defendants.
No. 03-CV-5697 FB RML.

June 24, 2005.

Stephen B. Roberts, Esq., Tabak, Mellusi & Shisha,
New York, NY, for Plaintiff.
Lawrence J. Kahn, Esq., Freehill Hogan & Mahar,
LLP, New York, NY, for Defendants/Third-Party
Plaintiffs.
Mark L. Levenson, Esq., Cheven Keely & Hatzis,
New York, NY, for Third-Party Defendants.

*MEMORANDUM AND ORDER*

BLOCK, District Judge.
**\*1** Third-party defendants MTC Transportation
Corporation and 716 Corporation (collectively
"MTC") move to vacate a default judgment entered
against them on August 26, 2004.[FN1] They contend
(1) that personal jurisdiction is lacking because of
improper service of process; alternatively, (2) that
they have a meritorious defense. For the reasons
that follow, the Court denies the motion.

> FN1. The difference between MTC Trans-
> portation Corporation and 716 Corporation
> is not apparent from the record. In their
> moving papers, however, they refer to

themselves collectively as "MTC Corp ."
and draw no distinction between the two
corporations. *See* [MTC's] Aff. Supp.
[Mot.]; Mem. L. [Supp. Mot.]. Further-
more, they share the same corporate of-
fices and at least one corporate officer. *See*
[MTC's] Aff. Supp. [Mot.] at ¶ 12
(referring to one individual, Mike Farino
("Farino"), as "the Vice President of MTC
Corp."). Accordingly, the Court treats the
two corporations as a single entity for pur-
poses of this decision.

I.

Defendants/third-party plaintiffs Maersk, Inc., Ak-
tieselskabet Dampskibsselskabet Svendborg and
Dampskibsselskabet Af 1912, Aktieselskabet
Maersk (collectively "Maersk") are Danish com-
panies engaged in a range of activities worldwide,
including shipping. MTC is a trucking company
that is incorporated in and has its principal place of
business in New York. On March 7, 2003, MTC
took possession of a Maersk shipping container at
the Port of Newark. On March 13, 2003, plaintiff
Francisco Garcia ("Garcia"), an MTC employee,
was allegedly injured by the door of that container.

In October 2003, Garcia commenced a lawsuit
against Maersk in New York Supreme Court, Kings
County, seeking over $1 million in damages for his
alleged injuries. Maersk removed to this Court and,
on May 5, 2004, filed a third-party complaint
against MTC seeking a declaration that "MTC and
its insurers are contractually obligated to defend,
indemnify and hold [Maersk] harmless for the
costs, disbursements, counsel fees and other ex-
penses incurred in the defense of this action."Third
Party Compl. ¶ 13. Maersk based its claim on a
contract between the parties, pursuant to which MTC

agrees to defend, hold harmless and fully indemnify
[Maersk] against any and all claims, suit, loss, dam-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1492380)**

Page 2

age, or liability, for bodily injury, death and/or property damage (including reasonable attorneys fees and costs incurred in the enforcement of this agreement) arising out of or relating to [MTC's]: Use or maintenance of the equipment during an interchange period; the performance of this agreement; and/or presence on the facility operator's premises.

Uniform Intermodal Interchange and Facilities Access Agreement ("Agreement") § F. (attached as Ex. 3 to Third Party Compl.). The Agreement also requires MTC to procure liability insurance naming Maersk as an additional insured. *See id.* The Agreement further provides that Maryland law shall govern its "validity, construction, enforcement and interpretation[.]" *See id.* § G.

Maersk hired a professional process server, United Process Service, Inc. ("United"), to serve its summons and third-party complaint on MTC. On May 28, 2004, Matthew C. Roth ("Roth"), one of United's licensed process servers, went to MTC's corporate offices; in his affidavits of service, Roth noted that the papers were accepted there by an individual who identified himself as Joe.[FN2] The affidavits of service further noted that the "person spoken to refused to state true first and/or last names"; accordingly, he was identified therein as "Joe 'Smith[.]' " Affs. of Serv. (attached as Exhibit B to Maerk's Aff. Opp'n Mot.). In a separate affidavit submitted in opposition to MTC's motion, Roth explained that "[i]n my experience, it is not unusual for a person accepting service of process to refuse to give his full name or his last name" and that in such circumstances, Roth "use[s] common names like 'Smith' and 'Doe' on the affidavit of service." Roth Aff. ¶ 7 (attached as Exhibit C to Maerk's Aff. Opp'n Mot.). The affidavits of service included a description of "Smith" as being approximately 40 years old, 6 feet tall, and 235 pounds. They also described "Smith" as being a "general agent[.]" Affs. of Serv. In his affidavit submitted in opposition to MTC's motion, Roth explained that he

> FN2. Roth executed separate affidavits of

service for MTC Transportation Corporation and 716 Corporation.

*2 asked whether the person to whom I was speaking was authorized to receive and accept the papers. As the affidavits [of service] confirm, said person replied in the affirmative, and I thereupon served both sets of Third-Party Summons and Their-Party Complaints on said individual.... It has always been my custom and practice to identify ... a person who states that he or she is authorized to accept service and thereafter accepts the service as a "general agent." For this reason, my affidavit[s] of service identified Joe "Smith" as a "general agent."
Roth Aff. ¶ 7-8.

In support of its motion, MTC submitted an affidavit of its vice president, Farino. He attested that "No Joe 'Smith' works at MTC[.]" Farino Aff. ¶ 3 (attached to [MTC's] Aff. Supp. [Mot.] as Ex. H).

Maersk alleges that on June 10, 2004, Maersk's counsel received a telephone call from an individual at MTC, who confirmed that the papers served by Roth were being forwarded to its insurer. MTC does not contest that allegation. Neither MTC nor its insurer timely interposed an answer, which was due on June 19, 2004. On July 14, 2004, Maersk filed an application for a clerk's certificate of default, copies of which application were mailed to MTC's offices.[FN3] The certificate was issued on August 17, 2004. On August 19, 2004, Maersk applied to the Court for a default judgment, again mailing copies to MTC's offices. The application was granted on August 25, 2004. MTC did not take any action in this matter until September 22, 2004, when its attorney advised the Court that he intended to file the motion now before the Court.

> FN3. When a party has "failed to plead or otherwise defend" an action, the clerk "shall enter the party's default." Fed.R.Civ.P. 55(a). Local Civ. R. 55.1 allows a party to apply for a certificate of default pursuant to Fed.R.Civ.P. 55(a). Following entry of a clerk's certificate of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1492380)

default, a party may "apply to the court" for entry of a "judgment by default." Fed.R.Civ.P. 55(b)(2); *see also* Local Civ. R. 55.2(b).

## II.

### A. Service of Process

A defendant may move to set aside a default judgment on the ground that the "judgment is void." Fed.R.Civ.P. 60(b)(4). A judgment is void if entered against a party over whom the court lacks personal jurisdiction. *See Peralta v. Heights Med. Ctr., Inc.,* 485 U.S. 80, 84-87 (1988); *Velez v. Vassallo,* 203 F.Supp .2d 312, 317-18 (S.D.N.Y.2002). In challenging personal jurisdiction pursuant to Rule 60(b)(4), a defendant that had notice of the proceedings bears the burden of establishing that service was improper. *See CSC Holdings, Inc. v. Fung,* 349 F.Supp.2d 613, 616 (E.D.N.Y.2004); *Velez* 203 F.Supp.2d at 324 (S.D.N.Y.2002).

Under the Federal Rules of Civil Procedure, service upon a corporation "may be effected in any judicial district of the United States ... pursuant to the law of the state in which the district court is located."Fed.R.Civ.P. 4(e)(1), 4(h)(1)."Under the laws of New York, service on a corporation may be effected by tendering the summons to, *inter alia,* a corporate director, officer, or managing or general agent."*Old Republic Ins. Co. v. Pacific Fin. Servs.,* 301 F.3d 54, 57 (2d Cir.2002) (citing N.Y. C.P.L.R. § 311(a)(1)). In tendering service, a process server may rely upon a corporation's employees to identify individuals authorized to accept service. *See id .*As long as the process server's reliance on corporate personnel is reasonable, "the defendant may not later complain" that it was not properly served "even if the complaint was mistakenly delivered to a person who was not authorized to accept service."*Id.; see also Fashion Page, Ltd. v Zurich Ins. Co.,* 406 N.E.2d 747, 752 (N.Y.1980) ("when the corporation is regularly doing business in the State, it generally cannot be heard to complain that

the summons was delivered to the wrong person when the process server has gone to its offices, made proper inquiry of the defendant's own employees, and delivered the summons according to their directions.").

*3 A process server's affidavit of service "establishes a prima facie case of the account of the method of service, and thus, in the absence of contrary facts, [courts] presume that [the defendant] was properly served with the complaint."*Old Republic,* 301 F.3d at 57. A defendant's sworn denial of receipt of service "rebuts the presumption of proper service established by the process server's affidavit and necessitates an evidentiary hearing."*Id.* No evidentiary hearing is required, however, "where the defendant fails to 'swear to specific facts to rebut the statements in the process server's affidavits.' " *Id.* at 58 (quoting *Simonds v. Grobman,* 716 N.Y.S.2d 692, 693 (2000)).

Roth's affidavits of service establish a prima facie case that MTC was properly served with Maersk's third-party complaint. As noted, Roth attested that he inquired of Joe "Smith" whether he was authorized to accept service on behalf of MTC and received an affirmative response. It was, therefore, reasonable for him to rely on that response and deliver the summons and third-party complaint to "Smith". In an effort to rebut the presumption of proper service, MTC offered Farino's Affidavit, which stated that "No Joe 'Smith' works at MTC." Farino did not, however, attest that no one by the name of Joe or meeting the physical description contained in the affidavits of service works at MTC. Nor did Farino offer any specific facts to rebut Roth's statements that such an individual identified himself as being authorized to accept service on behalf of MTC. Thus, MTC has failed to rebut the presumption of valid service created by Roth's affidavit, no evidentiary hearing is required, and the Court will not vacate the default judgment as being void for lack of personal jurisdiction.

### B. Meritorious Defense

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 4
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1492380)**

The Second Circuit has established three criteria to be considered in deciding whether to vacate a default judgment: "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented."*Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 96 (2d Cir.1993). As noted, MTC focuses its argument on the last of these criteria. In particular, it argues that it has a meritorious defense because Garcia's injuries were the result of Maersk's negligence and the Agreement's indemnification provision does not express an intent to indemnify Maersk against its own negligence. Whether a defense is meritorious "is measured not by whether there is a likelihood that it will carry the day, but whether the evidence submitted, if proven at trial, would constitute a complete defense."*Enron,* 10 F.3d at 98.

In the recent case of *Lopez v. Louro,* 2002 WL 91273 (S.D.N.Y. Jan. 23, 2002), the Southern District of New York analyzed the precise contractual indemnification language at issue here and held that it obligated a trucking company to indemnify the owner of a container "even for its own negligence." *Id.* at *2. Like the contract at issue here, the contract in *Lopez* was governed by Maryland law. Under Maryland law, "a contract will not be construed to indemnify a party for its own negligence absent an express provision to that effect."*Id.* at *1 (citing *Mass Transit Admin. v. CSX Transportation, Inc.,* 708 A.2d 298 (1998) ("*CSX*")). In *CSX,* the Maryland Supreme Court construed an agreement "to indemnify, save harmless, and defend CSXT from any and all casualty losses, claims, suits, damages or liability of every kind arising out of the Contract Service under this Agreement," and found that "[i]n 'unequivocal terms,' the indemnification in the instant matter includes the liability of CSXT for its own acts or omissions."708 A.2d at 310. Analyzing the contract at issue in *Lopez* in accordance with *CSX,* the Southern District reasoned that

*4 there is no reason to believe that the Maryland Supreme Court would reach a different conclusion

with respect to the contract at issue here. Among other things, the contract at issue uses the same broad "arising out of" language that was at issue in *CSX.* It also contains a provision obligating the indemnitor to obtain liability insurance, which the court in *CSX* found indicative of an intent to extend the indemnity to cover negligence of the indemnitee.

*Lopez,* 2002 WL 91273, at *1.

As noted, the indemnification provision at issue here required MTC to "defend, hold harmless and fully indemnify" Maersk against "any and all claims, suit, loss, damage, or liability, for bodily injury, death and/or property damage arising out of or relating to" MTC's use or maintenance of the container. Agreement § F. Further, it obligated MTC to obtain liability insurance naming Maersk as an additional insured. Thus, the reasoning of the Maryland Supreme Court compels the conclusion that, under Maryland law, MTC is obligated to indemnify Maersk, even for Maersk's own negligence; therefore, MTC lacks a meritorious defense to Maersk's indemnification action. Because MTC lacks a meritorious defense, the Court need not consider the other two *Enron* criteria. *See Silverman v. RTV Communications Group, Inc.,* 2002 WL 483421, at *4 (S.D.N.Y. Mar. 28, 2002)("Because [defendant] fails to present a meritorious defense, this Court need not consider the remaining two factors governing the analysis"); *see also Sony Corp. v. Elm State Elec.,* 800 F.2d 317 (2d Cir.1986) (affirming denial of motion to vacate default solely on the basis that defendant failed to demonstrate a meritorious defense).

## CONCLUSION

MTC's motion to vacate the default judgment is denied.

**SO ORDERED.**

E.D.N.Y.,2005.
Garcia v. Maersk, Inc.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1492380 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1492380)**

Page 5

Not Reported in F.Supp.2d, 2005 WL 1492380
(E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.