# COMPENDIUM OF UNREPORTED CASES

AS CITED IN DEFENDANT/COUNTERCLAIMANT'S
MEMORANDUM OF LAW IN OPPOSITION TO GREYSTONE'S MTION FOR
SUMMARY JUDGMENT AND TO DISMISS COUNTERCLAIMS

PART 4 OF 4

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 263008)**

Page 1

Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entertainment Services
S.D.N.Y.,1996.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
NATIONWIDE LIFE INSURANCE COMPANY, Plaintiff,
v.
HEARST/ABC-VIACOM ENTERTAINMENT SERVICES and Bankers Leasing Association, Inc., Defendants.
No. 93 CIV. 2680 (RPP).

May 17, 1996.

Day, Berry & Howard, by James L. Ackerman, Boston, MA, for Plaintiff.
Tofel Berelson Saxl & Partners, P.C. by Robert Tofel, Lawrence Tofel, Mark Lopeman, New York City, for Defendant Hearst/ABC-Viacom Entertainment.
Glenn Seiden & Associates, by Glenn Seiden, Paul Goodman, Chicago, IL, for Defendant Bankers Leasing Association, Inc.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.
*1 Defendant Hearst/ABC-Viacom Entertainment Services ("HAVES") moves, pursuant to Fed.R.Civ.P. 56(c), for summary judgment against Plaintiff Nationwide Life Insurance Company ("Nationwide") and Co-Defendant/Cross-Claimant Bankers Leasing Company ("BLA") dismissing this action for breach of contract relating to the financing of HAVES' purchase of equipment to run its business. BLA moves for summary judgment against HAVES on breach of contract and promissory estoppel claims contained in its Cross Complaint. Nationwide moves for summary judgment on its claim that HAVES' disavowal of its intent to rely upon Nationwide to provide permanent financing for the equipment constituted a breach of contract.

*Background*

Nationwide's First Amended Complaint, dated April 8, 1994, is based on an equipment lease financing agreement with BLA, pursuant to which HAVES obtained financing to purchase two satellite transponders from General Electric at a total cost of $19 million. Nationwide is an insurance company that invests in debt securities.

HAVES, a joint venture which owns and operates the Lifetime Cable Television Network, was formed in 1984. During the early years of its existence, HAVES was not able to obtain credit necessary to purchase equipment on its own behalf, and was required to seek financing for its acquisition of equipment. To this end, HAVES engaged in several equipment leasing transactions with Co-Defendant/Cross-Claimant BLA, a financing company in the business of short term equipment leasing.

On or about February 3, 1988, BLA and HAVES entered into a written Master Lease Agreement ("Master Lease") which established a framework for financing of future equipment acquisitions by HAVES. Appendix of Exhibits to Affidavit of Lawrence E. Tofel Submitted in Support of Hearst/ABC Viacom Entertainment Services' Motion for Summary Judgment ("HAVES") Ex. N. The Master Lease contained a provision enabling BLA to make assignments of its rights under the individual leases of equipment. HAVES Ex. N at ¶ 18.

Prior to the leasing transaction which is the subject of the current litigation, BLA had contracted with HAVES to provide lease financing for several acquisitions of equipment. An individual Equipment Schedule was executed for each acquisition. With knowledge and consent of HAVES, BLA assigned its rights under several of the Schedules to institutional lenders, including Nationwide Life Insurance Company ("Nationwide"). Appendix of Exhibits to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 263008)**

Nationwide's Opposition to Defendant Hearst/ABC-Viacom's Motion for Summary Judgment ("Nationwide") Ex. 7. In Lessee Notices provided to HAVES, BLA advised: "Lessee is hereby directed to pay directly to Lessor's Assignee ... all rentals and other payments required to be paid by the Lessee under the lease ..." Nationwide Ex. 7.

During discovery, Nationwide Vice President Mark Poeppelman ("Poeppelman") testified that BLA had negotiated several long term financing transactions with Nationwide on behalf of HAVES. He further testified that this was a common practice in the private placement business, where it is "typical for a lessor, investment banker or agent of one of those parties to act on behalf of their client." Nationwide Ex. 1 at 234.

*2 When, in 1989, HAVES sought to purchase from General Electric American Communications ("GE"), two satellite transponders which were to be constructed over the next several years at a total cost of $19 million, HAVES utilized its Master Lease agreement with BLA.

Under the leasing agreement, BLA agreed to make two initial $2 million payments in 1989 and quarterly progress payments of $700,000 to GE during the construction of the transponders. Interest on these progress payments was set at rate of prime plus three-quarters of one percent. In addition, upon completion of GE's construction of the transponders in April, 1993, BLA was to make a lump sum payment of $6.6 million. BLA would then lease the equipment to HAVES pursuant to a ten year lease. HAVES Ex. L. BLA was to retain title to the transponders until the expiration of the lease term, at which time HAVES would have the option to purchase them for a nominal fee. The agreement was memorialized in BLA's lease proposal letter dated August 10, 1989, which was accepted by HAVES' Vice President, Philip LaGreca. ("LaGreca"). HAVES Ex. L. The agreement provided that the interest rate on the lease would be fixed upon delivery of the transponders in April of 1993, at 125 basis points above the ten year treasury maturity. HAVES Ex. L.

BLA funded the initial payments and interim payments as agreed throughout 1989, 1990 and 1991. Each time a payment was made, a demand note was executed by HAVES in the amount of the aggregate interim financing provided by BLA. These notes provided that "[a]s additional security for the payment of liabilities, the undersigned hereby grants to the Lender a security interest in all property of the undersigned of any kind in the possession of the Lender at any time and all property described in any other security agreement, trust deed or mortgage at any time in favor of the Lender executed by the undersigned." Bankers' Response to Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Bankers' Response") Ex. F. In addition to its security interest in the transponders, BLA made two U.C.C. filings-one evidencing a security interest in the transponders and the other a general security interest covering HAVES' assets.FN1

> FN1. HAVES claims that the U.C.C. filings were made without its approval.

Beginning in or about January 1991, HAVES engaged in negotiations with Manufacturers Hanover Trust ("MHT") to obtain a $10 million line of credit. Bankers' Response Ex. X at 17. HAVES required the line of credit in order to make large outlays of cash in the early months of the year to fund production and promotion of projects which would yield income in the latter half of the year. Bankers' Response Ex. X at 18-19. The financing arrangements HAVES had made with BLA for its purchase of the satellite transponders were an issue during HAVES' negotiations with MHT for the line of credit. Bankers' Response Ex. X at 32. MHT "wanted to ... document the fact that [HAVES] has a source of financing installments and the balloon payment and had a source for takeout at the back end." Bankers' Response Ex. X at 32.

*3 An internal memorandum prepared by Sloveigh Marcks of MHT dated September 23, 1991 de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)  
**(Cite as: Not Reported in F.Supp., 1996 WL 263008)**

Page 3

scribed two steps MHT required HAVES to take to provide security for the contemplated line of credit: first, the notes executed on advances for the transponders from BLA were to be termed out and second, HAVES was to obtain "a commitment to finance the full $19MM of transponder advances obtained from Bankers Leasing, the Nationwide Insurance Company, over ten years based on a reaffirmation of the Cap Cities/ABC guarantee." Bankers' Response Ex. K. In addition, pursuant to negotiations for the line of credit from MHT, HAVES obtained from BLA a removal of language in the notes executed between BLA and HAVES in connection with the quarterly payments which had granted BLA a security interest in all of HAVES' property. Bankers' Response Ex. L.

During 1991, BLA sought to obtain a commitment for financing from Nationwide of the balloon payment of $6.6 million which was to become due upon completion of the transponders. No HAVES employees were involved in the negotiations which resulted in the Nationwide/BLA commitment letters. BLA contends that HAVES was aware of its intention to seek a separate lender to finance the ten year lease schedule, and that HAVES required a commitment from such a lender in order to obtain the line of credit it sought from MHT. Nationwide Ex. 4 at 183. This assertion is based upon prior leasing transactions between HAVES and BLA in which BLA had obtained a separate lender to finance the lease schedule. Nationwide Ex. 4 at 209.

A commitment letter signed by Poeppelman, Senior Securities Portfolio Manager of Nationwide, and William Glickauf ("Glickauf"), Senior Vice President of BLA, on July 22, 1991, evidences Nationwide's agreement to purchase the lease schedule for $19 million in April, 1993, upon completion of the construction of the transponders. HAVES Exs. R, S. The commitment letter of July 22, 1991 stated that the commitment was subject to the approval of Nationwide's Investment Committee and set forth a fixed rate of interest of 9.72%. HAVES Ex. R.

In a letter dated July 24, 1991, Glickauf wrote to HAVES' LaGreca "[a]s I mentioned on Friday afternoon, Nationwide Life Insurance Company circled the above referenced financing. By this, I mean they will provide approximately $19,000,000 of financing to be delivered in the second quarter of 1993." Nationwide Ex. 10.[FN2] A commitment letter of the same date, executed by Glickauf and LaGreca, lists Nationwide as the "debt participant" and states that it is "subject to the formal approval of the Nationwide Life Insurance Company's investment committee." Nationwide Ex. 3.

> FN2. In *Teachers Insurance and Annuity Association of America v. Ormesa Geothermal,* 791 F.Supp. 401 (S.D.N.Y.1991), the court explained that "[w]hen a financing is 'circled,' the parties orally agree that they will do the transaction on the specified terms, and the interest rate and certain other key economic terms are, by this oral agreement, fixed. It is the custom in the financial community that once the parties circle a deal, neither party tries to change the interest rate that has been agreed." *Id.* at 404.

On September 5, 1991, Glickauf and Poeppelman executed a second commitment letter, in which the language stating that the commitment was subject to the approval of Nationwide's investment committee was eliminated. HAVES Ex. S. HAVES employee Kevin Reardon ("Reardon") acknowledged that he provided this commitment letter (Nationwide Ex. 13; Bates No. 00108), as well as the July 24, 1991 commitment letter signed by Glickauf and executed by LaGreca, to MHT as proof that it had obtained a source of "takeout at the back end." Nationwide Ex. 2 at 32.[FN3]

> FN3. The papers submitted by Nationwide in opposition to HAVES' motion and in support of its own motion fail to identify clearly documents referred to during deposition testimony; this resulted in excess expenditure of the Court's time. With respect to future submissions, counsel are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)  
**(Cite as: Not Reported in F.Supp., 1996 WL 263008)**

Page 4

advised to be more considerate of the Court.

**\*4** Glickauf and LaGreca signed another commitment letter on September 26, 1991, which omitted the language regarding the approval of Nationwide's investment committee. Bankers' Response Ex. P. In late September or early October, 1991, MHT extended a $10 million line of credit to HAVES. Bankers' Response Exs. W at 178, X at 16.

In a letter dated March 6, 1992, LaGreca requested a term note for $10,300,000 from Glickauf, which would have represented the aggregate amount of HAVES' debt to BLA after the quarterly payment due in March, 1992 was made by BLA. Bankers' Response Ex. S. A letter dated March 12, 1992 from Glickauf to LaGreca stated:

Please find attached our revised commercial Term/Demand Note for $10,300,000. Please have Craig sign it and return it to my attention at your earliest convenience.

Ex. S. BLA claims that the Note attached to this letter was never signed and returned by HAVES. For this reason, BLA argues that it had no obligation to fund the quarterly payment of $700,000 which at that time became due to GE. HAVES disputes this representation and claims that it did not execute the term note because BLA had advised it that BLA would be unable to make the payment. Instead, HAVES funded quarterly payments due in March 1992 and thereafter from internally generated funds.

At a dinner meeting in September, 1992 attended by Glickauf, LaGreca, and Craig Harnett (a financial officer of HAVES), HAVES' representatives told BLA's representatives that HAVES no longer intended to honor its obligation under the lease agreement, because BLA had breached the agreement by failing to provide interim financing. Bankers' Response Ex. Y at 105.

In the current motion, HAVES urges the Court to grant summary judgment based on its contention that BLA breached the August 10, 1989 agreement by failing to pay the $700,000 progress payment which became due in March 1992. HAVES claims that summary judgment should issue in its favor because it was entitled to terminate its agreement with BLA after BLA failed to fund the March 1992 payment and because it had no independent commitment to Nationwide. The motion is opposed by Nationwide and BLA, who both contend that HAVES breached a binding agreement by terminating the financing plan. BLA claims that it funded all payments it was required to fund under the terms of the August 10, 1989 agreement. BLA argues that it was ready and willing to make the March, 1992 payment, but that it was not required to do so because HAVES never executed a term note providing security for that payment. Alternatively, BLA maintains that if it did commit a breach by failing to make the payment due in March 1992, the breach was not material and did not give HAVES the right to terminate its commitment letter agreement or the right to terminate the permanent financing agreement with Nationwide.

Nationwide argues that it is entitled to summary judgment because it has demonstrated [1] that BLA was acting as HAVES' agent when it entered into the agreement for financing memorialized in the commitment letters of July and September, 1991; [2] even if BLA wasn't acting as HAVES' agent when the commitment letters evidencing the agreement were signed, the agreement was ratified by HAVES; or [3] HAVES is liable because there was a novation.

*Discussion*

**\*5** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 263008)**

Summary judgment cannot issue if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden rests on the moving party to demonstrate that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party may satisfy its burden by showing the absence of evidence which would support the claims made by the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The Court must view the facts in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). If, however, the evidence presented by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby*, 477 U.S. at 249-250 (internal citations omitted); *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ...It follows from these settled principles that if the factual context renders respondents' claim implausible ... respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 587 (internal citations omitted)).

I. *HAVES' Motion for Summary Judgment*

Defendant HAVES moves, pursuant to Fed.R.Civ.P. 56(c), for summary judgment on all claims asserted by Plaintiff and all counterclaims asserted by BLA.

A. *HAVES' Motion for Summary Judgment Against Plaintiff Nationwide*

In support of its motion for summary judgment dismissing Nationwide's claims, HAVES contends that the record establishes that no contractual agreement existed between HAVES and Nationwide. HAVES asserts that it was unaware of the essential terms of the "permanent" or "lease" financing agreement between BLA and Nationwide and that Nationwide was unaware of essential terms of HAVES' agreement with BLA. Accordingly, HAVES argues that its agreements with BLA and BLA's commitment letter agreement with Nationwide should be treated as independent. HAVES contends that it should not be bound to a contract the terms of which it neither negotiated nor agreed to.

Several facts about HAVES' communications with BLA and its financial needs at the time BLA negotiated the permanent financing commitment with Nationwide undermine HAVES' assertions. HAVES was aware that Nationwide had provided permanent financing on at least one deal brokered by BLA in the past. Moreover, MHT had required HAVES to obtain a commitment for the permanent financing for the transponders before it would issue HAVES a $10 million line of credit and the commitment letter of July 24, 1991 between HAVES' LaGreca and BLA's Glickauf put HAVES on notice that Nationwide was a "debt participant" and that the commitment was "subject to the approval of Nationwide's investment committee."

*6 Accordingly, HAVES' argument that it was unaware of and uninvolved in the decision by BLA to seek permanent financing from Nationwide is not sufficiently supported in the record to grant summary judgment to HAVES on that issue. HAVES' motion for summary judgment on all of Plaintiff Nationwide's claims is hereby denied.

B. *HAVES' Motion for Summary Judgment Against BLA on its Cross Claims*

By Cross-Complaint dated February 17, 1994, BLA has asserted claims of breach of contract and promissory estoppel against HAVES. Specifically, BLA has alleged that HAVES "unilaterally and without cause withdrew from its commitment to complete the purchase, lease and financing of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-08377-RPP    Document 65-5    Filed 04/22/2008    Page 7 of 18    Page 78 of 86

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)  
**(Cite as: Not Reported in F.Supp., 1996 WL 263008)**

Page 6

purchase of The Transponders and, in fact, secured alternative financing for said purchase elsewhere." Cross-Complaint ¶ 29. BLA asserts that HAVES was obligated to "use and honor the financing arrangement it entered into with Bankers" and that it has suffered injury as a result of HAVES' breach of their agreement. Cross-Complaint ¶ 33, 36. BLA also asserts a claim of promissory estoppel against HAVES, contending that it reasonably relied upon HAVES' commitment to accept and proceed with permanent financing of the transponders by BLA or Nationwide. Cross-Complaint ¶ 37-41.

HAVES argues that the construction financing and the ten year lease were part of a single agreement which BLA breached because BLA was not ready, willing and able to perform its obligations, including making the March 1992 payment for the construction of the transponders. HAVES contends that BLA's failure to present any evidence supporting its capacity to make the payment warrants summary judgment dismissing BLA's cross-claims. BLA, HAVES argues, never made or suggested that it would or could have made payments that became due in March 1992 or thereafter.

BLA states that it has made all payments it was obligated to make under its agreement with HAVES. BLA contends that it was not obligated to make the progress payment due GE in March 1992 or payments that became due thereafter because HAVES did not execute a term note providing security for that payment and HAVES did not call upon it to make any payments.

HAVES contends that the documents that evidence the agreement reflect BLA's assumption of an obligation to fund the progress payments and that the obligation did not include any conditions precedent to its taking effect. The documents submitted do not explicitly reference any obligation by HAVES to perform any act, or to execute a note, prior to BLA's funding progress payments. HAVES contends that BLA had no need for a note evidencing quarterly payments made by BLA on HAVES' behalf, because HAVES' obligation to repay BLA for the payments was established in the Vendor Progress Payment rider to the Equipment Schedule to the Master Lease. HAVES further contends that a letter from LaGreca to Glickauf, dated March 6, 1992, indicated HAVES' intention to have BLA make the March 1992 payment. The letter stated: "Attached please find an invoice for $700,000 from GE American Communications for Transponder C-3 and C-4 which is due on March 15, 1992. Please prepare and forward for signing the Term Note for $10,300,000 with agreed language deletions." Bankers' Ex. S. HAVES argues that, because it never did anything to indicate that BLA should not make that payment, BLA was obligated to make it.

*7 Although documentation of the agreement between HAVES and BLA does not set forth execution of a term note as a condition for BLA's payment of quarterly progress payments due on the transponders, the ordinary course of dealing between the parties may well have required the execution of a note prior to the advancing of the funds for HAVES' benefit.

In addition to the issue of whether a note evidencing HAVES' indebtedness was required before BLA was obligated to finance interim payments, a factual question exists as to whether BLA was ready, willing and able to make the payment due in March 1992. BLA has responded to HAVES' argument that the note was not executed because HAVES had been advised that BLA was unable to make the March payment by denying that it so advised HAVES and stating that, although it was seeking financing to cover the payment, it did have sufficient funds to make the payment without such financing. Bankers' Response Ex. U at 133-34; Ex. AA at 48-49. HAVES has not provided sufficient proof to establish that no material issue of fact exists as to whether execution of a note by HAVES was a precondition to BLA's obligation to fund the March 1992 payment and as to BLA's ability to make the March, 1992 payment. Accordingly, summary judgment cannot issue in favor of HAVES on BLA's cross-claims at this time.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-08377-RPP   Document 65-5   Filed 04/22/2008   Page 8 of 18   Page 79 of 86

Not Reported in F.Supp.                                                                 Page 7
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 263008)

*C. Cross-Claimant BLA's Motion for Summary Judgment*

BLA moves for summary judgment on its claims against HAVES. As described in the preceding section on HAVES' arguments with respect to why summary judgment should issue against BLA, factual issues regarding the respective commitments of each side under the agreement to finance the construction of the transponders exist and therefore summary judgment cannot be granted.

Nor is BLA entitled to summary judgment on its claim of promissory estoppel. The August 10, 1989 lease proposal encompasses BLA's funding of interim payments during construction of the transponders and the lease to take effect upon completion of the construction in April 1993. If BLA failed to fulfill an obligation to fund a progress payment, HAVES would no longer have been bound to its obligations under the agreement. Accordingly, on the record before the Court, it cannot be determined whether, in view of the alleged breach by BLA, it was reasonable for BLA to rely on the binding nature of the letters of July 24, 1991 and September 26, 1991 between BLA and HAVES.

*D. Nationwide's Motion for Summary Judgment*

Plaintiff Nationwide claims that it is entitled to summary judgment on its claim that HAVES breached a contractual commitment to Nationwide to accept the permanent financing.

Plaintiff argues that it has adduced sufficient evidence to demonstrate that BLA was acting as an agent of HAVES when it entered into the agreement for permanent financing, and accordingly that HAVES was legally bound to fulfill obligations thereunder assumed. The Restatement (Second) of Agency defines "agency" as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act ... The one for whom action is to be taken is the principal ... The one who is to act is the agent." Rest. (2d) Agency § 1. The Restatement (Second) of Agency further explains that "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Rest. (2d) Agency § 26. *See 99 Commercial Street, Inc. v. Goldberg,* 811 F.Supp. 900 (S.D.N.Y.1993) (explaining that "[w]hether an agent has authority to enter into a contract with a third party is determined 'from the facts and circumstances of the case, in view of the object which the agent is appointed to accomplish.' ...Written consent is not necessary; the principal's spoken words or general conduct suffices, particularly when they lead the agent to conclude that the principal desires that the agent act in a particular way." *Id.* at 906.)

*8 An agent may have actual or apparent authority. Actual authority may be express or implied. Express authority is "[a]uthority delegated to [an] agent by words which expressly authorize him to do a delegable act. Authority distinctly, plainly expressed, orally or in writing." *Black's Law Dictionary* 521 (5th Ed., 1979). Implied authority exists where the acts or representations of a principal lend the appearance of authority to the agent. *99 Commercial Street, Inc.,* 811 F.Supp. at 906. Apparent authority is found where a third party is led, by words or conduct, to believe that the agent acts with authority granted by the principal. *Id.* Where reliance on apparent authority is reasonable in light of the circumstances surrounding the transaction, a principal is barred from disavowing obligations assumed by its agent. *Id; see also C.E. Towers Co. v. Trinidad and Tobago (BWIA Intern.) Airways Co.,* 903 F.Supp. 515 (S.D.N.Y.1995). The existence of apparent authority is a question of fact which requires a showing of reasonable reliance by a third party upon "the misrepresentations of the agent because of some misleading conduct on the part of the principal ... not the agent." *C.E. Towers Co.,* 903 F.Supp. at 523-24.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 8
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 263008)**

Where an agent acts without implied or actual authority, a principal may still be bound to an obligation assumed by an agent without actual or implied authority if, by some subsequent act, it ratifies the agent's actions. Ratification is defined as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act ... is given effect as if originally authorized by him." Res tatement (2d) Agency § 82. The Restatement further explains conditions under which receipt and retention of benefits constitute affirmance:

Receipt of Benefits as Affirmance

The receipt by a purported principal, with knowledge of the facts, of something to which he would not be entitled unless an act purported to be done for him were affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such receipt he repudiates the act. If he repudiates the act, his receipt of benefits constitutes an affirmance at the election of the other party to the transaction.

Retention of Benefits as Affirmance

The retention by a purported principal, with knowledge of the facts and before he has changed his position, of something which he is not entitled to retain unless an act purported to be done on his account is affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such retention he repudiates the act. Even if he repudiates the act, his retention constitutes an affirmance at the election of the other party to the transaction.

Nationwide has adduced the following facts that would lead any rational trier of fact to reach the conclusion that BLA had authority to enter into the leasing agreement with Nationwide as HAVES' agent or that HAVES ratified whatever agreement BLA entered with Nationwide for such financing. During negotiations with MHT regarding a $10 million line of credit, MHT required HAVES to obtain a commitment for permanent financing. Nationwide Ex. 2 at 22-23. On July 24, 1991, BLA provided HAVES with a commitment letter, which HAVES executed, which indicated that Nationwide was a debt participant and that the commitment was subject to the approval of Nationwide's investment committee. Nationwide Ex. 13. A letter from Glickauf of BLA to LaGreca of HAVES, also dated July 24, 1991, explained the terms of the financing to be provided by Nationwide. Nationwide Ex. 10. LaGreca responded to Glickauf's July 24, 1991 letter with a letter dated July 30, 1991, in which he indicated that HAVES was "awaiting formal approval from Nationwide Life Insurance Co., so that you will release the accounts receivable collateral on the Uniform Commercial Code financing statement." Nationwide Ex. 12. HAVES' Kevin Reardon testified that he sent a copy of the September 5, 1991 BLA-Nationwide commitment letter to Marcks of MHT as documentation that HAVES "had a source of financing installments and the balloon payment and had a source for takeout at the back end." Nationwide Ex. 2 at 32. In a memo dated September 19, 1991, MHT's Marcks wrote: "I have requested evidence of a firm commitment from Bankers Leasing and/or Nationwide Life Insurance Company to provide this financing and have been informed that we can expect to receive a copy of the firm commitment this week." Nationwide Ex. 3. Another commitment letter signed by Glickauf and acknowledged by Harnett of HAVES, dated September 26, 1991, omitted language indicating that the financing was subject to the approval of Nationwide's investment committee. Bankers' Response Ex. P. After receipt of the commitment letters, MHT issued the line of credit to HAVES in late September 1991. No rational trier of fact could conclude, given the facts set forth above, that HAVES did not either authorize BLA to negotiate a commitment from Nationwide or ratify whatever commitment BLA obtained from Nationwide. Certainly, Nationwide was reasonable in relying upon its receipt of executed copies of the July 24, 1991 and September 26, 1991 commitment letters. Ac-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 263008)**

Page 9

cordingly, Nationwide's motion for summary judgment on the issue of HAVES' liability is granted. Issues of fact remain, however, on the damages which Nationwide has sustained.[FN4]

> FN4. The unrebutted testimony of Poeppelman is that, but for its circling of the HAVES financing, Nationwide would have committed more money to three financings in which it participated in September and October of 1991. HAVES Ex. LL (Poeppelman Tr. at 656-660; Poeppelman Ex. 17). It is also undisputed that interest rates fell thereafter.

*Conclusion*

\*9 For the above mentioned reasons, the motions for summary judgment made by HAVES and BLA are denied. Nationwide's motion for summary judgment is granted.

IT IS SO ORDERED.

S.D.N.Y.,1996.
Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entertainment Services
Not Reported in F.Supp., 1996 WL 263008 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

122 F.R.D. 30                                                                                                Page 1
122 F.R.D. 30
(Cite as: 122 F.R.D. 30)

C
Northfield Ins. Co. v. Bender Shipbuilding & Repair Co., Inc.
S.D.Ala.,1988.

United States District Court, S.D. Alabama, Southern Division.
NORTHFIELD INSURANCE COMPANY, Plaintiff,
v.
BENDER SHIPBUILDING & REPAIR COMPANY, INC., and Gail Stuart, as Administratrix of the Estate of Stephen Stuart, Deceased, Defendants.
BENDER SHIPBUILDING & REPAIR COMPANY, INC., Counterclaimant,
v.
NORTHFIELD INSURANCE COMPANY, Mobile Metal Wreckers, Inc., Assured Insurance Agency, Inc., and Strickland General Agency, Inc., Counterdefendants.
Civ. A. No. 88-0191-AH-M.

Sept. 12, 1988.

Counterclaim defendant moved to dismiss counterclaim, alleging court lacked jurisdiction over counterclaim defendant. Counterclaim plaintiff moved to join counterclaim defendant as party without having to reserve. The District Court, Howard, J., held that leave of court was not required to join previous nonparty as counterclaim defendant.

So ordered.

West Headnotes

**Federal Civil Procedure 170A** ⇒281

170A Federal Civil Procedure
    170AII Parties
        170AII(G) Bringing in New Parties; Third-Party Proceedings
            170Ak281 k. In General. Most Cited Cases
Leave of court was not required to join previous nonparty as counterclaim defendant. Fed.Rules Civ.Proc.Rules 13(h), 19-21, 28 U.S.C.A.

*30 Harold Albritton, Andalusia, Ala., for plaintiff Northfield and for counterdefendant Northfield.
J. Hodge Alves, III, Mobile, Ala., for defendant Bender and for counterclaimant Bender.
Robert T. Cunningham, Jr., Mobile, Ala., for defendant Gail Stuart.
Harold Albritton, Andalusia, Ala., for counterdefendant Strickland.
John D. Richardson and Weyman W. McCranie, Mobile, Ala., for counterdefendant Assured.
Counterdefendant Mobile Metal has not made an appearance as of Sept. 14, 1988.

ORDER

HOWARD, District Judge.
This matter is before the Court on the counterdefendant Assured Insurance Agency, Inc.'s ("Assured") "Motion to Strike/Dismiss" (# 13). Assured moves to strike/dismiss the counterclaim of defendant/counterclaimant, Bender Shipbuilding & Repair Company, Inc. ("Bender") against Assured. Assured asserts that since it was *31 not an original party (it was named for the first time in Bender's counterclaim), the Court lacks jurisdiction over Assured. Assured's argument rests on its legal conclusion that "[t]he Federal Rules of Civil Procedure allow counter-claims to be brought only against those individuals or entities which are parties to a lawsuit at the time the counterclaim is made." Assured also notes that it has not been made a party to the lawsuit pursuant to either Rule 19 or 20 of the Fed.R. of Civ.P. Bender filed a brief in opposition to Assured's motion to strike/dismiss. In its brief Bender asserts that leave of court is not required to add counterclaim defendants. In the alternative Bender moves to join Assured and the other counterclaimants as parties without having to re-serve them. In a supplemental brief Bender asserts that Assured, under Fed.R.Civ.P. 21, lacks standing "to raise this lack of permission [to add counter-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claimant defendants]".

As the Court's research and the parties' briefs reveal, there is, apparently, no published court of appeals or Supreme Court decisions addressing the issue before this Court: whether under Fed.R.Civ.P. 13(h) a defendant/counterclaim plaintiff must obtain leave of court to join counterclaim defendants as parties to the action, such counterclaim defendants not being parties to the action prior to the filing of the counterclaim.

A literal reading of the Fed.R. of Civ.P. does not provide the answer. The few courts which have dealt with this issue have decided the issue both ways.

Fed.R. of Civ.P. 13(h) states:

**(h) Joinder of Additional Parties.** Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20.

Fed.R. of Civ.P. 13(h).

Fed.R. of Civ.P. 19 and 20 deal with mandatory and permissive joinder. They, too, do not expressly require a motion by a party. Indeed, Rule 19 may be read as implying that leave to join is not required: "If the person has not been so joined, the court shall order that the person be made a party."

In *Vermont Castings, Inc. v. Evans Products Co.,* 510 F.Supp. 940 (D.Vt.1981) Franklin Cast Products, Inc. filed a counterclaim against the plaintiff and a group of other companies the court referred to as "the IMEX Group". The IMEX Group moved to dismiss the counterclaim, asserting, among other things, that Franklin failed to obtain leave of court to join the IMEX Group as counterclaim defendants. Denying the motion to dismiss, the court stated:

Although Professor Moore notes in his Federal Practice treatise that the counterclaim-plaintiff seeking to bring in additional parties pursuant to Rule 13(h) should secure an order from the court that these parties be made defendants to the counterclaim, he also argues persuasively that the 1966 revision of the rule, which dropped the provision that "the court shall order [additional parties] to be brought in," eliminates the need to obtain leave of court where the new parties are being brought in on a counterclaim which is raised in the original answer. *See* 3 Moore's Federal Practice ¶ 13.39, at 13-998-99 (2d ed. 1980). We agree that leave of court is no longer required. The spirit of the Federal Rules is served by eliminating unnecessary motions. Any abuse of the joinder provisions can be remedied upon motion under Rule 21 which provides that parties may be dropped by order of the court on such terms as are just.

In his treatise Professor Moore makes the following observations and arguments:

Under the 1966 revision of Rule 13(h), it is not clear whether leave of the court must be obtained before a defendant can bring in new parties as additional defendants to a counterclaim. Former Rule 13(h) inferred that such leave was necessary since it stated "the court shall order them to be brought in ..." However, this language was omitted in favor of the present provision that "persons ... may be made parties ... in accordance with provisions of Rules 19 and 20." Good *32 arguments can, therefore, be advanced that leave of court is no longer necessary if the new parties are being brought in on a counterclaim which is raised in the original answer.²⁷

FN27 Since Rule 19 requires the counterclaimant to bring in indispensable parties, it would seem anomalous to require leave of court to perform an act which the rule mandates.

FNSecond, since the 1963 amendment of Rule 14 now provides that no leave of court is required to bring in new parties if the third party complaint is filed no later than ten days after service of the original

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 F.R.D. 30 Page 3
122 F.R.D. 30
(Cite as: 122 F.R.D. 30)

answer, the same policy ought to be applicable to counterclaims filed in the answer.

FNThird, since the Advisory Committee's Note of 1966 to subdivision (h) states that "the party pleading the claim is to be regarded as a plaintiff ... and amended Rules 19 and 20 are to be applied in the usual fashion," see ¶ 13.01[8.-2], *supra*, and a plaintiff in his original complaint does not require leave of court to name additional parties, it can be implied that the Committee intended that leave of court is not necessary.

FNFourth, functionally the spirit of the Rules is served by eliminating unnecessary motions, and any abuse can be remedied upon motion within the Court's discretion under Rule 21.

3 J. Moore, Moore's Federal Practice ¶ 1 3.39 (2d ed. 1987) (ftn. 26 omitted; part of ftn. 27 omitted).

Assured relies primarily on two cases which hold that leave of court is required to join counterclaim defendants: *Mountain States Sports, Inc. v. Sharman*, 353 F.Supp. 613 (D.Utah 1972) and *A.L. Williams & Assoc., Inc. v. D.R. Richardson & Assoc., Inc.*, 98 F.R.D. 748 (N.D.Ga.1983). Both cases reach their conclusions without much analysis. In *Mountain States Sports*, the court's entire discussion of the issue consisted of the following:

In 1966, Fed.R.Civ.P. 13(h) was amended in order to provide explicitly for the addition of parties to a counterclaim when the requirements for mandatory or permissive joinder, Fed.R.Civ.P. 19 and 20, were complied with. At the same time, the requirement that a court order be obtained to join additional parties was dropped without comment in the Advisory Committee's Notes. 3 Moore's ¶ 13.39 at 66-67 (Supp.1971). However, the general practice apparently continues to contemplate and order. *E.g., Ulichny v. General Electric Co.,* 3 09 F.Supp. 437 (N.D.N.Y.1970); *Timely Products Corp. v. Arron,* 303 F.Supp. 713 (D.Conn.1969); *United States v. Techno Fund, Inc.,* 270 F.Supp. 83 (S.D.Ohio 1967). *See*Fed.R.Civ.P. 21. The court chooses to comport with this practice so as to insure orderly compliance of proposed parties with the requirements of Rule 19 or 20. As a result, the motions [to dismiss for failure to obtain leave to join] should be granted with the understanding that the defendants may seek the court's leave for the proper addition of Mr. Daniels.

*Mountain States Sports,* 353 F.Supp. at 618.

This Court has reviewed the cases cited in *Mountain S tates S ports.* Those cases are distinguishable from the fact situation before the *Mountain States Sports* court, namely, that those cases did not address the issue of whether leave of court is required to join a party as a counterclaim defendant. In those cases, the party asserting the counterclaim had filed such a motion. Hence, whether such a motion is required was not at issue. Further, the *Mountain States Sports* court did not hold that the Fed.R. of Civ.P. *require* a motion for leave to join; rather, the court merely noted that "*the general practice* apparently continues to contemplate an order.... The court *chooses* to comport with this practice...." *Id.*(emphasis added). The question is not what is the general practice; the question is whether the rules *require* such a motion.

In *A.L. Williams* the court simply cited *Mountain States Sports* and the cases cited by *Mountain States Sports,* and without discussion dismissed two would-be counterclaim defendants. *A.L. Williams,*98 F.2d at 753, 54. The court twice noted that it was "open to a motion to join MILICO & Williams." *Id.* 98 F.R.D. at 753, n. 14 and at 754, n. 16.

Upon consideration, this Court is persuaded by the rationale set forth by Prof. Moore and by the *Vermont Casti ngs* decision and is of the opinion that leave of court is not required by the Fed.R. of Civ.P. to join a previous non-party as a counterclaim*33 defendant. This holding is based on the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1966 amendment to Rule 13(h) and the letter and spirit of the Fed.R. of Civ.P. Accordingly, Assured's motion to strike/dismiss is DENIED.

In the alternative, Bender's motion to add as counterclaim defendants Assured, Strickland General Agency, Inc., and Mobile Metal Wreckers, Inc. is GRANTED. Bender is not required to reserve these counterclaim defendants.

Because of these rulings, it is not necessary to address Bender's argument that Assured lacks the standing "to raise this lack of permission."

S.D.Ala.,1988.
Northfield Ins. Co. v. Bender Shipbuilding & Repair Co., Inc.
122 F.R.D. 30

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914
**(Cite as: Not Reported in F.Supp., 1985 WL 196)**

H
TEXWOOD LIMITED and TEXWOOD INCORPORATED (U.S.A.), individually and derivatively on behalf of DRAGER INDUSTRIES, INC., Plaintiffs, v. JORDAN GERBER, SCOTT DRAKE, JOSEPH SCHACHTER & CO., a partnership, JOSEPH SCHACHTER, LAWRENCE J. KAPLAN, RICHARD J. STONE, JAMES K. WAT and JOSO CONSULTANTS, INC., Defendants.
JORDAN GERBER, Defendant-Counterlclaimant, v.
S.D.N.Y. 1985.

United States District Court; S.D. New York.
TEXWOOD LIMITED and TEXWOOD INCORPORATED (U.S.A.), individually and derivatively on behalf of DRAGER INDUSTRIES, INC., Plaintiffs,
v.
JORDAN GERBER, SCOTT DRAKE, JOSEPH SCHACHTER & CO., a partnership, JOSEPH SCHACHTER, LAWRENCE J. KAPLAN, RICHARD J. STONE, JAMES K. WAT and JOSO CONSULTANTS, INC., Defendants.
JORDAN GERBER, Defendant-Counterlclaimant,
v.
TEXWOOD LIMITED, TEXWOOD INCORPORATED (U.S.A.), Plaintiffs-Defendants to Counterclaims, and WILLIAM WONG, K. W. CHUNG and SHIU TAM, Additional Defendants to Counterclaims.
**No. 83 Civ. 304 (WCC).**

January 16, 1985.

KRAVER & MARTIN, ESQS. 919 Third Avenue New York, New York 10022, for plaintiffs-defendants to Counterclaims TEXWOOD LIMITED, TEXWOOD INCORPORATED (U.S.A.) and WILLIAM WONG, K. W. CHUNG and SHIU TAM, Additional Defendants to Counterclaims; RICHARD M. KRAVER, ESQ., of counsel.
SUZANNE ANTIPPAS, ESQ., 681 Fifth Avenue New York, New York 10022, for defendant and counterclaimant Jordan Gerber and defendant Joso Consultants, Inc.
SPENGLER CARLSON GUBAR BRODSKY & FRISCHLING, ESQS. 280 Park Avenue New York, New York 10017, for defendants Joseph Schachter & Co. and Joseph Schachter; ROBERT KNUTS, ESQ., of counsel.
WOHL LOEWE STETTNER KRIM & FABRICANT, ESQS. 10 East 40th Street New York, New York 10016, for defendant Scott Drake; LEONARD HOLLAND, ESQ., of counsel.
EDWARD RUBIN, ESQ. 477 Madison Avenue New York, New York 10022, for defendant Richard J. Stone.
SCHNEIDER HARRIS & HARRIS, ESQS. 1015 Broadway Woodmere, New York 11598, for Defendant Lawrence J. Kaplan; SONDRA I. HARRIS, ESQ., of counsel.
HALL McNICOL HAMILTON & CLARK, ESQS. 220 East 42nd Street New York, New York 10017, for defendant James K. Wat; KENNETH V. HANDAL, ESQ., of counsel.

OPINION AND ORDER

CONNER, District Judge:
*1 This is an action under the federal securities laws, the New York State General Business Law and common law charging defendants with, inter alia, (1) inducing plaintiff Texwood, Limited, to purchase the capital stock of Drager, Inc. ('Drager') by false and fraudulent misrepresentations and concealment of material facts respecting Drager's financial condition and business prospects; (2) breach of warranties made in the stock purchase agreement; (3) negligence in the preparation of financial statements; (4) conversion of Drager's assets; and (5) violation of fiduciary duties in the management of Drager.

Defendants' Amended Answer to the Second Amended Complaint contains two counterclaims under Rule 10b-5 promulgated by the Securities & Exchange Commission under the authority of §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-08377-RPP    Document 65-5    Filed 04/22/2008    Page 16 of 18    Page 84 of 86

Not Reported in F.Supp.                                                              Page 2
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914
(Cite as: Not Reported in F.Supp., 1985 WL 196)

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) on behalf of defendant Gerber against plaintiffs Texwood Limited, Texwood (U.S.A.) and three additional defendants on the counterclaims, William Wong, K. W. Chung and Shiu Tam. The first counterclaim alleges that the counterclaim defendants induced Gerber, Drake and Drager to sell to Texwood (U.S.A.) a total of one-third of the capital stock of Drager for $496,633 by falsely representing (1) that Texwood Limited, as Drager's exclusive supplier of jeans, would supply to Drager jeans made by it in Hong Kong of such quality and at such prices that Drager could resell them at a profit; and (2) that Gerber and Drake would continue to be in charge of the operation of Drager and would receive compensation and expense allowances comparable to those they had been receiving. The first counterclaim further alleges that these representations were false and were wilfully and fraudulently made with the intention of terminating the employment of Gerber and Drake and taking over control of Drager so that Texwood Limited could 'dump' into the United States large quantities of inferior merchandise at inflated prices.

The second counterclaim alleges that in about August 1981, after Drager had sustained large financial losses as a result of the inferior, over-priced jeans supplied to it by Texwood Limited, and had thus become insolvent, Wong and Chung, acting on behalf of themselves and the other counterclaim defendants, induced Gerber to terminate his employment by Drager, forgive Drager's obligations to him and his counselling firm Joso Consultants, Inc., and to transfer his remaining Drager stock to Texwood (U.S.A.) by falsely and fraudulently representing that plaintiffs would release Gerber from all claims of whatever nature which they had against him. Although this agreement was consummated by the execution and delivery of general releases by Texwood (U.S.A.) and Drager in favor of Gerber, it is alleged that the counterclaim defendants never intended to honor the releases given to Gerber but were planning to and did institute the present action notwithstanding such releases.

The additional counterclaim defendants have moved to dismiss both counterclaims on the grounds: (1) that leave of Court was not obtained for adding defendants on the counterclaims; (2) that the Court lacks personal jurisdiction over the counterclaim defendants Tam and Chung; and (3) that the counterclaims fail to state a claim on which relief can be granted and fail to plead fraud with the particularity required by Rule 9(b), F.R.Civ.P.

*1. Addition of counterclaim defendants without leave of Court*

**\*2** The additional counterclaim defendants cite no authority supporting the proposition that leave of court is required for the addition of defendants on a counterclaim, and we know of none. Rule 13(h), F.R.Civ.P., provides that

Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20.

Rule 19 relates to joinder of necessary or indispensable parties, while Rule 20 relates to permissive joinder. Neither rule requires advance leave of Court for joinder of parties. Moore thus states that because 'a plaintiff in his original complaint does not require leave of court to name additional parties, it may be implied that the committee intended that leave of court is not necessary [to do so by counterclaim].' 3 Moore's Federal Practice ¶13.39, at 13-239 n.27 (2d ed. 1984).

*2. Personal jurisdiction of Tam and Chung*

Defendant Gerber asserts that the Court has personal jurisdiction of counterclaim defendants Tam and Chung by virtue of § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, which provides for suit in any district 'wherein the defendant is found or is an inhabitant or transacts business.'

In Leasco Data Processing Equipment Corp. v.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-08377-RPP    Document 65-5    Filed 04/22/2008    Page 17 of 18    Page 85 of 86

Not Reported in F.Supp.
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914
(Cite as: Not Reported in F.Supp., 1985 WL 196)

Page 3

Maxwell, 468 F.2d 1326, 1339 (2d Cir. 1974), Judge Friendly stated:

We hold that Congress meant § 27 [of the Securities Exchange Act] to extend personal jurisdiction to the full reach permitted by the due process clause . . ..

This requires only the existence of 'minimum contacts' between the defendant and the forum 'such that the maintenance of the suit does not offend 'traditional nations of fair play and substantial justice.' International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940). This determination involves an inquiry into the nature and extent of the defendant's contacts with the forum. Kulko v. Superior Court of California, 436 U.S. 84 (1978). The defendant must have purposely availed himself of the privilege of conducting business within the forum state. Hanson v. Denckla, 357 U.S. 235, 253 (1958), and his contacts with the forum must have been related to the subject of the claim. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104 S.Ct. 1868 (1984). In Leasco, supra, the Court ruled that a single meeting of a foreign national in the United States for the purpose of inducing the purchase or sale of a security in violation of Rule 10b-5 is sufficient to confer personal jurisdiction under § 27 of the 1934 Act.

As established by uncontroverted affidavits filed in support of the motion, both Tam and Chung are citizens and residents of the British Colony of Hong Kong, and both are employed there. Except for Tam's stock ownership in Texwood Limited, which in turn owns Texwood (U.S.A.), neither Tam nor Chung has any property in New York State nor derives any income from any source here. Neither participated in any negotiations in New York leading to execution of the contract which is the subject of the first counterclaim, although they did meet with Gerber in Hong Kong in December 1979 for that purpose. It is conceded that Wong and Chung came to New York in 1981 to meet with Gerber to discuss the releases which are the subject of the second counterclaim. However, those negotiations were obviously conducted on behalf of Texwood (U.S.A.) and Drager, who executed the releases in question, and not on behalf of Wong and Chung personally.

*3 Under the 'fiduciary shield' doctrine recognized in this and a number of other circuits, Wong and Chung are not subject to personal jurisdiction here because their acts here were committed in the course of their employment by and for the benefit of their corporate employer. As the Court of Appeals stated in Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 902 (2d Cir. 1981):

The teaching of the courts of this Circuit and of New York is that there is a dichotomy between the principles governing the personal liability of corporate agents for torts committed in their corporate roles and the principles governing the amenability of such agents to personal jurisdiction solely on the basis of those acts . . .. These cases have recognized that if an individual has contact with a particular state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise, by that state, of jurisdiction over him personally on the basis of that conduct. Thus, his conduct, although it may subject him to personal liability, may not form the predicate for the exercise of jurisdiction over him as an individual. The underpinning of this fiduciary shield doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.

This rule has been repeatedly applied in this Court. Trafalgar Capital Corp. v. Oil Producers Equipment Corp., 555 F. Supp. 305, 309-10 (S.D.N.Y. 1983); Louis Marx & Co., Inc. v. Fuji Seiko Co., Ltd., 453 F. Supp. 385, 389 (S.D.N.Y. 1978).

It follows that neither Tam nor Chung is personally suable here on either counterclaim and both counterclaims will be dismissed as to them.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-08377-RPP    Document 65-5    Filed 04/22/2008    Page 18 of 18    Page 86 of 86

Not Reported in F.Supp.
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914
**(Cite as: Not Reported in F.Supp., 1985 WL 196)**

Page 4

*3. Alleged failure to state a claim*

The counterclaim defendants urge that both the first and second counterclaims are deficient in that, although both counterclaims allege that defendants were induced to transfer their stock in Drager to Texwood (U.S.A.) by certain false and fraudulent representations, 'no objective facts are alleged from which an inference could be drawn that the statements were false when made.' The first counterclaim is also attacked on the ground that it does not specify which of the counterclaim defendants made which misrepresentations nor when they were made nor whether they were made in person or by telephone.

However a careful reading of the counterclaim convinces the Court that their allegations state a claim under Rule 10b-5 and satisfy at least the minimum requirements of Rule 9(b), F.R.Civ.P. All five of the counterclaim defendants are alleged to have made in or about December 1979 each of the false representations set forth in Paragraphs 88(a), (b) and (c) and 89. In Paragraph 89 it is alleged that Gerber, Drake and Drager relied on these misrepresentations and were thereby induced to transfer certain of their Drager shares to Texwood (U.S.A.), and in Paragraph 96 it is alleged that they were thereby injured in specified respects.

*4 Although there is no detailed specification as to where and how the alleged misrepresentations were made, this information is obtainable by interrogatories or depositions. No purpose would be served by requiring these details to be set forth in the pleadings, which are already sufficiently specific to apprise the counterclaim defendants of the nature of the claim and to permit them to prepare their defense. Whether the allegations can be proven, of course, remains to be seen.

The same is true of the second counterclaim. The counterclaim defendants attack it on the further ground that it alleges that Drager and Berger were induced by fraudulent misrepresentations made by the counterclaim defendants to transfer their remaining Drager stock to Texwood (U.S.A.) and drop their claims against Texwood (U.S.A.) in exchange for general releases from Texwood (U.S.A.) and Drager. This allegation is asserted to be inconsistent with defendants' reliance on the releases as an affirmative defense to the main action against them. But inconsistent pleadings are not only permitted but are so common as not to require a citation of supporting authority. Indeed, plaintiffs' main action itself is inconsistent with the general releases, since the releases, if effective, would appear to constitute an absolute defense to plaintiffs' claims against Gerber.

SUMMARY

The first and second counterclaims are dismissed as to Tam and Chung. The motion of the counterclaim defendants is in all other respects denied.

SO ORDERED.

S.D.N.Y. 1985.
Texwood Ltd. v. Gerber
Not Reported in F.Supp., 1985 WL 196 (S.D.N.Y.), 40 Fed.R.Serv.2d 907, Fed. Sec. L. Rep. P 91,914

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.