# APPENDIX "A"

85DGGREC

1

85DGGREC                    ROUGH DRAFT COPY
```
 1              (Case called)
 2         THE DEPUTY CLERK:  Is the plaintiff ready?
 3         MR. HARNIK:  Plaintiff is ready, your Honor.
 4         THE DEPUTY CLERK:  And the defendant ready?
 5         MR. DAVID:  Defendant is ready, your Honor.
 6         THE COURT:  Good morning.  There are three motions I
 7    guess.  We have the defendant's motion under 1404(a) and the
 8    plaintiff's cross motion to dismiss and the motion for summary
 9    judgment by the plaintiff.  Why don't we hear the last motion
10    first and the second motion second and the first motion last so
11    I have all the considerations before me before I listen to the
12    1404(a) motion.
13         MR. HARNIK:  Good morning, your Honor.  Steven Harnik
14    for the plaintiff Greystone CDE.  In point of fact, the summary
15    judgment motion is probably the simplest of the three motions,
16    the least procedurally complicated.  The record is clear that
17    the defendants signed the guarantees.  The guarantees were
18    unconditional, irrevocable, and absolute, and they waived all
19    of their defenses.
20         THE COURT:  Excuse me?
21         MR. HARNIK:  They have waived all of their defenses.
22    The one defense that they bring up is that the loan was not in
23    default, but that claim is based upon their reading of the
24    contract, which states that they were not in financial default.
25    However, the guarantees do not make a distinction between a
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

85DGGREC                    ROUGH DRAFT COPY
```
 1    financial default and a default under the terms of the
 2    agreements.
 3         THE COURT:  Well, as I read your papers, the issue is
 4    whether or not the default occurred before August of 2007, and
 5    you say they were notified that they were in default, as shown
 6    by Exhibit I to the amended complaint.
 7         MR. HARNIK:  That's right.  Your Honor --
 8         THE COURT:  As I read Exhibit I that relates to the
 9    Section 9.1 G and J of the bridge loan agreement.
10         MR. HARNIK:  That's correct, yes, your Honor, and they
11    did not get --
12         THE COURT:  But I don't have -- and G and J relate to
13    the contract or sale, or one of them does.
14         MR. HARNIK:  That's correct, yes.  The --
15         THE COURT:  Well, where is the evidence in your motion
16    of any breach of the contract of sale?  Where is the contract
17    of sale documents?
18         MR. HARNIK:  Contract of sale is attached --
19         THE COURT:  Wouldn't I need that to determine whether
20    or not they were in breach?
21         MR. HARNIK:  Yes, your Honor.  They're attached to --
22    I think it's Exhibit C.  It's Exhibit B -- here.
23         THE COURT:  Where is it?
24         MR. HARNIK:  Contract of sale is here.  It's attached
25    to Exhibit B, contract of sale for real estate.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

85DGGREC                    ROUGH DRAFT COPY
```
 1         THE COURT:  Where is exhibit B --
 2         MR. HARNIK:  B is the --
 3         THE COURT:  Okay.
```
Page 1

85DGGREC

```
 4          MR. HARNIK:  -- of the purchase agreement.
 5          THE COURT:  This is the purchase agreement?
 6          MR. HARNIK:  Right.  And it's an attachment to the
 7  purchase agreement.
 8          THE COURT:  Well, it's a little hard to tell from your
 9  56 that that's the fact.  There it is.  I see.
10          MR. HARNIK:  And, your Honor, it's very simple.  The
11  purchase agreement had certain dates by which the apartment
12  was -- the building was to be sold, and Greystone gave the
13  defendants one extension.  But when it was clear to them --
14          THE COURT:  Where is the extension?
15          MR. HARNIK:  The extension was -- that's Exhibit --
16          THE COURT:  Where is the extension?
17          MR. HARNIK:  Here.  It's addendum -- yeah.  It's
18  addendum No. 1, which extended the closing date to March 31.
19  And buyer to pay additional $50,000 \***.
20          THE COURT:  It would be helpful if you would identify
21  these documents.
22          MR. HARNIK:  Yeah.  That was the first extension, and
23  then there was an addendum No. 2 which extended the contract to
24  October 15.
25          THE COURT:  October 15, 2006?
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                4

85DGGREC                    ROUGH DRAFT COPY

```
 1          MR. HARNIK:  Right.
 2          THE COURT:  Then there's a letter agreement between
 3  Mr. --
 4          MR. HARNIK:  I'm sorry.  2007.
 5          THE COURT:  2007.  The addendum 3, is that it?
 6          MR. HARNIK:  No.  That was addendum 2.  And the
 7  problem is -- then the seller -- I'm sorry.  The defendants
 8  purported to enter into addendum No. 3, but that was never
 9  consented to by Greystone.  They did that on their own, and the
10  contract specifically requires Greystone's consent for an
11  extension.
12          THE COURT:  This is an agreement between Waverly Creek
13  Apartments.  Are they the owners of the -- let's just see.
14  They're the owners.  Where are the sellers?
15          MR. HARNIK:  Correct.
16          THE COURT:  Where is addendum No. 2?
17          MR. HARNIK:  That we don't have, and I see that in
18  the -- I don't see that in the papers here.
19          THE COURT:  It's dated July 20, 2007.
20          MR. HARNIK:  July 20, 2007, correct.  It's referred to
21  in addendum No. 3.
22          So the point is that under addendum No. 1, they were
23  given until March 31, and then they had three separate 30-day
24  periods to further extend the closing based upon certain
25  conditions being met.  And it did not close.  And so our client
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                5

85DGGREC                    ROUGH DRAFT COPY

```
 1  brought this fact to the defendants' attention and said that
 2  you're in default.  And then the next thing we heard was that
 3  they --
 4          THE COURT:  But they had separate extensions under the
 5  contract, why isn't addendum No. 3 appropriate under the
 6  contract of sale?
 7          MR. HARNIK:  Yeah.  But by October 15, it had expired.
 8          THE COURT:  October 15 --
```

                              Page 2

85DGGREC
```
 9          MR. HARNIK: Before October 15, it expired and what
10   they did then --
11          THE COURT: Your notice of default is in August.
12          MR. HARNIK: That's right. Yeah. Well, by that time,
13   they had gotten the extension. It was extended to March 31,
14   and then they had three separate 30-day periods to extend.
15          THE COURT: Tell me where you're reading from. March
16   31 --
17          MR. HARNIK: Addendum No. 1.
18          THE COURT: Where does the contract call for the
19   closing to occur?
20          MR. HARNIK: The contract originally called for
21   December 2006.
22          THE COURT: That's in Exhibit B.
23          MR. HARNIK: Yeah.
24          THE COURT: Attached to Exhibit B, is that --
25          MR. HARNIK: Right.
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                 6
85DGGREC                    ROUGH DRAFT COPY
```
 1          THE COURT: On which page?
 2          MR. HARNIK: Closing shall be -- that's on page --
 3   well, it's at paragraph 8.
 4          THE COURT: Shall be agreed upon as between seller and
 5   buyer by no later than 30 days after the award of AHTC. AHTC
 6   is a scheduled preorder on January 31, 2007. I'm reading from
 7   paragraph 8 \***. That doesn't quite seem to be accurate as to
 8   the closing date, but maybe it's reflected in a subsequent
 9   document. Do you know when the AHTC --
10          MR. HARNIK: I'm just looking for that, your Honor.
11          THE COURT: I guess before we go on to that, I ought
12   to ask you about where is the extensions? Where is the
13   provision for the extensions?
14          MR. HARNIK: That's right behind the contract. That
15   starts with addendum No. 1.
16          THE COURT: These are unsigned.
17          MR. HARNIK: Addendum No. 1 is signed. And then on
18   June 22, it was --
19          THE COURT: No later than March 31st, addendum No. 1.
20          MR. HARNIK: Right. And then there's a letter beneath
21   that, June 22nd, where it says -- where Mr. Oliphant says, This
22   letter shall serve as confirmation that Santa Fe Pointe L.P.
23   hereby elects to extend the closing date until July 31, 2007.
24   Those extensions were agreed to by --
25          THE COURT: Where is that?
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                 7
85DGGREC                    ROUGH DRAFT COPY
```
 1          MR. HARNIK: That's right beneath the addendum No. 1.
 2          THE COURT: Attached to the letter dated --
 3          MR. HARNIK: June 22nd.
 4          THE COURT: June 22nd?
 5          MR. HARNIK: Right. Let me go back and look at that.
 6   I don't see the 14. I don't see that paragraph 14 deals with
 7   it.
 8          THE COURT: According to this extension, Santa Fe
 9   hereby elects to extend the closing date for the purchase of
10   Santa Fe Pointe apartments until July 31, 2007 pursuant to
11   Section 14 of the contract of sale. Section 14 doesn't have
12   anything to do with contract of sale, as I see it.
13          MR. HARNIK: Well, it has too with the --
```
                               Page 3

85DGGREC
14          THE COURT:  Special conditions --
15          MR. HARNIK:  Each time that they wanted to get an
16   extension, they had to give the seller $25,000.
17          THE COURT:  All right.  Well, now, assuming that's
18   correct, where is the provision for the extensions of time on
19   the closing?
20          MR. HARNIK:  That's paragraph --
21          MR. DAVID:  Your Honor, may I have the document where
22   Mr. Harnik is referring to, because I've gotten lost at this
23   point.
24          THE COURT:  You're lost?
25          MR. DAVID:  Yes.  I would just like the document.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                8
85DGGREC              ROUGH DRAFT COPY
1          THE COURT:  It's Exhibit B, Mr. David.
2          MR. DAVID:  Thank you.
3          THE COURT:  And attached to the back of exhibit B are
4    the contract of sale and the First Amendment to the contract of
5    sale, the modification.  And then an extension letter by
6    election.  They're just before you get to Exhibit C.
7          MR. DAVID:  I have it.
8          MR. HARNIK:  Well, 312 says the buyer intends to
9    obtain fingerprinting  --
10         THE COURT:  Where are you?
11         MR. HARNIK:  This is paragraph 3.12 of the --
12         THE COURT:  3.12?
13         MR. HARNIK:  Right.  It says --
14         MR. HARNIK:  Buyer intends to obtain financing from
15   tax-exempt multifamily bonds and affordable housing tax credits
16   AHTC.
17         THE COURT:  Right.
18         MR. HARNIK:  Buyer shall have until February 1, 2007
19   in which to obtain such financing as buyer discretion shall
20   deem advisable with respect to its acquisition of property.
21   Buyer shall make application for said financing or on or before
22   September 17, 2006.  So then it goes to paragraph 8, subject to
23   provisions contained herein --
24         THE COURT:  Let me look at paragraph 8.  All right.
25   So the closing had to be within 30 days --
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                9
85DGGREC              ROUGH DRAFT COPY
1          MR. HARNIK:  30 days after the AHTC.
2          THE COURT:  After February 1st.  Is that right?  The
3    buyer should have the right to extend the closing date for two
4    separate 30-day periods.
5          MR. HARNIK:  Right.
6          THE COURT:  Provided the following conditions are met.
7    The buyer provides a written notice to seller at least ten days
8    prior to the closing date and buyer transfers an extension fee
9    to seller in the amount of $25,000 contemporaneous with the
10   closest delivery of each such notice.  Okay.  So they had the
11   right to extend the closing date.  And they did so by --
12         MR. HARNIK:  Addendum No. 1.
13         THE COURT:  And also by two.  Right?
14         MR. HARNIK:  Well, we have the letter of June 22nd
15   where it says that it was extended --
16         THE COURT:  That's evidently the second extension of
17   time.
18         MR. HARNIK:  To July 31.  Correct.
                           Page 4

85DGGREC
```
19          THE COURT:  Okay.
20          MR. HARNIK:  And that's it.  And Greystone agreed to
21   those two extensions but --
22          THE COURT:  There's no showing that they agreed to it
23   but --
24          MR. HARNIK:  Well, we don't deny that they --
25          THE COURT:  Why did they have to agree to it?  What
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                  10
85DGGREC                    ROUGH DRAFT COPY
```
1    right did they have?
2           MR. HARNIK:  Under the assignment, it was required
3    that there could be no amendment to the --
4           THE COURT:  Where?
5           MR. HARNIK:  That's at paragraph Section 4.
6           THE COURT:  What exhibit?  What section?
7           MR. HARNIK:  This is -- it's Exhibit B, the
8    assignment.
9           THE COURT:  Exhibit B?
10          MR. HARNIK:  Section 4.
11          THE COURT:  Section 4.
12          MR. HARNIK:  Negative covenants.
13          THE COURT:  Let me just look.  So you're saying that
14   the extension -- you're saying that this third extension
15   violated Section 4 because the borrower of covenants -- that
16   the borrower shall not assign, transfer, mortgage, pledge or
17   otherwise encumber or permit to have further suffered to exist
18   any lien or other encumbrance on or in any of the right, title,
19   and interest of the borrower into and under the purchase
20   agreement, except in favor of the lender?  Is that right?
21          MR. HARNIK:  Well, we're relying on B, amend or modify
22   any of the terms of the purchase agreement, except with the
23   prior written consent of the lender.
24          THE COURT:  Well, the extension of -- I thought it was
25   possibly A, because as I read the third addendum, the seller --
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                  11
85DGGREC                    ROUGH DRAFT COPY
```
1    it was the seller's mortgage, in effect.  Took a $500,000
2    interest in the property.  I think that's the last provision in
3    C.
4           MR. HARNIK:  Well that, too, your Honor, yes, as
5    between Walnut Creek and the Oliphant parties, that's correct,
6    yeah, they were purporting to take a $500,000 money mortgage.
7    So it's for two reasons.
8           THE COURT:  Look, if you file a motion for summary
9    judgment, aren't you supposed to outline in your statements of
10   material fact to these facts that we just spent half an hour
11   going through?
12          MR. HARNIK:  Well, we have, your Honor.  The point was
13   that they didn't get our agreement to extend the contract for
14   beyond July 31.  They did not have our written agreement, and
15   there's nothing in the record to show that they did.
16          THE COURT:  Well --
17          MR. HARNIK:  And their only defense is that this was
18   not a financial default, but it's a default under the terms of
19   the contract.
20          THE COURT:  Okay.  I must say I think it could have
21   been presented in a more logical fashion.
22          MR. HARNIK:  Well --
23          THE COURT:  Do you want to make any further argument
```
                              Page 5

85DGGREC

24  on this?
25          MR. HARNIK:  Well, just that they were notified that
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                    12
85DGGREC                    ROUGH DRAFT COPY
1   they were in default, that they then claimed that we should
2   have rescinded our notice of default, which was a second
3   admission that they were in default.  We refused.  We saw that
4   this agreement was going nowhere, because they had not been
5   able to find a syndicator, and it was our right to terminate at
6   that point.  Once we terminated -- no longer give them
7   extensions on the apartment sale, they were in default on the
8   loan, and they had to repay it.
9           THE COURT:  Well, the contract says -- as I understand
10  the contract of sale, they were grading money from the home
11  loan administration to be raised by bonds on the property \***.
12  why?
13          MR. HARNIK:  Yeah.  But they couldn't do that
14  without --
15          THE COURT:  Which they could then put into the
16  purchase of the property with the proceeds of the bonds.
17  Right?
18          MR. HARNIK:  Right.  But the --
19          THE COURT:  But they were also waiting on a
20  third-party investor.
21          MR. HARNIK:  Syndicator.
22          THE COURT:  Well, I don't know it's a syndicator.  I
23  just say third-party investor, who is, I gather, was a known
24  person.
25          MR. HARNIK:  Well, no.  It was a person that
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                    13
85DGGREC                    ROUGH DRAFT COPY
1   Mr. Oliphant said that he was going to find, but he never found
2   him.
3           THE COURT:  He was going to find him.
4           MR. HARNIK:  That was his responsibility, and he never
5   did.  And we kept -- Greystone kept giving him extensions and
6   saying, okay, get this thing off the ground, and he wasn't able
7   to do it.
8           THE COURT:  All right.
9           MR. HARNIK:  And the summary judgment -- once they
10  were in default under the guarantees, they waived all defenses,
11  as we state, and even if they were to make the claim that
12  somehow CDE and Greystone are the same -- one and the same
13  parties, the point was that when they signed the guarantees,
14  they knew all the material relevant fact.
15          THE COURT:  When you say CDE and Greystone?
16          MR. HARNIK:  Greystone Services.
17          THE COURT:  And Greystone --
18          MR. HARNIK:  That seems to be their defense that
19  they're all one and the same here.
20          THE COURT:  Well, the way I read their papers -- I
21  agree, you could raid the papers that way.
22          MR. HARNIK:  I mean, it's hard to understand what
23  they're saying.  That's the reason we've asked for a more
24  definite statement as to their counterclaims.  But in any
25  event, at the time he signed, he knew all the relevant facts.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                    14
                         Page 6

85DGGREC
85DGGREC                    ROUGH DRAFT COPY
1    In fact, he complained.  He says I was forced to sign.  So
2    there's no -- he doesn't even make the claim that there was
3    some sort of fraud or induce., but he couldn't make that claim,
4    because he knew what he was signing.
5            THE COURT:  All right.  Let me hear from the defense.
6            MR. DAVID:  Your Honor, if I may, Donald David for
7    Sante Fe Pointe.  The problem that I have with the motion for
8    summary judgment is twofold.  Number one, and most importantly,
9    as just has been demonstrated by 45 minutes of the Court's
10   time, this motion is procedurally defective.  Number two, it's
11   substantively defective.  Let me turn to procedurally first.
12   The fact is that under the local rules, the Rule 56 statement
13   must make citation as to where there is admissible evidence in
14   support of the particular contention.  If you look at their
15   Rule 56 statement, all they've done is copied over the
16   statements that are contained in their complaint.  Thus, what
17   happens is we and the Court are left to search for where the
18   evidence is that supports this.
19           In this court, at least, the --
20           THE COURT:  Well, in all respects, Mr. David, I mean,
21   I've read your papers and all, but Mr. Harnik does cite to
22   exhibits attached to the amended complaint.
23           MR. DAVID:  Your Honor, he does --
24           THE COURT:  And those are documents signed by the
25   parties.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              15
85DGGREC                    ROUGH DRAFT COPY
1            MR. DAVID:  Your Honor, if I may, he --
2            THE COURT:  That puts me on notice and puts you on
3    notice that that's what they're relying on.
4            MR. DAVID:  But that's not what the Rule 56 statement
5    requires under the local rules of this court.  It requires a
6    statement of a contested fact and then a specific reference to
7    the document, the paragraph, the affidavit, whatever it may be
8    that supports that contention of fact.  We're not supposed to
9    do what the Court had to do this morning, which was search
10   through -- and we certainly didn't have the opportunity to
11   search through with Mr. Harnik and ask Mr. Harnik, okay,
12   Mr. Harnik, exactly where is it in the documents you think you
13   find support for this proposition?  There was a failure to
14   comply with this Court's local rule, and that, by itself, is a
15   predicate for denying this motion.
16           THE COURT:  Well, this motion is brought before any
17   discovery and --
18           MR. DAVID:  I apologize.  I keep interrupting you.
19           THE COURT:  This motion is brought without any
20   discovery, and I notice that -- let me have the defendants' --
21   I mean, I noticed that -- I know 56.1 pretty thoroughly by now,
22   but under those circumstances, I think it is all right to cite
23   documents which are attached to the amended complaint.
24           MR. DAVID:  Your Honor, I don't disagree with that,
25   but what I'm --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              16
85DGGREC                    ROUGH DRAFT COPY
1            THE COURT:  There were agreements that were made,
2    documents and their trust.
3            MR. DAVID:  Your Honor, I don't disagree with that
4    \***.  what I disagree with is the fact that you can't make a
                        Page 7

85DGGREC

```
 5   generalized statement and not make a reference to a particular
 6   document and a particular paragraph number.  If you take a look
 7   at Rule 56, all right, it specifically says that they're
 8   supposed to have numbered paragraphs, the material facts as to
 9   which there is no issue, and a corresponding -- I'm sorry.  And
10   that they are supposed to tell us where in the record we can
11   find it.  The fact that you don't have discovery is no excuse
12   for not saying, okay, paragraph 8 of the sales contract
13   provides such and such.  We shouldn't be searching, as the
14   Court had to do, for which paragraph they're relying upon to
15   claim that there was a default.  And that's what they have
16   created.  At the very, very least, the motion should be denied
17   without prejudice for them to renew it upon a proper Rule 56
18   statement so that everybody can be playing with the same facts.
19           THE COURT:  All right.  Well, let me ask you a
20   question.  Is there any disagreement that -- loan agreement is
21   annexed -- is a copy of the loan agreement annexed in the
22   amended complaint as Exhibit A is not a statement of the terms
23   of that loan agreement?
24           MR. DAVID:  No, your Honor, it's not.  There's no
25   disagreement as to that.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

85DGGREC                    ROUGH DRAFT COPY

```
 1           THE COURT:  And in paragraph -- I take it that
 2   there's -- that although you don't like the way that the
 3   plaintiff states if it's a limited liability company, duly
 4   organized and existing under the laws of Delaware authorized to
 5   do business in New York with an office at 152 west 57th Street,
 6   that there really isn't any dispute.  You may not have
 7   knowledge with respect to maybe one or another of the
 8   adjectives or words used in that paragraph, but you really
 9   don't dispute paragraph No. 1 or paragraph No. 2 or paragraph
10   No. 3.
11           MR. DAVID:  Well, your Honor, if I may, for example,
12   paragraph No. 14 --
13           THE COURT:  Well, now, I'm getting to that.  I have
14   some sympathy with you when you get over to paragraph 14.  In
15   other words, once we get past the events of December 20th then,
16   it seems to me, that you have trouble in finding Exhibit H.
17   No.  Here is the -- but then you have paragraph 13 and 14.
18           MR. DAVID:  But, your Honor, can I stop you for one
19   moment there at the allonge?
20           THE COURT:  Yeah.
21           MR. DAVID:  The allonge says that the date that the
22   loan matures is December 31, 2007, and yet, they're calling a
23   default in August, on August 12th, having already withdrawn our
24   application to HUD to get the financing that they knew was
25   necessary to close the deal.  And understand, they send out the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

85DGGREC                    ROUGH DRAFT COPY

```
 1   notice of default on August 21, 2007.
 2           THE COURT:  Well, let's go back to paragraph 13 -- or
 3   12 you wanted to go to, didn't you?
 4           MR. DAVID:  No.  Actually it was 14, your Honor, but
 5   you were referring to the allonge, all right, and that's
 6   paragraph 12, I believe.  All right.  But, again, this is the
 7   kind of problem that we have.
 8           THE COURT:  Well, the allonge is in paragraph 11.
 9           MR. DAVID:  The maturity date of this loan was
```

Page 8

85DGGREC

10  December 15 --
11          THE COURT:  That's the maturity date of the loan, but
12  there are two agreements that have to be put together on this
13  transaction, the loan and the contract of sale, and the
14  contract of sale, what their alleging is that the loan was
15  conditioned on their having a valid contract of sale extim, in
16  other words, to purchase the property.
17          MR. DAVID:  Right.
18          THE COURT:  They had a right to purchase the property.
19          MR. DAVID:  Correct.
20          THE COURT:  And the loan was conditioned on that right
21  continuing to exist, because otherwise, the project wouldn't go
22  forward.
23          MR. DAVID:  That is correct also, your Honor.
24          THE COURT:  Right.  So the allonge extends the note
25  for the loan, but it doesn't extend the contract of sale.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            19
85DGGREC              ROUGH DRAFT COPY
1           MR. DAVID:  No.  The contract of a sale is they
2   acknowledge, your Honor, was extended by reason of an agreement
3   between the seller and the buyer, and it was extended, as they
4   themselves note in paragraph 16, to October 15, 2007.
5           THE COURT:  Well, let me just see.
6           MR. DAVID:  Your Honor, do you mind if I sit down?  I
7   have a problem in my back.
8           THE COURT:  But their point is that when they executed
9   addendum 3 to the purchase contract, purporting to extend the
10  purchase contracts, they had a provision in there.  One, they
11  were not permitted to do that under the terms of the loan
12  agreement, according to Mr. Harnik's argument, because by doing
13  that, they were modifying the terms of the purchase and sale
14  agreement.  They had to do that with Greystone's approval.
15          MR. DAVID:  We disagree respectfully, your Honor.
16          THE COURT:  All right.  The second one is, which it
17  seems to me is possibly more damaging from the point of view of
18  the defendants, is that that agreement, by its terms, gives the
19  seller an interest in the property of $500,000 on a seller's
20  mortgage, which clearly would interfere with the value of the
21  property which they have as security for their $500,000 loan.
22          MR. DAVID:  Your Honor, again, if I may, the problem
23  is we're putting the cart before the horse.  That's not the
24  default which they acted upon.  It's not the default which they
25  proceeded upon in this case --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            20
85DGGREC              ROUGH DRAFT COPY
1           THE COURT:  Well, wait a minute.  The notice dated
2   August 29th that they have cites those two provisions.
3           MR. DAVID:  No, your Honor.  The August cites the fact
4   that the date for the purchase and sale of the apartment has to
5   pass without the date being extended \***.  That's what the
6   default notice says.
7           THE COURT:  No.  As I look at it, it's Exhibit I, an
8   it says the expiration date of the contract for, the purchase
9   and sale of the contract, without the same having been
10  extended, that's A.  They're relating -- where am I?  I haven't
11  got the right one.  All right.  That's the first one.  And B is
12  pursuant to 91J, termination of expiration provide an equity
13  investment \***.
14          MR. DAVID:  That has nothing to do with the extension,
                        Page 9

85DGGREC
```
15    your Honor.  The only -- I believe, if you look at it, the only
16    objection they have got there is to the date passing.
17            THE COURT:  I agree.  I think that is a weakness in
18    their position.
19            MR. DAVID:  Right.  So the fact -- as a matter of
20    fact, I mean, this is not a surprise.  Mr. Harnik wasn't even
21    thinking a that paragraph until the Court pointed it out to
22    him, and he said, oh, yeah, that would be another basis.  The
23    fact of the matter is that they send out a default notice.
24    Now, you've got to get the sequence down, because it's
25    important to understand the sequence, if I might, your Honor.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

85DGGREC                    ROUGH DRAFT COPY
```
1     All right.  August 9th, they pulled out early, withdraw the
2     application to HUD, in essence, killing our ability to finance
3     it.
4             THE COURT:  They didn't withdraw the application.  The
5     Greystone CDE --
6             MR. DAVID:  Well, your Honor, if I may, Greystone CDE,
7     the default notice is sent out on the letterhead of Servicing
8     for CDE, or is it backwards?  Do I have it backwards?  No.
9     That's correct.  We're not the one who does this.  They're the
10    ones who match in pair, which is part of the problem.  So if I
11    could, they withdraw the application on August 9th.  They send
12    us out, in us sense, in their own line saying, uh-huh, we've
13    got them.  Because remember, they're negotiating with somebody
14    else, with another developerment they say, ah-ha, we've got
15    them.  So now on August 21st, they smile.  They say, we
16    withdrew your application.  So now we're going to send you a
17    default notice.  The only thing is Mr. Oliphant outsmarted
18    them.  He was able to get the seller to make an agreement to
19    extend.  And that's where the root of the problem is.  The root
20    of the problem is that all of this is tainted by what they have
21    done.
22            And your Honor, if I might, that's not my statement.
23    That's your statement in the transcript --
24            THE COURT:  My statement?
25            MR. DAVID:  Yes, your Honor.  If I could, transcript
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

85DGGREC                    ROUGH DRAFT COPY
```
1     of February 14, 2008, page 19.  And I'm going to read a little
2     bit earlier starting at page 4, only to put it in context:  And
3     they claim that these papers came in on the verge of the seller
4     of the property not giving them an extension and that they also
5     had to issue the tax bonds.  They had an obligation, I guess,
6     with respect to the underwriters of the bond \***, but in any
7     event, it cost about $250,000, is my recollection.  Starting on
8     line 11, the Court says the following:  They claim that those
9     circumstances amount to duress.  I find that's an issue of
10    fact.  I may find that other rather thick for attorney and
11    Mr. Oliphant's circumstances to really feel that that was
12    duress and go ahead and sign the papers under those
13    circumstances, but it is an issue of fact that's been raised by
14    the defendants here so they claim that the bridge loan was
15    obtained -- or when they obtained the bridge loan, they were
16    under duress.
17            I'd read the rest but I don't think it --
18            THE COURT:  Well, I understand, but that's no longer a
19    claim.  Am I right?
```
Page 10

                              85DGGREC
20          MR. DAVID:  Say again, your Honor.
21          THE COURT:  That has to do with December 20th.
22          MR. DAVID:  No, your Honor.
23          THE COURT:  The events of December 20th.
24          MR. DAVID:  That has to do with their claim that
25     they're entitled to proceed under the guarantee.  Remember, if
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    23
       85DGGREC                  ROUGH DRAFT COPY
1      you put -- respectfully, your Honor, that they were before
2      you --
3              THE COURT:  I know what you're referring to now, and I
4      understood that that was your position at that time.  I do not
5      see that to be your position at this time.
6              MR. DAVID:  Oh, your Honor, it absolutely is our
7      position.  We --
8              THE COURT:  You're going to claim duress despite the
9      documents which some have undercutted?
10             MR. DAVID:  Your Honor, yes, we're going to claim it.
11             THE COURT:  Mr. Oliphant signed those documents.
12             MR. DAVID:  Your Honor, absolutely, but you knew that
13     when you made that statement.
14             THE COURT:  Well, I knew that, but the fact that it's
15     an issue of fact --
16             MR. DAVID:  If it's an issue --
17             THE COURT:  I'm not sure it's a material issue of fact
18     when, once we get all the discovery.  But --
19             MR. DAVID:  But that's the point, your Honor.
20             THE COURT:  At that point -- I agree with that
21     December 20th, but you're not answering my questions.
22             MR. DAVID:  Oh, I apologize.
23             THE COURT:  -- which I'm trying to deal with, which is
24     what happened on August 29th.  I'm trying to narrow the issues
25     in this case.  You guys shouldn't be wasting a lot of lawyer's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    24
       85DGGREC                  ROUGH DRAFT COPY
1      money going in on all the issues in the case.  They're two
2      separate issues, if you want.  If you're still raising that
3      duress issue, then you discover on the duress issue.
4              MR. DAVID:  Your Honor, we are.
5              THE COURT:  If you're also -- if you're raising the
6      issue of whether or not there was a breach of the agreement on
7      August 29th, then the discovery should be limited to that
8      issue.
9              MR. DAVID:  Your Honor, we're raising all of those
10     issues.
11             THE COURT:  Well, I know.  That's one of the problems.
12             MR. DAVID:  But, your Honor, we're entitled --
13             THE COURT:  You'll just cause legal fees.  Both
14     parties will sustain legal fees that are unnecessary under the
15     circumstances of this case.
16             MR. DAVID:  Your Honor, with all due respect, if I
17     might -- and I know judges hate that term, but I'm sorry.  It's
18     just instinctual.
19             THE COURT:  Oh, I hate that term.
20             MR. DAVID:  I know that.  I apologize.  The only issue
21     on this motion for summary judgment is whether there are issues
22     of fact.
23             THE COURT:  But I'd like to narrow them.
24             MR. DAVID:  Your Honor --
                              Page 11

85DGGREC
25          THE COURT:  Whenever I have a motion for summary
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

85DGGREC                    ROUGH DRAFT COPY
1  judgment, it's wise to narrow them so the parties don't extend
2  themselves under the all-out war on issues that are really not
3  crucial to their case at all.
4          MR. DAVID:  Your Honor, if I could, let's be clear.
5          THE COURT:  And we have a -- it's like a political
6  fight.  It's like Obama versus Clinton.
7          MR. DAVID:  I'm not going to comment on that.  I'm not
8  stupid --
9          THE COURT:  Up, you'll have all that side issues gone
10 into by the lawyers hoping they'll find something.
11         MR. DAVID:  Your Honor --
12         THE COURT:  You have two separate issues here.
13         MR. DAVID:  I have more than two separate issues, your
14 Honor.  I have a number of different issues, some of which were
15 the product of the original complaint, some of which are the
16 product of the counterclaims that we have served.  All of them,
17 in our mind, bear on the question of the propriety of this
18 motion for summary judgment.  I mean, there's no question --
19         THE COURT:  Well, you raise your -- you give me a list
20 of your issues.
21         MR. DAVID:  Your Honor, respectfully, at this point in
22 time, I can't sit here and give you a list of each of the
23 issues.
24         THE COURT:  Well, you tell me.  You've got a lot of
25 them.  Give them to me.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

85DGGREC                    ROUGH DRAFT COPY
1          MR. DAVID:  Well, your Honor, I'll give you some of
2  them.  Number one, the fact that they were attempting to set us
3  up and not acting in good faith when they terminated our
4  ability to finance with HUD by withdrawing our application
5  without our permission, all right, and then claim that we were
6  in default.
7          Number two, they sent out letters to all the credit
8  agencies attacking Mr. --
9          THE COURT:  Well, when you say they, you're talking
10 about Greystone service, are you not?
11         MR. DAVID:  I'm talking about Greystone Servicing,
12 and, your Honor, I'm sorry, we do not agree with the
13 distinction that you're drawing between Greystone Servicing and
14 Greystone CDE, because they don't agree with it.  Otherwise,
15 how do they send out a default letter on the letterhead of one
16 organization for another?
17         THE COURT:  Look, that's an issue of -- that's an
18 issue which you take up at time of trial, but my point is, when
19 you're making these statements, "they" is not helpful.  You get
20 to the individual company who did it unless your making an
21 alter ego argument, and that's your prerogative, but I'd like
22 to know whether you're making an alter ego argument or you're
23 making a joint --
24         MR. DAVID:  We're presenting them as alternatives
25 because of the behavior of the --
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

85DGGREC                    ROUGH DRAFT COPY
Page 12

85DGGREC

1    THE COURT:  But you have some idea if you are -- or
2    whoever negotiated this agreement has some idea whether or not
3    those two issues are -- I mean, they are mutually distinct
4    issues.
5    MR. DAVID:  I realize that, your Honor, but --
6    THE COURT:  And at this point, you ought to know, I
7    think, which avenue you're going to pursue, because if you
8    don't pursue it properly, I mean, you -- I know what it takes
9    to prove an alter ego case in New York, and it takes quite a
10   bit.
11   MR. DAVID:  Your Honor, if I may, we are at the
12   preliminary pleading stage.  They've chosen to bring a motion
13   for summary judgment without any discovery whatsoever.  At this
14   stage, our position is that they, in fact, acted together, and
15   alternatively that one is the alter ego of the other, and the
16   best evidence of that is their own default notice.  They send
17   out a default notice that includes both entities.
18   THE COURT:  I see that.
19   MR. DAVID:  All right.  And you're trying to make me
20   choose at a pleading stage before I even have an answer to our
21   counterclaims, before I have an appearance by Greystone CDE --
22   THE COURT:  It's not just to their pleading stage,
23   because discovery is going on, and I gather, at a fairly rapid
24   rate in California.  So you're not just in the discovery stage.
25   MR. DAVID:  But, your Honor, if I could, they're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

85DGGREC                    ROUGH DRAFT COPY
1    fighting every inch of the way in both jurisdictions.  I know
2    why the Court wished --
3    THE COURT:  Well, if you raise all these issues, of
4    course they're fighting every inch of the way.
5    MR. DAVID:  Well, your Honor, respectfully, that's why
6    we're saying one court -- let me give you a perfect example.
7    All right.  We have one court, the California court, that has
8    already ruled both on the original motion and on the motion for
9    reconsideration that the venue provisions were permissive.
10   Nonetheless, they're still here arguing to you that they're
11   mandatory.  And quite clearly, now that we have the motion for
12   reconsideration decided and the California court has said we're
13   going forward with this case, all right, it makes absolutely no
14   sense for the case to go forward in both jurisdictions.
15   You're --
16   THE COURT:  Now you're moving on to the last argument
17   I wanted to hear.
18   MR. DAVID:  Well, the only reason I did, your Honor,
19   was because you pointed out the foolishness, which I agree
20   with, of fighting all these issues in both places.  But the
21   issues are interrelated.  There's no choice.  It's not a
22   question of you can --
23   THE COURT:  I wanted to hear that argument at the end
24   after I have heard this argument.
25   MR. DAVID:  All right.  Your Honor, if I might, let me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

85DGGREC                    ROUGH DRAFT COPY
1    be clear.
2    THE COURT:  I'd like to make some progress on the
3    summary judgment motion so you narrow the issues.
4    MR. DAVID:  You can't, because the summary judgment
5    motion entangles all of the other aspects of this case.

Page 13

85DGGREC

```
 6              THE COURT:  Well, I have an alternative.  I have the
 7   right to, in view of your 56.1 statement, which is not
 8   responsive and not ripe, is to throw it out and grant them
 9   summary judgment because you haven't responded properly.
10              MR. DAVID:  Well, your Honor, respectfully --
11              THE COURT:  And I have the prerogative to do that.
12              MR. DAVID:  Well, your Honor, respectfully --
13              THE COURT:  So I want to get a little answers from
14   you.
15              MR. DAVID:  I thought I was answering --
16              THE COURT:  Not waffling.  Answers.
17              MR. DAVID:  I'm not waffling, your Honor.  I'm being
18   specific, which is disagree on what I'm saying \***, all right,
19   which at this stage of the process is not inappropriate.  The
20   fact of the matter is our response --
21              THE COURT:  I've heard that.
22              MR. DAVID:  Say again, your Honor.  I'm sorry?
23              THE COURT:  I've heard that.
24              MR. DAVID:  Your Honor, at this statement, given their
25   Rule 56 statements, our response was totally appropriate.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                30
85DGGREC                 ROUGH DRAFT COPY

```
 1   They're the ones who are not in compliance with the local rule.
 2              THE COURT:  I'm not saying that you're right.  I'm
 3   saying -- and I'm not saying that you're wrong.  I'm saying
 4   that, in many respects, their Rule 56.1 statement is adequate
 5   under the local rules, adequate --
 6              MR. DAVID:  Your Honor, look --
 7              THE COURT:  There are some respects which I don't
 8   think are adequate.
 9              MR. DAVID:  And those are key respects.  For example,
10   that there's been a default.
11              THE COURT:  No.  I don't disagree with that, but I
12   would like to -- your portion -- I can mark right down these
13   lists and state the ones for that court out in California that
14   are -- you have not responded properly to and your answers are
15   deemed irresponsive and state that the plaintiff's allegations
16   1 through so and so are deemed admitted by the defense in view
17   of the answers being argumentative and not proper under our
18   rules.
19              MR. DAVID:  Your Honor, respectfully, that would only
20   be applicable to the motion for summary judgment.  The Rule
21   56 --
22              THE COURT:  That's right.
23              MR. DAVID:  -- statement would have nothing beyond
24   that.  And given the fact that they are missing key aspects
25   necessary to win summary judgment, all right, in their Rule 56,
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

                                                                31
85DGGREC                 ROUGH DRAFT COPY

```
 1   the motion would, presumably, at that point be denied as not
 2   having a basis.  And we would then proceed from there.
 3              What I'm suggesting to you is manage --
 4              THE COURT:  I don't disagree with what you're saying,
 5   except Rule 56 has two purposes.  One is for full relief, and
 6   one can be for partial relief.
 7              MR. DAVID:  Your Honor --
 8              THE COURT:  -- so that the parties don't waste their
 9   time on a lot of matters that are not necessary for them to
10   waste their time in discovery on.  And attorneys fees being one
```
                              Page 14

                              85DGGREC
11  of them.
12          MR. DAVID:  Your Honor, we're not going to argue over
13  whether that's a question of a copy of the contract or it's not
14  a copy of the contract.  That's not where the root of this is.
15  The root of this is that there was no default.  The root of
16  this is that they tried to create a default because they were
17  in the midst of negotiating with another developer.  The root
18  of this is that they created the problem themselvessings by
19  failing -- I'm sorry.  By unilaterally withdrawing our HUD
20  application, that when we got an extension, they didn't come
21  back and say, oh, that form of the extension is no good,
22  because it provides for a note to be granted, a note which
23  never was granted, by the way, but rather --
24          THE COURT:  What notice?
25          MR. DAVID:  The $500,000 note, that was never
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              32
    85DGGREC            ROUGH DRAFT COPY
1   executed.  There was never anything -- nothing was ever done
2   that, in fact, invoked that paragraph.  All right.  And they
3   never --
4           THE COURT:  The seller's mortgage?
5           MR. DAVID:  Yeah.  And the fact of the matter is they
6   never objected to the notice -- to the extension based upon
7   that.  They objected to the extension -- well, actually, you
8   know what?  We don't know why they objected to the extension.
9   They simply said we're not going to do anything.  But they
10  don't have the right to approve it.  That's the key.  And the
11  problem which we face is the key issues in the case for them to
12  get summary judgment are in dispute.  Their Rule 56 doesn't
13  address those key issues.  And therefore, the result should be
14  that the motion for summary be denied.  It's that simple.
15          MR. HARNIK:  Judge, can I just ask your Honor to take
16  a look at paragraph 103 of the counterclaim?
17          THE COURT:  Of the counterclaim?
18          MR. HARNIK:  Yeah.  This is the purported counterclaim
19  that's been asserted here.  They claim that they have to fish
20  around to finger out what our default was about.  In their own
21  counterclaim --
22          THE COURT:  Let me see.
23          MR. DAVID:  Respectfully, your Honor, I don't see
24  anything that has any relevance to what I just said.
25          THE COURT:  Just let me look back, and you can respond
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              33
    85DGGREC            ROUGH DRAFT COPY
1   to Mr. Harnik after I have got his point.
2   I'm trying to figure out who James is.
3           MR. HARNIK:  I'm sorry.  James was a Greystone --
4           THE COURT:  Greystone Servicing?
5           MR. HARNIK:  Greystone Servicing.
6           THE COURT:  What is it --
7           MR. HARNIK:  He's actually employed by Greystone and
8   cone.
9           The point is that -- it's a very simple thing.  That
10  the defendants admit that on September 11th, they notified
11  Greystone that they had purportedly obtained an extension,
12  which they knew they needed to get, and they are referring to
13  addendum No. 3.  So for them to claim that they had an
14  agreement -- that, A, either that they didn't need an agreement
15  is disingenuous, and the fact is that the document that they're
                              Page 15

85DGGREC

16    referring to was never consented to by Greystone.
17        THE COURT:  Well, wait a minute.  103 says that
18    Greystone's unilateral withdraw of the HUD application made
19    negotiations with the seller of the apartment building
20    difficult.  The Oliphant parties nevertheless were able to
21    obtain another agreement.
22        MR. HARNIK:  To extend the close date.
23        THE COURT:  Of what?
24        MR. HARNIK:  That's the addendum No. 3.
25        THE COURT:  Extend the close date of what?
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                        34
85DGGREC                ROUGH DRAFT COPY
 1        MR. HARNIK:  Of the purchase of the apartment
 2    building.  That's addendum No. 3.  That's what he's referring
 3    to, and that's what he showed us.
 4        MR. DAVID:  And your Honor, that --
 5        THE COURT:  I'm sorry.  What's your point?
 6        MR. HARNIK:  The point is he didn't have our consent,
 7    and that's a material -- it's a breach of the agreement.  He
 8    didn't extend the contract with our consent.  That's the sum
 9    and substance of this.
10        THE COURT:  That's subsequent to the August 29th.
11        MR. HARNIK:  That's right, because on July 31s, it
12    expired.
13        THE COURT:  It isn't in your summary judgment judgment
14    motion.
15        MR. HARNIK:  It is.  Yes.  We refer to that.
16        THE COURT:  Where?
17        MR. HARNIK:  Here.
18        THE COURT:  Let me see the 56 --
19        MR. DAVID:  Your Honor, I'll concede.  It is in there.
20        THE COURT:  It is in there?
21        MR. DAVID:  I saw -- because I just referred to it.
22    Yeah.  I just referred to it, your Honor.  That's exactly the
23    point.  They send out a default notice.  We cure the default
24    notice, even though they made it difficult, we cure the default
25    notice, and of course he's saying, oh, well, you came to us and
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                        35
85DGGREC                ROUGH DRAFT COPY
 1    told us this.  That means you knew that you needed our consent.
 2    No.  What it means is they sent out a default notice on August
 3    21st.  When we cured the default --
 4        THE COURT:  I've got to see the document.
 5        MR. DAVID:  I'm sorry, your Honor.
 6        THE COURT:  Where are the documents that show that
 7    Walnut Creek extended the close date?
 8        MR. HARNIK:  Here, it's --
 9        THE COURT:  On September 11th?  Notified on September
10    11th.  What exhibit is that?
11        MR. DAVID:  It's not an exhibit.  It's in their Rule
12    56 statement, your Honor --
13        THE COURT:  16.
14        MR. HARNIK:  16.  Correct.
15        MR. DAVID:  Paragraph 16.  And --
16        THE COURT:  No one had cured the HUD thing yet.
17        MR. DAVID:  Well, we couldn't cure it.  They're the
18    ones who sent out the notice.
19        THE COURT:  I'm saying --
20        MR. DAVID:  And your Honor, if I could, Mr. Harnik
                        Page 16

85DGGREC

21 what made exactly --
22          THE COURT:  But that provision with respect to
23 addendum No. 3 is the one that has the seller's mortgage in it.
24          MR. DAVID:  Yes, your Honor, but as I pointed out to
25 you, they never objected to the seller's mortgage.  They
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

36

85DGGREC                    ROUGH DRAFT COPY
1 objected only to the fact that we hadn't extended.  That's No.
2 1.  What they could have dope is they could have withdrawn the
3 notice of default that it wasn't extended and instead sent out
4 a notice of default that said that extension is no good because
5 of.  They didn't do that, and therefore, they didn't comply
6 with the -- that they put us on notice.  Because if they had,
7 we would have told them that no note had issued, that there
8 was, in fact, no seller's mortgage that had issued at that
9 point in time.
10          THE COURT:  It doesn't matter if it didn't issue.
11 There was an agreement to issue it, which would modify the
12 terms.
13          MR. DAVID:  Well, your Honor, if in fact it was
14 issued, it would have modified the terms, but it's irrelevant.
15 It's totally irrelevant, because the fact of the matter is that
16 they never claim that the extension was no good because of
17 that.  The only thing they claim was that there was no
18 extension because they hadn't consented to it, period.  They
19 never even thought about what you just said until you said it
20 to them.  That's the first -- Mr. Harnik stood up here and
21 said, oh, yeah, that's another basis.
22          THE COURT:  No.  But when you agree -- if they had
23 agreed to that note and approved that extension, Exhibit I or
24 whatever it is, then they would have had to agree to the
25 $500,000.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

37

85DGGREC                    ROUGH DRAFT COPY
1          MR. DAVID:  Your Honor, we didn't --
2          THE COURT:  The --
3          MR. DAVID:  I'm sorry.  We didn't need their approval.
4 All right.  That's number one.  Number two, the fact of the
5 matter is the $500,000 was going to pay off their $500,000.
6 That's the reason the numbers are the same.  So their $500,000
7 note would have been paid off.
8          THE COURT:  Remember, they had the sale documents, and
9 they were assigned the rights under the contract, under the
10 terms of the loan agreement.
11          MR. DAVID:  And, your Honor, we did not in any way
12 impinge upon their rights.  Understand, they created a web.
13 The web they created was because they revoked our ability to
14 get financing from HUD when they unilaterally withdrew our
15 application, but the fact of the matter is on a motion for
16 summary judgment, the Court has got to accept these statements
17 as true, and the fact is that it's true -- it's undisputed, on
18 August 9th unilaterally they withdrew the HUD application.
19 That's not an issue.  All right.
20          Second, on August --
21          THE COURT:  Greystone Servicing did.  But go ahead.
22          MR. DAVID:  Yeah.  Number two, all right, on August
23 21st, Greystone Servicing, on behalf of Greystone CDE, sends
24 out a default notice.  Then we come back -- and the default
25 notice is predicated upon the fact that there hasn't been an
                            Page 17

85DGGREC
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

85DGGREC                        ROUGH DRAFT COPY
1  extension of the purchase agreement.  We come back to them and
2  say, okay, the seller has agreed to extend the purchase
3  agreement.  Now, if they wanted to say, no, that's not good
4  enough because this provision about the $500,000 purchase is
5  wrong, then we could have engaged in a discussion with them and
6  explained to them that the $500,000 paid off their $500,000,
7  and we would have had that discussion, but the point is we
8  didn't have the discussion.  And in order to be pursuing what
9  they've been seeking summary judgment on, that hadn't been a ground
10  on which they alleged the default, and they didn't.
11         MR. HARNIK:  Your Honor, how can Mr. David claim that
12  they didn't need our consent to extend this contract?  I just
13  don't understand that.  It couldn't be more specific than in
14  the negative covenants, the purchase contract between the
15  seller of the apartment building and the buyer had a closing
16  date of July 31st.  That date came and went.  And then they
17  purported to extend it without our consent, and now they're
18  claiming that they didn't need our consent.
19         THE COURT:  All right.  I've heard both parties on the
20  issue.  Let's go on to the second argument.
21         MR. DAVID:  Your Honor, would you like the second --
22  our motion to dismiss and the 1404 motion -- oh, it's their
23  motion.  I apologize.
24         MR. HARNIK:  Your Honor, this is also -- well, this is
25  a motion to dismiss the counterclaims, and this is based,
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39

85DGGREC                        ROUGH DRAFT COPY
1  essentially, on your Honor's own observation that the claims
2  that are made against CDE and Servicing are so mixed up, that
3  it is impossible to figure out what claims are being made
4  against which party.  There certainly is no claim against -- no
5  claim can be made against CDE, because they have waived their
6  claims against CDE under the guarantees.  The claims against
7  Servicing need to be repled, because we just don't know -- they
8  mixed them all up and state that all of the acts of CDE are
9  those of Servicing, and those of Servicing are of CDE, and they
10  have not overcome the presumption of corporate separateness.
11  Even under the liberal notice pleading requirements of the
12  federal rules, the complaint simply fails to state a cause of
13  action against these two defendants.
14         MR. DAVID:  Your Honor.  I'm sorry, are you done,
15  Mr. Harnik?  I apologize.
16         Also, with respect to Servicing, they haven't properly
17  served the complaint.  So that's a threshold issue for them.
18  And in addition, they haven't properly --
19         THE COURT:  I'm sorry.  That service argument, a woman
20  came down, accepted papers on behalf of them.
21         MR. HARNIK:  Well, she's not a serving employee.  But
22  in any event --
23         THE COURT:  Wasn't that adequate service under the
24  circumstances?
25         MR. HARNIK:  Well --
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

85DGGREC                        ROUGH DRAFT COPY
1         THE COURT:  They were in the bidding --
Page 18

85DGGREC

```
 2              MR. HARNIK:  She's not a Servicing employee.  But
 3    leaving that aside --
 4              THE COURT:  You're in one of these buildings where
 5    they send someone down and they're delegated for that purpose,
 6    aren't they?
 7              MR. HARNIK:  Well, leaving that aside, we're not going
 8    to make a big issue of the service, but the fact is that they
 9    haven't -- they purported to bring a counterclaim against a
10    nonparty.  They first should have come to this court, asked for
11    leave to bring in Servicing as an additional defendant, which
12    they did not do.
13              THE COURT:  Why do they have to do that.
14              MR. HARNIK:  Under rules 13 and 20, the rules provide
15    for that.  There's no reason to have Servicing and CDE in this
16    action together.  They could be companion cases, but there's
17    really no reason to have them consolidated as defendants here,
18    because their claim in California is based upon the engagement
19    letter, and CDE was not a party to that letter, to that
20    agreement.  And all of the allegations in the counterclaim
21    arise out of the engagement letter.
22              THE COURT:  Out of what?
23              MR. HARNIK:  Out of the engagement letter that was
24    entered into between Servicing and the Oliphant parties.  It's
25    a separate lawsuit.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

85DGGREC                    ROUGH DRAFT COPY

```
 1              THE COURT:  Well, not when you have Servicing signing
 2    a notice of default under the loan agreement \***.
 3              MR. HARNIK:  Well, your Honor, that's actually
 4    Greystone and -- but that doesn't take away from the fact that
 5    the agreement was between Servicing and the Oliphant parties
 6    and not between CDE and the Oliphant parties.
 7              But substantively, your Honor, they really have to
 8    differentiate what conduct is attributable to CDE and what
 9    conduct is attributable to Servicing.
10              THE COURT:  Why can't they find a counterclaim?
11              MR. HARNIK:  Excuse me?
12              THE COURT:  Why can't they find a counterclaim here
13    that -- when you have them joining additional parties in their
14    rule 19 and 20?  Why isn't that perfectly appropriate?  13(h).
15    I don't see why they aren't asserting the right to relief in
16    the matter arising out of the same transaction or series of
17    transactions or occurrences.
18              MR. HARNIK:  Well, that's what they seem to be
19    alleging, yes.
20              THE COURT:  Well, then it's perfectly appropriate for
21    them to serve Greystone Servicing in this case if it arises out
22    of the same transaction or series of transactions or
23    occurrences, it seems to me that's clear.
24              MR. HARNIK:  Well, we would agree with that, your
25    Honor.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

85DGGREC                    ROUGH DRAFT COPY

```
 1              THE COURT:  All right.  Then that aspect of the motion
 2    is denied.
 3              MR. HARNIK:  But in terms of the pleading, it's
 4    impossible to decipher.
 5              THE COURT:  Do you want them to make it more
 6    definite --
```

Page 19

85DGGREC

7        MR. HARNIK:  A more definite statement as to what
8    conduct is attributable to CDE and what conduct is attributable
9    to Servicing.
10        THE COURT:  Let me hear from the defendants.
11        MR. DAVID:  Your Honor, if I may, I thought I said it
12    before.  I'll say it again, perhaps more clearly.  In our mind,
13    these two entities acted in concert, together and perhaps as
14    alter egos for each other.  One sends out a default notice for
15    the other.  Therefore, all conduct of both are attributable to
16    both, and that's our theory.  And if I could, we're now dealing
17    now with a motion to dismiss and --
18        THE COURT:  Then let's deal with it as a motion for a
19    more definite statement.
20        MR. DAVID:  Your Honor, I believe that we make it
21    clear in our counterclaim that the reason why we consider the
22    actions of all of them to be the -- or the actions of one to be
23    an action of all of them is because of the two theories which
24    I've already posited.  An alter ego theory and a theory that
25    they were acting together and in concert.  So if that is true,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                43
85DGGREC                        ROUGH DRAFT COPY
1    there may come a point in time when as an issue of fact, one of
2    the claims will be denied on summary judgment, denied at trial,
3    whatever it may be when we get to that point, but at this
4    stage, there's not a question of a more definite statement.
5    It's clear what we're saying is if CDE does something, it's the
6    same as Servicing does it.  And if Servicing does something,
7    it's the same as CDE doing it.
8        And, your Honor, if I may, all right --
9        THE COURT:  That isn't --
10        MR. DAVID:  If I could, look at rule 11.  And this is
11    in the federal civil rules handbook, Baker, B-a-i-c-e-r --
12    B-a-i-c-k-e-r McGee.  All right.  As they say on rule 11, they
13    say as a disfavored remedy, motions for a more definite
14    statement will ordinarily only be granted where the pleading is
15    unintelligible.
16        This pleading is not unintelligible.  You may disagree
17    with the theory behind it, but it is certainly not up
18    intelligible.  And respectfully, whether you treat it as a
19    motion to dismiss or treat it as a motion for a more dent
20    statement, both of them should be denied.
21        THE COURT:  All right.  I'm going to deny the motion
22    to dismiss for failure to properly serve, because I think that
23    the person who came down to accept the service was, from the
24    facts and circumstances alleged, specially delegated to accept
25    service on that day, because she came down from the floors that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                44
85DGGREC                        ROUGH DRAFT COPY
1    they rent to the lobby for, as I understand it, and accepted
2    service upon notice that she was supposed to do \***.  And
3    under those circumstances, it seems to me service is
4    appropriate.
5        I also think that since the defendant -- let me see
6    what the aspect of that motion was.  I think that the
7    defendants don't need to have leave to file their counterclaims
8    against Greystone Servicing under rule 19 they can do that and
9    under rule 13, I think it is that \*** they can do that.  It
10    rises out of the same transactions.  And I'm going to deny the
11    motion for a more dent statement, although I do think that
                            Page 20

85DGGREC

12  the -- it would be preferable for the defendants to state the
13  parties and state by name who performed various acts, but that
14  can be determined during discovery.  The parties will be able
15  to ascertain exactly what hat was being used in connection with
16  the various acts.  That can be determined in discovery.  State
17  the party who did the act and state whether they were acting in
18  concert or as alter ego, whichever theory you're pursuing as
19  part of the allegation.
20          Then we move to the third and remaining issues, ruling
21  on the summary judgment motion and the motion to transfer.  Is
22  that what's out standing now?
23          MR. DAVID:  Yes, your Honor.  That's our motion.
24          THE COURT:  All right.
25          MR. DAVID:  Your Honor, if I may, let me first deal
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

85DGGREC            ROUGH DRAFT COPY

1   with two peripheral -- what I consider to be two peripheral
2   matters, subject to the Court telling me that I'm wrong.  All
3   right.  They refer to rule 12 and say that under rule 12, we
4   have waived our right to, in fact, make a motion under 14.04.
5   The fact of the matter is that's not true.  That provision
6   governs the question of defenses, not the question of a motion
7   under 14.04.  And as such, I do not believe that it is proper
8   to allege that we have waived the right to make the 14.04 --
9           THE COURT:  Well, as I understand your motion, your
10  motion is made under 14.04(a).
11          MR. DAVID:  That is correct, your Honor, and we don't
12  believe that 12 governs a motion made under 14.04(a).  They've
13  argued that it does.  We don't believe that it does, subject to
14  the Court saying to me, no, Mr. David, I agree with them, I'm
15  going to drop it at that point, unless the Court has a
16  question, but the second point is they argue that the venue
17  provision is mandatory.  Now, and therefore, because it's
18  mandatory, there can't be a transfer.  This gets back to where
19  I was before.  All right.  Number one, even if there is a
20  mandatory provision under the cases we have cited, we don't
21  think that absolutely precludes transferring to 14.04(a).  But
22  number two, there's already been a determination by one court
23  that the venue provisions in this case are, in fact, permissive
24  and --
25          THE COURT:  There is a provision -- well, that's
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

85DGGREC            ROUGH DRAFT COPY

1   correct.  14.04(a) says, for the convenience of parties and
2   witnesses and the interest of justice, a district court may
3   transfer any civil action to another district where --
4           MR. DAVID:  \*** and your Honor, I think that perhaps
5   in this court the leading case on that question should be U.S.
6   bank note v. E vick l.  All right.  The fact of the matter
7   is --
8           THE COURT:  I don't think any case I have decided is
9   the case.
10          MR. DAVID:  Well, I said in this court, anyway.  The
11  fact of the matter is that as you pointed out in vick l (or
12  bike l), all right, the considerations of trial efficiency tip
13  the balance towards the transfer, in that case to
14  Massachusetts; in this case to California.  It is clear that as
15  currently exists, the two cases are identical in substance.
16  They are virtually identical in parties.  The court in
                        Page 21

85DGGREC
17 California has already determined that it will not transfer the
18 case here.  There is, in fact, a mediation scheduled in
19 California for May 22nd, and as the Court pointed out to me
20 previously, there is already an accelerating discovery process
21 going on in California.  It makes no sense for two courts to be
22 trying the same case, both from the point of view of judicial
23 economy and from the point of view of avoiding potential
24 conflicting rulings.  Consider, if you might, that even as we
25 sit here today, they are still arguing to you that you should
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    47
85DGGREC                    ROUGH DRAFT COPY
 1 ignore the California court's ruling on the permissive nature
 2 of the venue provisions and make your own ruling.  That would
 3 be dangerous, and it makes absolutely no sense.
 4        why would we do discovery there, discovery here, trial
 5 there, trial here?  It just wastes the Court's time.
 6 Everything can be resolved in California, and now the last time
 7 the argument was, oh, the cases aren't the same, because you
 8 haven't put in your counterclaims yet, and therefore, we only
 9 have this piece of the case.  Well, now everything is spread
10 before you, and all that's going to happen if the Court doesn't
11 transfer is two different judges on two different coasts are
12 going to be ruling on the same case.
13        If I might, the California judge -- and we provided
14 the Court with a copy of this.  The California Court -- and I
15 think their ruling is not binding, obviously, on this Court but
16 should be of some persuasion.  And in its February 4 order the
17 Court determined considered numerous factors under a transfer
18 of 28 was now warrant \***.  These included were the relevant
19 agreements were.
20        THE REPORTER:  I'm sorry.  I can't keep up.
21        MR. DAVID:  I apologize.  These included where the
22 relevant agreements were negotiated and were to be performed,
23 the contacts of parties and witnesses to the two four and which
24 state laws would likely be applicable.  The Court also based
25 its decision on the conclusion that the forum selection clause
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    48
85DGGREC                    ROUGH DRAFT COPY
 1 cited by defendants were permissive.  These considerations
 2 remain unchanged, notwithstanding the fact that the New York
 3 action now mirrors this action.
 4        Respectfully, your Honor, under the U.S. Bank note
 5 case, under your decision -- give me one second, your Honor.  I
 6 apologize.  In your decision in north field insurance company,
 7 I believe that there's not much more than I can say than you
 8 have already said.  This thing should be sent to California.
 9        THE COURT:  Mr. Harnik.
10        MR. HARNIK:  Judge, what Mr. David is not quoted to
11 the Court is the last sentence, nor is -- this is judge spear
12 row:  Nor is the Court persuaded that the case management
13 challenges posed by the dual actions justify a reversal of this
14 court of its earlier decision.
15        The point being that judge spear row fully recognizes
16 that this case in New York has to go forward, and the reason
17 being that CDE is in New York, and CDE has a contractual
18 provision.  I'm sorry.  The defendants are contractually bound
19 by the guarantees to litigate in New York.
20        THE COURT:  Where are the guarantees?
21        MR. HARNIK:    All three of them.
                         Page 22

85DGGREC
```
22          THE COURT:  Just give me the exhibit and line and
23   paragraph.
24          MR. HARNIK:  Your Honor, even in your own decision --
25   this is exhibit -- your Honor, you wrote in the order of
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49
85DGGREC                    ROUGH DRAFT COPY
```
 1   February 20th, more importantly, plaintiffs selected this forum
 2   based on the forum selection clause of the loan guarantees
 3   which each defendant executed in favor of Greystone CDE.  By
 4   signing the guarantee and suring ship agreement defendant
 5   Oliphant irrevocably agreed that Greystone CDE may bring an
 6   action arising out of the guarantee any state or federal court
 7   located in New York, consented to the jurisdiction of such
 8   court in any action and waived any objection to the laying of
 9   venue \*** of any such action.  That is Exhibit C to the
10   complaint.  Defendants Santa Fe, management LLC, Oliphant and
11   Rant also signed a pledge agreement by which they irrevocably
12   and unconditionally submitted themselves and their property and
13   any legal action relating to those agreements to the
14   nonexclusive general jurisdiction of the state and federal and
15   appellate courts in the state of New York.  Subsequent to
16   signing the loan and guarantee agreements, defendant Oliphant's
17   law office rendered a legal opinion as to the validity and
18   enforceability of the bridge loan agreement and the partners'
19   guarantees thereof.  That's Exhibit G.  Having previously
20   agreed to litigate this case in New York, should plaintiff
21   institute an action here, defendants cannot now claim that
22   their burden in doing so outweighs the interest of plaintiff in
23   proceeding with its action.
24          This is CDE's action here in New York.  CDE has not
25   made any claims in California.  We are entitled to proceed
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50
85DGGREC                    ROUGH DRAFT COPY
```
 1   here.  So the case in California is a subset of what is
 2   happening in New York.  All parties are in New York.  All
 3   claims are in New York.  In their latest motion, they say --
 4   and I'm quoting from their brief --
 5          THE COURT:  I thought CDE had brought an action in
 6   California.
 7          MR. HARNIK:  It says the counterclaims arise out --
 8          THE COURT:  CDE has brought an action in California,
 9   hasn't it?
10          MR. HARNIK:  No it has not.  CDE is a defendant in
11   California.
12          THE COURT:  Oh.
13          MR. HARNIK:  Here, I'm reading from the Oliphant's
14   briefs at page 5:  The counterclaims arise out of the same
15   transaction or occurrence as CDE's complaint.  And your Honor
16   just observed this in the oral argument this morning that they
17   arise out of the same transaction.  So there is no question
18   that all issues belong in New York under the venue provision of
19   the guarantees which the Oliphant parties signed.  There's no
20   way that this case could go to California.  However, there
21   California -- and we don't really -- we don't understand what
22   judge -- we don't agree with judge Gary's reasoning.  If the
23   case in California is to go forward, well, then it will, but it
24   shouldn't be in place of our case, because CDE is here.  We
25   sued here.  We agreed by contract that this is the proper
```
SOUTHERN DISTRICT REPORTERS, P.C.
Page 23

85DGGREC
(212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
1  venue. And now the defendants have agreed as well by bringing
2  a counterclaims and claiming that the counterclaims arise out
3  of the transaction occurrences in CDE's complaint. So they
4  have agreed that the venue provision of the guarantees is
5  binding on them.
6          THE COURT:  Well --
7          MR. HARNIK:  And Servicing is now in New York, so the
8  case can two forward in New York. They recollect replead as
9  against Servicing. Or if not replead, we can engage in
10 discovery as to what is to be understood in the counterclaims
11 as between the two parties, and we move forward, but CDE is not
12 in California as a plaintiff.
13         MR. DAVID:  But it has counterclaims. You keep
14 ignoring that.
15         MR. HARNIK:  We have not made any counterclaims in
16 California.
17         MR. DAVID:  You have made cross-claims on the first
18 complaint.
19         MR. HARNIK:  We moved to dismiss the first complaint.
20         MR. DAVID:  There is a first amended complaint out
21 now.
22         MR. HARNIK:  There's a second amended complaint.
23         MR. DAVID:  I'm sorry. Second amended complaint.
24         MR. HARNIK:  Yeah. We move to dismiss it.
25         THE COURT:  What documents were you referring to?
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
1          MR. HARNIK:  These are the California documents he's
2  referring to.
3          THE COURT:  Well can you recollect show me what --
4          MR. HARNIK:  Well, they're attached.
5          THE COURT:  Specifically.
6          MR. HARNIK:  These are attached to my declaration,
7  your Honor.
8          THE COURT:  That's not --
9          MR. DAVID:  Your Honor, if I may, I'm going to
10 withdraw the statement I just made. I'm not intimately
11 familiar with the California case. I relied on something a and
12 I may have made a mistake. I don't want to make a
13 representation to the Court that may be inaccurate. All right.
14 But it is certainly clear that if CDE chose, in the context of
15 the California action, to proceed on a counterclaim, they could
16 do so. The question is very, very simple.
17         THE COURT:  What I have is just a notice of motion to
18 dismiss. That doesn't tell me what is in the counterclaim or
19 whether there's a cross-claim.
20         MR. HARNIK:  We have not made one.
21         MR. DAVID:  Your Honor, I'm telling you I want to
22 withdraw that representation, please, all right, respectfully,
23 because I'm not -- unlike Mr. Harnik, I'm not intimately
24 familiar with the California action, and I may have misspoke.
25 And rather than say something --
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
1          THE COURT:  I appreciate that.
2          MR. DAVID:  May I address Mr. Harnik's point, your
                         Page 24