85DGGREC

```
 3   Honor?
 4           THE COURT:  Yeah.
 5           MR. DAVID:  Your Honor, if I may, Mr. Harnik points to
 6   the last page in the decision from the California Court where
 7   it says, nor is the Court persuaded that the case management
 8   challenges posed by the dual actions justify a reversal by this
 9   Court of its earlier decision.  To understand that, this much I
10   do know:  You have to put that in the context of what was
11   happening out there.  Out there, it was Mr. Harnik's cocounsel
12   out in California who was arguing that the California court
13   should transfer it here, because if it wasn't transferred here,
14   there would be two lawsuits going on in two different courts.
15   So the court in California says, look, I'm not going to
16   transfer the California case there, because I think there are
17   other ways to work it out.  One of the ways to work it out, if
18   I could respectfully suggest, is the 14.04 motion.  Mr. Harnik
19   refers to the guarantees, and he refers to the other documents,
20   one that says you may bring an action in New York, the other
21   which says that there is nonexclusive jurisdiction in New York.
22   There is no question but that if everything stood alone and
23   they wanted to sue in New York, they can.  We're not disputing
24   that.
25           THE COURT:  What about the provision in the pledge
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```

                                                                54
85DGGREC                    ROUGH DRAFT COPY
```
 1   agreements which says that the pledgors agree that they won't
 2   argue that the proceeding was brought in an inconvenient forum
 3   and agree not to claim that?
 4           MR. DAVID:  Your Honor, that was in the context of
 5   having the right to bring the case in New York.  That's all it
 6   was in the context of, if you read the paragraph.  That doesn't
 7   mean --
 8           THE COURT:  I'm looking at Exhibit E to the amended
 9   complaint.  The pledgor hereby irrevocably often
10   unconditionally submits itself and its property to any legal
11   action in proceeding relating to this agreement or any other
12   document executed in connection with a transactions
13   contemplated in the loan agreement.  To the nonexclusive
14   general jurisdiction, of the courts of the state of New York.
15           MR. DAVID:  That's right.  It's not --
16           THE COURT:  The courts of the United States of America
17   for the state of New York and the appellate courts from any
18   thereof.
19           MR. DAVID:  That's --
20           THE COURT:  Then it goes on and consents to any
21   extension action or proceeding may be brought in such courts
22   and waives any objection that may now or hereafter -- that it
23   may now or hereafter have to the venue of any such action or
24   proceeding in any such court or that such action or proceeding
25   was brought in an inconvenient court and agree not to plead or
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```

                                                                55
85DGGREC                    ROUGH DRAFT COPY
```
 1   claim the same.
 2           MR. DAVID:  Your Honor, even where they're --
 3           THE COURT:  What do they do in California?
 4           MR. DAVID:  Well, your Honor, the --
 5           THE COURT:  Didn't they claim that in California?
 6           MR. DAVID:  Your Honor, if I may, the fact of the
 7   matter is that specifically says it's nonexclusive.  It doesn't
```
                              Page 25

85DGGREC

```
 8   say that we can't which he knows an action someplace other than
 9   New York.  It just says if they bring an action here, they can
10   do so and -- I'm sorry?
11              THE COURT:  But it also says they agree they'll not
12   plead or claim that --
13              MR. DAVID:  But, your Honor, we're not --
14              THE COURT:  -- inconvenient forum.
15              MR. DAVID:  We're not pleading it as a defense.  All
16   right.  What we're saying to you is does it make practical
17   sense --
18              THE COURT:  I know that.  You're not pleading it here.
19   I'm addressing myself to what was done in California.
20              MR. DAVID:  Your Honor, that's done.  All right.  The
21   real question is, is this Court going to put two federal court
22   judges to the task of trying the same case.
23              THE COURT:  I understand.  That's my problem.
24              MR. HARNIK:  Your Honor, let's be clear that the
25   magistrate judge in California -- again, we don't agree with
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

56

85DGGREC                ROUGH DRAFT COPY

```
 1   his latest decision.  But the point is that they have now --
 2   the Oliphant parties have now brought a counterclaim here in
 3   New York, and in their counterclaim, they say that it arises
 4   out of the same transaction or occurrence in CDE's complaint.
 5   So by their own admission, their claims are tied to our
 6   contract, and our contract has this venue provision.
 7              MR. DAVID:  Your Honor, we --
 8              THE COURT:  I'm faced with the situation where you're
 9   asking two courts to go ahead at the same time, and that, to
10   me, is a waste of judicial manpower, especially since we can't
11   get parties together here.
12              MR. HARNIK:  All parties are in New York.
13              THE COURT:  Talk about a telescope discovery in
14   getting this case off the docket.
15              MR. HARNIK:  This case is proceeding faster than the
16   case in California.
17              MR. DAVID:  Well, your Honor, we've already got
18   discovery going on out there, and if it is proceeding, it's
19   only because they tried every dilatory tactic in the book out
20   in California.  The fact of the matter is, when a decision was
21   made on a motion for reconsideration, the California judge,
22   right or wrong -- and I don't stand in judgment of any judge,
23   obviously -- right or wrong found that it was proper in
24   California, and he wasn't going to transfer it.  And maybe
25   Mr. Harnik should have been there arguing the motion instead of
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

85DGGREC                ROUGH DRAFT COPY

```
 1   his cocounsel, but the fact of the matter is that's where we
 2   sit, and now we've got to deal with a mess.
 3              MR. HARNIK:  Well, your Honor, this case was set for
 4   trial actually this week.
 5              MR. DAVID:  No, your Honor.  It was sell for trial on
 6   the original --
 7              MR. HARNIK:  Originally.
 8              THE COURT:  -- discovery or anything.
 9              MR. DAVID:  -- and it was set on the original claim,
10   not on the counterclaims, your Honor, because they represented
11   to the Court it was a simple case.  Oh, it's so easy.  It's
12   just this.  There's no issue.  Here are the documents.  It's
```

Page 26

85DGGREC
```
13    over.  And, by the way, they did that before we were even
14    served and brought into the case.  The scheduling was done
15    before that occurred.
16           MR. HARNIK:  Your Honor, this case -- as we pointed
17    out, the summary judgment is clear.  We don't need discovery on
18    the --
19           THE COURT:  I don't think summary judgment is clear.
20           MR. HARNIK:  Well, your Honor, they did not have
21    consent --
22           THE COURT:  They've raised issues of fact --
23           MR. HARNIK:  They have not --
24           THE COURT:  -- notice of default is not done by
25    Greystone CDE.  It's done by Greystone Servicing.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
```
1            MR. HARNIK:  But nonetheless, there was no consent to
2     the extension.
3            MR. DAVID:  But the default --
4            THE COURT:  It doesn't matter that there was no
5     consent to the jurisdiction --
6            MR. HARNIK:  No consent to the extension.
7            THE COURT:  To the extension.
8            MR. HARNIK:  The contract expired, by their own
9     admission, July 31, and they say, they come back to us and they
10    say, hey, listen, we got the extension.  The extension was
11    gotten without our consent, and the negative covenant very
12    clearly says that no amendments to the purchase contract can be
13    made without our consent.
14           MR. DAVID:  Your Honor, the default notice is
15    defective under New York law.  It's sent by the wrong party.
16           THE COURT:  Whether that means that an extension of
17    time on the contract is a modification of the contract or
18    not --
19           MR. HARNIK:  Well, it's not -- I think it's --
20           THE COURT:  That's an issue, it seems to me, that
21    could be raised.
22           MR. HARNIK:  Well, to the contrary, they haven't
23    raised it.  They say they got the extension.
24           MR. DAVID:  Your Honor --
25           THE COURT:  They got an extension.  Whether or not
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
```
1     they have to get your permission to get an extension may be an
2     issue of fact.
3            MR. HARNIK:  How?  Under what reading of the contract?
4     The contract specifically says --
5            THE COURT:  No.  It says modification of the contract
6     terms, as I understand it.
7            MR. HARNIK:  Yes.
8            THE COURT:  Well, it's true that -- I would think that
9     modification of the contract terms would include an extension.
10           MR. HARNIK:  That's correct.
11           THE COURT:  I I didn't negotiate the contract.
12           MR. HARNIK:  But it's a material term of any contract
13    what the --
14           MR. DAVID:  Well, that's a dispute, your Honor.
15    That's a factual issue whether it's material or not.  And, in
16    fact, if they were not seeking to try and mess with us, why
17    would it make a difference to them if we got the extension?
```
                              Page 27

85DGGREC

18   It's only because they were trying to negotiate with somebody
19   else to do our deal.
20        THE COURT:  Well --
21        MR. HARNIK:  That's not what the contract -- they're
22   asking the Court to go beyond the four corners of the contract.
23   The contract was very specific.  It said that it ended July
24   31st.  They needed our consent to extend it.  We had given them
25   an extension once.  They did not find a syndicator --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    60
85DGGREC               ROUGH DRAFT COPY
1         THE COURT:  There's no showing that you have given
2    them an extension once.
3         MR. HARNIK:  That's the first --
4         THE COURT:  Where does it show they have your consent
5    on?
6         MR. HARNIK:  Well, we don't deny that they have --
7         MR. DAVID:  It's not on there, because they never --
8         THE COURT:  -- consent there.
9         MR. DAVID:  It was on the second one either.
10        MR. HARNIK:  Well, but the contract has a no waiver
11   provision, so whether we extended or not, we --
12        MR. DAVID:  Your Honor, if it's not clear there are
13   issues of fact by now after all of this...
14        MR. HARNIK:  Your Honor, the contract provides that in
15   paragraph -- applied waivers, Section 11.
16        MR. DAVID:  Your Honor, but they're trying to
17   interpret a section as being a material breach under the
18   contract.  Not really a breach --
19        THE COURT:  Section 11 of what document are you
20   looking at, Mr. Harnik?
21        MR. HARNIK:  Of the assignment, Exhibit B, the
22   assignment of the purchase contract.
23        MR. DAVID:  This is the same provision --
24        THE COURT:  You're not looking at the purchase
25   contract.  You're looking at the loan agreement?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    61
85DGGREC               ROUGH DRAFT COPY
1         MR. HARNIK:  No.  The assignment of purchase contract,
2    which is Exhibit --
3         THE COURT:  Assignment of purchase agreement?
4         MR. HARNIK:  Correct.  The purchase agreement is an
5    exhibit to this agreement.
6         THE COURT:  Right.  So --
7         MR. HARNIK:  The purchase agreement had a termination
8    date originally in December.  It was extended.  We agreed to
9    the first extension.  Now, your Honor has pointed out that it's
10   not in writing, but under Section 11, it didn't have to be in
11   writing.  We could consent to that without waiving any rights.
12   But when they asked for an extension beyond July 31st --
13        THE COURT:  The extension isn't of this agreement,
14   Exhibit B that we're talking about, is it?
15        MR. HARNIK:  It's an extension of the purchase
16   agreement between walnut --
17        THE COURT:  I thought it was the purchase contract you
18   were talking about.
19        MR. HARNIK:  Right.  The purchase between Walnut Creek
20   apartments and the Rant.
21        THE COURT:  Well, that's not even an exhibit to your
22   motion.
                              Page 28

85DGGREC
```
23          MR. HARNIK:  Yes, it is.  That's --
24          THE COURT:  That's an exhibit -- I thought you said
25  that was an exhibit --
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            62
85DGGREC              ROUGH DRAFT COPY
```
 1          MR. DAVID:  To the complaint, your Honor.
 2          MR. HARNIK:  It's Exhibit B.
 3          THE COURT:  Exhibit B to the complaint?
 4          MR. HARNIK:  Correct.
 5          THE COURT:  Well, then, why do you refer to it as an
 6  assignment of the purchase agreement?
 7          MR. HARNIK:  That's what it's called.
 8          THE COURT:  I thought the breach you were talking
 9  about was the breach of the contract of sale, which is an
10  addendum to this, an attachment to the purchase agreement.
11          MR. HARNIK:  The contract of sale is Exhibit A to the
12  assignment of the purchase agreement.
13          THE COURT:  Right.
14          MR. HARNIK:  Okay.  And that agreement required that
15  the buyer and the seller to consummate the sale of the
16  apartment building by a date certain.
17          THE COURT:  Right.
18          MR. HARNIK:  Okay.  And paragraph 4 says that --
19          THE COURT:  Paragraph 4 of?
20          MR. HARNIK:  Of the assignment.
21          THE COURT:  Of the assignment?
22          MR. HARNIK:  Of the purchase agreement.
23          THE COURT:  Yes.
24          MR. HARNIK:  States --
25          THE COURT:  Let me look for it.  I thought it only
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            63
85DGGREC              ROUGH DRAFT COPY
```
 1  applied to the assignment of purchase agreement.
 2          MR. HARNIK:  No.  In paragraph B, it says that --
 3          THE COURT:  Let me look for it.  Just a second.  Okay.
 4  Survey review?
 5          MR. HARNIK:  No.  Section 4 of the assignment.
 6          THE COURT:  Negative covenants?
 7          MR. HARNIK:  Correct.  It says borrower, covenants
 8  with lender that the borrower shall not assign, transfer,
 9  mortgage, etc.  Then goes to B, amend or modify any terms of
10  the purchase agreement.  And the purchase agreement is Exhibit
11  A to this agreement, and that's the agreement that they
12  purported to extend without our consent.
13          MR. DAVID:  And, your Honor, if I could --
14          MR. HARNIK:  And there is nothing in the record which
15  shows that they got the consent.  They claim they got the
16  consent because they give us a document that's signed between
17  walnut and them, but it's not signed by us.
18          MR. DAVID:  No, your Honor.  We don't claim we got the
19  consent.
20          MR. HARNIK:  103 says --
21          MR. DAVID:  Excuse me.  As a matter of fact, in 103,
22  we say that you won't give us the consent.
23          MR. HARNIK:  No. it says we got the consent.
24          MR. DAVID:  No. it says we got the consent of the
25  seller.  All right.  Our position is that we were entitled to
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                        Page 29

85DGGREC

85DGGREC                    ROUGH DRAFT COPY
1   extend the purchase date without their consent.  Now they're
2   saying that, in fact, it was and it was a material breach,
3   because it had to be a material breach of the agreement in
4   order to be a grounds for default, and I'm saying to you, how
5   can it be a material breach of the agreement when they called
6   upon us to cure it in their August 21st letter, all right, and
7   we did, in fact, cure it, and what motivation --
8               THE COURT:  Cured it by what?
9               MR. DAVID:  We cured it by giving them an extension
10  from the seller.
11              THE COURT:  You mean addendum 3?
12              MR. DAVID:  The addendum 3.
13              THE COURT:  Addendum 3?
14              MR. DAVID:  Yes.  So we cured it.  And now they're
15  saying, oh, yes, but we didn't -- even though we sent you a
16  default, that said that you needed to cure, having not extended
17  it, we didn't mean for you to get an extension.  We know they
18  didn't mean for us to do it, because that prevents them from
19  being able to do their deal with the other developer.  Of
20  course they didn't intend for us to be able to do it.  So the
21  question of whether, in fact, that's a material breach and
22  whether it's excused or not is an issue of fact for this Court
23  to have to determine after we do discovery and after we
24  proceed.  I mean, I'm sorry we're back to arguing the very
25  first motion all over again, but, I mean, the things are
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
1   starting to get lost.  We're being referred to this document
2   and that document, oh, go back over here.  There are a whole
3   series, as you said before, there are a whole series of issues
4   of fact that have to be resolved, and those prevent granting a
5   motion for summary judgment.
6               MR. HARNIK:  Your Honor, Mr. David is just not stating
7   the record.  If you'll take a look at the notice of default,
8   August 21st, we set forth certain defaults that were
9   noncurable.  This is Exhibit I -- and certain defaults that
10  needed to be cured within 30 days.  The noncurable default was
11  that they extended the contract without our consent -- or that
12  it expired.
13              THE COURT:  Where do you see that?
14              MR. HARNIK:  This is all 21.
15              THE COURT:  Excuse me.  Read the portion you're
16  referring to.  You just don't seem to have any discipline on
17  that.
18              MR. HARNIK:  August 21st, the notice of default.
19              THE COURT:  I know.  I've got it open.
20              MR. HARNIK:  Here.  It says, you are hereby notified
21  of the following events of default.  This is the one that your
22  Honor observed yourself.  It's paragraph 9.1(g) and --
23              THE COURT:  That's the bridge loan agreement.
24              MR. HARNIK:  Yeah.  Because of the expiration of the
25  contract for the purchase and sale of the project without the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
1   same having been extended.
2               Now, what Mr. David just said was that we gave him 30
3   days to cure that and they cured it, but that's not what this
                        Page 30

85DGGREC

4     says.  If you go to page 2, we then --
5            THE COURT:  Excuse me.  Just slow down a minute.  30
6     days -- there is a 30-day vision farther down.
7            MR. HARNIK:  That's right.  Those are different
8     breaches.
9            MR. DAVID:  But we don't know that, your Honor.
10           MR. HARNIK:  These are different breaches.  Mr. David
11    said that we gave them 30 days to cure the first breach.
12    That's not the case.  The first breach was noncurable.
13           MR. DAVID:  It doesn't say that.
14           MR. HARNIK:  It says that you are in breach.
15           MR. DAVID:  Yes, but it doesn't -- you, be quiet.  All
16    right.  It's --
17           THE COURT:  Let him answer.
18           MR. DAVID:  No.  I meant my client.
19           THE COURT:  No.  You answer.
20           MR. DAVID:  Your Honor, it doesn't say that it's
21    noncurable, number one.  Number two, we're still missing one of
22    the fundamental issues.  Under New York law, one organization
23    can't send out a default notice for another organization.  The
24    entire default notice is defective.  You have to have a power
25    of --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67

85DGGREC          ROUGH DRAFT COPY

1           THE COURT:  I've got that point.
2           MR. DAVID:  So I'm just saying, all I'm trying to do
3    is I can give you a panoply of issues, but the --
4           THE COURT:  Let's stick with this one, though.
5           MR. DAVID:  It says you're in default.  You didn't
6    extend the contract.  Nowhere does it say that's a noncurable
7    default.  So we go out and we extend the contract, and lo and
8    behold, they don't object to the terms of the extension.  They
9    object to the fact that we can't cure it.
10          Now, understand, the reason why we were having
11    difficulty -- and it's in our pleadings.  The reason we were
12    having difficulty in being able to extend the contract was
13    because CDE -- I'll use the specific.  CDE had withdrawn our
14    HUD application.  So now, having bound us by withdrawing the
15    HUD application, the seller says, what's going on here?  You're
16    not dealing with HUD.  It's been withdrawn.  So what they have
17    done is they have created a self-fulfilling prophesy.  They
18    prevent us from getting an extension, and then, lo and behold,
19    even when we get the extension, they complain, oh, you should
20    have gotten our consent.  No place else had they ever said you
21    need our consent for an extension.  No place else had they ever
22    given us their consent for the extension.
23          THE COURT:  That's what I pointed out to Mr. Harnik,
24    and I didn't get a response to that.  It seemed to me addendum
25    No. 1, there's no showing of consent.  And certainly there's no

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

68

85DGGREC          ROUGH DRAFT COPY

1    showing of a consent with respect to No. 2, which apparently is
2    this letter from Mr. Oliphant dated June 22nd.  So with respect
3    to addendum No. 3, it's an unsigned document.  As far as this
4    record goes, it's an unsigned document.
5           MR. DAVID:  Your Honor, if I may, in their --
6           THE COURT:  It's an unsigned document.
7           MR. DAVID:  No.  Your Honor, if I may, Rule 56, their
8    Rule 56 statement, they acknowledge it.

Page 31

85DGGREC

```
 9          THE COURT:  Who does?
10          MR. DAVID:  They do in their Rule 56 statement, they
11   state the following:  On or about September -- this is
12   paragraph 16 of the Rule 56 statement:  On or about September
13   10, 2007, defendants rant and Santa Fe point LP executed
14   addendum 3 to the purchase contract, which purported to extend
15   the purchase contract through October 15, 2007 and provided for
16   buyer extension options with additional earnest money following
17   October 15th of 2007.
18          Paragraph 16, your Honor.
19          THE COURT:  Just a second.
20          That does seem to me not to comply with Rule 56.1, the
21   plaintiff's allegation, because --
22          MR. DAVID:  Your Honor, we admit that.
23          MR. HARNIK:  That's an admitted fact.
24          MR. DAVID:  We admit that.  We agree with them.
25          THE COURT:  You don't admit it here.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

69

85DGGREC                    ROUGH DRAFT COPY

```
 1          MR. DAVID:  No.  No.
 2          THE COURT:  Cites no admissible evidence and simply an
 3   unsupported allegation \***.
 4          MR. DAVID:  That is correct, but we admit that, your
 5   Honor.  As you said before, all right, we're not disputing
 6   that, and they're agreeing on it.
 7          THE COURT:  All right.  Then I'll deem that admitted.
 8          MR. HARNIK:  But, your Honor, Mr. David has, once
 9   again, misread the record.  He just said that CDE pulled the
10   HUD application, and in your pleading, they say it was
11   Greystone Servicing that pulled it, not CDE.
12          THE COURT:  They're saying that Greystone Services --
13   they're relying on the letter being Greystone services.
14          MR. DAVID:  That's right, your Honor.
15          MR. HARNIK:  But, your Honor, all they're relying on,
16   in truth, is the letterhead.  Somebody pulled out a letterhead
17   that said Greystone Servicing.  It didn't even say Greystone
18   Servicing.  It said Greystone and company, but it's signed
19   Greystone CDE.  Your Honor, take a look, please, at page 3.
20   Oh, it says Servicing.  I'm sorry.
21          THE COURT:  Greystone Servicing incorpse, Inc.
22          MR. HARNIK:  Yes.  But look at page 4.
23          MR. DAVID:  Your Honor, they're treating the two
24   entities identical.
25          MR. HARNIK:  But whatever it is, it's a default.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

70

85DGGREC                    ROUGH DRAFT COPY

```
 1          MR. DAVID:  No whatever it is.  That's key.
 2          THE COURT:  Please.  Please.
 3          MR. DAVID:  I'm sorry.
 4          THE COURT:  You're interrupting each other.
 5          MR. DAVID:  You're right, your Honor.  I'll sit down.
 6   I apologize.
 7          THE COURT:  It is signed by Greystone CDE.
 8          MR. HARNIK:  Correct, and whether it's Greystone
 9   Servicing or CDE, it's an undisputed fact that the purchase
10   agreement expired on July 31st and needed to be extended.
11   Their own counterclaims admits, paragraph 103 says that they
12   needed to get an extension, and they claim to have gotten an
13   extension, but it's undisputed that they didn't have our
```

Page 32

85DGGREC
14   consent to that extension.  That is a material breach of the
15   purchase agreement, and there is nothing in the record that
16   they have pointed out to counter that.  All they claim is that
17   it was not a financial breach, but there is nothing in the
18   contract which makes a distinction between a financial default
19   and any other type of default.  And obviously, if a contract
20   expires, that's a material term.  I mean, the expiration date
21   of a purchase contract is obviously a material term.  I don't
22   think that that needs to be a matter that needs to be briefed.
23              MR. DAVID:  Well, your Honor, respectfully --
24              MR. HARNIK:  And we gave them one extension.  They
25   didn't find a syndicator, and this transaction was going
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
 1   nowhere.
 2              MR. DAVID:  Your Honor --
 3              MR. HARNIK:  So it was our client's prerogative to
 4   say, finished.
 5              MR. DAVID:  Your Honor, in --
 6              MR. HARNIK:  We're not going to give you another
 7   extension.
 8              MR. DAVID:  I'm sorry.  I thought he was done.  I
 9   apologize.  In June of 2007 --
10              THE COURT:  Let him talk.  Let Mr. David talk.
11              MR. DAVID:  In June of 2007, we had and we notified
12   them of the syndicator.  The fact of the matter is that
13   although Mr. Harnik wants to treat the fact that CDE wrote
14   letters on the letterhead of Servicing to declare the default,
15   as if, according to his nonsworn testimony, oh, it's just a
16   mistake, the fact of the matter is, under New York law, such a
17   notice is a nullity.  And, moreover, and more importantly,
18   please remember the reason that we were having difficulty
19   getting an extension as of the date of that notice was because
20   they had pulled our HUD financing.  They had pulled our
21   application.
22              THE COURT:  But that happened in August, didn't it?
23              MR. DAVID:  That happened August 9th.  And they sent
24   out the default.
25              THE COURT:  That's after the contract of sale's
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
 1   expiration date.
 2              MR. DAVID:  Your Honor, but the fact is that they
 3   didn't send out the default notice until August 21st.  During
 4   that entire period of time, we're trying to get the seller to
 5   agree to this, and we get the seller to where it's supposed to
 6   be, and then they pull our HUD financing.  And only after they
 7   pull our HUD financing, when they think they finally have
 8   killed our ability to get an extension, do they then send out
 9   the default notice.
10              Now, the Court will have to make a determination
11   whether it is material that we, in fact, were able within less
12   than 20 days to get the extension despite their actions, and
13   they still refused to pull their purported default notice.  So
14   what happens is they tried to interfere with our ability to get
15   the extension.  Then when they think they have done it by
16   killing our HUD financing, they send out the default notice.
17   Then, when we surprise them and we still get the extension, all
18   right, that's how we end up here.
                         Page 33

85DGGREC

19    The point is what you have said before.  There are any
20    number of issues of fact that play into this issue and these
21    questions, and with those issues of fact, you can't have a
22    summary judgment motion.
23    MR. HARNIK:  Your Honor, Mr. David complains about
24    unsworn testimony.  He says that we interfered with the
25    contract.  We didn't interfere with anything.  They had until

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73

85DGGREC          ROUGH DRAFT COPY
1     July 31st to put this transaction together.  They didn't do it.
2     We sent -- Greystone, not CDE.  He keeps mixing this up.
3     Greystone pulled the HUD application in August after the
4     contract had terminated, it had expired.  They didn't have our
5     consent to continue.
6     THE COURT:  But you didn't send out the notice --
7     MR. HARNIK:  And then we sent out the notice August
8     21st.
9     THE COURT:  You didn't send it out before they pulled
10    the HUD application.
11    MR. HARNIK:  No.  Absolutely not.  After it had
12    expired.
13    MR. DAVID:  It didn't expire.  He pulled it.
14    THE COURT:  ...The contract for the purchase of the
15    apartment building expired July 31.  Greystone pulled the HUD
16    after it had expired when it was clear there was no transaction
17    and they hadn't gotten a syndicator.  They had every right to
18    do that.  They had the reputation on the line with HUD.
19    MR. DAVID:  If they had a reputation on the line,
20    perhaps they shouldn't have pulled the application without
21    consulting with us.  But that's not the point.  The point is
22    when they sent out --
23    THE COURT:  If the contract had terminated --
24    MR. DAVID:  It hadn't terminated, your Honor,
25    because --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

74

85DGGREC          ROUGH DRAFT COPY
1     THE COURT:  It had terminated.
2     MR. DAVID:  No, your Honor.  As in any contract,
3     there's no --
4     THE COURT:  You said that that other agreement wasn't
5     entered into until September.
6     MR. DAVID:  Your Honor, as in any other contract of
7     sale, time is not of the essence, unless it is made of the
8     essence.  In this case, the fact of the matter is it was
9     between the parties to continue it if they chose.  The parties
10    did choose to do so.  So at that point in time --
11    THE COURT:  There's that 30-day -- those extensions
12    were limited to a certain number of 30 days' extensions.
13    MR. DAVID:  Only in the original contract, your Honor.
14    The fact of the matter is Mr. Harnik --
15    THE COURT:  There's no amendment to that.
16    MR. DAVID:  There is.  It was addendum 3 that was
17    signed by the parties.
18    MR. HARNIK:  Not us.
19    THE COURT:  Addendum 3 was not signed until September.
20    MR. DAVID:  Your Honor, it makes no difference --
21    THE COURT:  By your admission.
22    MR. DAVID:  Your Honor, but it makes no difference
23    when it was.  The fact --
Page 34

85DGGREC
24        THE COURT:  It does if it's after the default notice
25   has been given.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

75

85DGGREC              ROUGH DRAFT COPY
1        MR. DAVID:  No, your Honor.  Only if there is no
2    opportunity to cure, all right, number one, and only if the
3    default notice itself is proper, number two, and only if they
4    have not been their conduct contributed --
5        THE COURT:  If the contract by its own terms ended on
6    July 31st --
7        MR. DAVID:  No. respectfully, your Honor.
8        THE COURT:  -- by its own terms, the two amendments,
9    you had a contract that had been defaulted on on July 31st --
10        MR. DAVID:  But, your Honor, under New York law, the
11   expiration of a term for a contract of sale does not
12   necessarily expire on the date set forth in the contract.  It
13   depends upon what the parties do thereafter.
14        THE COURT:  All right.  But in this case you have a
15   third party who had the bridge loan, and it notifies you that,
16   as I understand it, that this contract of sale had ended.  Now,
17   the issue you seem to be raising is whether by virtue of the
18   fact that the HUD loan was pulled after the contract was, to
19   all appearances --
20        MR. DAVID:  Unilaterally pulled.
21        THE COURT:  whether there's any liability for
22   Greystone to have pulled the HUD loan from the contract to all
23   appearances was ended, and then, for the notice of default to
24   have occurred thereafter, as opposed to occurred prior thereto.
25        MR. DAVID:  Your Honor, there are actually four
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

76

85DGGREC              ROUGH DRAFT COPY
1    separate things we're saying.  Number one is what you have just
2    said.
3        THE COURT:  Is what I said just right, the issue
4    you're raising?
5        MR. DAVID:  That's one of the issues we're raising.
6    We're also raising the fact that the notice itself is defective
7    under New York law.  We're raising the issue that the bridge
8    loan itself --
9        THE COURT:  Why is it defective under New York law?
10        MR. DAVID:  Because you can't have letterhead from one
11   party and purport to send out a letter from one party and then
12   have a signature from another party.
13        THE COURT:  Well, the letterhead is under one party,
14   but the letter is signed, clearly, by the party who has the
15   power to sign it.
16        MR. DAVID:  Your Honor, the most typical situation
17   that this comes up with is in landlord tenant cases involving
18   leases in New York, where the managing agent signs a letter for
19   the opener, and the Court just said, no, that's no good.  You
20   can't send out a default notice that way.
21        THE COURT:  But this is signed by the party that it
22   was supposed to be signed by.  The letterhead is wrong, and the
23   question -- I understand that.
24        MR. DAVID:  And there's a third issue, your Honor.  We
25   argue the fact that even the execution of the bridge loan was
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

77

85DGGREC
85DGGREC                    ROUGH DRAFT COPY
1   improper because of the circumstances that they got
2   Mr. Oliphant to sign under going back to my original duress
3   argument, which the Court said was an issue of fact previously.
4   And I'm trying to remember what the fourth one is now.  After
5   three hours, I'm a little bit tired.
6           The point is, your Honor, that the parties to the
7   sales contract, the sales agreement, did not deem the contract
8   to be over, and they had the ability to to that.  Mr. Harnik
9   argues in return that they didn't have the ability to do that
10  among themselves, that his consent was necessary to do that.
11          THE COURT:  His client's consent.
12          MR. DAVID:  His client's consent.  Our objection to
13  that is there is no indication that his client's consent was
14  obtained on any of the or extensions, that there is no
15  provision that says that that is expressly required, that he is
16  trying to argue that it constitutes a modification and
17  therefore should be covered by it, but then the issue becomes
18  one of whether the extension is a material modification.  And
19  that's an issue of fact.
20          THE COURT:  Well, it seems to me when you get to the
21  consent issue, that is -- this motion is geared towards, as I
22  see it, there being a default as of July 31st.  So that's what
23  I understand the motion is.  The motion was default as of July
24  31st, because there wasn't an extension of the contract.  As of
25  July 31st, there was no extension of the contract, and as of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            78
85DGGREC                    ROUGH DRAFT COPY
1   September, something like that, there was an extension of the
2   contract, but that occurred after the default.
3           MR. DAVID:  Your Honor, but the notice of default --
4   up until the point --
5           THE COURT:  So I don't think that Mr. Harnik's
6   argument about they needed his consent.  The consent really is
7   important, because the consent -- assuming -- since the
8   contract hadn't been extended in on July 31st, there was a
9   breach.
10          MR. DAVID:  Your Honor, but the question is whether
11  it's a curable breach or not.
12          THE COURT:  Well, that may be.  I have to look at
13  that.  In any event, it seems to me, when you have a third
14  party in there, that it's a different situation than you deal
15  when you have a buyer and seller agreeing to continue the
16  contract after the contract had breached.
17          MR. DAVID:  Your Honor, respectfully, by definition,
18  cures to default occur after the notice of default has been
19  sent out.  In this case the notice of default was sent out on
20  August 21st.  Proximate to that, less than 20 days later, we
21  cured the default.  Now, Mr. Harnik says, oh, our notice --
22  first, he said our notice said that that default was
23  noncurable, and it didn't say that.  So then his argument --
24          THE COURT:  Where in the contract is there an
25  opportunity to cure the default in Exhibit B?  The bridge loan
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            79
85DGGREC                    ROUGH DRAFT COPY
1   agreement.
2           THE REPORTER:  Your Honor, I need a bathroom break.
3           (Recess)
4           MR. DAVID:  Your Honor, if I may, I'm now looking at
                        Page 36

85DGGREC

```
 5   Exhibit A to the complaint and draw your attention to Section
 6   9.1, events of default.
 7              THE COURT:  All right.
 8              MR. DAVID:  Page 15.
 9              THE COURT:  I've got it.
10              MR. DAVID:  The first subparagraph A applies where
11   there's a failure to make a payment.  Subparagraph B provides a
12   30-day cure period except where there is a breach of an event
13   somewhere else in Section 9.1.  If you then turn over --
14              THE COURT:  Let me just see where you are.  I've got
15   to read this.
16              MR. DAVID:  It says, provided, however, that no notice
17   or remedial period shall apply to events specifically described
18   elsewhere in this Section 9.1 or to a default under Section 8.3
19   or Section 8.4.
20              You then go over to G, which is another provision
21   under the same paragraph.
22              THE COURT:  I've got to look --
23              MR. DAVID:  It's on page 16.
24              THE COURT:  -- modify to any event specifically
25   described elsewhere in this 9.1 and 8.3 and 8.4.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

80

85DGGREC                     ROUGH DRAFT COPY

```
 1              MR. DAVID:  You don't need to go to 8.3 or 8.4, your
 2   Honor.  If I could, respectfully, because they're citing
 3   9.1(g).  Those are the two defaults they're talking about in
 4   that provision.  So you need to look at G and J, and when you
 5   say G and J, you will see that these are provisions that do not
 6   get specifically the 30-day cure period.
 7              Now, you then need to go to Section 9.2, which is
 8   right underneath that, and that's remedies upon an event of
 9   default.  And 9.2 --
10              THE COURT:  Let me go back and read this section
11   again.
12              All right.  Now I've gone to G and J.  Go ahead.
13              MR. DAVID:  All right.  You then go to 9.2,
14   recommendties upon an event of default, and under 9.2(a), there
15   are various rights and remedies which the lender has.  9.2(a)
16   gives them the ability to accelerate and declare the
17   indebtedness due.  Then go to Section 9.3, and that says that
18   you get an automatic acceleration of the amount due, all right,
19   only when there is an event of default under 9.1(d).  Now, go
20   to Exhibit I.  Exhibit I is the so-called notice of default.
21   And if you note the bottom of the first page and the top of the
22   second page are the defaults that we are talking about, 9.1(g)
23   and 9.1(j).
24              THE COURT:  They're the ones we've been focusing on.
25              MR. DAVID:  That's correct, your Honor.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

81

85DGGREC                     ROUGH DRAFT COPY

```
 1              THE COURT:  They have others.
 2              MR. DAVID:  Yes.  But those are the ones which we've
 3   been discussing.  If you then look at page No. 3, the second
 4   paragraph from the bottom, it says the following:  As a result
 5   of the foregoing --
 6              THE COURT:  Wait a minute.
 7              MR. DAVID:  -- interest --
 8              THE COURT:  Page what?
 9              MR. DAVID:  I'm sorry.  Page 3, the second paragraph
                          Page 37
```

85DGGREC

```
10   of the bottom from Exhibit I.
11            THE COURT:  As a result?
12            MR. DAVID:  Right.  As a result of the foregoing,
13   interest on the note and all amounts payable under the loan
14   document shall accrue at the default rate from the date hereof
15   until paid in full.  In addition, as a result of the events of
16   the default described above Texas lender reserves the right to
17   declare the amounts due under the loan documents immediately
18   due and payable.
19            Now, the fact of the matter is the lender never
20   accelerated the amounts due under the mortgage.
21            THE COURT:  So?
22            MR. DAVID:  So the lender never accelerated the
23   amounts due under the mortgage, all they did was they said,
24   okay, we're going to try -- do a default rate of interest.
25   We're going to get more money.  At that point in time, because
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
```
1    they never accelerated, the loan wasn't due.  The loan wasn't
2    due until December of 2007.
3             THE COURT:  So?
4             MR. DAVID:  So if the loan wasn't due until December
5    of 2007, everything that happened thereafter falls into place,
6    the fact that they pulled our HUD --
7             THE COURT:  How does that fall into place?
8             MR. DAVID:  Because their mortgage wasn't due.  They
9    never accelerated it.
10            THE COURT:  If they accelerate the guy, he'd be
11   bankrupt.  Right?
12            MR. DAVID:  No.  Actually, Mr. Oliphant wouldn't have
13   been bankrupt.  All right.  But that's not the point.  The
14   point is they can't sue for the principal amount of the loan --
15            THE COURT:  I'm not talking about Mr. Oliphant.  I'm
16   talking about the venture.
17            MR. DAVID:  No.
18            THE COURT:  The Santa Fe Properties L.P.  They needed
19   the bridge loan.  If they didn't have the bridge loan, they
20   didn't have -- they wouldn't have asked for a bridge loan if
21   they didn't need it.
22            MR. DAVID:  Your Honor, you're making all sorts of
23   assumptions, respectfully.  The fact of the matter is if
24   Mr. Oliphant has said pay off our loan, all right, then he
25   would, in fact, be called upon, if he felt he had liability to
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

85DGGREC                    ROUGH DRAFT COPY
```
1    pay it off or if he didn't feel he had liability, he would
2    dispute it.  The fact of the matter is they never accelerated
3    the lope.
4             THE COURT:  Where does that leave you?
5             MR. DAVID:  Where that leaves me is that the actions
6    which they took afterwards which impacted on Mr. Oliphant's
7    ability to proceed with the transaction were improper.  They
8    didn't have the right to take those actions.  They interfered
9    with his business when he did not, in fact, owe them a debt,
10   because they hadn't accelerated.
11            THE COURT:  Well, I don't know what happened
12   thereafter.
13            MR. DAVID:  Well, your Honor -- we know what happened
14   thereafter.  We know from the documents before you that on
```
                              Page 38

85DGGREC

15    August 9th, they pulled his HUD application.  We know that in
16    September, even though we got an extension, they went to the
17    credit agencies.  So --
18              THE COURT:  Where is that?
19              MR. DAVID:  That is in paragraph 106 of the
20    counterclaim.
21              THE COURT:  Oh, I don't have the -- I'm looking at
22    this motion on summary judgment.  I'm not looking at the
23    counterclaims.  You may have counterclaims.  That's different,
24    separate.
25              MR. DAVID:  But they're seeking summary judgment based
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                84
85DGGREC                        ROUGH DRAFT COPY
1    upon the pleadings.
2              THE COURT:  What?
3              MR. DAVID:  They're seeking summary judgment based
4    upon the pleadings.
5              THE COURT:  No.  On the complaint.
6              MR. DAVID:  Yes.  But our answer to the claim, too,
7    your Honor.
8              THE COURT:  Counterclaim is a separate claim.
9              MR. DAVID:  Your Honor, the point is that they're
10    clearly not having accelerated -- the Court said, oh, once
11    there was a default under the sale.  Then they were, in
12    essence, privileged to do the other things they did, all right,
13    because that ended the issue.  The issue ended on July 31st.
14    I'm saying it didn't end on July 31st, because even the notice
15    they send out doesn't purport to terminate the loan.  It
16    doesn't purport to say that the loan is due and owing.  I mean,
17    if you ignore everything else, if you ignore the fact that
18    there was duress, if you ignore the fact that they wrote the
19    letter on the letterhead of a different entity, if you ignore
20    everything else, the fact of the matter is that as of July
21    31st, yes, the term of the contract hadn't then come to an end
22    on its face, but under New York law, those parties were
23    permitted to negotiate an extension, and the very fact that
24    they didn't accelerate it, that they only chose to take a
25    default rate of interest shows that the loan wasn't due when
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                85
85DGGREC                        ROUGH DRAFT COPY
1    they claimed it was due.  It was due in December, December of
2    2007.
3              THE COURT:  They were exercising their right to call
4    it due now.
5              MR. DAVID:  No, they weren't.  Look at the document.
6              THE COURT:  I agree.  They weren't exercising their
7    right to call it -- to do it right then.
8              MR. DAVID:  Yeah.  Instead, they wanted a default rate
9    of interest.  I can't blame them.  It's nice.  All right.  But
10    the fact of the matter is it wasn't in default at that -- I'll
11    change that.  It wasn't called at that point, and it wasn't due
12    at that point, because this action has to be predicated upon
13    the loan having been due, and all of the pleading is predicated
14    in this case upon the loan having been due when that notice
15    went out.  And it wasn't.  It wasn't due at the very latest --
16    at the very earliest until December 15th.  And then what should
17    have happened --
18              THE COURT:  Why do you say then the very earliest?
19              MR. DAVID:  Because under the terms of the documents,
                              Page 39

85DGGREC

```
20   your Honor --
21              THE COURT:  The loan agreement.  All right.
22              MR. DAVID:  Under the terms of the loan agreement,
23   they had the ability to call the loan due, like any other loan.
24   They didn't do it.
25              THE COURT:  Well, wait.  But that isn't the same.  The
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86

85DGGREC                    ROUGH DRAFT COPY

```
1    loan term was due on June 15th.
2              MR. DAVID:  No.  No.  No, your Honor.  The loan term
3    was not due on June 15th.
4              THE COURT:  It was originally.
5              MR. DAVID:  Yes.  And then it was extended under the
6    allonge agreement.
7              THE COURT:  No.  The allonge agreement does not extend
8    the loan agreement.
9              MR. DAVID:  Your Honor, the --
10             THE COURT:  The allonge agreement does not extend the
11   loan agreement.  The allonge agreement merely extends the --
12   merely gives the pledgors -- they merely agree that they'll be
13   still held till the end.
14             MR. DAVID:  I'm sorry.  Say that again, your Honor.
15             THE COURT:  They merely agreed that they will be
16   obligated through December 15th in case this thing doesn't go
17   through.  It doesn't extend the termination date or anything
18   else.  It's merely an agreement to, as I read it, allow the
19   lender -- the validity of the pledge agreements will be
20   extended.
21             MR. DAVID:  Your Honor, if I could, give me one
22   moment.
23             THE COURT:  Am I not right?
24             MR. DAVID:  No.  Respectfully, I don't believe you are
25   correct.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

87

85DGGREC                    ROUGH DRAFT COPY

```
1              THE COURT:  What exhibit is it again?
2              MR. DAVID:  Your Honor, if I may --
3              THE COURT:  Allonge is --
4              MR. DAVID:  All right.  Paragraph --
5              MR. HARNIK:  H.
6              THE COURT:  H.
7              MR. DAVID:  Your Honor, paragraph 11, referring to
8    Exhibit H, says the following.  It's paragraph 11 at the Rule
9    56:  On or about June 29, 2007, for good and valuable
10   consideration, Santa Fe Pointe LP executed an allonge to the
11   bridge promissory note.  It was the note that was extended,
12   whereby the maturity date --
13             THE COURT:  The note sex tended, but not terms of
14   default.
15             MR. DAVID:  Your Honor, at that point in time, there
16   is no default.  At that point in time -- the allonge
17   agreement --
18             THE COURT:  All right.
19             MR. DAVID:  All right.  So there's no default at that
20   point in time.  They agree that the loan --
21             THE COURT:  To extend loan.
22             MR. DAVID:  That the loan agreement will be extended
23   till December 15, 2007.  What happens in the interval is,
24   subsequent to the allonge agreement, they claim --
```

Page 40

```
                              85DGGREC
        25        THE COURT:  The maturity date of the note.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

```
        85DGGREC                   ROUGH DRAFT COPY
 1         MR. DAVID:  Right.
 2         THE COURT:  Not an amendment of the --
 3         MR. DAVID:  Purchase agreement.
 4         THE COURT:  Of the loan agreement.
 5         MR. DAVID:  No. it is an amendment.  It's the note.
 6         THE COURT:  The note is -- the promissory note that
 7    accompanies the loan agreement is extended but not the loan
 8    agreement.
 9         MR. DAVID:  Your Honor, but the note is the only thing
10    that gives rise to the obligation.  It's the notice, the
11    obligation to pay.
12         THE COURT:  Through that period.
13         MR. DAVID:  And it's extended through December 15,
14    2007.  So now what happens is we come into the area where they
15    claim that there has been a default, and they had the right to
16    accelerate through the paragraph I just read of the loan
17    agreement.
18         THE COURT:  Right.
19         MR. DAVID:  They don't accelerate, and therefore, at
20    the time at which they take action to collect on the debt, the
21    debt isn't due, and they haven't accelerated the debt.
22         THE COURT:  I'm not sure that --
23         MR. DAVID:  Your Honor, your Honor, it's right there.
24         THE COURT:  No, it isn't right there.  It's on terms
25    of the loan agreement, not the allonge.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

```
        85DGGREC                   ROUGH DRAFT COPY
 1         MR. DAVID:  Well, but I went through the lope
 2    agreement, your Honor, with you.
 3         THE COURT:  I know.  And there's been -- okay.
 4         MR. DAVID:  And then amended by the allonge agreement,
 5    which is consented to -- and you'll see 2.4, Roman 2, execution
 6    and delivery by the borrower of an allonge by the confirmation
 7    of the guarantor \***.  Both of those were done.  And that's
 8    conceded in paragraph 11 of Rule 56 statement.  And it's part
 9    of Exhibit H.
10         So the loan agreement itself sex tended to December
11    15, 2007.
12         THE COURT:  The term is extended.
13         MR. DAVID:  Right.  So their actions taken as if they
14    had act semirated or the amounts were due, including the
15    commencement of a lawsuit were improper, because they have to
16    send out a notice saying that the amounts are due, and they
17    didn't do that.  They didn't accelerate it.
18         THE COURT:  Well, it says in the event of a default,
19    upon occurrence of any one more events of default, the lender
20    may exercise all or any of the following rights, and one of the
21    rights that they had a right to do was to accelerate it but
22    regardless of the extension in the allonge.
23         MR. DAVID:  But, your Honor, no, no, no.  The
24    allonge -- they had the right to accelerate it by reason of a
25    default.  They didn't accelerate it.  Because they didn't
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

```
        85DGGREC                   ROUGH DRAFT COPY
                                   Page 41
```

85DGGREC
```
 1   accelerate it, the payment due date is December 15, 2007,
 2   remains what it was.  The actions that they took prior to that
 3   date were to collect the sum that was not then due.
 4             THE COURT:  All right.
 5             MR. DAVID:  That's fairly fundamental contract
 6   interpretation.
 7             THE COURT:  I don't disagree with that.
 8             MR. HARNIK:  Judge, you know, let's cut this short.
 9   Mr. David concedes that he's not familiar with the --
10             THE COURT:  What?
11             MR. HARNIK:  Mr. David has conceded that he's really
12   not familiar with the facts.  His own 56.1 statement admits
13   that we sent out an acceleration notice, and if your Honor will
14   take a look at Exhibit J --
15             THE COURT:  Where is --
16             MR. HARNIK:  Exhibit J, you'll see that Greystone CDE
17   sent out the acceleration notice on September 18th of 2007.
18   This is admitted in their 56.1 statement.  So we've now been
19   hearing for 20 minutes that we did not accelerate.  But here's
20   the --
21             MR. DAVID:  Your Honor --
22             MR. HARNIK:  Let me just finish.  And the other point
23   that Mr. David makes is he says that time is not of the else
24   sense in respect of the purchase contract, and if your Honor
25   will take a look at the purchase contract, that's a specific
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```

85DGGREC                    ROUGH DRAFT COPY
```
 1   paragraph in the agreement.  It says time is of the essence.
 2   So I think those two points --
 3             THE COURT:  Where are you talking about?  No one has
 4   given me the line and page, and you hand me a 2-inch-thick --
 5             MR. HARNIK:  It's Exhibit B, and it's paragraph 13.10.
 6   Time is of the essence in the performance of this agreement.
 7             THE COURT:  Let me just see.
 8             MR. DAVID:  Your Honor, may I respond to those two
 9   points?  Please take a look -- Mr. Harnik has just made my
10   point.  The notice of acceleration is September 18, 2007.
11   That's after the contract is already extended and after they
12   have received notice that the contract is extended.  It's only
13   after we extend the contract --
14             THE COURT:  But it's not after the note -- it's after
15   the notice of default too.
16             MR. DAVID:  Well, it's after the notice of default
17   too.  That's correct.  Your Honor, if I may, again, under New
18   York law, the time of the essence provision, like any other
19   provision, is dependent upon the parties' conduct.  Here, the
20   parties were in contract for a year with successive extensions.
21   The parties did not choose to declare the contract in default.
22   So what you have got is you have got a succession of extensions
23   of the contract, which is the parties' conduct under the
24   contract, and you have then got another extension between the
25   notice of default and the notice of acceleration.  At the time
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```

85DGGREC                    ROUGH DRAFT COPY
```
 1   of the notice of acceleration, the contract had been extended.
 2             The intent of the parties to this agreement, based
 3   upon the entire panoply of circumstances, is all -- even
 4   assuming that the notice was not defective itself because of
 5   the fact that it was sent out on the letterhead of the wrong
                          Page 42
```

85DGGREC

6   entity, assuming the notice was not defective itself, assuming
7   that there wasn't an issue as to whether the bridge lope was
8   signed under duress, which the Court previously said was an
9   issue of fact, assuming all of that, all of this still creates
10  issues of fact as to what it was --
11          THE COURT:  There's got to be a genuine issue of
12  material fact.  There's no affidavit in here on these motion
13  papers that even asserts duress, nothing.  There's nothing on
14  this motion that asserts duress.
15          MR. DAVID:  Your Honor, you had previously --
16          THE COURT:  I may have said that they have to show
17  that it's a material, a genuine issue of material fact, not
18  that it's an issue of fact.
19          MR. DAVID:  But, your Honor, if I could, in the
20  context of your previous ruling --
21          THE COURT:  It's not even raised as a dense here.
22          MR. DAVID:  Your Honor, I'm sorry.  It --
23          THE COURT:  It's not raised.
24          MR. DAVID:  It is raised, your Honor.
25          THE COURT:  Only orally, but you're supposed to raise
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              93
85DGGREC              ROUGH DRAFT COPY
1   it in admissible evidence.
2           MR. DAVID:  Your Honor, if we are going to deal -- let
3   me go back.  All of these things come to one conclusion.  This
4   case needs to be tried, or at least needs discovery.  All
5   right.
6           THE COURT:  I know about that.  I think as a matter of
7   New York law --
8           MR. DAVID:  Respectfully, your Honor --
9           THE COURT:  I think there's a good chance of summary
10  judgment.
11          MR. DAVID:  Well, respectfully, if I could, then, I
12  would ask the opportunity to brief the question of the
13  sufficiency of the default notice, because the Court is
14  apparently under the belief that sending it out on Greystone --
15  when they assert the different entity, sending it out on the
16  letterhead of one entity and signing it by another entity
17  doesn't affect the validity of it, and I believe that it does.
18          THE COURT:  Well, you'll probably have that
19  opportunity.  I'm going to, one -- I'm going to send is t
20  claims that have been raised with respect to the Greystone
21  Servicing out to California, because I'm not going to try both
22  cases in both places.
23          With respect to the motion for summary judgment, I
24  think that the plaintiffs LCR 56.1 statement of material
25  factses is appropriate in many respects, since there has been
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              94
85DGGREC              ROUGH DRAFT COPY
1   no discovery here.  I think they're entitled to rely on the
2   fact that they are -- Greystone is a limited liability company
3   clearly organized and existing under the laws of the state of
4   Delaware, and I don't find that there's any genuine opposition
5   to that allegation, including the authorization to do business
6   in New York with \*** 152 west 57th street.
7           And certain of the allegations with regarding the
8   defendants are all admitted by the defense, and think it is
9   adequate for the plaintiff to allege, as it does in paragraphs
10  6, 7, 8, and 9 of the copies of the loan agreements that are
                      Page 43

85DGGREC

11  involved, copies of the guarantees, copies of the partner
12  pledge agreements.  I'm going through 6, 7, 8, 9, 10, copies of
13  the bridge promissory note, copies of the allonge consent
14  annexed to the amended complaint, copies of the terms -- an
15  allegation with respect to the terms of the note which should
16  have -- I think the plaintiff should have directed the Court
17  and defense to the actual note by exhibit.  And they are
18  defective in their 56.1 statement in not doing so.
19      Also that the most serious defect is that there is no
20  allegations of fact that relate to the events of default.  We
21  had to go through those on oral argument here, and that's not
22  the proper way to bring up Rule 56.1 motion.  There should be
23  statements.  There was no extension of the contract on July
24  31st on or before July 31st, and accordingly, there was no
25  purchase and sale agreement in place at that time and that,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

95

85DGGREC                    ROUGH DRAFT COPY

1  consequently, there was a default.  That should have been
2  stated as a material fact.  Those are genuine issues that --
3  those are facts of the -- and I don't think the issue of
4  consent that has been raised is material, because the contract
5  was in default on July 31st, evidently, since the defendant
6  admits that addendum No. 3 was executed on September 10th of
7  2007, a good 40 days thereafter.
8      Now, that doesn't -- the problem is that the motion is
9  not properly brought.  The defense does not raise the issue of
10  duress in connection with this motion in their papers.  They
11  have orally.  Whether it is a genuine issue of material fact is
12  something for some other judge to determine, and I'm going to
13  pass on that matter.  But based on what I have heard here
14  today, the only issue is whether there is some -- whether the
15  defendants can prove that the plaintiff Greystone CDE in
16  notifying -- I think all of the letterhead of Greystone
17  Servicing was used, I think it is clear that the notice came
18  from Greystone CDE, because they sent a letter signed that way.
19  And obviously, they are the party that was party to the bridge
20  loan.  So I'm going to deny the motion for summary judgment,
21  and without prejudice, because it seems to me that the facts
22  weigh heavily in the plaintiff's favor.
23      On the motion to transfer, I'm going to grant the
24  motion to transfer in the interest of justice, because I don't
25  think it is wise for two courts to be engaged in the same

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96

85DGGREC                    ROUGH DRAFT COPY

1  litigation and possibility of jury trials and the case is
2  reaching the contrary results \***.  So I'll send it out to
3  judge spear row.  Although I do note that it appears to me that
4  the defendants in pleading, that there should not be a change
5  of venue in California, did violate the term of actual explicit
6  terms of the agreements which they signed \***, because they're
7  not supposed to claim a claim or plead things that -- as I read
8  the provisions of the loan agreement, that object in any way to
9  venue in this court.  That's been determined out there, and I'm
10  not an appellate court.  I'm just another district court.  So I
11  think I've -- have I handled anything?  Anything open?
12          MR. DAVID:  I don't believe so, your Honor.
13          MR. HARNIK:  May I be heard for a moment?
14          THE COURT:  Not on these issues.  I've already decided
15  them.  I think I have covered everything.  If I haven't covered

Page 44

85DGGREC

16  something, you can raise that.
17          MR. DAVID:  I believe we covered everything, your
18  Honor.
19          MR. HARNIK:  Judge, may I just ask that before the
20  case -- the CDE case is transferred to California, that we be
21  permitted to brief 1407.
22          THE COURT:  14.04?
23          MR. HARNIK:  1407.  Because --
24          THE COURT:  This matter was brought up here.  You had
25  an opportunity if you wanted to raise something under 1407.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            97
85DGGREC                    ROUGH DRAFT COPY
1           MR. HARNIK:  Well, 28 USC 1407 is the multidistrict
2   litigation provision, and that permits us to consolidate the
3   two cases here.  It was not our expectation that the CDE case,
4   which was properly before the Court here and which your Honor
5   held already --
6           THE COURT:  Seems to me you should have done that
7   before the California court if you were going to do it.
8           MR. HARNIK:  Well, your Honor, the California
9   respectfully seems to be convinced that the case with Servicing
10  should go forward in California, but the CDE case, your Honor,
11  we already have law of the case that it belongs here.
12          MR. DAVID:  We have no such law of the case, your
13  Honor.
14          MR. HARNIK:  Your own honor's --
15          THE COURT:  I think my decision ruled that a
16  jurisdiction was proper here.
17          MR. HARNIK:  And venue.
18          MR. DAVID:  -- had to two forward here, your Honor.
19          MR. HARNIK:  As well as venue.
20          MR. DAVID:  Because you didn't have before you at that
21  time the full panoply of counterclaims.  You had a different
22  case before you.  Now everything is in -- you have two mirror
23  image cases, as the California court held.
24          MR. HARNIK:  Judge, I would just --
25          MR. DAVID:  What's going to happen, your Honor, if the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            98
85DGGREC                    ROUGH DRAFT COPY
1   California court rules in our favor on the issues we have
2   raised and, therefore, that, in fact, the bridge loan was not
3   valid or that they, in fact -- and I'm not asking you to make
4   that conclusion.  I'm just saying what happens if they come to
5   different conclusions?  You don't want to be there.
6           THE COURT:  I've argued that, and I'm not going to
7   allow any further briefing.
8           MR. DAVID:  Thank you, your Honor.
9                            oOo
10
11
12
13
14
15
16
17
18
19
20

                            Page 45

85DGGREC

21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300