# NOT OFFICIALLY REPORTED CASE

*Metropolitan West Asset Management, LLC v. Shenkman Capital Management, Inc.* 2005 WL 1963943, 5 -6 (S.D.N.Y.2005)

Westlaw.
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 1

**H**
Metropolitan West Asset Management, LLC v. Shenkman Capital Management, Inc.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
METROPOLITAN WEST ASSET MANAGEMENT, LLC, Plaintiff,
v.
SHENKMAN CAPITAL MANAGEMENT, INC. and JPMorgan Chase Bank, Defendants.
No. 03 Civ. 5539(NRB).

Aug. 16, 2005.

Ira A. Schochet, Laurence D. Paskowitz, Goodkind, Labaton, Rudoff & Scharow, LLP, New York, NY, for Plaintiff.
Thomas J. Fleming, Olshan Grundman Frome Rosenzweig & Wolosky LLP, New York, NY, for Defendant Shenkman Capital Management, Inc.
John M. Callagy, Robert S. Friedman, Kelley Drye & Warren LP, New York, NY, for JPMorgan Chase Bank.

MEMORANDUM AND ORDER

BUCHWALD, J.
*1 Plaintiff Metropolitan West Asset Management, LLC ("Met West" or "plaintiff"), a subordinate noteholder in an investment vehicle (the "Fund") known as a "collateralized bond obligation" or "CBO," has brought this action against Shenkman Capital Management, Inc. ("SCM") and JPMorgan Chase Bank ("JPMC") [FN1] (collectively, "defendants") alleging breach of contract and gross negligence. Defendants now move for summary judgment against all of plaintiff's claims. For the reasons set forth herein, defendants' motions are granted.

   FN1. JPMorgan Chase Bank is now known as JPMorgan Chase Bank, N.A.

BACKGROUND

This case arises from the liquidation of a pool of high yield bonds in which Met West, a company engaged in the business of investing in securities for institutions and high net worth individuals, was a subordinate noteholder. Defendant JPMC served as the Fund's Trustee pursuant to an indenture dated June 18, 1998 (the "Indenture"). Defendant SCM served as the Fund's Investment Manager.

In May 2003, the Fund's senior noteholders voted to liquidate the Fund's assets. The entire proceeds of that liquidation, which were realized pursuant to a June 18, 2003 liquidation agreement, were paid to the Fund's senior noteholders, leaving plaintiff and the other subordinate noteholders with no payment on the principal amount of their investments. This lawsuit ensued.

Plaintiff originally brought this action asserting claims for breach of contract, breach of fiduciary duty and gross negligence.[FN2] On June 24, 2004, we issued an Order granting in part and denying in part defendants' motions to dismiss. *See Metropolitan West Asset Management, LLC v. Magnus Funding, Ltd.,* No. 03 Civ. 5539, 2004 WL 1444868 (S.D.N.Y. June 25, 2004) (the "June 24, 2004 Order").[FN3] We declined to dismiss plaintiff's claims that: (i) JPMC breached its obligations under the Indenture by failing to procure an Accountant's Certificate prior to effecting the June 18, 2003 liquidation; and (ii) SCM acted with gross negligence in acquiescing to the June 18, 2003 liquidation plan in the absence of an Accountant's Certificate (collectively, the "Certificate Claims"). We dismissed each of plaintiff's remaining claims, including claims of gross negligence and breach of fiduciary duty against JPMC and a claim of gross negligence against SCM.

   FN2. Plaintiff also originally named Magnus Funding Ltd. and Magnus Funding Corp., companies that were created for the purpose of issuing notes in the Fund, as defendants in this case. On October 30, 2003,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 2

the action was voluntarily dismissed as against those companies.

FN3. Much of the background relevant to the present motions is explained in the June 24, 2004 Order, familiarity with which is assumed herein.

By letter dated August 23, 2004, the parties proposed a discovery plan relating to the remaining issues in the case that extended through July 23, 2005. By letter of September 21, 2004, we directed the parties to complete certain initial discovery and to appear before the Court on December 13, 2004 for a conference to discuss the scope and timing of additional discovery. On October 20, 2004, however, plaintiff requested leave to amend its complaint for a second time.[FN4] Shortly thereafter, we directed the parties to appear for a conference on November 30, 2004 to address plaintiff's proposed amendment. At that conference, plaintiff explained that it wanted to add an amended claim that, in the months leading up to the June 18, 2003 liquidation, JPMC improperly sold various Fund assets. Plaintiff contended that these sales lowered certain of the Fund's collateral ratios and thereby permitted the Fund's senior noteholders under the Indenture to vote for the June 18, 2003 liquidation without seeking the consent of subordinate noteholders such as plaintiff, a result that was improper because the sales were improper. Defendants objected to the proposed amendment but represented that plaintiff's new claim could be resolved with an immediate summary judgment motion. We permitted plaintiff to amend and directed defendants thereafter to submit their motions for summary judgment.

FN4. Plaintiff had once previously amended its complaint as of right in October 2003.

*2 On December 29, 2004, plaintiff filed its second amended complaint (the "Complaint"). Shortly thereafter, defendants moved for summary judgment. On July 6, 2005, after briefing was complete, the Court heard oral arguments from the parties. Below, we set forth the relevant provisions of the Indenture and the events that are the subject of this lawsuit before describing the claims in the Complaint and defendants' arguments in support of summary judgment.

I. The Indenture

The Fund was created for the purpose of allowing noteholders to receive the benefits of investment in a pool of high yield bonds. Specifically, according to the Complaint, the Fund was "designed so that various series of noteholders would enjoy attractive interest payments generated by a pool of high yield bonds for a number of years, and then eventually receive repayment of the principal amount of their investments."Compl. ¶ 4. The Indenture governed the manner in which the Fund's assets were to be managed in furtherance of this purpose.

A. Management of Assets

The Indenture authorized the Fund to commence its operation by issuing $289 million in notes, denominated Class A, Class B, Class C and Income Notes.[FN5] The proceeds of that sale were used to purchase "Initial Collateral Debt Securities," which consisted mainly of high yield debt and emerging market securities that had an aggregate face value of $300 million. Consistent with the Fund's goal of allowing noteholders to enjoy periodic interest payments for a time before ultimately receiving repayment of the principal amount of their investments, the Indenture directed that certain Collateral Debt Securities [FN6] be disposed of if those securities ceased or appeared close to ceasing to make interest payments. Thus, the Indenture permitted and/or required the Investment Manager (SCM) and the Trustee (JPMC) under certain circumstances to sell, among other Fund assets, Collateral Debt Securities deemed to be "Credit Risk Securities," "Defaulted Securities" and "Equity Securities." Specifically, Section 12.1(a) of the Indenture provides that, so

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 3

long as no Event of Default is ongoing, "the Investment Manager may direct the Trustee ... to sell, and the Trustee shall release from the lien of this Indenture and sell in the manner directed by the Investment Manager, any Defaulted Security, Equity Security, [or] Credit Risk Security."Section 12.1 goes on to clarify the particular circumstances in which "Credit Risk Securities," "Defaulted Securities" and "Equity Securities" may be sold.

> FN5. The Indenture authorized $202 million in Class A Notes, $34.5 million in Class B Notes, $28 million in Class C Notes and $24.5 million in Income Notes.

> FN6. The securities comprising the Fund's portfolio of assets will be referenced throughout the remainder of this memorandum, as they are in the Indenture, as "Collateral Debt Securities."

1. Credit Risk Securities

The Indenture defines a "Credit Risk Security" as a Collateral Debt Security that, "in the Investment Manager's sole judgment, has a significant risk of declining in credit quality and, with lapse of time, becoming a Defaulted Security." § 1.1. Section 12.1(a)(ii) restricts the above-quoted general authorization to sell Credit Risk Securities by stating that the Investment Manager shall not sell a Credit Risk Security unless the security "is sold during the Interest-Only Period,[FN7] [and (1) ] following such sale the Investment Manager will use reasonable efforts to purchase (and the Investment Manager believes in its sole judgment that it will be able to purchase), no later than twenty (20) days after such Credit Risk Security is sold, one or more Substitute Collateral Debt Securities [FN8] having an aggregate Principal Balance no less than the Sale Proceeds from such sale, and (2) after giving effect to such sale and purchase, the Weighted Average Life Test FN9 will be met." § 12.1(a)(ii). For purposes of the present motions, as will be discussed below, the parties agree that, in 2002 and 2003, Credit Risk Securities totaling approximately $8.5 million in face value were sold in violation of this provision.

> FN7. The Indenture defines the "Interest-Only Period" as the period beginning on June 18, 1998 and continuing through June 2, 2003. § 1.1.

> FN8. The Indenture defines a "Substitute Collateral Debt Security" as "[a] Collateral Debt Security that is purchased by [the Fund] and pledged to the Trustee as security for the Notes as described herein with the proceeds of the sale or payment of another Collateral Debt Security in the [Fund's asset pool]." § 1.1.

> FN9. The Indenture defines the "Weighted Average Life Test" in § 1.1. It is unnecessary to describe the test in detail here, however, because, as will be explained below, the parties do not dispute either the test's substance as applicable to § 12.1(a)(ii) or that it was not met at any time during the period relevant to plaintiff's allegations.

2. Defaulted Securities and Equity Securities

*3 The Indenture defines a "Defaulted Security" as a Collateral Debt Security "with respect to which there has occurred and is continuing any default or event of default under the related Underlying Instrument [FN10] which entitles the holders thereof, with the giving of notice or passage of time or both, to accelerate the maturity of all or a portion of the principal amount of such obligations." § 1.1. An "Equity Security" is defined as "[a]ny security that does not provide for periodic payments of interest at a stated coupon rate and repayment of principal at a stated maturity and any other security that is not eligible for purchase by the Issuer as a Collateral Debt Security."*Id.* Section 12.1(d), which modifies the general sale provision of § 12.1(a) with respect to Defaulted Securities and Equity Securities, provides as follows:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 4

> FN10. The Indenture defines an "Underlying Instrument" as the agreement pursuant to which a given Collateral Debt Security was issued and any other agreement governing the terms of such a security. § 1.1.

A Defaulted Security or an Equity Security may be sold without regard to the foregoing restrictions. During the Interest-Only Period, the Investment Manager shall use reasonable efforts in accordance with its existing procedures and practices to purchase, no later than the end of the Due Period in which such securities are sold, Substitute Collateral Debt Securities with an aggregate Principal Balance no less than the Sale Proceeds from such sale and with (i) stated maturity dates not later than the end of the Due Period in which the stated maturity date of the Defaulted Security or Equity Security occurred, and (ii) par values greater than or equal to the Sale Proceeds received from the sale of the Defaulted Security or Equity Security. The Investment Manager on behalf of the Issuer, acting pursuant to the Investment Management Agreement, shall effect the sale of any Defaulted Security within one year after it becomes a Defaulted Security and any Equity Security within one year of its receipt.
§ 12.1(d). As is explained in more detail below. Defaulted Securities totaling approximately $65 million in face value were sold during 2002 and 2003. The parties dispute whether these sales violated the provision just quoted.

3. Restrictions on Purchases of Substitute Collateral Debt Securities

As is reflected in §§ 12.1(a) and 12.1(d), the Indenture contemplated that when Collateral Debt Securities were sold pursuant to § 12.1 the Investment Manager would purchase Substitute Collateral Debt Securities to take their place in the Fund's portfolio. In addition to restricting the circumstances in which the various classes of Collateral Debt Securities could be sold, however, the Indenture also specified the circumstances and procedures under which Substitute Collateral Debt Securities could be purchased.

When a Collateral Debt Security was sold pursuant to § 12.1, the proceeds of the sale were to be deposited into a "Collection Account" maintained by the Trustee for the benefit of the noteholders. § 10.3(d). Upon receiving an order from the Investment Manager to acquire a Substitute Collateral Debt Security, the Trustee was then required to withdraw funds from the Collection Account and use them to purchase the substitute security. Section 12.4 limits such withdrawals, however, by providing that:

*4 the Investment Manager shall not request any such withdrawal from the Collection Account for the purchase of any Substitute Collateral Debt Security unless after giving effect to such purchase, the Class A Interest Coverage Test, Class B Interest Coverage Test and Class C Interest Coverage Test FN11 are met.

> FN11. These tests are referenced collectively hereinafter as the "Interest Coverage Tests."

§ 12.4(a). It is not necessary to discuss the Interest Coverage Tests in detail here because the parties agree that: (i) the Class C Interest Coverage Test was not met in February 2002 or any time thereafter; and (ii) the Class A and Class B Interest Coverage Tests were not met in July 2002 or any time thereafter. As a result, the parties agree, § 12.4 prohibited the Trustee from withdrawing funds from the Collection Account to purchase Substitute Collateral Debt Securities in the years 2002 and 2003.

B. Liquidation Scenarios

To effect the differing levels of protection intended for the Class A, Class B, Class C and Income Notes, the Indenture provided that, upon the occurrence of certain scenarios, JPMC would be authorized to declare an Event of Default, at which point various classes of noteholders would be authorized

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-08377-RPP    Document 72-4    Filed 05/19/2008    Page 6 of 15

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 5

to compel a liquidation of the Fund and receive payment on all or part of their principal investments.

1. Events of Default

Section 5.1 of the Indenture provides that, among other scenarios, an Event of Default would occur if the Fund failed "to maintain an Aggregate Principal Amount of Collateral Debt Securities and Eligible Investments [FN12] at least equal to 100% of the Aggregate Principal Amount of the Class A and Class B Notes." § 5.1(d). If such an Event of Default occurred, § 6.2 of the Indenture required JPMC to send to SCM and the noteholders a notice explaining that an Event of Default had occurred (the "Notice of Default"). Thereafter, § 5.2 provides, "the Trustee may, and at the direction of the Requisite Noteholders [FN13] shall, declare the principal of the Notes to be immediately due and payable." § 5.2. Once such a notice of acceleration was issued, § 5.4 provides that "the Trustee may, after notice to the Noteholders, and shall, upon direction by the Requisite Noteholders," liquidate the Fund's assets in various enumerated ways. § 5.4(a).

> FN12. Generally speaking, the Indenture defines this Aggregate Principal Amount as the outstanding principal amount of all securities in the Fund's portfolio at a given point in time.
>
> FN13. The Indenture defines "Requisite Noteholders" as "[t]he Holders of more than 66 2/3% of the Aggregate Principal Amount of (a) the Class A Notes, so long as any Class A Notes remain Outstanding, (b) thereafter, the Class B Notes so long as any Class B Notes remain Outstanding, (c) thereafter, the Class C Notes so long as any Class C Notes remain Outstanding and (d) thereafter, the Income Notes." § 1.1.

Section 5.4 also contains specific pre-liquidation voting requirements that vary depending on the degree to which the principal value of the Fund's portfolio has deteriorated in relation to the aggregate face value of the outstanding Class A Notes:

the Trustee may not sell or liquidate the [Fund's assets], or any portion thereof, or any rights or interests therein, unless such sale or liquidation has been consented to in writing by the Holders of at least 66 2/3% of the Aggregate Principal Amount of each of the Class A Notes and Class B Notes (unless the Principal Coverage Amount at such time is less than 110% of the Aggregate Principal Amount of the Class A Notes, in which case the Holders of 66 2/3% of the Class A Notes, acting alone, shall have the right to consent to any sale or a liquidation)....

*5 § 5.4(a). The Indenture provides a specific definition of the "Principal Coverage Amount" of the Fund, but for our purposes here it is sufficient to paraphrase that definition as the principal face value of the Collateral Debt Securities in the Fund's portfolio. Essentially, then, the Indenture provided that, if the aggregate face value of all of the securities in the Fund's portfolio was not greater than 110% of the aggregate face value of the outstanding Class A Notes,[FN14] then the Class A noteholders would be entitled to proceed to liquidation without the junior noteholders' consent.

> FN14. We refer to this measurement throughout the remainder of this memorandum as the "110% Test."

2. Noteholders' Rights to Payment on Liquidation

Section 13.1 of the Indenture states that the Class B Notes, Class C Notes and Income Notes "shall be subordinate and junior to the Class A Notes to the extent and in the manner set forth in this Indenture." § 13.1(a). In the context of a liquidation pursuant to § 5.4, the Indenture requires that all unpaid interest and principal on the Class A Notes be paid in full before the holders of any other classes of notes are paid. § 5.8; *see also* § 13.1(a). Once the holders of Class A Notes are entirely paid, the hold-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 6

ers of Class B Notes are entitled to be paid on their outstanding interest and principal. And so on down to the Income Notes.

3. The Accountant's Certificate Requirement

The last relevant provision of the Indenture is the Accountant's Certificate requirement of § 5.4, which provides that, in connection with a proposed liquidation:

the Trustee shall, on behalf of the Issuer, send notice to each of the Noteholders of any proposed sale or liquidation of the [Fund's assets] together with a brief description thereof and such notice shall be accompanied by an Accountant's Certificate (i) confirming the information with respect to such sale or liquidation (to the extent such accountants shall be able and willing to confirm such information) and (ii) specifying the procedures, if any, undertaken by them to review the data and computations relating to such sale or liquidation.

We discussed this provision at length in our June 24, 2004 Order and will not repeat that discussion here, except to note that the provision required the Trustee to send to each noteholder an Accountant's Certificate *prior* to any liquidation under § 5.4.

II. The Operation of the Fund in 2002 and 2003

The allegations in the Complaint relate to JPMC's and SCM's management of the Fund's assets in the years 2002 and 2003. At the beginning of 2002, the Fund held assets in an aggregate principal amount of $271,190.000. During 2002 and 2003 JPMC and SCM sold certain of those assets that were believed to be Defaulted Securities and Credit Risk Securities.

A. Sales of Credit Risk Securities in 2002

During 2002, the Fund disposed of Credit Risk Securities that totaled approximately $8.5 million in principal face value. *See* Def 56.1 ¶ 53; Pl. 56.1 ¶ 53. From those sales, the Fund received approximately $4 million in proceeds. *See id.* The parties agree for purposes of the present motions that these sales were not permitted by the Indenture.

B. Sales of Defaulted Securities in 2002 and 2003

*6 During 2002 and 2003, Collateral Debt Securities representing at least $66 million of the face value of the Fund's portfolio became Defaulted Securities. *See* Def. 56.1 ¶ 48; Pl. 56.1 ¶ 48. In 2002, the Fund sold or exchanged approximately $50 million worth of those securities and received approximately $2.2 million in proceeds as a result. *See* Def 56.1 ¶ 52; Pl. 56.1 ¶ 52.[FN15] In February and March 2003, the Fund exchanged approximately $16.5 million worth of Defaulted Securities and received no proceeds [FN16] in return. *See* Def 56.1 ¶¶ 56, 57; Pl. 56.1 ¶¶ 56, 57. The parties dispute whether these sales violated the Indenture.

> FN15. In response to defendants' joint Local Rule 56.1 statement's assertions that various Defaulted Securities were sold or exchanged by the Fund at various points in time, plaintiff admits that these sales and exchanges are "what the reports show" but also states that plaintiff "has had no discovery on these issues and therefore cannot attest as to what occurred and what is accurate."Pl. 56.1 ¶¶ 53-56. Neither in its Local Rule 56.1 statement nor during oral argument did plaintiff offer any basis to conclude that any report showing sales by the Fund was inaccurate. Accordingly, we deem these matters admitted for the purposes of these motions.

> FN16. These Defaulted Securities were exchanged for Equity Securities, which, the Indenture states, are not counted for purposes of determining the Fund's asset coverage ratios relevant to this litigation.

C. The Notice of Default and the Liquidation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 7

By letter dated December 18, 2002, JPMC notified SCM and the noteholders pursuant to Section 6.2 of the Indenture that, as of December 16, 2002, an Event of Default under § 5.1(d) had occurred due to the Fund's "failure to maintain an Aggregate Principal Amount of Collateral Debt Securities and Eligible Investments at least equal to 100% of the Aggregate Principal Amount of the Class A and Class B Notes."Friedman Decl., Ex. 5. According to Fund records, the aggregate principal amount of the Fund's Collateral Debt Securities as of December 16, 2002 was $186,347.500 and the aggregate principal amount of the outstanding Class A and Class B Notes was $187,096,311. See Def 56.1 ¶ 58; Pl. 56.1 ¶ 58.[FN17]

> FN17. Again, in response to defendants' Local Rule 56.1 statement's assertions that the Fund carried certain aggregate principal amounts of Collateral Debt Securities and that the outstanding Class A Notes and Class B Notes were valued in certain ways, plaintiff's Local Rule 56.1 statement "admits that defendants have made these calculations, but denies that the calculation[s] are correct since defendants should not have sold either Credit Risk Securities or Defaulted Securities in 2002."Pl. 56.1 ¶¶ 58-62. As plaintiff's challenge is aimed at a substantive legal issue rather than defendants' mathematical calculations, we again construe plaintiff's responses to these paragraphs as admissions that defendants' calculations are correct.

By notice dated May 23, 2003 (the "Notice of Acceleration"), Class A noteholders representing more than 66 2/3% of the value of the outstanding Class A Notes declared the notes immediately due and payable under § 5.2 of the Indenture and directed JPMC, as Trustee, to liquidate the Fund's assets pursuant to § 5.4. The liquidation was accomplished, as noted above, pursuant to a June 18, 2003 liquidation agreement. Among other things, the liquidation agreement stated that, "[n]otwithstanding Section 5.4(a) of the Indenture, no Accountant's Certificate shall be required in connection with the liquidation of the Collateral until the [liquidation is complete]." Compl., Ex. B at 3. While the proceeds of the liquidation have been paid entirely to the Class A noteholders, it appears that even those individuals have not yet received all of their principal investment values and unpaid interest.[FN18]

> FN18. Plaintiff contends that some Class A noteholders may have purchased their notes for below face value and therefore that it is not possible to determine without discovery whether the Class A noteholders turned a profit as a result of the liquidation. Although there has been no evidence presented that any Class A noteholder purchased his or her notes for below face value, we need not resolve this issue in order to decide the motions before us.

III. Plaintiff's Complaint

In addition to restating the Certificate Claims, the Complaint adds the claims that the sales in 2002 and 2003 of Defaulted Securities and Credit Risk Securities constituted a violation of § 12.1 of the Indenture by JPMC and gross negligence by SCM (the "Sale Claims"). As a result, plaintiff contends, the Class A noteholders' vote to liquidate and subsequent Notice of Acceleration were invalid and improperly deprived plaintiff of receiving any benefit of continued ownership of its subordinate notes.

Defendants have moved for summary judgment against all of plaintiff's claims. With respect to the Certificate Claims, defendants argue that the failure to procure an Accountant's Certificate prior to the liquidation did not cause plaintiff any actual harm. With respect to the Sale Claims, defendants argue that the Indenture permitted the sales of Defaulted Securities in 2002 and 2003 and therefore that, independent of any Credit Risk Security sales, an Event of Default would have occurred in March 2003 that would have supported the Class A note-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 8

holders' vote to liquidate. Therefore, defendants argue, plaintiff has suffered no actual loss as a proximate result of any breach of the Indenture.

*DISCUSSION*

*7 A motion for summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). The motion must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."*Golden Pacific Bancorp. v. F.D.I.C.,* 375 F.3d 196, 200 (2d Cir.2004) (internal citations and quotation marks omitted). Evaluating defendants' motions under these standards, we first examine the Sale Claims.

I. The Sale Claims

Defendants argue that the Sale Claims must fail because § 12.1(d) of the Indenture permitted Defaulted Securities to be sold during the period at issue. Regardless of whether the Indenture permitted Credit Risk Securities to be sold, defendants argue, the permissible sales of Defaulted Securities were sufficient on their own to cause an Event of Default by at least March 10, 2003. Moreover, defendants argue, the Defaulted Security sales were sufficient on their own to cause the value of the Fund's assets to decline to a point where the 110% Test gave the Class A noteholders a unilateral right under § 5.4 to vote for liquidation without consulting subordinate noteholders such as plaintiff. Thus, defendants argue, the only impropriety that may have occurred-namely, the sale of Credit Risk Securities-did not proximately cause any actual harm to plaintiff because a liquidation would have occurred in any event.

A. The Language of Section 12.1(d)

Defendants' argument that the Indenture permitted sales of Defaulted Securities in 2002 and 2003 relies on the language of § 12.1(d), which, as noted above, states that "[t]he Investment Manager ... shall effect the sale of any Defaulted Security within one year after it becomes a Defaulted Security."Plaintiff counters that interpretation by pointing to the second sentence in § 12.1(d), which states: "[d]uring the Interest-Only Period, the Investment Manager shall use reasonable efforts in accordance with its existing procedures and practices to purchase, no later than the end of the Due Period in which [a Defaulted Security is] sold, Substitute Collateral Debt Securities with an aggregate Principal Balance no less than the Sale Proceeds from such sale."Plaintiff then refers to § 12.4, which states that "the Investment Manager shall not request any ... withdrawal from the Collection Account for the purchase of any Substitute Collateral Debt Security unless after giving effect to such purchase, the [Interest Coverage Tests] are met." § 12.4(a). Further, plaintiff argues that, because the effect of § 12.4(a) is to preclude purchases of Substitute Collateral Debt Securities when the Interest Coverage Tests are not met, the Indenture could not have contemplated that the Investment Manager would use "reasonable efforts" under § 12.1(d) during these times to purchase such securities. Plaintiff concludes that, read together, §§ 12.1(d) and 12.4(a) therefore require that the Fund abstain from disposing of Defaulted Securities pursuant to § 12.1(d) during times in which § 12.4(a) prohibited it from purchasing Substitute Collateral Debt Securities. Thus, plaintiff argues, building on the parties' agreement that § 12.4(a) prohibited defendants from purchasing Substitute Collateral Debt Securities in 2002 and 2003,[FN19] that defendants were also prohibited from selling any Defaulted Securities during that time.

> FN19. As noted above, the parties agree that the Interest Coverage Tests were not met during 2002 and 2003.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 9

*8 We disagree with plaintiff's reading of §§ 12.1(d) and 12.4(a). For reasons we will set out, the plain language of § 12.1(d) permits-indeed, *mandates*-the sale of Defaulted Securities at times during which § 12.4(a) may prohibit the purchase of corresponding Substitute Collateral Debt Securities. First, and most persuasively, § 12.1(d) explicitly states that "[t]he Investment Manager ...*shall* effect the sale of any Defaulted Security within one year after it becomes a Defaulted Security." § 12.1(d) (emphasis added). "Shall" means "shall." Section 12.1(d)'s requirement that the Investment Manager use "reasonable efforts" during the applicable Due Period to acquire Substitute Collateral Debt Securities does not interfere with this mandate because "reasonable efforts" cannot require the Investment Manager to violate the Indenture. Thus, if § 12.4 prohibited the Investment Manager from purchasing substitute securities, "reasonable efforts" simply would not result in an acquisition of a substitute security.[FN20]

> FN20. Moreover, § 12.1(d) requires reasonable efforts to be used to acquire substitute securities during the Due Period applicable to when the Defaulted Security at issue is sold. Therefore, there may well be a scenario in which a Defaulted Security is sold at a point when § 12.4(a) prevents Substitute Collateral Debt Securities from being purchased, but where, later in the applicable Due Period, the Interest Coverage Tests improve such that § 12.4(a)'s restriction on purchases no longer applies and the Investment Manager is able through reasonable efforts to acquire Substitute Collateral Debt Securities. Such a scenario would be entirely consistent with both § 12.1(d) and § 12.4(a). Yet plaintiff's reading of those provisions would prevent Defaulted Securities from being sold in the first place.

Second, § 12.1(d) by its terms states that a Defaulted Security "may be sold without regard to the foregoing restrictions." One of the "foregoing restrictions" in § 12.1 is a prohibition in § 12.1(a)(ii) barring sales of Credit Risk Securities unless "the Investment Manager believes in its sole judgment that it will be able to purchase" Substitute Collateral Debt Securities in their place. Plaintiff's reading of § 12.1(d) as prohibiting sales of Defaulted Securities when purchases of substitute securities could not be effected would essentially import § 12.1(a)(ii)'s restriction into § 12.1(d), which would render the "without regard to the foregoing restrictions" language meaningless with respect to § 12.1(a)(ii).[FN21]

> FN21. Plaintiff attempts to address this point by arguing that "the 'foregoing restrictions' referred to in Indenture Sect. 12.1(d) seem to refer to immediately proceeding [sic] restrictions in Indenture 12.1(c)" rather than any restriction in § 12.1(a). Plaintiff's reading does not comport with the pattern established by other provisions in § 12.1, however. Section 12.1(b), for example, authorizes the Investment Manager to sell various Collateral Debt Securities "without regard to the restrictions contained in Section 12.1(a)." Similarly, § 12.1(c) authorizes the Investment Manager to sell various Collateral Debt Securities "without regard to the foregoing limitations in Sections 12.1(a) and (b)." Plaintiff's reading of § 12.1(d)'s "foregoing restrictions" language to apply only to § 12.1(c), and not to § 12.1(a) or § 12.1(b), would not be consistent with this pattern of disregarding all foregoing restrictions.

Third, plaintiff's reading would require that, during times in which § 12.4(a) barred purchases of Substitute Collateral Debt Securities, the Fund simply hold on to Defaulted Securities and Equity Securities, neither of which would be making periodic interest payments. Such a result is inconsistent with the Fund's stated purpose of affording investors

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-08377-RPP   Document 72-4   Filed 05/19/2008   Page 11 of 15

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 10

periodic interest payments followed by repayment of their principal investments. On the other hand, reading § 12.1(d) as contemplating the sale of Defaulted Securities even in times when they could not be replaced by Substitute Collateral Debt Securities would at least afford investors with repayment of part of their principal investments from the proceeds of sold-off Defaulted Securities that were not paying interest.

Plaintiff counters that our reading of § 12.1(d) is inconsistent with defendants' course of conduct prior to this lawsuit. In support of its argument, plaintiff points to several Defaulted Securities that were apparently not sold by the Fund within one year after defaulting.

Plaintiff's argument fails because extrinsic evidence such as defendants' course of conduct may be considered only when the contractual provisions at issue are ambiguous.[FN22] Here, they are not. As explained above, the Indenture is consistent on its face and both § 12.1(d) and § 12.4(a) can be read as their plain language dictates. Moreover, even if we could consider defendants' conduct, that conduct would not create an ambiguity because it does not support plaintiff's reading of the Indenture. Although defendants may not have sold every Defaulted Security within twelve months, they did sell many Defaulted Securities during the period in which § 12.4(a) prevented purchases of Substitute Collateral Debt Securities. At best, therefore, defendants' conduct supports both parties' arguments equally.[FN23]

> FN22. In an attempt to escape the consequences of this rule, plaintiff, citing *CV Holdings, LLC v. Artisan Advisors, LLC*, 9 A.D.3d 654, 655-657, 780 N.Y.S.2d 425, 427-28 (3d Dep't 2004), states that "[a] post-hoc debate over what contractual provisions actually required, coupled with inconsistent conduct, may support a finding that the provisions of the contract are ambiguous." Pl. SCM Opp'n at 13. To the extent plaintiff is suggesting that *CV Hold-

*ings* stands for the proposition that extrinsic evidence of the parties' dealings may be introduced to create an otherwise nonexistent ambiguity in the Indenture, plaintiff is simply mistaken. *CV Holdings* actually states the familiar rule that "[e]vidence outside the four corners of the agreement may not be considered in discerning the parties' intent unless it is first determined that the contract is ambiguous."9 A.D.2d at 656, 780 N.Y.S.2d at 427.Indeed, the court in *CV Holdings* did not consider the extrinsic evidence offered by the parties in that case until after it had concluded that its "reading of the agreement reveal[ed] ambiguity."9 A.D.2d at 657, 780 N.Y.S.2d at 428.

> FN23. In support of its reading of the Indenture, plaintiff has also submitted two "expert" affidavits opining that the language and structure of the Indenture either is ambiguous or supports plaintiff's reading as to whether Defaulted Securities were permitted to be sold. As previously explained, however, consideration of such extrinsic evidence is not permissible at this stage. Accordingly, having not found § 12.1(d) to be ambiguous, we have not considered plaintiff's affidavits.

*9 For the reasons explained above, we hold that § 12.1(d) permitted the sale of Defaulted Securities during 2002 and 2003, even though § 12.4(a) may have prohibited corresponding purchases of Substitute Collateral Debt Securities during that time.

B. Damages

The implication of our holding above on the viability of plaintiff's Sale Claims is disputed. Defendants argue that, if we assume that sales of Defaulted Securities were allowed but sales of Credit Risk Securities were not, then plaintiff is correct that an Event of Default did not occur in December 2002.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 11

However, the only sales of Credit Risk Securities that the Fund actually made in 2002 totaled $8.5 million in principal face value, sales from which the Fund received approximately $4 million in proceeds, which were then used to pay down the outstanding principal owed to the Class A noteholders. As a result, defendants argue, had the Credit Risk Securities properly been held instead of sold, the aggregate principal value of the assets in the Fund's portfolio would have been only $8.5 million higher in December 2002 and the outstanding principal balance of the Class A Notes would have been $4 million higher. Under this scenario, defendants contend, an Event of Default would have occurred by March 10, 2003 because, according to Fund records produced in this litigation, the Fund disposed of an additional $16.5 million in Defaulted Securities in February and March 2003. Thus, defendants conclude, the Class A noteholders would have been entitled to vote for a liquidation in March 2003 regardless of the Credit Risk Security sales, and those sales therefore could not have caused plaintiff any actual loss.

Not surprisingly, plaintiff disputes this analysis. Plaintiff does, however, concede that the Fund reports show that, even assuming the Credit Risk Securities at issue had not been sold, the aggregate principal value of the Fund's assets after March 10, 2003 would have been lower than 100% of the face value of the outstanding Class A and Class B Notes. This means that an Event of Default could have been declared at that time. Plaintiff also concedes that the 110% Test was failing as of March 10, 2003 and therefore that, if an Event of Default had been declared at that time, the Class A noteholders would have had a unilateral right to vote to liquidate the Fund.

Where plaintiff departs from defendants' analysis is in defendants' assumption that, if an Event of Default had been declared on March 10, 2003, the Class A noteholders would, in fact, have voted for a liquidation. Plaintiff argues that, assuming the Credit Risk Securities should not have been sold, we must assume that the $8.5 million in principal value of the improperly sold Credit Risk Securities was actually "back in the pot" before analyzing whether there is an issue of fact as to whether the Class A noteholders would actually have voted for liquidation. Plaintiff argues that there is no way to tell without discovery whether, having this $8.5 million still in the Fund would have tipped the scales enough so that the Class A noteholders would have chosen to wait out the Fund's underperformance in hopes of rehabilitation rather than voting to liquidate. Thus, plaintiff concludes, discovery should be allowed to determine whether, had the Fund held onto the Credit Risk Securities instead of selling them, this would have altered the Class A noteholders' decision to liquidate.[FN24]

> FN24. Plaintiff also offers as a damages theory that SCM is liable for restitution of ill-gotten gains by SCM and/or the Class A noteholders as a result of SCM's alleged breach of fiduciary duty to plaintiff. This theory must fail, however, because there has been no evidence presented that SCM or any of the Class A noteholders received any gain from the sale of Credit Risk Securities that they would not have received from selling those securities in the ultimate liquidation, which we assume would have happened even had the Credit Risk Securities not been improperly sold in 2002.

*10 We disagree, for several reasons. First, as noted above, the allegedly improper Credit Risk Security sales generated proceeds of approximately $4 million, which were paid to the Class A noteholders. Thus, the net effect of adding back the Credit Risk Securities to the Fund's portfolio would be approximately $4.5 million in face value, not the $8.5 million that plaintiff assumes. Second, there has been no suggestion that the Credit Risk Securities, although improperly sold, were not, in fact, impaired. Therefore, we cannot assume that the $4.5 million net addition to the principal value of the Fund's portfolio (which, it should be noted, would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 12

have constituted approximately 2.5% of that value) would, for purposes of deciding whether to liquidate, have been translated by the Class A noteholders into the same amount in actual dollars. Third, as defendants pointed out at oral argument, even assuming that the $8.5 million in improperly sold Credit Risk Securities were added back, by March 2003 the Fund had sold $16.5 million in Defaulted Securities and thus would have been in a worse net position then than it had been in December 2002, when the Event of Default was actually declared. Finally, and perhaps most tellingly, there has been no indication that any Class A noteholder has come forward to express dissatisfaction with the sale of the Credit Risk Securities or otherwise.

In these circumstances, we find that it is highly unlikely that adding back the principal value of the improperly sold Credit Risk Securities would have made a difference in the Class A noteholders' decision to liquidate, and that plaintiff's suggestion to the contrary is just conjecture. Accordingly, we find that discovery into the Class A noteholders' decision-making process would amount to an impermissible fishing expedition. Moreover, even assuming the Credit Risk Securities were improperly sold, in light of our holding that the Defaulted Securities were properly sold and would have caused an Event of Default and subsequent liquidation, no reasonable jury could conclude that the Credit Risk Security sales caused any actual loss to plaintiff in connection with the liquidation. Accordingly, defendant SCM's motion for summary judgment is granted with respect to the Sale Claim.

With respect to JPMC's motion, summary judgment is appropriate on the questions of whether: (i) sales of Defaulted Securities were proper (they were); and (ii) plaintiff suffered actual loss (it did not). However, while JPMC assumed for purposes of this motion that the Fund's sales of Credit Risk Securities were in breach of the Indenture, but ultimately disputes plaintiff's contention in this regard, an issue remains as to whether plaintiff is entitled to nominal damages. *See, e.g., Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95, 595 N.Y.S.2d 931, 935 (1993) ("Nominal damages are always available in breach of contract actions...."). [FN25] That remaining issue precludes dismissal of the Sale Claim against JPMC in its entirety.

> FN25. Even if it were ultimately determined that the Credit Risk Security sales were improper, plaintiff would not be entitled to nominal damages from SCM, as the Sale Claim against SCM is for gross negligence, not breach of contract. *See, e.g., Kronos, Inc.*, 81 N.Y.2d at 90, 595 N.Y.S.2d at 935 ("In [most tort] cases, actual loss must be demonstrated....").

II. The Certificate Claims

*11 Defendants have also moved for summary judgment against the Certificate Claims. They argue that the failure to procure an Accountant's Certificate prior to the liquidation-which, we held in the June 24, 2004 Order, constituted a breach of the Indenture-did not proximately cause any actual loss to plaintiff because the liquidation would have gone forward even if an Accountant's Certificate had issued.

In the June 24, 2004 Order, we explained our hesitancy to adopt plaintiff's argument that the lack of an Accountant's Certificate could have proximately caused any actual loss to plaintiff. Specifically, we stated that, "[s]hould the facts as ultimately established support the unilateral liquidation by the Class A noteholders, we would be reluctant to award damages in these circumstances."June 24, 2004 Order at 18. Nevertheless, we declined to dismiss plaintiff's claim before discovery was taken on the issue whether the operative principal values of the Fund's assets and outstanding notes in early 2003 actually were such that a unilateral vote by the Class A noteholders would have been permissible under § 5.4.

We find that summary judgment against the Certificate Claims is appropriate at this time. As was ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)  
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

Page 13

plained above, it cannot seriously be disputed that, notwithstanding the allegedly improper Credit Risk Security sales, an Event of Default would have occurred by March 10, 2003 and a vote for liquidation was thereafter permitted under the Indenture. Moreover, because the 110% Test failed throughout early 2003, it was the Class A noteholders' unilateral right to vote for liquidation without consulting the junior noteholders. As a result, the fact that the Class A noteholders thereafter improperly declined to issue an Accountant's Certificate in connection with the liquidation cannot have proximately caused plaintiff any actual loss, because plaintiff was not empowered by the Indenture to challenge the liquidation in any event.[FN26]

> FN26. It should be remembered that, although our June 24, 2004 Order held that § 5.4(a) of the Indenture required the issuance of an Accountant's Certificate prior to a liquidation of the Fund's assets, there is nothing in § 5.4(a) that required an Accountant's Certificate to issue prior to a *vote* by the Class A noteholders to liquidate. Thus, to the extent plaintiff suggests that an Accountant's Certificate would have changed the outcome of the Class A noteholders' May 2003 vote to liquidate, plaintiff is once again engaged in pure speculation.

In opposing this result, plaintiff argues that there are material issues of fact as to what a properly issued Accountant's Certificate would have stated. In particular, plaintiff argues that the parties dispute the Accountant's Certificate's "purpose; its intended content[;] ... whether it would have confirmed that an Event of Default occurred in either December 2002 or March 2003; and whether a Certificate refusing to confirm an Event of Default would have precluded the Class A noteholders from proceeding with a liquidation ." Pl. SCM Opp'n at 14.[FN27] Plaintiff argues further that, in the face of a hypothetical Accountant's Certificate stating that "issues existed as to the existence of an Event of Default, and the regularity of the transactions that had been effectuated by the Investment Manager," the Class A noteholders, if they desired a liquidation, would have been forced to negotiate with junior noteholders and ultimately to seek "a consensual liquidation in which the junior noteholders would share in the proceeds." Pl. JPMC Opp'n at 21.

> FN27. Plaintiff also argues that it is a disputed issue whether an Accountant's Certificate "had to be distributed prior to a liquidation." Notwithstanding the parties' briefing on this, however, our June 24, 2004 Order decided this issue for summary judgment purposes.

*12 Plaintiff's argument must be rejected. To begin with, there is nothing in the language of § 5.4(a) indicating that an accountant would have been required to render an opinion "confirm[ing] that an Event of Default occurred." To the contrary, § 5.4(a) requires only that an accountant confirm "the information with respect to" a proposed liquidation and specify the procedures by which he or she "review[ed] the data and computations relating to" the proposed liquidation. § 5.4(a). Moreover, even if § 5.4(a) did require an accountant to certify that an Event of Default had occurred, plaintiff offers no real basis (other than its contention that the Defaulted Security sales violated the Indenture) for how an accountant could have come to the conclusion that an Event of Default did not occur as of March 10, 2003.[FN28]

> FN28. Plaintiff's suggestion in its papers that § 5.4(a) would have required an accountant to analyze the language of the Indenture to determine whether Defaulted Security sales were allowed, and thus whether an Event of Default had properly been declared, is not consistent with the Indenture. Section 5.4(a), by its terms, governs the notice that the Trustee was required to give "of any proposed sale or liquidation." As explained previously, a separate section of the Indenture, § 6.2, gov-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 14
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.))

erns the "notice of default" that the Trustee was required to send to the noteholders when an Event of Default occurred. If the parties to the Indenture truly contemplated that an accountant would be required to certify that an Event of Default had actually occurred, we think that such a requirement would have been grafted onto § 6.2 and not left to § 5.4(a), which, as noted previously, did not contain a requirement that an Accountant's Certificate issue before a vote to liquidate had occurred.

For these reasons, we find that no material issue of fact exists as to whether a liquidation would have occurred regardless of whether an Accountant's Certificate had been issued prior to the vote. We find, therefore, that no reasonable jury could conclude that plaintiff suffered any actual loss as a result of the lack of an Accountant's Certificate. SCM's motion for summary judgment against the Certificate Claim is therefore granted in its entirety. JPMC's motion is granted in all respects except on the issue of nominal damages, which, for the reasons stated in the previous section, may be appropriate in light of our June 24, 2004 ruling that JPMC's failure to procure an Accountant's Certificate prior to the liquidation constituted a breach of the Indenture.

*CONCLUSION*

For the reasons set forth above, SCM's motion for summary judgment is granted in its entirety and the claims against SCM are dismissed in their entirety. JPMC's motion is granted with respect to all issues except for possible nominal damages for breach of contract claims. Plaintiff and JPMC should update the Court in writing by August 24, 2005 as to whether there will be further litigation with respect to those remaining claims for which only nominal damages are available.

IT IS SO ORDERED.

S.D.N.Y.,2005.
Metropolitan West Asset Management, LLC v. Shenkman Capital Management, Inc.
Not Reported in F.Supp.2d, 2005 WL 1963943 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.